EXHIBIT A



Positive
As of: August 13, 2021 5:12 PM Z

## *Alamiin v. Patton*

United States District Court for the Western District of Oklahoma

December 13, 2016, Decided; December 13, 2016, Filed

Case No. CIV-13-1001-F

**Reporter**

2016 U.S. Dist. LEXIS 172044 *; 2016 WL 7217857

WAHIID M. ALAMIIN a/k/a JAMES SHOCKEY., Plaintiff, -vs- ROBERT PATTON, et al., Defendants.

**Prior History:** *Alamiin v. Patton, 2016 U.S. Dist. LEXIS 172856 (W.D. Okla., Aug. 30, 2016)*
*AlAmiin v. Patton, 2016 U.S. Dist. LEXIS 172854 (W.D. Okla., Aug. 30, 2016)*
*AlAmiin v. Patton, 2016 U.S. Dist. LEXIS 172858 (W.D. Okla., Aug. 30, 2016)*

## Core Terms

magistrate judge, defendants', diet, recommended, summary judgment, plaintiff's claim, contends, objects, motion to dismiss, halal-diet, argues, objection to the report, motions, rights, halal

**Counsel:** [*1] Wahiid M Alamiin A/K/A James Shockey, Plaintiff, Pro se, Lawton, OK USA.

For Joe M Allbaugh, in his official capacity, Robert Patton, Director, Oklahoma Department of Corrections, Justin Jones, individually, Debbie Morton, individually, Debbie Morton, official capacity, Genese Mccoy, individually, Genese Mccoy, official capacity, Defendants: John D Hadden, LEAD ATTORNEY, Attorney General's Ofc-Ne 21street-Okc, Oklahoma City, OK USA.

For Imad Enchassi, individually, Imad Enchassi, official capacity, Defendants: William F O'Brien, Oklahoma City, OK USA.

For Connie Danley, individually, Connie Danley, official capacity, Dean Caldwell, individually, Dean Caldwell, official capacity, Billy Gibson, individually, Billy Gibson, official capacity, Nancy Fennell, individually, Nancy Fennell, official capacity, Defendants: Carson C Smith, Robert S

Lafferrandre, Pierce Couch Hendrickson Baysinger & Green-OKC, Oklahoma City, OK USA.

**Judges:** STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** STEPHEN P. FRIOT

## Opinion

**ORDER**

This civil rights action is brought pursuant to *42 U.S.C. § 1983* by plaintiff Wahiid M. AlAmiin a/k/a James Shockey who appears *pro se* and whose pleadings are liberally construed. On August 30, 2016, Magistrate Judge Charles [*2] B. Goodwin issued three Reports and Recommendations. Doc. no. 105 (88 pages), doc. no. 106 (42 pages), and doc. no. 107 (9 pages). The Reports submitted by Magistrate Judge Goodwin address the following motions: Caldwell, Danley and Fennell's (the Lawton Correctional Facility "LCF" defendants') motion to dismiss or for summary judgment (doc. no. 60, Caldwell's motion, and doc. no. 76, permitting Danley and Fennell to adopt Caldwell's arguments); Patton,[1] Jones, McCoy and Morton's (the Oklahoma Department of Correction "ODOC" defendants') motion to dismiss or motion for summary judgment (doc. no. 67); and defendant

---

[1] Former ODOC Director Patton is not named in the original complaint. He was substituted for official capacity claims originally alleged against former ODOC Director Jones. Accordingly, the only claims against Patton are official capacity claims which were once asserted against Jones. *See*, doc. nos. 105, p. 2, n.3; 106, p.2, n.2.

Enchassi's motion to dismiss or for summary judgment (doc. no. 72).[2]

The Reports address the following topics.

The First Report (doc. no. 105).

Defendants' assertion of *eleventh amendment* immunity, and counts one and three of the complaint, are addressed in the First Report. Count one relates to plaintiff's halal-diet claims. Count three relates to plaintiff's claim that the LCF defendants have not complied with a prior halal-diet order entered in another lawsuit which was also presided over by the undersigned. The order and final judgment in the prior case provided that a halal diet consisting **[*3]** of food prepared and served in compliance with certain ODOC standards and procedures, would be provided to plaintiff so long as he was housed at LCF. *See*, Alamiin v. Miller, Case No. CIV-08-1371-F, Order and Judgment of May 14, 2012, doc. no. 171, p. 4.[3] The First Report recommends that the motions filed by defendants Jones, Patton, McCoy, Morton, Caldwell, Danley and Fennell (doc. nos. 60, 67) be granted in part and denied in part as set out in detail in the First Report. The First Report also recommends that defendant Enchassi's motion be granted.

The Second Report (doc. no. 106).

Count two is addressed in the Second Report. In count two, plaintiff alleges violation of the *Religious Land Use and Institutionalized Persons Act ("RLUIPA")*, and violation of the *First*, *Sixth*, *Eighth* and *Fourteenth Amendments of the United States Constitution*, due to defendants' refusal to process grievances and provide plaintiff with medical treatment pursuant to requests made in plaintiff's legal name of Wahiid AlAmiin rather than in his former name of James Shockey. The Second

Report recommends that the motions filed by defendants Jones, Patton, McCoy, Morton, Caldwell, Danley and Fennell (doc. nos. 60, 67) be granted in part and denied in part as set out in detail in that **[*4]** Report.

The Third Report (doc. no. 107).

Plaintiff's claims alleged against unserved defendant Billy Gibson are addressed in the Third Report. Gibson, an LCF employee, is alleged to have participated in the violation of plaintiff's constitutional rights and RLUIPA, as outlined in counts one and two of the complaint. The Third Report recommends that plaintiff's claims against Gibson be dismissed without prejudice for failure to effect timely service.

Objections to the Reports (doc. no. 118, plaintiff's objections; doc. nos. 116, 117, defendants' objections).

The parties have filed objections to the Reports. All objected-to matters have been reviewed *de novo*.

Plaintiff states at least thirteen numbered objections, many of which have sub-parts. Doc. no. 118. Although not necessarily a complete list, the gist of some of these objections is described below. Whether or not listed below, the court has reviewed all of plaintiff's objections, all of their sub-parts, and all portions of the Reports including but not limited to the pages cited by plaintiff in his objections.

With respect to the First Report (doc. no. 105) plaintiff objects that the magistrate judge did not address all of plaintiff's **[*5]** claims. Plaintiff also objects to pp. 50-53 of that Report as containing numerous errors and on the grounds that the magistrate judge erred in concluding that McCoy and Morton were entitled to qualified immunity. Plaintiff objects to pp. 53-68 of that Report as containing numerous errors and on the ground that the magistrate judge erred in concluding that Jones was entitled to qualified immunity. Plaintiff objects that he is owed an answer or resolution to certain grievances and appeals so that if he does not

---

[2] Enchassi is the alleged leader of the Islamic Society of Greater Oklahoma City.

[3] The prior case settled after jury selection, and the parties were directed to submit an agreed final order memorializing the settlement.

otherwise obtain relief he can move to the next stage. Plaintiff objects to pp. 9-17 of the Report, arguing that the magistrate judge erred by not addressing the four-year RLUIPA statute of limitations, and argues this failure means the magistrate judge erred when he recommended dismissal of Enchassi because plaintiff contends he alleged diet claims against Enchassi under RLUIPA. Plaintiff argues the Report errs with respect to the §1983 claim, contending that plaintiff made clear when he learned of Jones's and Enchassi's actions but that this timing was ignored by the magistrate judge.

Plaintiff objects to the Second Report (doc. no. 106), arguing that the magistrate judge erred when **[*6]** he concluded that the RLUIPA claim was foreclosed by the weight of authority and by the evidence in the record. Plaintiff sets out a number of sub-parts to this objection, including but not limited to arguments that the magistrate judge has drawn attention to what plaintiff now contends is an *ex post facto* violation as a result of policy changes, and arguing that DOC's dual name policy only requires usage of dual names on envelopes. Plaintiff argues that the Report errs because defendants are required to demonstrate a compelling interest to the particular person whose expression of religion is burdened, and because defendants' arguments regarding their alleged penological interest are conclusory and exaggerated, and because the policy regarding dual names is not neutral but is designed to suppress expression and religion without penological interests being served. Plaintiff also argues that he raised his right to constitutional protection of his personal identity, and his right to communicate and to associate, but that these issues were not addressed by the Report. Plaintiff argues that he is substantially burdened by a requirement that he continue to use his incarcerated name even **[*7]** if used along with his religious name, due to his sincerely held belief that he will be sent to hell eternally for this continued use of his incarcerated name. Plaintiff contends that, upon review, this court will conclude that the magistrate erred and that the defendants did not

meet their burdens.[4] Plaintiff contends he raised certain discovery issues but that the magistrate judge did not address these issues. Plaintiff contends that the cases cited by the magistrate judge are distinguishable because plaintiff has evidence to show that defendants do not serve any penological interest by keeping plaintiff from using his religious name only.

Plaintiff objects to the Third Report (doc. no. 107) on the ground that plaintiff should have been granted leave to serve Billy Gibson through the newspaper.

In addition, at the end of his objections, plaintiff argues, in the broad terms and without citing any specifics of any proposed amendments, that he should be granted "leave to amend the complaint to correct the record and defects as a matter of course...." Doc. no. 118, p. 13. That request is denied.

Plaintiff's objections pertain to issues which are adequately, and correctly, covered in the **[*8]** Reports. In addition, any new arguments made by plaintiff for the first time in his objections and not presented to the magistrate judge, are waived. In light of the magistrate judge's thorough and carefully reasoned Reports, further discussion of plaintiff's objections is not necessary here. Plaintiff's objections to the Reports are **DENIED**. Doc. no. 118.

Defendants have filed two, separate objections to the Reports.

Defendants' first objection (doc. no. 116) sets out three propositions, all of which pertain to the First Report (doc. no. 105).

In the first proposition, LCF defendants Caldwell, Danley and Fennell object to the First Report primarily on the ground that the magistrate judge did not fully address their limitations defense with respect to plaintiff's constitutional and statutory RLUIPA rights. Defendants concede that the

---

[4] Objections (such as this one) which could be construed as pertaining to general matters and thus to more than one of the Reports, have been construed broadly as pertaining to all three of the Reports.

statements in their brief on this issue were general. They argue, however, that the record contains sufficient facts to indicate that plaintiff's *Free Exercise Clause* and RLUIPA-based halal-diet claims were known to plaintiff more than two years before September 12, 2011, the date of filing for limitations purposes as found by the magistrate judge. The magistrate judge explained **[*9]** that defendants had not adequately supported their limitations arguments. In addition, a four-year limitations period would appear to apply to RLUIPA claims, an issue which plaintiff has raised in his objections. *Pettigrew v. Zavaras, 574 Fed. Appx. 801, 807 (10th Cir. 2014)*, unpublished. Given the record which was before the magistrate judge, the court finds no error with the Report's handling of the limitations defenses.

In the second proposition of their first objection, the LCF defendants object to the First Report's holding that plaintiff's 2011 grievance appeal exhausted his administrative remedies with respect to complaints regarding a diet plan instituted in 2012. The First Report, however, found that plaintiff's 2011 grievance appeal tracked plaintiff's current legal claims alleged in count one sufficiently to put prison officials on notice of the alleged wrong, and that it provided enough information for officials to investigate and address the complaints raised by plaintiff in response to the later changes to the diet referred to by plaintiff as the "pseudo-halal" diet provided by LCF. The court finds no error with respect to the Report's conclusions that, on the record before the magistrate judge, defendants did not meet their burden **[*10]** to show that undisputed material facts establish that plaintiff failed to exhaust his administrative remedies as required by the PLRA, and that defendants' motions should be denied insofar as they request judgment on the basis of the affirmative defense of non-exhaustion. *See*, doc. no. 105, p. 33.

In the third proposition of their first objection, the LCF defendants object to the First Report on the ground that the magistrate judge erred when he failed to find that the halal-diet claims were not actionable. Defendants argue that the magistrate judge's conclusions stated in another portion of the Report, indicate that plaintiff alleges he has received a religious diet option different from the general population and designed to accommodate the requirements of halal, although plaintiff contends the diet does not meet the requirements of halal as plaintiff practices it. Defendants argue that this conclusion disposes of the diet claims because it is clear that plaintiff's religious rights are not being substantially burdened.

The magistrate judge found that plaintiff's allegations and evidence were sufficient to show a genuine question of fact as to whether defendants had denied plaintiff **[*11]** a proper halal diet and forced him to decide between untenable choices, thereby consciously or intentionally interfering with plaintiff's rights. Doc. no. 105, p. 44. As a result, the magistrate judge concluded that defendants were obligated to identify the legitimate penological interests that justified the impinging conduct. *Id.* The Report states that to satisfy this requirement, the prison must make a minimal showing that a rational relationship exists between its policy and stated goals, and that the defendants "fail to make even this minimal showing." *Id.* at 45. The Report explains this conclusion in detail, reviewing the record and defendants' failure in this regard. *Id.* at 45-46. Given the record which was before the magistrate judge, the magistrate judge did not err on this issue.

Defendants' second set of objections (doc. no. 117) pertains to the Second Report (doc. no. 106). LCF defendants Caldwell, Danley and Fennell object to the Second Report on the ground that the magistrate judge did not address all of their arguments. Defendants focus on what they contend is the Report's failure to address their limitations defense with respect to plaintiff's *eighth amendment* claim that his medical care was delayed because **[*12]** of the dual name issue. Defendants concede that the Report references on-going treatment, but they argue that this claim accrued at the time of plaintiff's initial complaint and that it is barred under a two-year limitations period. Defendants argue that plaintiff became aware of his name change, and of its effect on his requests for prison services, by July 13, 2011 at the latest, when plaintiff's request for health services was returned to him because the listed

2016 U.S. Dist. LEXIS 172044, *12

name and DOC number did not match. Their objection cites no record evidence in support of these arguments. Regardless, the court declines to find error with regard to any purported failure on the part of the magistrate judge to adequately address this issue, given the record and the briefs which were before him.

Defendants' objections to the Reports are **DENIED**. Doc. nos. 116, 117.

With all objections having been denied, the Reports and Recommendations of Magistrate Judge Goodwin are **ACCEPTED, ADOPTED** and **AFFIRMED** (doc. nos. 105, 106, 107), as follows.

As recommended in the First Report (doc. no. 105):

The motions to dismiss or for summary judgment filed by defendants Jones, Patton, McCoy, Morton, Caldwell, Danley and Fennell **[\*13]** (doc. nos. 60, 67) are **GRANTED IN PART** and **DENIED IN PART**, as stated in more detail below. In addition, defendant Enchassi's motion to dismiss or for summary judgment (doc. no. 72) is **GRANTED**.

Specifically:

1. Plaintiff's federal claims seeking money damages against defendants Patton, McCoy and Morton in their official capacities are **DISMISSED** without prejudice because, based on *eleventh amendment* immunity, the court lacks subject matter jurisdiction over these claims.

2. With respect to count one (the halal-diet claims):

a. The "pseudo-halal diet" claim of conspiracy in violation of *42 U.S.C. § 1983* is **DISMISSED** in its entirety, with prejudice, as barred by the applicable statute of limitations, and defendant Enchassi is **DISMISSED** from this action;

b. Plaintiff's remaining claims of unlawful conspiracy and of retaliation are **DISMISSED** in their entirety, without prejudice, for failure to state a claim upon which relief can be granted;

c. Defendants McCoy, Morton and Jones are

**GRANTED** summary judgment on the *first amendment* free exercise claim, but this claim remains pending against defendants Caldwell, Fennell and Patton; and

d. The RLUIPA claim remains pending against defendants Patton, Caldwell and Fennell.

3. To the extent that count **[\*14]** three: (a) attempts to allege a violation of the Constitution or RLUIPA based upon non-compliance with the order and final judgment entered in Al-Amiin v. Miller, Case No. CIV-08-1371-F; or (b) attempts to allege a violation of the *Eighth Amendment* based on receipt of an improper halal diet, all claims therein are **DISMISSED** without prejudice for failure to state a claim upon which relief can be granted.

4. Plaintiff's motion seeking resolution of the summary and opposition motions (doc. no. 104) is **DENIED** as moot.

As recommended in the Second Report (doc. no. 106):

The motions to dismiss or for summary judgment filed by defendants Jones, Patton, McCoy, Morton, Caldwell, Danley and Fennell (doc. nos. 60, 67) are **GRANTED IN PART** and **DENIED IN PART**, as stated in more detail below.

Specifically, with respect to count two (the legal-name claims):

1. Plaintiff's *sixth amendment* access-to-courts claim and plaintiff's *fourteenth amendment* equal protection claim, are **DISMISSED**, without prejudice, for failure to state a claim upon which relief can be granted;

2. Summary judgment is **GRANTED** in all defendants' favor on plaintiff's *first amendment* and RLUIPA claims; and

3. Plaintiff's *eighth amendment* claim for denial of medical treatment is **DISMISSED**, without prejudice, as to defendants **[\*15]** Jones, Morton and McCoy in their individual capacities, but remains pending against defendant Patton and

2016 U.S. Dist. LEXIS 172044, *15

against defendants Caldwell, Danley and Fennell.

<u>As recommended in the Third Report (doc. no. 107)</u>:

Plaintiff's claims against defendant Billy Gibson are **DISMISSED**, without prejudice, for failure to effect timely service.

<u>Summary of the Remaining Claims</u>:

The surviving claims are summarized as follows.

Count one, alleging halal-diet claims, remains to the extent that it brings claims against defendants Caldwell, Fennell and Patton, under the *First Amendment's Free Exercise Clause* and under RLUIPA.[5]

Count two, alleging name-related claims, remains to the extent that it brings claims against defendants Patton, Danley and Fennell under the *Eighth Amendment* based on denial of medical treatment.

The claims which survive against Patton are official capacity claims, the only capacity in which Patton was substituted as a party in this action. *See*, n.1, *supra*. The claims which survive against Caldwell, Fennell and Danley, are individual capacity claims.[6]

<u>Defendant Allbaugh Substituted, Going Forward.</u>

_____

[5] As discussed by the magistrate judge, plaintiff stated in his briefing papers that he seeks no money damages, and that he seeks only declarative and injunctive relief on his RLUIPA claims. *See*, doc. no. 105, p. 69.

[6] Caldwell, Fennell and Danley are employees of LCF, a private prison owned and operated by GEO Group Inc. pursuant to a contract with ODOC. These defendants were originally sued in their individual and official capacities. As employees of a private prison, they are not state officials, and official capacity claims cannot be asserted against them. *See*, *Jones v. Barry, 33 Fed. Appx. 967, 971, n.5 (10th Cir. 2002)* (employees of a private prison lack an "official capacity" for purposes of the *Eleventh Amendment*, but can be held personally liable).

The First and Second Reports state that Patton is no longer ODOC Director and that the current ODOC Director should be substituted as the defendant **[*16]** with respect to claims against Patton. Doc. no. 105, p. 2, n.3; doc. no. 106, p. 2, n.2. To avoid confusion, the court has, to this point, continued to refer to claims against Patton. However, Joe M. Allbaugh is the current, interim director of ODOC.[7] Accordingly, going forward, Allbaugh, in his official capacity, is **SUBSTITUTED** for defendant Patton. The claims which this order describes as remaining against Patton are the claims which remain against Allbaugh in his official capacity. In future filings, the caption of this case should substitute the name of defendant Joe M. Allbaugh for the name of defendant Robert Patton.

Dated this 13th day of December, 2016.

/s/ Stephen P. Friot

STEPHEN P. FRIOT

UNITED STATES DISTRICT JUDGE

_____

**End of Document**

_____

[7] *See*, https://www.ok.gov/doc/Organization/Director's_Office/index.html (last visited December 12, 2016).

Ⓐ Neutral

As of: August 13, 2021 5:16 PM Z

## *Davis v. Corecivic, Inc.*

United States District Court for the Eastern District of Oklahoma

November 9, 2020, Decided; November 9, 2020, Filed

No. CIV 17-293-JFH-SPS

**Reporter**

2020 U.S. Dist. LEXIS 209076 *; 2020 WL 6565262

EZEKIEL DAVIS, Plaintiff, v. CORECIVIC, INC., et al., Defendants.

**Subsequent History:** Appeal dismissed by *Davis v. Core Civic, Inc., 2021 U.S. App. LEXIS 16441 (10th Cir., Feb. 3, 2021)*

**Prior History:** *Davis v. Core Civic, Inc., 2019 U.S. Dist. LEXIS 22536 (E.D. Okla., Feb. 12, 2019)*

## Core Terms

grievance, exhausted, unanswered, resubmit, inmate, staff, allegations, ten days, grievance process, administrative remedy, law library, documents, courts, constitutional right, match, plaintiff's claim, summary judgment, staff member, mail, injunctive relief, conspiracy, asserts, prison, rights, motion to dismiss, abuse of process, answered, offender, repeated

**Counsel:** [*1] Ezekiel Davis, Plaintiff, Pro se, McAlester, OK.

For Core Civic, Inc., James Yates, Warden, M. Gentry, Assistant Warden, Dorman, Chief over Max Unit/Law Library Supervisor, Willa Burney, Law Library Supervisor, Ms. Hamilton, Mental Health, Tiffany Ade, Max-Unit, Unit Mgr., Terry Underwood, Grievance/Misconduct Corrdinator, Mrs. Brill, Nurse, Ms. Hassan, Acting DCF/Law Library Supervisor, Frederick Sanders, Doctor, Ray Larimer, DFC Medical Supervisor, Serena Brewer, Nirse Practioner, Keith Ivans, DCF Doctor - Chief Medical Officer, Sue Burlchalter, Nurse Practitioner, Romine, Correctional Officer, Defendants: Darrell L. Moore, LEAD ATTORNEY, J. Ralph Moore, PC, Pryor, OK.

For Andrea Skelton, Mental Health, Defendant: Jessica L. Dark, Russell L. Hendrickson, Pierce Couch Hendrickson Baysinger & Green, LLP (OKC), Oklahoma City, OK.

For David Cincotta, General Counsel, Mark Knutson, Director Designee, Defendants: Kari Y. Hawkins, Office of the Attorney General (OKC), Oklahoma City, OK.

**Judges:** JOHN F. HEIL, III, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOHN F. HEIL, III

## Opinion

### OPINION AND ORDER

Plaintiff Ezekiel Davis ("Plaintiff") is a pro se state prisoner in the custody of the Oklahoma Department of Corrections ("DOC"). [*2] He is incarcerated at Davis Correctional Facility ("DCF"), a private prison in Holdenville, Oklahoma, which is owned and operated by CoreCivic [Dkt. No. 305 at 7]. He brought this action under the authority of *42 U.S.C. § 1983*, seeking monetary and injunctive relief for alleged constitutional violations occurring during his incarceration at DCF.

The DOC Defendants are Joe M. Allbaugh, David Cincotta, and Mark Knutson. The remaining CoreCivic/DCF Defendants are CoreCivic, Inc.; Warden James Yates; Assistant Warden Gentry; Chief Dorman; Willa Burney; Ms. Hamilton; Tiffany Ade; Terry Underwood; Mrs. Brill; Ms. Hassan; Dr. Frederick Sanders; Ray Larimer; Serena Brewer;

2020 U.S. Dist. LEXIS 209076, *2

Dr. Keith Ivans; Sue Burkhalter; Correctional Officer Romine; and Brittney Summer-Hope.[1]

The defendants have filed numerous motions to dismiss or for summary judgment [Dkt. Nos. 239, 284, 305, and 306], and Plaintiff has filed responses to the motions [Dkt. Nos. 245, 288, 310, 311]. The defendants also have submitted special reports at the direction of the Court, in accordance with _Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978)_.

## Standards of Review

### Motion to Dismiss

The pleading standard for all civil actions was articulated in _Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_. See _Ashcroft v. Iqbal, 556 U.S. 662, 684, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_. To avoid dismissal for failure to state a claim under **[*3]** _Fed. R. Civ. P. 12(b)(6)_, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level." _Twombly, 550 U.S. at 555_. The complaint also must contain "enough facts to state a claim to relief that is plausible on its face." _Id. at 570_. A court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the plaintiff. _Id. at 555-56_. "So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the cause of action should be dismissed. _Id. at 558_.

A pro se plaintiff's complaint must be broadly construed under this standard. _Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)_; _Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)_. The

generous construction to be given to the pro se litigant's allegations, however, "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." _Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)_. Notwithstanding a pro se plaintiff's various mistakes or misunderstandings of legal doctrines or procedural requirements, "if a court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so . . . ." _Id._ A reviewing court need not accept "mere conclusions characterizing pleaded **[*4]** facts." _Bryson v. City of Edmond, 905 F.2d 1386, 1390 (10th Cir. 1990)_; see also _Twombly, 550 U.S. at 555_. The Court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." _Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997)_.

### Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." _Fed. R. Civ. P. 56(a)_. A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_. A fact is material if it "might affect the outcome of the suit under the governing law." _Id._ In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." _Id. at 255_. A party opposing a motion for summary judgment, however, may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. _Fed. R. Civ. P. 56(c)_. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." _Anderson, 477 U.S. at 251-52_.

---

[1] CoreCivic/DCF Defendants Deborah Courtney and Amanda Shirley were dismissed on July 2, 2019 [Dkt. No. 225]. CoreCivic/DCF Defendant Darrell L. Moore was dismissed on March 17, 2020 [Dkt. No. 253]. CoreCivic/DCF Defendants Andrea Skelton, Lotoya Edwards, and Justin Pham were dismissed without prejudice on April 8, 2020 [Dkt. No. 262].

2020 U.S. Dist. LEXIS 209076, *4

## CoreCivic/DCF Defendant [*5] Brittney Summer-Hope

Plaintiff alleges that in June 2017, Defendant Correctional Officer Brittney Summer-Hope retrieved his legal documents and told him she had read them [Dkt. No. 169 at 19]. Defendant Summer-Hope also allegedly called Plaintiff a "snitch" in the presence of other prisoners. *Id.*

The record shows that Defendant Summer-Hope's Form USM-285 for service of the amended complaint was returned unexecuted on April 8, 2019, because she no longer worked at DCF [Dkt. No. 201]. On July 2, 2019, Plaintiff was directed to show cause why Defendant Summer-Hope should not be dismissed from this action for Plaintiff's failure to serve her in accordance with *Fed. R. Civ. P. 4(m)* [Dkt. No. 227]. Plaintiff's response to the order alleged, among other things, that he did not have access to all his legal papers, and the defendants had been uncooperative in providing last known addresses to the United States Marshals Service [Dkt. No. 230]. The CoreCivic/DCF Defendants, however, alleged that the last known address for Defendant Summer-Hope had been sent to the Marshals Service [Dkt. No. 231].

On April 3, 2020, Plaintiff was directed to complete a new Form USM-285 for Defendant Summer-Hope [Dkt. No. 259], and the [*6] Court reissued the summons for her on April 13, 2020 [Dkt. No. 265]. It was returned executed on June 15, 2020 [Dkt. No. 295], however, Defendant Summer-Hope did not answer the amended complaint. Although Plaintiff sought a default judgment against Defendant Summer-Hope prior to her service [Dkt. Nos. 53, 159, 160], he did not seek a default judgment against Summer-Hope after she was served. Therefore, Defendant Summer-Hope is DISMISSED WITHOUT PREJUDICE for Plaintiff's failure to prosecute pursuant to *Fed. R. Civ. P. 41(b)*. *See Olsen v. Mapes, 333 F.3d 1199, 1204 n.3 (10th Cir. 2003)* ("Although the language of *Rule 41(b)* requires that the defendant file a motion to dismiss, the Rule has long been interpreted to permit courts to dismiss actions sua sponte for a plaintiff's failure to prosecute or comply with the rules of civil procedure or court's orders.").

Further, as evident below, Plaintiff failed to exhaust his claims against Defendant Summer-Hope through the DCF grievance procedure. The Court thus notes that Plaintiff's claims against her could have been dismissed for Plaintiff's failure to exhaust his administrative remedies for those claims.

## DOC Defendants Joe M. Allbaugh, David Cincotta, and Mark Knutson

Plaintiff complains that Defendant DOC Director Allbaugh [*7] reviewed and approved a memorandum created by DOC General Counsel Cincotta and CoreCivic/DCF employees. The memo allegedly implemented procedures and practices for DCF that were slightly different from the DOC procedures regarding grievances (OP-090124) and access to the courts (OP-030117) [Dkt. No. 169 at 20, 41-42]. Plaintiff argues that the policy deviations were intended to impede him in his access to the courts and to medical care. *Id.* at 42.

Plaintiff specifically complains that his grievances were not file-stamped and were answered by the wrong staff members. *Id.* at 33-34. He also claims the DCF law library supervisor limited him to ten sheets of typing paper and required him to confirm that he was using the paper for legal purposes. *Id.* at 35. Plaintiff further asserts that "the General Counsel can influence whether Plaintiff receive [sic] adequate medical treatment to parole, General Counsel members have engaged in adversarial actions against the Plaintiff and their participation in a civil conspiracy against me is sufficient to deter a person of ordinary firmness in the exercise of constitutional rights." *Id.* at 42.

Plaintiff also claims Defendant Mark Knutson, DOC Director's Designee, is responsible for impartially [*8] reviewing Plaintiff's grievance appeals. *Id.* at 20. Plaintiff asserts that because of the memorandum, Knutson was able to deny his grievances without investigating them [Dkt. No. 245 at 17]. In addition, Knutson allegedly conspired with other defendants to deny Plaintiff his *First*

2020 U.S. Dist. LEXIS 209076, *8

*Amendment* rights of access to the courts, equal protection, the right to be heard, and free speech [Dkt. No. 169 at 20, 32-33]. Plaintiff further contends Defendant Cincotta was "the moving force behind Plaintiff['s] not receiving adequate medical care by a qualified physician." *Id.* at 33.

DOC Defendants Cincotta, Knutson, and Allbaugh's motions to dismiss allege Plaintiff has failed to state a claim upon which relief may be granted [Dkt. Nos. 239,[2] 284[3] ]. These defendants claim that deviations from prison policies did not violate Plaintiff's constitutional rights. It is well settled that creation of a prison policy does not, in and of itself, create a constitutional right to that procedure or its implementation in any particular manner. *Sandin v. Conner, 515 U.S. 472, 481-82, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*. Instead, DOC procedures are implemented to "aspire to instruct subordinate employees how to exercise discretion vested by the state in the [Director], and to confine the authority of [department] personnel **[*9]** in order to avoid widely different treatment of similar incidents." *Id. at 482*.

Regarding the grievance process, the Tenth Circuit has held that "there is no independent constitutional right to state administrative procedures." *Boyd v. Werholtz, 443 F. App'x 331, 332 (10th Cir. 2011)*. "Nor does the state's voluntary provision of an administrative grievance process create a liberty interest in that process." *Id.* (citing *Bingham v. Thomas, 654 F.3d 1171, 1177-78 (11th Cir. 2011))*. *See also Butler v. Bowen, 58 Fed. Appx. 712 (9th Cir. 2003)* ("[A] prisoner has no constitutional right to prison grievance procedures."). Accordingly, Plaintiff's claims that his rights were violated by alleged deviations from

DOC grievance policy must fail.

Plaintiff also contends the DOC Defendants interfered with his right of access to the courts when DCF modified its law library and grievance polices. Plaintiff clearly has a constitutional right of meaningful access to the courts, and he must be provided a "reasonably adequate opportunity" to present his legal claims. *Bounds v. Smith, 430 U.S. 817, 825, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)*; *Petrick v. Maynard, 11 F.3d 991, 994 (10th Cir. 1993)*. In a prison setting, this standard generally means prisoners must be afforded paper, writing implements, postage, etc. *Bounds, 430 U.S. at 824-25*. The prisoner, however, must show an alleged deprivation resulted in an actual injury to his ability to pursue litigation. *Lewis v. Casey, 518 U.S. 343, 349, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)*. Here, Plaintiff has cited to no particular proceeding or legal matter **[*10]** that he was unable to pursue because of the DOC Defendants' alleged conduct. Instead, Plaintiff complains that these defendants allowed different procedures for DCF's law library. Because his conclusory allegations fail to demonstrate an actual injury, Plaintiff's claim against the DOC Defendants concerning access to the courts also fails.

Regarding Plaintiff's claim that Defendants Cincotta and Knutson conspired with private prison officials to modify policies in order to violate his rights, this claim also is meritless. Conclusory allegations of a conspiracy will not suffice. *Wise v. Bravo, 666 F.2d 1328, 1333 (10th Cir. 1981)*. To recover on a conspiracy claim under *§ 1983*, a plaintiff must establish an actual deprivation of his rights, in addition to proving that a conspiracy actually exists. *Dixon v. City of Lawton, 898 F.2d 1443, 1449 (10th Cir. 1990)*. Plaintiff's allegations of a conspiracy, backed up with no factual showing of an agreement and concerted action amongst the defendants, are insufficient to support such a claim. *See Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir.)*, *cert. denied, 513 U.S. 832, 115 S. Ct. 107, 130 L. Ed. 2d 55 (1994)*. Here, Plaintiff has not shown that he was deprived of any constitutional right to a particular prison policy, nor has he shown he was denied his right of access to the courts. Therefore, his conspiracy claim must

---

[2] Defendants Cincotta and Knutson's motion for dismiss states it relies upon a special report [Dkt. No. 239], however, there are no citations or other references to the special report in the motion.

[3] Defendant Allbaugh's motion is captioned as a motion to dismiss and motion for summary judgment. The motion, however, presents no arguments for summary judgment, instead arguing for dismissal under *Fed. R. Civ. P. 12(b)(6)*. Therefore, the Court considers the motion only under *Rule 12(b)(6)*.

2020 U.S. Dist. LEXIS 209076, *10

fail.

Plaintiff also alleges the DOC **[*11]** Defendants conspired to discriminate against him by not providing him adequate medical care for his serious medical needs because he is a "jailhouse lawyer" and "writ writer," thereby violating his equal protection rights under the theory of a "class of one" [Dkt. No. 169 at 43]. To state a standard equal protection claim, Plaintiff must show that a governmental decision-maker intentionally discriminated against him because he was a member of a protected class of people. *SECSYS, LLC v. Vigil, 666 F.3d 678, 685 (10th Cir. 2012)*.

Analyzing the case through equal protection's so-called "class of one" doctrinal prism changes nothing. Class of one doctrine focuses on discrimination not between classes or groups of persons, as "traditional" equal protection doctrine does, but on discrimination against a specific individual. *Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008)*. Even so, the familiar principles and procedures associated with equal protection class discrimination doctrine apply. *Id. at 602* ("class-of-one theory . . . [is] not so much a departure from" as it is "an application of" traditional equal protection principles).

*SECSYS, 666 F.3d at 688*.

To state a plausible claim under the "class of one" doctrine, Plaintiff must allege specific and detailed facts to "establish that others, similarly situated in **[*12]** every material respect, were treated differently" from him. *Id.* The class of one theory of liability employs a two-part test. First, Plaintiff must demonstrate that he was intentionally treated differently from other individuals with materially similar traits. *Id.* Second, Plaintiff must demonstrate that there was no rational basis for the different treatment. *A.M. v. Holmes, 830 F.3d 1123, 1166-67 (10th Cir. 2016)*. *See also Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1213 (10th Cir. 2011)*.

Here, the Court finds Plaintiff has failed to show that Defendants Cincotta or Knutson treated him differently from other similarly-situated inmates, jailhouse lawyers, or writ writers. In fact, Plaintiff's allegations that an alleged memorandum with deviations from DOC policy fails to assert that the memo was only enforced against him. Therefore, Plaintiff's "class of one" claim is meritless.

Defendant Allbaugh also asserts that Plaintiff has failed to show Allbaugh's personal participation in any constitutional violation. "Personal participation is an essential allegation in a *§ 1983* claim." *Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)* (citations omitted). *See also Mee v. Ortega, 967 F.2d 423, 430-31 (10th Cir. 1992)*. Plaintiff must show that a defendant personally participated in the alleged civil rights violation. *Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)*. Supervisory status is not sufficient to support liability under *§ 1983*. *Id. See also Polk County v. Dodson, 454 U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981)*.

The Tenth Circuit **[*13]** has repeatedly held that in *§ 1983* actions, specific factual allegations with regard to the elements of each claim are particularly important, because "state actors may only be held liable under *§ 1983* for their own acts." *Robbins v. Oklahoma, 519 F.3d 1242, 1251 (10th Cir. 2008)*. "[I]t is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id. at 1250* (citation omitted) (emphasis in original). For Plaintiff's complaint to survive dismissal, this Court must be able to read the allegations in the complaint and the requests for relief against the defendants and "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citation omitted). After careful review, the Court finds Plaintiff has failed to articulate any specific allegations of Defendant Allbaugh's personal participation, and Plaintiff's complaint falls far short of this standard with regard to his *Eighth Amendment* claims against Defendant Allbaugh.

2020 U.S. Dist. LEXIS 209076, *13

Next, to the extent Plaintiff seeks injunctive relief to obtain medical care from a neurologist, such relief is not [*14] available when there is not a continuing violation of federal law. *Green v. Mansour, 474 U.S. 64, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985)*. Because Plaintiff has failed to state a claim for a constitutional violation against Defendants Allbaugh, Cincotta, or Knutson, Plaintiff's request for injunctive relief must be denied.

Accordingly, after careful review, Defendants Joe M. Allbaugh, David Cincotta, and Mark Knutson's motions to dismiss [Dkt. Nos. 239, 284] are GRANTED, pursuant to *Fed. R. Civ. P. 12(b)(6)*.

**CoreCivic/DCF Defendants CoreCivic, James Yates, Terry Underwood, Willa Burney, Tiffany Ade, Mrs. Brill, Assistant Warden Gentry, Ms. Hamilton, Sue Burkhalter, Chief Dorman, Ms. Hassan, Dr. Frederic Sanders, Ray Larimer, Serena Brewer, Dr. Keith Ivens, and Correctional Officer Romine**

Defendants CoreCivic, Yates, Underwood, Burney, Ade, Brill, Gentry, Hamilton, Burkhalter, Dorman, Hassan, Sanders, Larimer, Brewer, Ivens, and Romine have filed a motion for summary judgment, alleging among other things that Plaintiff has failed to exhaust the administrative remedies for any of his claims [Dkt. No. 305]. Pursuant to the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined [*15] in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a)*. Inmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed. *Booth v. Churner, 532 U.S. 731, 740-41, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)*; *Yousef v. Reno, 254 F.3d 1214, 1216 n.1 (10th Cir. 2001)*. "An inmate who begins the grievance process but does not complete it is barred from pursuing a *§ 1983* claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002)* (citation omitted).

According to Terry Underwood, DCF Grievance Coordinator, DCF utilizes the Oklahoma DOC administrative remedies policy, OP-090124 [Dkt. No. 305-2 at ¶ 5, Affidavit of Terry Underwood; Dkt. No. 305-3, DOC Policy OP-090124]. Pursuant to the DOC Offender Grievance Process, an inmate first must attempt to resolve his complaint informally by communicating with staff within three days of the incident [Dkt. Nos. 305-3; 305-4 at ¶ IV(B).][4] If that is unsuccessful, he may submit a Request to Staff ("RTS") to the appropriate staff member within seven calendar days of the incident, alleging only one issue or incident per form. *Id.* at ¶ IV(C). If the offender does not receive a response to his RTS within 30 calendar days of submission, he may submit [*16] a grievance to the Review Authority (warden's office), asserting only the issue of the lack of response to the RTS. *Id.* at ¶ IV (C)(11). If the complaint is not resolved after the response to the RTS, the offender then may file a grievance, attaching the RTS with the response from the staff member. *Id.* at ¶ V. If the grievance also does not resolve the issue, the inmate may appeal to the DOC Administrative Review Authority ("ARA"), personal identity ARA, or Medical ARA, whichever is appropriate, within 15 days of receipt of the reviewing authority's decision or any amended decisions. *Id.* at ¶ VII(B). The administrative process is exhausted only after all of these steps have been taken. *Id.* at ¶ VII(D)(1).

This policy also instructs that if the inmate does not follow instructions as explained in the policy provision and on the grievance forms, the grievance may be returned to him unanswered for proper completion. If the inmate is allowed to resubmit the grievance, he must properly resubmit the grievance within ten (10) calendar days of receipt. *Id.* at ¶ VI. The continued failure to follow instructions may result in restrictions being imposed on the inmate. *Id.* at ¶ IX.

The policy further [*17] holds that an inmate who abuses the grievance process may be placed on Grievance Restriction [Dkt. No. 305-2 at ¶¶ 9-10, Underwood Affidavit]. In determining abuse of the

---

[4] Defendants have submitted the Grievance Policies for 2016-2017 [Dkt. No. 305-3] and for 2018 [Dkt. No. 305-4].

2020 U.S. Dist. LEXIS 209076, *17

grievance process, the appropriate reviewing authority may determine there is abuse or misuse of the grievance process and may restrict the inmate's ability to submit a grievance [Dkt. No. 305-3, 305-4 ¶ IX, OP-090124]. The grievance process sets forth the types of abuse, which include, but are not limited to:

a. Grievances intended to harass another;

b. The continual and repeated submitting of frivolous grievances (frivolous grievances are those with no basis in fact or law);

c. The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response;

d. Grievances about de minimis (small, trifling, no available remedy) issues;

e. Repetitive grievances by multiple inmates/offenders about the same issue;

f. An inmate/offender writing letters instead of utilizing the grievance process and failing to bring complaints by formal grievance;

g. Continued procedural defects, such as submitting additional pages, after having been previously warned.

[Dkt. Nos. 305-3; 305-4 **[*18]** ¶ IX(A)(1), OP-090124].

If it is determined that the inmate has abused the grievance process, he is to be notified in writing, citing the above-listed reason(s) for placement on grievance restriction. A copy of the determination will be placed in the inmate's field file, and a copy also will be provided to the reviewing authority and the ARA. If the determination of abuse of the process is made at the first level of review, the action is appealable to the ARA [Dkt. No. 305-3 ¶ IX(A)(2); OP-090124].

The CoreCivic/DCF Defendants assert Plaintiff's amended complaint contains allegations occurring from the time of his arrival at the facility in June 2017 through July 2018. During that time, Plaintiff submitted 21 separate grievances consisting of 213 pages. [Dkt. Nos. 305-5, 305-6, 305-7, 305-8]. According to the defendants, Plaintiff did not exhaust any of the issues he has presented to this Court.

Terry Underwood, DCF Grievance Coordinator,

states by affidavit that she reviewed the grievance logs for the period of May 2017 through July 2018, the time covered in Plaintiff's amended complaint [Dkt. No. 305-2 at ¶ 13]. The grievances are summarized below:

**Grievance No. 2017-148**, submitted on **[*19]** June 20, 2017, was marked as "emergency/sensitive" and concerned the behavior of Plaintiff's cellmate. It was returned to him unanswered on the date of submission, because the issue was not an emergency or sensitive, and he was given ten days to correct and resubmit it. Instead, Plaintiff submitted an appeal to the DOC ARA. His appeal was returned unanswered on July 10, 2017, with a notation that the issue was not of a sensitive or emergency nature. Because Plaintiff had failed to follow proper procedures, he was out of time. No issues were exhausted through this grievance. [Dkt. No. 305-2 at ¶ 14; Dkt. No. 305-5 at 2-6].

Plaintiff was placed on grievance restriction on July 29, 2017, because of his repeated submission of multiple RTSs about issues that previously had been addressed by staff. Plaintiff's appeal of the grievance restriction was denied by the DOC ARA. [Dkt. No. 305-2 at ¶¶ 15-16].

**Grievance No. 2017-171**, submitted on July 10, 2017, concerned his issues with the law library. The grievance was returned unanswered on July 26, 2017, noting that the RTS action he had requested did not match the relief he sought with his grievance, and the grievance lacked specific information. **[*20]** Also, Plaintiff was on grievance restriction, and he had not complied with the process and procedures set forth in the DOC policy for grievance submission. Plaintiff was given ten days to correct and resubmit his grievance, but he failed to do so. No issues were exhausted by the grievance. [Dkt. No. 305-2 at ¶ 17; Dkt. No. 305-5 at 7-15].

**Grievance 2017-172**, also submitted on July 10, 2017, requested shoes, a thicker mattress, and a chair for his cell and for outside recreation. The grievance was returned to him unanswered on July 26, 2017, because it was untimely and because Plaintiff was on grievance restriction. No issues were exhausted by this grievance. [Dkt. No. 305-2

2020 U.S. Dist. LEXIS 209076, *20

at ¶ 18; Dkt. No. 40 at 23-26].

**Grievance No. 2017-194**, submitted on August 8, 2017, complained that Defendant Willa Burney, the Law Library Supervisor, did not return his legal documents within 48 hours, and Ms. Burney was untrained and unqualified to be the law library supervisor. The grievance was returned unanswered to Plaintiff on August 9, 2017, noting that the relief requested in his RTS did not match the action requested in his grievance and that requests to transfer to another facility are not grievable. **[\*21]** In addition, Plaintiff was on grievance restriction, and he did not comply with the DOC process and procedures for proper grievance submission. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 19; 305-5 at 41-49].

**Grievance No. 2017-195**, also received on August 8, 2017, requested that Law Library Supervisor Burney stop denying him copies and that she be properly trained before maintaining her position as Library Supervisor. The grievance was returned unanswered, because the RTS did not match the grievance issue, and more than one issue was raised in the grievance. In addition, Plaintiff was on grievance restriction, and proper documentation was not included. Plaintiff was advised that he could correct and resubmit his grievance within ten days, but he did not do so. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 20; Dkt. No. 305-5 at 51-59].

**Grievance No. 2017-203**, submitted on August 9, 2017, complained that Plaintiff's placement on grievance restriction was retaliatory and asked to have the restriction removed. He also complained about the law library supervisor. The grievance was returned unanswered on August 9, 2017, noting that Plaintiff was on **[\*22]** grievance restriction, and he had not complied with the process and procedures spelled out in the DOC policy for proper grievance submission. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 21; Dkt. No. 305-5 at 60-67].

**Grievance No. 2017-323**, submitted on November 30, 2017, complained about the mailroom staff. It was returned unanswered on November 30, 2017,

noting that the form was not properly completed, because Plaintiff's DOC Identification Number was not on the grievance form. Plaintiff was given ten days to correct and resubmit the grievance. He resubmitted the grievance on December 6, 2017, however, the resubmission failed to provide a correct affidavit related to his grievance restriction. The resubmitted grievance was returned unanswered to him on December 12, 2017, noting the defects and that because of his failure to properly submit, he was out of time. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 22; Dkt. No. 305-6 at 2-19].

**Grievance No. 2018-125**, submitted on May 17, 2018, complained about the law library visits to the maximum-security housing unit and about untrained staff. The grievance was returned to him unanswered on May 22, 2018, **[\*23]** because an answered RTS addressed to the correct staff member was not attached to the grievance. Plaintiff was advised that he could correct and resubmit his grievance within ten days, but he did not do so. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 23; Dkt. No. 305-6 at 21-28].

**Grievance No. 2018-126**, submitted on May 17, 2018, complained about Plaintiff's receiving a disciplinary report. The grievance was returned to him unanswered on May 22, 2018, because misconducts are not grievable, he was on grievance restriction, and the submission did not comply with grievance restriction requirements. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 24; Dkt. No. 305-6 at 29-36].

**Grievance No. 2018-127**, also submitted on May 17, 2018 complained that Ms. Hassan, the library supervisor, failed to return Plaintiff's documents in accordance with policy. Plaintiff also complained that Ms. Hassan needed to be trained. The grievance was returned unanswered on May 22, 2018, because Plaintiff was on grievance restriction, and the submission did not comply with grievance restriction requirements. Plaintiff was given ten days to correct and resubmit his grievance, **[\*24]** however, he did not do so. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 25; Dkt. No. 305-6 at 37-44].

**Grievance No. 2018-128** also was submitted on May 17, 2018. It stated Plaintiff wanted his legal documents, requested information on paper allotments, and complained about untrained staff. The grievance was returned unanswered on May 22, 2018, because it required an answered RTS addressed to the correct staff member, and Plaintiff was on grievance restriction and had not included the required documentation. Plaintiff was given ten days to correct and resubmit the grievance, but he failed to do so. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 26; Dkt. No. 305-7 at 2-9].

**Grievance No. 2018-129**, was Plaintiff's fifth grievance submitted on May 17, 2018. The grievance requested that staff not be allowed to sanction inmates or restrict Plaintiff's rights to showers or outside recreation. It was returned unanswered on May 22, 2018, noting that Plaintiff was on grievance restriction, and he had failed to include the proper documentation. He was given ten days to correct and resubmit the grievance. Plaintiff, however, did not resubmit. No issues were **[*25]** exhausted by this grievance. [Dkt. No. 305-2 at ¶ 27; Dkt. No. 305-7 at 10-17].

**Grievance No. 2018-134**, submitted on May 24, 2018, requested a transfer to a different prison facility. The grievance was returned to him unanswered on May 30, 2018, because Plaintiff was on grievance restriction and proper documentation was not included. He was given ten days to correct and resubmit his grievance, but he failed to do so. No issues were exhausted by this Grievance. [Dkt. No. 305-2 at ¶ 28; No. 305-7 at 18-25].

**Grievance No. 2018-135**, submitted on May 24, 2018, concerned Plaintiff's claims of harassment and retaliation by DCF staff. The grievance was returned unanswered on May 30, 2018, because there was no date of the incident, inmates are not allowed to file separatees against staff, and Plaintiff failed to include an affidavit concerning his grievance restriction. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 29; Dkt. No. 305-7 at 27-34].

**Grievance No. 2018-136** also was submitted on May 24, 2018. The grievance alleged that the DCF law library had untrained staff. It was returned to him unanswered on May 30, 2018, noting that the grievance was a duplicate of Grievance No. **[*26]** 2018-128, and he was on grievance restriction. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 30; Dkt. No. 305-7 at 36-44].

**Grievance No. 2018-173** was submitted on July 16, 2018, after Plaintiff's grievance restriction expired on June 29, 2018. The grievance again complained about the law library operation and objected to Plaintiff's giving his personal legal information to an inmate legal assistant. The grievance was returned unanswered to him on July 18, 2018, because the RTS issue did not match the grievance issue. He was given ten days to correct and resubmit.

The grievance was resubmitted on July 28, 2018, and it was answered on August 1, 2018. DOC policy OP-030115 was reviewed, and it was noted that the library staff member may assign a research assistant to help an inmate conduct research and draft pleadings that relate to conditions of confinement or post-conviction relief. The grievance response further stated that the policy did not require Plaintiff to give his personal legal information to the inmate research assistant. Plaintiff thus was granted relief. [Dkt. No. 305-2 at ¶¶ 31-32; Dkt. No. 305-8 at 2-14].

**Grievance No. 2018-180**, submitted on July 25, 2018, **[*27]** stated that Plaintiff wanted a trace/track placed on certified mail. The grievance was returned unanswered on July 31, 2018, noting that the RTS did not match the grievance. The return memorandum also warned Plaintiff that his continued abuse of the process would result in his being returned to grievance restriction. Plaintiff was given ten days to correct and resubmit the grievance. [Dkt. No. 305-2 at ¶ 33; Dkt. No. 305-8 at 21-26].

Plaintiff resubmitted Grievance No. 2018-180 on August 8, 2018, asking why he was not provided with the completed certificate of mailing forms and asking how long he had to wait to trace/track the mail. The resubmission was returned to him unanswered on August 13, 2018, noting that only

2020 U.S. Dist. LEXIS 209076, *27

one issue could be submitted per grievance. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 34; Dkt. No. 305-8 at 16-20].

**Grievance No. 2018-181**, submitted on July 25, 2018, stated that Plaintiff wanted the DCF staff to stop taking adverse action against him that interfered with his access to the courts. He also asked to be provided with legal materials such as postage and envelopes. The grievance was returned unanswered on July 31, 2018, because the RTS **[*28]** was a duplicate request and the RTS did not match the grievance issue. Plaintiff was warned that continued abuse of the process would result in his being placed on grievance restriction. He was granted ten days to properly resubmit the grievance. [Dkt. No. 305-2 at ¶ 35; Dkt. No. 305-8 at 34-39].

Plaintiff resubmitted Grievance No. 2018-181 on August 8, 2018. His requested action stated, "I would like to know where to get the envelopes I request." The resubmitted grievance was returned to him unanswered on August 13, 2018, for lack of an answered RTS addressed to the correct staff member. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 35; Dkt. No. 305-8 at 28-33].

**Grievance No. 2018-182**, submitted on July 25, 2018, stated that the mail room staff were harassing him and impeding him from access to the courts. The grievance was returned to him unanswered on July 31, 2018, because the RTS issue did not match the grievance issue. Plaintiff was given ten days to correct and resubmit it. He resubmitted the grievance on August 8, 2018, asking what happened to his legal documents. After an investigation, it was determined that Plaintiff's documents were mailed by certified **[*29]** mail on July 5, 2018. The issue of Plaintiff's certified mail was therefore exhausted. [Dkt. No. 305-2 at ¶ 36; Dkt. No. 305-8 at 52-67].

**Grievance No. 2018-183**, submitted on July 31, 2018, concerned the library staff. It was returned to Plaintiff unanswered on July 31, 2018, because the RTS issue did not match the grievance issue. In addition, Plaintiff had requested disciplinary action against staff, and the grievance was a duplicate of

Grievance Nos. 2018-128 and 2018-136. Plaintiff was warned that continued abuse of the process would result in his being placed back on grievance restriction. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 37; Dkt. No. 305-8 at 56-67].

**Grievance No. 2018-188**, submitted on July 31, 2018, concerned medical clinic issues. It was returned unanswered on August 13, 2018, noting that Plaintiff had failed to complete the grievance form properly. Also, because the grievance concerned a medical issue, it should have been addressed to Ray Larimer, HSA. Plaintiff was allowed ten days to correct and resubmit the grievance, but he failed to do so. No issues were exhausted by this grievance. [Dkt. No. 305-2 at ¶ 38; Dkt. No. 305-8 at 61-67].

On August **[*30]** 7, 2018, Defendant Warden Yates sent a letter to Plaintiff, notifying him that he was being returned to grievance restriction for 12 months for repeated abuse of the process. Plaintiff had made repeated submission of frivolous grievances and repetitive requests to staff. [Dkt. No. 305-2 at ¶ 39].

After careful review of Plaintiff's grievance records, the Court finds that the only grievances correctly submitted by Plaintiff were Grievance Nos. 2018-173 and 2018-182. Neither of these two grievances, however, concerned the claims in this civil rights action. Plaintiff argues the defendants interfered with exhaustion when they turned the grievance process into an adversarial process by placing him on grievance restriction for no reasons that justified their allegation of abuse. After his placement on grievance restriction, the defendants allegedly refused to assist him in correcting his grievance submissions. [Dkt. No. 311 at 3]. He further asserts he failed to exhaust his administrative remedies through no fault of his own, because he was "hindered, thwarted, impeded, and frustrated from the grievance process," and he is only required to exhaust available remedies. *Id.* at 10.

"Where prison officials **[*31]** prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy

'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little v. Jones, 607 F.3d 1245, 1250 (10th Cir. 2010)*. Here, the Court finds Plaintiff's unsupported, conclusory allegations do not demonstrate that the defendants made the administrative remedies for his claims unavailable.

Regarding Plaintiff's request for injunctive relief from the CoreCivic/DCF Defendants, as explained above, he must establish a violation of his constitutional rights. *Rizzo v. Goode, 423 U.S. 362, 377, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976)*. Because Plaintiff has failed to exhaust the administrative remedies for his claims, he cannot show his constitutional rights were violated. He thus cannot be granted injunctive relief.

After consideration of the pleadings and other submitted materials, the Court is of the view that there are no genuine issues of material fact with respect to whether Plaintiff's claims are unexhausted and whether Plaintiff is entitled to injunctive relief. Therefore, summary judgment is GRANTED for CoreCivic/DCF Defendants CoreCivic, Inc.; Warden James Yates; Assistant Warden Gentry; Chief Dorman; Willa Burney; Ms. Hamilton; Tiffany Ade; Terry Underwood; Mrs. Brill; Ms. Hassan; **[*32]** Dr. Frederick Sanders; Ray Larimer; Serena Brewer; Dr. Keith Ivans; Sue Burkhalter; and Correctional Officer Romine.

**THEREFORE**,

1. Defendant Brittney Summer-Hope is DISMISSED WITHOUT PREJUDICE from this action for Plaintiff's failure to prosecute.

2. Defendants Joe M. Allbaugh, David Cincotta, and Mark Knutson's motions to dismiss [Dkt. Nos. 239, 284] are GRANTED.

3. Defendants CoreCivic, James Yates, Terry Underwood, Willa Burney, Tiffany Ade, Mrs. Brill, Assistant Warden Gentry, Ms. Hamilton, Sue Burkhalter, Chief Dorman, Ms. Hassan, Dr. Frederic Sanders, Ray Larimer, Serena Brewer, Dr. Keith Ivens, and Correctional Officer Romine's motion for summary judgment [Dkt. No. 305] is GRANTED.

4. All remaining pending motions are DENIED as moot.

5. This dismissal shall count as a "PRIOR OCCASION" or "STRIKE," pursuant to *28 U.S.C. § 1915(g)*. *See Thomas v. Parker, 672 F.3d 1182, 1184 (10th Cir. 2012)* (holding that the imposition of a strike is appropriate when "the plaintiff's claims are dismissed in part for failure to state a claim and in part for failure to exhaust administrative remedies, and no claims are allowed to proceed on the merits").

**IT IS SO ORDERED** this 9th day of November 2020.

/s/ John F. Heil, III

JOHN F. HEIL, III

UNITED STATES DISTRICT JUDGE

**End of Document**

🛈 Cited
As of: August 13, 2021 5:15 PM Z

## *Discover Prop. & Cas. Ins. Co. v. Collective Brands, Inc.*

United States District Court for the District of Kansas

July 15, 2008, Decided

Case No. 07-2577-JAR

**Reporter**
2008 U.S. Dist. LEXIS 54705 *; 2008 WL 2783144

DISCOVER PROPERTY & CASUALTY INSURANCE COMPANY, Plaintiff, vs. COLLECTIVE BRANDS, INC.(FKA PAYLESS SHOESOURCE, INC.), PAYLESS SHOESOURCE WORLDWIDE, INC., and COLLECTIVE LICENSING INTERNATIONAL, LLC., Defendants.

## Core Terms

Policies, License, infringement, allegations, insured, attorney's fees, district court, indemnify, defendants', declaratory judgment, coverage, advertising injury, indemnification, parties, costs, declaratory judgment action, ripe for adjudication, provide coverage, retention, Brands, indispensable party, obligated, Powers, join, coverage issue, accumulating, proceedings, reimburse, resolving, footwear

**Counsel:** **[*1]** For Discover Property & Casualty Insurance Company, Plaintiff: Steven G. Emerson, Thomas H. Davis, LEAD ATTORNEYS, Stinson Morrison Hecker LLP- Walnut, Kansas City, MO.

For Collective Brands, Inc., formerly known as Payless Shoesource, Inc., Payless Shoesource Worldwide, Inc., Collective Licensing International, LLC, Defendants: Matthew K. Corbin, LEAD ATTORNEY, Lathrop & Gage, LC - OP, Overland Park, KS; Michael W. Rhodes, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

**Judges:** Julie A. Robinson, United States District Judge.

**Opinion by:** Julie A. Robinson

## Opinion

## MEMORANDUM AND ORDER

The Court now considers defendants' Collective Brands, Inc. ("CB"), Payless ShoeSource Worldwide, Inc. ("Payless"), and Collective Licensing International, LLC's ("CLI") Motion to Dismiss or Stay Action (Doc. 15). For the reasons explained in detail below, defendants' motion is denied.

### I. Background

Beginning on August 12, 2003, Payless commenced a License Agreement with Airwalk International ("Airwalk"). Airwalk granted to Payless a non-exclusive license to use in the manufacture, distribution, sale, and promotion of the Airwalk brand and products. The License Agreement provides that licensee, here Payless, agrees to indemnify **[*2]** licensor, Airwalk, for any claims and damages for which the indemnified party may become liable, including claims for damages to intellectual property. The License Agreement excludes claims arising "from the use of the Licensed Trademarks or Footwear Designs in accordance with the terms and restrictions of" the License Agreement. The License Agreement also requires Payless to maintain a product liability insurance policy, of which Airwalk is to be listed as an additional insured, with respect to the licensed products, with a limit of no less than $ 3 million. In December 2003, Airwalk, CLI, and Payless entered into an Consent to Assignment wherein Payless assigned the License Agreement to CLI.

Complicating matters is the fact that defendants

2008 U.S. Dist. LEXIS 54705, *2

CB, CLI, and Payless are corporate affiliates. Payless is a wholly-owned subsidiary of CB. CLI is a wholly-owned subsidiary of another corporation, Collective International, which in turn is a wholly-owned subsidiary of CB. CLI is in the business of brand marketing, management, and global licensing. It includes brands such as Vision Street Wear(R), Lamar(R), Sims(R), and many more. The brand at issue in this case is Airwalk(R). CLI owns Airwalk, **[*3]** which it manufactures in China for importation and distribution in the United States. On March 6, 2007, Payless signed an agreement with Collective Partners, LLC, Sunrise Capital Partners, L.P., and Lifestyle Brands, Ltd. to acquire the remaining interest in Collective International, the parent of CLI. Thus, Collective International became a wholly-owned subsidiary of Payless.

Plaintiff Discover Property and Casualty Insurance Company ("Discover") seeks a declaratory judgment that Discover has no duty to defend or indemnify any of the defendants or their affiliated companies for defense costs or expenses associated with the Crocs United States International Trade Commission Infringement Proceeding or the Crocs United States District Court Infringement lawsuit.

Discover, an Illinois insurance company with its principal place of business in Connecticut, provided two commercial liability insurance policies to defendant Payless and CB: (1) Policy D002Q00102, valid from December 1, 2004 at 12:01 AM to December 1, 2005 at 12:01 AM; and (2) Policy D002Q00123, valid from December 1, 2005 at 12:01 AM to December 1, 2006 at 12:01 AM ("Policies"). Under those Policies, CB, Payless, and their affiliates **[*4]** are named as insureds. CLI, however, is not named as an insured. The Policies provide the named insureds with personal and advertising injury insurance coverage with a $ 1 million policy limit, a $ 1 million per occurrence limit, and a self-insured retention of $ 1 million.

The Policies' coverage section provides that Discover "will pay the 'ultimate net loss' [1] in excess

of the 'self-insured retention' [2] because of 'personal and advertising injury' [3] to which this insurance applies." The Policies further state that insurance applies to "'personal and advertising injury' caused by an offense arising out of your business, but only if the offense was committed in the 'coverage territory' during policy period." The Policies exclude from coverage personal and advertising injury:

> (1) [c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury"; [sic] (2) [a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; (3) [a]rising out of oral or written publication of material whose first publication took place **[*5]** before the beginning of the policy period; [and] (4) [a]rising out of criminal act committed by or at the direction of any insured . . . .

---

expenses" associated with those damages. "Claim expenses" means payments allocated to the a claim or suit, including "[a]ttorneys fees and all other litigation expenses . . .[,] reasonable expenses incurred by the insured in the investigation or defense of the claim . . .[,] costs taxed against the insured . . .[, and] [p]re-judgment interest awarded against the insured . . . ." Claim expenses does not include "[s]alaries and expenses of [Discover's] employees or the insured's employees" other than for attorneys, and "[f]ees and expenses of independent claims adjusting organizations hired by" the insured. "Suit" "means a civil proceeding in which damages because of . . . 'personal and advertising injury' to which this insurance applies are alleged." *See* Policy D002Q00102, Section IV-Definitions, 12 & Common Policy Definitions, D (Doc. 1-5).

[2] "Self-insured retention" "means the amount shown in the Declarations you must pay under the **[*6]** Coverage A and Coverage B for 'ultimate net loss' because of all 'bodily injury', [sic] 'property damage' or 'personal and advertising injury' arising out of the same 'incident' before [Discover's] obligation to begin payment commences." *See* Policy D002Q00102, Section IV-Definitions, 10 (Doc. 1-5).

[3] "Personal and advertising injury" is "injury, including consequential 'bodily injury', [sic] arising out of one or more of . . . [t]he use of another's advertising idea in your 'advertisemene'; [sic] or [i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement'." [sic] *See* Policy D002Q00102, Common Policy Definitions, H (Doc. 1-5).

---

[1] "Ultimate net loss" means the sum of the amount the insured becomes legally obligated to pay as damages and the "claim

2008 U.S. Dist. LEXIS 54705, *6

On March 31, 2006, Crocs, Inc. ("Crocs") filed an action with the United States International Trade Commission ("ITC") under section 337 of the Tariff Act of 1930, [4] claiming that CLI had imported for sale foam footwear into the United States in violation of Crocs's 858 and 789 Patents. [5] The complaint further alleges that CLI began selling the allegedly infringing footwear in February 2005, marketing it as Airwalk and that CLI copied the Crocs Trade Dress [6] with the intent to use the goodwill of Crocs to sell its product. This latter [*7] allegation was withdrawn by Crocs and the ITC formally terminated the investigation on that issue. Crocs continues to seek an order from the ITC prohibiting CLI from importing and selling the allegedly infringing footwear in the United States and from being sold for exportation to other countries. The Administrative Law Judge has issued an order against Crocs, finding that the 858 Patent was invalid due to obviousness, and that CLI/Payless did not infringe Crocs's 789 Patent. Crocs has appealed the decision to the ITC.

In addition to filing an action with the ITC, Crocs filed an action in the District Court for the District of Colorado on April 3, 2006. [7] In that action, Crocs alleges that CLI and others infringed upon its 858 and 789 Patents, infringed on Crocs Trade Dress, violated Colorado consumer protection statutes, and unfairly competed with Crocs by "knowingly and purposefully import[ing] infringing products . . . that are distributed [*8] throughout the United States . . . ." The complaint in the District Court action alleges that CLI and others, without authority, imitated the Crocs Trade Dress by trading on Crocs's goodwill and success, resulting in high volume sales. The complaint alleges that CLI willfully and in bad faith infringed 858 and 789 Patents. The complaint goes on to allege that CLI

has sold merchandise that infringes on the Crocs Trade Dress and constitutes a false representation of origin, and that such conduct constitutes deceptive practices under the Colorado Consumer Protection Act. [8] Crocs alleges that CLI has willfully and in bad faith engaged in deceptive trade practices to injure Crocs, and that this activity is unfair competition. The action before the District Court of Colorado has been stayed pending resolution of the action before the ITC. CB and Payless are not named in the action before the District Court or the ITC.

On April 12, 2006, CLI notified Payless that it had been named a defendant in the proceeding before the ITC and the District Court of Colorado. CLI demanded that Payless [*9] and CB, pursuant to the License Agreement and Consent Assignment, provide a defense and indemnify it as to any judgment. On April 13, 2006, Payless notified Discover that it required indemnification for the accumulating attorneys fees and defense it has provided to CLI in the pending actions before the ITC and the Colorado District Court. Payless asserts that the Licensing Agreement obligates it to indemnify CLI, and as a result, Discover is obligated to indemnify Payless. Discover has refused to provide any coverage and the parties have been deadlocked since. In the resulting action before this Court, Discover seeks a declaratory judgment finding that it has no duty to defend or indemnify Payless for the costs incurred in defending CLI or affiliates for "any defense costs, investigative costs, court costs, settlement costs, judgments, or any other costs or expenses associated with or arising from the" ITC proceeding or the District of Colorado action.

## II. Discussion

Defendants assert a number of reasons why this Court should dismiss or stay plaintiff's declaratory judgment action. Defendants claim that the indemnification issues are not ripe for adjudication, and that there is no subject [*10] matter jurisdiction because plaintiff failed to join a

---

[4] *19 U.S.C. § 1337*.

[5] Crocs's patents include United States Patent No. 6,993,858 B2 and No. D517,789.

[6] The Crocs Trade Dress is an image produced by Crocs footwear "typically characterized as colorful foam clogs with a sporty European design.'" (Doc. 5)

[7] *Crocs, Inc. v. Acme EX-IM, Inc., et. al.*, No. 06-CV-00605 (Apr. 3, 2006).

[8] *Colo. Rev. Stat. §§ 6-1-101, et. seq.*

2008 U.S. Dist. LEXIS 54705, *10

necessary and indispensable party. Alternatively, defendants contend that the Court should dismiss or stay the action under the Declaratory Judgment Act ("DJA"), or stay the action pursuant to 28 U.S.C. § 1659. The Court will discuss each argument in turn.

The court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face," [9] or when an issue of law is dispositive. [10] The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not suffice. [11] The court must accept the facts alleged in the complaint as true, even if doubtful in fact, [12] and view all reasonable inferences from those facts in favor of the plaintiff. [13] Viewed as such, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." [14] The issue in resolving such a motion is "not whether [the] plaintiff will ultimately prevail, but whether the claimant [*11] is entitled to offer evidence to support the claims." [15]

## A. Ripeness

Article III's case and controversy requirement of the United States Constitution cautions courts to

not engage in abstract and premature adjudications. [16] One of the doctrines that enables this constitutional mandate is the doctrine of ripeness, which requires controversies to be presented in "clean-cut and concrete form." [17] This inquiry focuses on whether the plaintiff's harm has "matured sufficiently to warrant judicial intervention." [18] When considering whether a claim is ripe for adjudication, the Court must consider a two-part test evaluating the "fitness of the issue for judicial resolution and . . . the hardship to the parties of withholding judicial consideration." [19] [*12] When considering the fitness prong, the Court must ask "'whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" [20] However, "'the contingent nature of the right or obligation in controversy will not bar a litigant from seeking declaratory relief when the circumstances reveal a need for present adjudication.'" [21] The hardship prong requires the Court to ask "'whether the challenged action creates a direct and immediate dilemma for the parties.'" [22]

Defendants [*13] argue that the issues before the Court are not fit for adjudication because they are indemnification issues, and "the law is well-settled

---

[9] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007); Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).

[10] Neitzke v. Williams, 490 U.S. 319, 326, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).

[11] Twombly, 127 S.Ct. at 1964-65.

[12] Id. at 1965.

[13] Tal v. Hogan, 453 F.3d 1244, 1252 (10th Cir. 2006).

[14] Twombly, 127 S.Ct. at 1965 (citations omitted).

[15] Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

[16] U.S. West Inc. v. Tristani, 182 F.3d 1202, 1208 (10th Cir. 1999) (quoting Keyes v. School Dist. No. 1, Denver, Colo., 119 F.3d 1437, 1443 (10th Cir. 1997)).

[17] Id. (quoting New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)).

[18] Kansas Judicial Review v. Stout, 519 F.3d 1107, 1116 (10th Cir. 2008) (quoting Renne v. Geary, 501 U.S. 312, 322, 111 S. Ct. 2331, 115 L. Ed. 2d 288 (1991)).

[19] U.S. West Inc., 182 F.3d at 1208 (citing New Mexicans for Bill Richardson, 64 F.3d at 1499).

[20] Morgan v. McCotter, 365 F.3d 882, 890 (10th Cir. 2004) (quoting New Mexicans for Bill Richardson, 64 F.3d at 1499)).

[21] U.S. Fire Ins. Co. v. Bunge N. Am., Inc., No. 05-2192-JWL, 2006 U.S. Dist. LEXIS 20905, 2006 WL 1007099, at *2 (D. Kan. Apr. 14, 2006).

[22] Morgan, 365 F.3d at 890.

2008 U.S. Dist. LEXIS 54705, *13

that indemnification issues are not ripe for adjudication until the underlying suit for damages has been resolved." Defendants contend that plaintiff's arguments presuppose that the patents at issue are valid and have been infringed. Plaintiff, on the other hand, argues that whether it should indemnify defendants based on the Licensing Agreement is separate and apart from any issues before the District of Colorado or the ITC. Discover notes that the issues of indemnification under the License Agreement can be determined by looking to the License Agreement and issues of coverage can be distilled by looking to the District of Colorado complaint and comparing it to the language in the Policies.

It seems to the Court that there are two issues of indemnification. One issue is whether the Policies cover the alleged infringement by CLI. Another is whether Discover is obligated to reimburse the excess attorney's fees above the $ 1 million retention in the Policies. The Court will discuss the infringement issue first.

Defendants cite to *Park University Enterprises, [*14] Inc. v. American Casualty Co. of Reading, PA*, arguing that indemnification issues are not ripe for adjudication where the underlying issues of liability are unresolved. [23] Discover, however, cites to *Youell v. Grimes*, in which Judge Lungstrum stated that declaratory judgments are sometimes proper "where an insurer seeks a declaration that it will not be liable to indemnify an insured for any damages." [24] In conjunction with a provision in the Policies that excludes from coverage the intentional acts of the insured, Discover argues that the allegations in the Complaint are sufficient for the Court to decide whether the alleged infringement is covered by the Policies.

In *Park University*, as Discover notes, plaintiff conceded that the indemnification issues were not

ripe for adjudication. [25] In that case, the court dismissed the action because there was no case or controversy. [26] In *Youell*, however, the court concluded that a "[d]eclaratory [*15] judgment on the underwriters' liability under the insurance contract . . . [was] appropriate even without a judgment against the insured. [27] Defendants contend that *Youell* is not analogous because there was no underlying case dealing with the same issues pending before another tribunal. Defendants' argument, however, is more suited to why the Court should not exercise its discretion under the Declaratory Judgment Act, not whether the action is ripe for consideration. In any event, Discover's view prevails, and this Court concludes that the coverage issues are ripe for adjudication.

Defendants still argue that resolving the issues in this case would intrude upon the other tribunals' efforts in resolving the pending actions. Again, defendants' arguments miss the mark. There is no uncertainty in resolving the coverage issues. It is clear from the reading of the License Agreement and the Policies that they do not provide coverage for intentional acts. The License Agreement excludes the licensee from indemnifying licensor for "any claims arising directly from use of the Licensed Trademarks or Footwear Designs [*16] in accordance with the terms and restrictions of the" License Agreement. The Policies exclude from coverage personal and advertising injury "caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" As Discover notes, there would be no need to resolve the issues before the ITC or the Colorado District Court; rather, the Court need only decide whether, as alleged in Crocs's complaint, Discover must indemnify defendants for the "Advertising Injury" alleged. [28]

---

[23] *No. 03-2522-KHV, 2006 U.S. Dist. LEXIS 97926, *6 (D. Kan. July 7, 2006)*.

[24] *No. 00-2207-JWL, 2001 U.S. Dist. LEXIS 1613, 2002 WL 121955, at * 3 (D. Kan. Feb. 8, 2001)*.

---

[25] *No. 03-2522-KHV, 2006 U.S. Dist. LEXIS 97926 at *4*.

[26] *2006 U.S. Dist. LEXIS 97926 at *2*.

[27] *Youell, 2001 U.S. Dist. LEXIS 1613, 2002 WL 121955, at *3*.

[28] The Court is aware that it would also have to determine whether CLI was an insured under the Policies. Though that issue is ripe at the moment, determining the coverage issues

2008 U.S. Dist. LEXIS 54705, *16

The claims pending before the ITC and Colorado District Court are entirely separate from the claims before this Court; those tribunals must determine whether there was some type of infringement to Crocs's patents and sales dress, whereas this Court would have to determine whether Discover's Policies provide coverage for the acts alleged **[*17]** by Crocs. Moreover, the Court must view the allegations in the light most favorable to the plaintiff. [29] Accordingly, if Crocs's complaint "alleges only acts that are clearly not covered by the policy, then a declaratory judgment action is proper to determine the issue of coverage." [30]

Whether Discover is obligated to reimburse the accumulated attorney's fees beyond the $ 1 million retention in the Policies is fit for adjudication. Section 15.2 of the License Agreement provides that "Licensee agrees to defend . . . Licensor . . . in respect to any and all actions . . . and all costs and expenses (including, without limitation, reasonable attorney's and experts' fees and expenses and costs associated therewith), which the Indemnified Parties may sustain . . . ." Currently, CLI has surpassed the $ 1 million retention cap and has requested a defense based on the License Agreement and the Policies, arguably activating Discover's obligation to defend.

Defendants argue that because the Colorado suit is stayed, there are currently no attorney's fees **[*18]** accruing. Moreover, adjudicating whether Discover is obligated to reimburse the attorney's fees is premature, depending on the outcome in the ITC and District of Colorado proceedings. Namely, defendants argue, the likelihood that Crocs will amend its complaint in the Colorado District Court shows the futility of any adjudication on the issue. Discover denounces defendants' arguments and asserts that the Court could establish whether there is a duty to defend by simply looking to the Policies and the District of

Colorado complaint. Discover is correct on this point. [31] Indeed, defendants have requested that Discover pay certain amounts in attorney's fees even though the District of Colorado case is stayed and no attorney's fees are accumulating. It can hardly be argued that there is no controversy when defendants have requested that Discover reimburse over $ 1 million in attorney's fees. As such, the Court is convinced that the issue of reimbursement for defense and for continued attorney's fees beyond the $ 1 million retention is ripe for adjudication.

Defendants argue that there is no hardship to Discover in resolving the defense issue now because the proceeding before the District of Colorado is stayed. The Court disagrees. Although the proceeding is stayed, there is still an accumulation of interest on the amount allegedly owed. Requiring Discover to wait, as it notes, would be prejudicial because of the uncertainty of when the issues will be resolved in the District of Colorado case. Moreover, there is an accumulation of attorney's fees for the ITC proceeding, which continues to develop and change.

Defendants suggest that *Morgan v. McCotter*, [32] in which the court held that the issue was not ripe, is similar to the case hand. This Court disagrees. After a career in law enforcement, plaintiff Morgan was appointed Deputy Director of Utah Department of Corrections, a position that was not classified as a "career service employee." [33] Career service employees are tenured employees with a statutory property interest in their employment. [34] A career service employee has **[*20]** the right to certain procedures before termination and the right to

---

and whether CLI is an insured would be futile if the Crocs's District of Colorado action is amended to include Payless.

[29] *Hall v. Bellmon, 935 F.2d 1106, 1109 (10th Cir. 1991)*.

[30] *Am. Ins., Co. v. Powers, No. 02-2403-JWL, 2003 U.S. Dist. LEXIS 1255, 2003 WL 194594, at *2 (D. Kan. Jan. 21, 2003)*.

[31] *See Advantage Homebuilding, LLC v. Maryland Cas. Co., 470 F.3d 1003, 1007 (10th Cir. 2006)* (insurer has a duty to defend "if, based **[*19]** on the pleadings and any facts brought to the insurer's attention or reasonably discoverable during the insurance investigation, there is a potential for liability.").

[32] *365 F.3d 882 (10th Cir. 2004)*.

[33] *Id. at 885*.

[34] *Id.*

appeal to an independent body after termination. [35] Because plaintiff had achieved career service status, he had priority for reassignment to a comparable position when one was available. [36] Plaintiff was terminated but did not seek a comparable position within the government. [37] At trial, plaintiff argued that he had a property interest in his right to be reassigned to a similar position, and the loss of his position as deputy Director resulted in the loss of his priority for reassignment without due process of law. [38] The court concluded that there was no 'direct and immediate dilemma for the parties'" [39] because plaintiff had not requested a position in the public service sector similar to his position. [40]

Here, unlike *Morgan*, there is a direct dilemma because defendants have requested that Discover pay certain amounts above the $ 1 million retention cap in the Policies. In addition, while Morgan did not request a similar position **[*21]** or seem to have any interest in returning to work in the public sector, defendants have already stated their positions for requesting the amount of attorney's fees and costs. As such, defendants cannot argue that the defense issue is not ripe.

## B. Failure to Join a Necessary and Indispensable Non-diverse Party

Defendants argue that there is another reason this Court lacks jurisdiction--Discover's failure to join a necessary and indispensable party. Defendants contend that Zurich American Insurance Company [41] is a necessary and indispensable party; with its principal place of business in Illinois, the same state as Discover, joining Zurich destroys diversity jurisdiction.

*Rule 19 of the Federal Rules of Civil Procedure* "provides a three-step process for determining whether an action should be dismissed for failure to join a purportedly indispensable party." [42] First, the court must determine whether a party is necessary under *Rule 19(a)*. [43] If so, the court **[*22]** must determine whether joinder of the party is feasible, and if not, whether the party is indispensable under *Rule 19(b)*; namely, whether in equity and good conscience the action can continue in the party's absence. [44]

Under *Rule 19(a)(1)*:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. [45]

Under *Rule 19(a)(1)(A)*, defendants assert that complete relief cannot be accorded unless Zurich is added because Payless cannot **[*23]** obtain adjudication of Zurich's liability. *Rule 19(a)(1)(B)* is satisfied because if Discover's view prevails, Zurich's ability to assert that its policies exclude

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id. at 886*.

[39] *Id. at 891* (citing *New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)*).

[40] *Id.*

[41] Discover's Policies terminated on February 1, 2006, the same date that Zurich's policies went into effect. Zurich's

---

policies continued through February 1, 2008. Both insurers' policies provide coverage for "personal advertising injury."

[42] **Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 997 (10th Cir. 2001)** (citing *United States v. Bowen, 172 F.3d 682, 688 (9th Cir. 1999)*).

[43] *Id.*

[44] *Id.*

[45] *Fed. R. Civ. P. 19(a)(1)(A)-(B)(i-ii)*.

2008 U.S. Dist. LEXIS 54705, *23

"first publication" [46] would be impaired. Discover, on the other hand, cites to *Babb v. Mid-America Auto Exchange* [47] and *Salt Lake Tribune Publishing Co. v. AT&T*, [48] in support of its position that Zurich is not needed to accord it and defendants complete relief because the Court need only interpret Discover's Policies, and any subsequent policies held by Zurich on behalf of defendants is not relevant to the issues in this action.

In *Salt Lake Tribune*, the court found that Desert News was not a necessary party because its absence would not prevent plaintiff from obtaining complete relief. [49] The court reasoned that it could simply fashion a remedy in accordance with the court's equitable powers or simply award **[*24]** damages for breach of contract. [50] In addition, the court found that fashioning a remedy that does not impair Desert News's ability to protect its interests or to be free from inconsistent or multiple obligations could easily be completed. [51] In *Babb*, the court concluded that joint tortfeasors are not necessary parties where defendants, if found liable, would seek indemnification or contribution. [52]

In this case, Zurich is not a necessary party, therefore, it cannot be an indispensable party. This case is similar to *Salt Lake Tribune* in that this Court need only interpret Discover's Policies to fashion a remedy for Discover. Defendants' view that the Court would not be able to fashion a

remedy for Zurich because Zurich is not present in the litigation misses the point. It is not a remedy for Zurich that is sought, but one for Discover. Nonetheless, Zurich's remedies are still available, assuming that the positions laid out by defendants are Zurich's positions. Zurich can still move for a declaration that its policies do not provide coverage for certain exclusions and still argue that its policies do not provide coverage **[*25]** for the allegations by Crocs. Yet defendants still argue that if Zurich is not made a party, Payless could be left without coverage for the allegations by Crocs. Again, this is of no relevance to the issue of whether Zurich is a necessary party. Simply put, if Zurich's policies and Discover's Policies exclude certain actions from coverage, then defendants will not be covered. Here, simply interpreting whether Discover's Policies provide coverage does not leave Zurich without grounds to argue that its policies do not provide coverage either.

As Zurich is not a necessary party, there is no need to move on to the second prong, whether Zurich is an indispensable party.

## C. Discretionary Dismissal or Stay under Declaratory Judgment Act

Defendants' final argument is that the Court should stay the proceedings pursuant to the Declaratory Judgment Act. The Declaratory Judgment Act, *28 U.S.C. § 2201*, gives the federal courts authorization "to make a declaration of rights; it did not impose a duty to do so." [53] "Whether to entertain a justiciable declaratory judgment action is a matter committed to the sound discretion of the court." [54] Generally, a federal court should not "entertain a declaratory **[*26]** judgment action over which it has jurisdiction if the same fact-dependent issues are likely to be decided in another pending

---

[46] This provision in the Zurich policies exclude from coverage "'personal and advertising injury' arising out of oral and written publication of material whose first publication took place before the beginning of the policy period."

[47] *No. 06-2230-CM, 2006 U.S. Dist. LEXIS 68578, 2006 WL 2714273 (D. Kan. Sept. 22, 2006)*.

[48] *320 F.3d 1081 (10th Cir. 2003)*.

[49] *Id. at 1097*.

[50] *Id.*

[51] *Id. at 1097-98*.

[52] *Babb, 2006 U.S. Dist. LEXIS 68578, 2006 WL 2714273, at *2*.

---

[53] *Kunkel v. Cont'l Cas. Co., 866 F.2d 1269, 1273 (10th Cir. 1989)* (quoting *Pub. Affairs Assoc., Inc., v. Rickover, 369 U.S. 111, 112, 82 S. Ct. 580, 7 L. Ed. 2d 604 (1962)*).

[54] *Id.* (citing *Ala. State Fed'n of Labor v. McAdory, 325 U.S. 450, 462, 65 S. Ct. 1384, 89 L. Ed. 1725 (1945)*).

proceeding." [55] Similarly, _28 U.S.C. § 1659_ requires a court to stay a civil action if a proceeding involving the same parties and same issues is pending before the ITC, allowing the ITC to determine the issues and avoid duplicative proceedings. [56] Therefore, under the Declaratory Judgment Act and the policy of _§ 1659_, a dismissal or stay is appropriate when the parties of the declaratory judgment action are also parties to another suit involving the same issues.

Defendants liken this case to _Cellco Partnership v. Broadband_, [57] in which the Federal Circuit found that the district court did not abuse its discretion by staying the proceedings pending resolution of the validity of certain patents before the ITC. [58] **[*27]** The district court found that the proceedings raised many of the same issues before the ITC, including the patent issues. [59]

Discover cites to _American States Insurance Co. v. Powers_, [60] claiming that this case is more analogous. The Court again agrees with Discover. In _Powers_, plaintiffs contracted with Powers to build a building. [61] After completion of the building, plaintiffs sued Powers, claiming breach of contract, negligence, fraud, and misrepresentation. [62] Powers's insurance provider, American States Insurance Company, defended Powers with reservation of rights. [63] In a separate proceeding, American filed a declaratory judgment action seeking a declaration that its policy did not provide

coverage and that it had no duty to defend. [64] The court concluded that the declaratory action was proper because there is "simply no potential for liability under the policy issued to Mr. Powers and the facts alleged by the [plaintiffs] in the underlying action." [65] Citing _State Farm & Casualy Co. v. Finney_, [66] the court found that "in determining whether there is a 'potential for liability,' the insurer must examine the allegations in the **[*28]** complaint; for if the complaint alleges only acts that are clearly not covered by the policy, then a declaratory judgment action is proper to determine the issue of coverage." [67]

Without prejudging the action, the Court notes that the complaint in the District of Colorado case makes a number of allegations, including that defendants "knowingly and purposefully" imported infringing products, that defendants' infringement of the patents is willful, and that defendants engaged in this activity to intentionally injure Crocs. The Policies at issue exclude from coverage personal and advertising injury "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another. . . ." In this case, the Court can simply interpret the Policies at issue, including an analysis of the District of Colorado complaint. As such, a stay under the Declaratory Judgment Act or _§ 1659_ is not appropriate.

## D. Motion for Attorney's Fees

Defendants also seek attorney's **[*29]** fees, claiming that Kansas law provides that when an insurer files a declaratory action against an insured and loses, it is required to pay attorney's fees. This request is denied as premature because Discover has neither lost its declaratory action nor has the Court dismissed or stayed the action.

---

[55] _Id. at 1276_ (quoting _Brillhart V. Excess Ins. Co., 316 U.S. 491, 495, 62 S. Ct. 1173, 86 L. Ed. 1620 (1942))_.

[56] _In re Princo Corp, 478 F.3d 1345, 1356 (Fed. Cir. 2007)_.

[57] _227 Fed. App'x 889, 890 (Fed. Cir. 2007)_.

[58] _Id._

[59] _Id._

[60] _No. 02-2403-JWL, 2003 U.S. Dist. LEXIS 1255, 2003 WL 194594 (D. Kan. Jan. 21, 2003)_.

[61] _2003 U.S. Dist. LEXIS 1255, [WL] at *1_.

[62] _Id._

[63] _Id._

---

[64] _Id._

[65] _2003 U.S. Dist. LEXIS 1255, [WL] at *2_.

[66] _244 Kan. 545, 553-54, 770 P.2d 460 (1989)_.

[67] _Powers, 2003 U.S. Dist. LEXIS 1255, 2003 WL 194594, at *2_ (citing _Finney, 244 Kan. at 553-54_).

2008 U.S. Dist. LEXIS 54705, *29

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Collective Brands, Inc., Payless ShoeSource Worldwide, Inc., and Collective Licensing International, LLC's Motion to Dismiss or Stay Action (Doc. 15) is DENIED.

**IT IS SO ORDERED.**

Dated this 15th day of July 2008.

/s/ Julie A. Robinson

Julie A. Robinson

United States District Judge

---

End of Document

✚ Positive
As of: August 13, 2021 5:13 PM Z

## *Gilbert-Mitchell v. Gerlach*

United States District Court for the Western District of Oklahoma

September 22, 2017, Decided; September 22, 2017, Filed

Case No. CIV-17-732-HE

**Reporter**

2017 U.S. Dist. LEXIS 204276 *

WALLACE GILBERT-MITCHELL, Plaintiff, v. JIM GERLACH, et al., Defendants.

**Subsequent History:** Adopted by, Dismissed by, in part, Dismissed by, in part, As moot, Dismissed without prejudice by, in part *Gilbert-Mitchell v. Gerlach, 2017 U.S. Dist. LEXIS 203205 (W.D. Okla., Dec. 11, 2017)*

Magistrate's recommendation at *Gilbert-Mitchell v. Gerlach, 2018 U.S. Dist. LEXIS 222471 (W.D. Okla., Dec. 28, 2018)*

## Core Terms

sexual assault, allegations, individual capacity, assault, monetary damages, inmate, conditions of confinement, conditions, declaratory relief, injunctive relief, fail to protect, deprivation, quotation, failure to protect, subjective component, official capacity, prison official, due process, Recommendation, confinement, jail, moot, marks, deliberate indifference, corrective action, pro se, declaration, inhumane, guards, cell

**Counsel:** [*1] Wallace Gilbert-Mitchell, Plaintiff, Pro se, Washington, DC.

**Judges:** SHON T. ERWIN, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** SHON T. ERWIN

## Opinion

## REPORT AND RECOMMENDATION

Plaintiff Wallace Gilbert-Mitchell, appearing *pro se* and *in forma pauperis*, brings this action under *42 U.S.C. § 1983*, alleging a violation of the *Eighth Amendment*. (ECF No. 1). Chief United States District Judge Joe Heaton referred this matter to the undersigned magistrate judge for initial proceedings consistent with *28 U.S.C. § 636(b)(1)(B)-(C)*. A review of the complaint has been conducted pursuant to *28 U.S.C. § 1915A(a)* and *28 U.S.C. § 1915(e)(2)(B)*. Based on that review, it is recommended that the Court: (1) dismiss, as moot, the claims for injunctive relief against both Defendants; (2) dismiss, with prejudice, the claims for declaratory relief against both Defendants; (3) dismiss, without prejudice, the official capacity claims for monetary damages against both Defendants; (4) dismiss, without prejudice, the individual capacity damages claim based on a theory of "Punishment Without Due Process;" (5) conclude that Plaintiff has stated a valid individual capacity *Eighth Amendment* claim against Defendant Owings for monetary damages based on the alleged sexual assault; (6) dismiss, without prejudice, the individual capacity *Eighth Amendment* claim for monetary damages against [*2] Defendant Gerlach based on the theory that he failed to protect Plaintiff from being sexually assaulted; (7) conclude that Plaintiff has stated a valid individual capacity *Eighth Amendment* claim against Defendant Gerlach for monetary damages based on a theory that Defendant Gerlach had failed to protect Plaintiff after gaining knowledge of the sexual assault; and (8) dismiss, without prejudice, Plaintiff's individual capacity claims for monetary damages against Defendant Gerlach alleging unconstitutional conditions of confinement for failure to state a

2017 U.S. Dist. LEXIS 204276, *2

claim.

# I. SCREENING REQUIREMENT

The Court must review each complaint in which a prisoner seeks redress against a governmental entity, officer, or employee. *28 U.S.C. § 1915A(a)*. The Court likewise must review each case brought by a prisoner with respect to prison conditions and each case in which a plaintiff proceeds *in forma pauperis*. *42 U.S.C. § 1997e(c)(1)*; *28 U.S.C. § 1915(e)(2)*. The Court is required to dismiss the complaint or any portion of the complaint that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See 28 U.S.C. §§ 1915A(b), 1915(e)(2)(B)*; *42 U.S.C. § 1997e(c)(1)*.

# II. STANDARD OF REVIEW

The Court must accept Plaintiff's allegations as true and construe **[*3]** them, and any reasonable inferences to be drawn from them, in the light most favorable to Plaintiff. *See Kay v. Bemis, 500 F.3d 1214, 1217 (10th Cir. 2007)*. Since Plaintiff is proceeding *pro se*, his complaint must be construed liberally. *See id. at 1218*. The Court "review[s] the complaint for plausibility; that is, to determine whether the complaint includes enough facts to state a claim to relief that is plausible on its face." *Young v. Davis, 554 F.3d 1254, 1256 (10th Cir. 2009)* (quotations and citation omitted).

A complaint fails to state such a claim when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (footnote and citation omitted). Bare legal conclusions in a complaint, however, are not assumed to be true; legal conclusions "must be supported by factual allegations" to state a claim upon which relief may be granted. *Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

"[A] pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*; *see also Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997)* (noting that although courts construe *pro se* pleadings liberally, courts "will not supply **[*4]** additional factual allegations to round out a plaintiff's complaint"). Whether a complaint contains sufficient facts to avoid dismissal is context-specific and is determined through a court's application of "judicial experience and common sense." *Iqbal, 556 U.S. at 679*; *see also Gee v. Pacheco, 627 F.3d 1178, 1184-85 (10th Cir. 2010)* (discussing *Iqbal*).'

# III. PLAINTIFF'S CLAIMS AND NAMED DEFENDANTS

Mr. Gilbert-Mitchell's lawsuit is based on allegations that he was sexually assaulted and exposed to inhumane conditions of confinement while in the Grady County Law Enforcement Center (GCLEC). (ECF No. 1:6-8). Plaintiff names two Defendants: GCLEC Warden, Jim Gerlach and GCLEC Guard, FNU Owings. (ECF No. 1:1, 4, 6-7). Plaintiff asserts claims involving: punishment without due process; cruel and unusual punishment; failure to protect; and a violation of the *Prison Rape Elimination Act* (PREA) (ECF No. 1:6-8). Mr. Gilbert-Mitchell sues Defendants Gerlach and Owings in their official and individual capacities and seeks monetary damages, as well as injunctive and declaratory relief. (ECF No. 1:4, 7, 8).

# IV. CLAIMS FOR INJUNCTIVE RELIEF

Mr. Gilbert-Mitchell alleges that while incarcerated at GCLEC, he was sexually assaulted and subjected to inhumane conditions of confinement. **[*5]** (ECF No. 1:6-8). As one form of relief, Plaintiff seeks "an injunction and/or temporary restraining order to bar Defendants from operating GCLEC." (ECF No. 1:7-8). The Court

2017 U.S. Dist. LEXIS 204276, *5

should dismiss the request for injunctive relief as moot.

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Institute, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)*. As noted by the United States Supreme Court, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton, 414 U. S. 488, 495-96, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)*.

Mr. Gilbert-Mitchell is currently incarcerated in a Washington, D.C. jail. (ECF No. 1-1). As a result, Plaintiff is no longer subject to being under the custody and/or control of either Defendant or any official at GCLEC. Because Mr. Gilbert-Mitchell has been transferred from GCLEC to another state, the presence of ongoing, adverse consequences related to **[*6]** either Defendant does not exist. Under similar circumstances, courts have routinely dismissed "penitentiary-specific" conditions-of-confinement claims seeking injunctive relief as moot. *See Sossamon v. Texas, 563 U.S. 277, 304, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011)* ("A number of . . . suits seeking injunctive relief have been dismissed as moot because the plaintiff was transferred from the institution where the alleged violation took place prior to adjudication on the merits."); *accord Abdulhaseeb v. Calbone, 600 F.3d 1301, 1311 (10th Cir. 2011)* (dismissing claims for injunctive relief as moot, stating: "Because Mr. Abdulhaseeb has been transferred away from OSP and GPCF, it appears that . . . injunctive relief will not be available against [these Defendants].").

**V. CLAIMS FOR DECLARATORY RELIEF**

Plaintiff also seeks declaratory relief against the Defendants in the form of: "a declaration that Plaintiff's rights were violated." (ECF No. 1:7-8). The Court should dismiss the request for declaratory relief with prejudice.

"It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion—is the settling of some dispute which affects the behavior of *the defendant toward the plaintiff*." *Jordan v. Sosa, 654 F.3d 1012, 1025 (10th Cir. 2011)* (emphasis in original). In other words, "where a **[*7]** plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in his complaint." *Id.* "The ultimate question is whether declaratory relief will have some effect in the real world." *Van Deelen v. Fairchild, 2005 U.S. Dist. LEXIS 30503, 2005 WL 3263885, at *7 (D. Kan. 2005)* (citing *Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000))*. However, the mere fact that a plaintiff's requested relief would give satisfaction that he was wronged in the past, does not create an actual, live controversy. *Id.* (citing *Bauchman v. West High Sch., 132 F.3d 542, 548-49 (10th Cir. 1997))*.

If the Court were to declare that Defendants had violated Mr. Gilbert-Mitchell's constitutional rights, such declaration would not "affect[ ] the behavior of [D]efendant[s] toward [P]laintiff," because Defendants would not be required to take any course of action. *See Rhodes v. Stewart, 488 U.S. 1, 4, 109 S. Ct. 202, 102 L. Ed. 2d 1 (1988)*. In other words, Mr. Gilbert-Mitchell is seeking a retrospective opinion that Defendants wrongfully harmed him, which is an impermissible use of a declaratory judgment. *See Ashcroft v. Mattis, 431 U.S. 171, 172, 97 S. Ct. 1739, 52 L. Ed. 2d 219 (1977)* (holding that a claim for declaratory relief was moot where the "primary claim of a present interest in the controversy is that [the plaintiff] will obtain emotional satisfaction from [the] ruling"); *Green v. Branson, 108 F.3d 1296, 1299 (10th Cir. 1997)* ("This 'legal interest' must be more than simply the satisfaction of a declaration **[*8]** that a

2017 U.S. Dist. LEXIS 204276, *8

person was wronged.").

Plaintiff's request for declaratory relief simply does not state "a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pacific Coal and Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)*. As a result, the Court should dismiss Plaintiff's claim requesting a declaration that his constitutional rights were violated. The dismissal shall be with prejudice because Plaintiff cannot amend his complaint to overcome the established law with respect to retrospective declaratory relief. *See Oxendine v. Kaplan, 241 F.3d 1272, 1275 (10th Cir. 2001)* (dismissal with prejudice appropriate "where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend.").

## VI. OFFICIAL CAPACITY CLAIMS

Mr. Gilbert-Mitchell seeks liability for various constitutional violations against Defendants Gerlach and Owings in their official capacities. (ECF No. 1:4). The Court should dismiss these claims, without prejudice.

A suit against a local government official in his official capacity is treated as a suit against the local government itself. *See Cox v. Glanz, 800 F.3d 1231, 1254 (10th Cir. 2015)* (holding that a suit against a county employee in his or her official capacity is "the equivalent of a suit against [the] County" **[*9]** (internal quotation marks omitted)). Thus, to succeed on the claims against Defendants Gerlach and Owings, Plaintiff must allege that they: (1) "committed a constitutional violation" and (2) a Grady County "policy or custom was the moving force behind the constitutional deprivation." *Campbell v. City of Spencer, 777 F.3d 1073, 1077 (10th Cir. 2014)* (internal quotation marks omitted). Mr. Gilbert-Mitchell has not made any discernable allegations involving Grady County's policies or customs—he only alleges that he was sexually assaulted and exposed to inhumane conditions of confinement while in the GCLEC. (ECF No. 1:6-8). Therefore, Plaintiff has failed to state a claim for

relief under *42 U.S.C. § 1983* against Defendants Gerlach and Owings in their official capacities, and the Court should dismiss these claims, without prejudice.

## VII. INDIVIDUAL CAPACITY CLAIMS

With the recommendations, what remains are claims against both Defendants in their individual capacities for monetary relief. To state an individual capacity claim for monetary damages, Plaintiff must sufficiently plead personal involvement, causation, and state of mind. *Schneider v. City of Grand Junction Police Dept., 717 F.3d 760, 767 (10th Cir. 2013)*. Also, a defendant may be liable in a supervisory capacity if the plaintiff demonstrates that the defendant: (1) promulgated, created, implemented, **[*10]** or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm and (3) acted with the state of mind required to establish the alleged constitutional deprivation. *Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)*. To prove liability in a supervisory capacity, the plaintiff must also identify the specific policies over which the defendants possessed responsibility that led to the alleged constitutional deprivation. *Pahls v. Thomas, 718 F.3d 1210, 1226 (10th Cir. 2013)*.

Plaintiff alleges: (1) both Defendants wrongfully punished Plaintiff without Due Process, (2) Defendant Owings sexually assaulted Plaintiff while in the Grady County Jail, (3) Defendant Gerlach failed to protect Plaintiff against the sexual assault, (4) Defendant Gerlach failed to "take any corrective action" once notified of the assault, and (5) Defendant Gerlach subjected Plaintiff to various inhumane conditions of confinement. (ECF No. 1:6-8).

## A. Claims for Wrongful Punishment Without Due Process

In the complaint, Plaintiff alleges a claim against both Defendants for: "Punishment Without Due Process." (ECF No. 1:6-7). But in the body of the complaint, Mr. Gilbert-Mitchell has not made any

2017 U.S. Dist. LEXIS 204276, *10

allegations regarding wrongful punishment or that he was denied any particular **[\*11]** process. *See* ECF No. 1. Plaintiff's failure to elaborate on the specifics of this claim renders the claim legally deficient. *See Nasious v. Two Unknown B.I.C.E. Agents, at Arapahoe County Justice Center, 492 F.3d 1158, 1163 (10th Cir. 2007)* (explaining "that, to state a claim in federal court, a complaint must explain what each defendant did to [the pro se plaintiff]; when the defendant did it; how the defendant's action harmed (the plaintiff); and, what specific legal right the plaintiff believes the defendant violated."). Accordingly, the Court should dismiss, without prejudice, Plaintiff's claims of "Punishment Without Due Process" for failure to state a claim.

## B. Claim Against Defendant Owings

Plaintiff alleges one claim against Defendant Owings: "On or about March 10, 2016, Defendant Owings (phonetic "Owens") did sexually assault Plaintiff by forcibly performing oral sex, on Plaintiff in a secluded area of GCLEC." (ECF No. 1:7).

The *Eighth Amendment's* prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including "adequate food, clothing, shelter, and medical care," and to "take reasonable measures to guarantee the safety of the inmates *Farmer v. Brennan, 511 U.S. 825, 833, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape **[\*12]** of one prisoner by another serves no legitimate penological objectiv[e], any more than it squares with evolving standards of decency." *Id. at 833-34* (internal citations and quotation marks omitted). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id. at 834* (internal citations and quotation marks omitted).

"The test for constitutional liability" under the *Eighth Amendment* "involves both an objective and a subjective component." *Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005)* (internal quotation marks omitted). Regarding the objective component, the "prisoner must first [show] . . . that the deprivation at issue was in fact 'sufficiently serious.'" *Mata, at 751 (10th Cir. 2005)* (quoting *Farmer, 511 U.S. at 834*). The subjective component requires a plaintiff to show "the prison official's culpable state of mind" and this element may be satisfied with allegations the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* So, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." *Id.* (quotation omitted).

Mr. Gilbert-Mitchell has alleged that Defendant Owings sexually assaulted Plaintiff while **[\*13]** he was an inmate in the GCLEC. (ECF No. 1:7). Sexual assault satisfies the "objective component" required to state an *Eighth Amendment* claim. *See Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008)* ("There is no question that sexual assault of the kind suffered by Ms. Tafoya meets this objective component of an *Eighth Amendment* claim."); *Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993)* ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards."). And Plaintiff's allegations that Defendant Owings "forcibly" committed the assault are sufficient to satisfy the *Eighth Amendment's* "subjective component." Accordingly, at this stage, the Court should conclude that Plaintiff has stated an individual capacity *Eighth Amendment* claim for monetary damages against Defendant Owings for sexual assault.

## C. Claims Against Defendant Gerlach

Plaintiff has alleged that Defendant Gerlach violated the *Eighth Amendment* by: (1) failing to protect Mr. Gilbert-Mitchell against the sexual assault committed by Defendant Owings, (2) failing to "take any corrective action" following the alleged assault, or separate Plaintiff from Defendant Owings, and (3) subjecting Plaintiff to various inhumane conditions of confinement. (ECF No. 1:6-7).

2017 U.S. Dist. LEXIS 204276, *13

**Failure to Protect/Take Corrective Action**

As stated, the *Eighth Amendment* protects prisoners against cruel and unusual **[*14]** punishment, which includes a duty on prison officials to protect prisoners in custody from violence. *Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. "To establish a cognizable *Eighth Amendment* claim for failure to protect an inmate from harm . . ., the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." *Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)* (quotation and brackets omitted). Under the subjective component, the official must "actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837*.

Additionally, in order to successfully assert a *§ 1983* claim for failure to protect, a plaintiff must show personal involvement or participation in the incident. *Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)*. Supervisor status alone is insufficient to support liability. *Id.* A supervisor is not liable under *§ 1983* for the actions of a subordinate unless an "affirmative link" exists between the constitutional deprivation and either the supervisor's personal participation or his failure to supervise. *Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008)*, *Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir.1993)*.

Here, Plaintiff's allegations against Defendant Gerlach under a "failure to protect" theory **[*15]** are two-fold: (1) that Defendant Gerlach failed to protect him from being sexually assaulted by Defendant Owings; and (2) that after Plaintiff informed Defendant Gerlach of the assault, he failed to take any "corrective action," including separating Plaintiff from Defendant Owings. (ECF No. 1:7).

Without question "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the *Eighth Amendment*." *Keith v. Koerner, 707 F.3d 1185, 1188 (10th Cir. 2013)*. However, the Court should dismiss Plaintiff's claim that Defendant Gerlach failed to protect Plaintiff from the sexual assault before it occurred because Mr. Gilbert-Mitchell has failed to allege that Defendant Gerlach was personally involved in the incident or had acted with the requisite deliberate indifference to state an *Eighth Amendment* claim.

Plaintiff does not allege that Defendant Gerlach had been personally involved in the assault or was aware of circumstances from which he could have inferred that a sexual assault was likely to occur. Likewise, Mr. Gilbert-Mitchell has not alleged that Defendant Gerlach should be held liable in a supervisory role for failing to properly supervise Defendant Owings. Accordingly, the Court should dismiss, without prejudice, **[*16]** Plaintiff's claim against Defendant Gerlach for liability under the *Eighth Amendment*, for "failure to protect" him from being sexually assaulted.

However, after the sexual assault allegedly occurred, Mr. Gilbert-Mitchell alleges a "secondary" theory of liability against Defendant Gerlach for "failure to protect." Plaintiff states that after informing Defendant Gerlach that the assault had occurred, he failed to "take any corrective action, or separate Plaintiff from Owings." (ECF No. 1:7). The Court should conclude that these allegations are sufficient to state a claim.

In *Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008)*, the plaintiff had alleged liability against a county sheriff under the *Eighth Amendment* after being sexually assaulted by a county jail guard under the sheriff's employ. *Tafoya, 516 F.3d at 914-916*. On appeal, the Tenth Circuit Court of Appeals reversed the district court's grant of summary judgment to the defendant-sheriff. *Id. at 917-922*. Three years prior to the assault in *Tafoya*, other, similar claims of sexual assault had been made against officials at the same County Jail. *Id. at 915-916*. As a result, the defendant-sheriff in *Tafoya* had taken steps to remedy the risk of sexual assault by guards against inmates. *Id.* However, the Tenth Circuit found that a factual

2017 U.S. Dist. LEXIS 204276, *16

dispute existed, which precluded **[\*17]** summary judgment for the sheriff on the *Eighth Amendment* claim, based on evidence that the sheriff: (1) had failed to enforce policies implemented to reduce the opportunity for sexual assault to occur in the future, (2) knew that "blind spots" existed which were out of range of security cameras installed to prevent sexual assaults, and (3) continued to hire guards with criminal backgrounds. *Id. at 917-923*.

Based on *Tafoya*, the Court should conclude Plaintiff has stated a claim under the *Eight Amendment* for "failure to protect"—i.e.—take proper corrective measures after the assault occurred. Mr. Gilbert-Mitchell has alleged that after the assault occurred, he notified Defendant Gerlach, who thereafter failed to separate Plaintiff from Defendant Owings. (ECF No. 1:7). Based on the allegations of a prior sexual assault, a reasonable person could infer that another assault might occur if Plaintiff was not separated from Defendant Gerlach. The undersigned is not suggesting that any such assault occurred or was likely to occur, but at this stage, the possibility exists that with the knowledge of the prior assault, Defendant Gerlach could be liable for a potential future assault on Plaintiff by failing to separate the two men or take other **[\*18]** corrective measures. As a result, the Court should conclude that Plaintiff has stated a valid individual capacity *Eighth Amendment* claim against Defendant Gerlach for monetary damages based on a theory that Defendant Gerlach had failed to protect Plaintiff after gaining knowledge of the sexual assault.

## Conditions of Confinement

The *Eighth Amendment* requires jail officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998)*; *see also Ramos v. Lamm, 639 F.2d 559, 568 (10th Cir. 1980)* holding that prison officials must provide "reasonably adequate ventilation, sanitation, bedding, hygiene materials, and utilities (*i.e.* hot and cold water, light,

heat, and plumbing")). To hold a prison official personally liable for violating an inmate's right to humane conditions of confinement, a plaintiff must satisfy two requirements, consisting of a subjective and an objective component. *See id.* The subjective component is satisfied only if the "'[prison] official knows of and disregards an excessive risk to inmate health and safety.'" *Barney, 143 F.3d at 1310* (*quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*). "It is not enough to establish that the official should have known of **[\*19]** the risk of harm." *Id.* The objective component requires that the alleged deprivation be "sufficiently serious." *See Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)*. Jail conditions may be "'restrictive and even harsh'" without violating constitutional rights. *Barney, 143 F.3d at 1311* (*quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*). "[O]nly those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an *Eighth Amendment* violation." *Wilson, 501 U.S. at 298* (internal quotation marks and citation omitted).

Mr. Gilbert-Mitchell alleges that Defendant Gerlach violated the *Eighth Amendment* due to a litany of conditions of confinement present at the GCLEC. Plaintiff states:

> On or about February 18, 2016 and continuing to March 20, 2016 Gerlach forced Plaintiff into a cell designed for 2 inmates, with 3 other inmates; burned the lights in the cells 24 hours; provided no shower; no out-of-cell recreation; no outside recreation; no outside light into the cell; no change of underwear; no change of bedsheets; no medical services from a physician; no eating utensils; saturated the cell with cold air condition during winter season; forced plaintiff to cell with multiple different races of inmates and active gang members; blocked the inmate telephones so that plaintiff could not make collect calls **[\*20]** to his attorney, family members; or the United States Inspector General's Hotline; and offered no mental health services.

(ECF No. 1:8-9).

2017 U.S. Dist. LEXIS 204276, *20

The Court should conclude that Plaintiff's allegations are too conclusory to demonstrate either the objective or subjective components of a valid conditions of confinement claim. As the Tenth Circuit has stated: "[P]laintiff must do more than claim a foul. He must state with sufficient particularity what the foul involved, who was involved, and when and where it took place. It is not sufficient to use legal jargon and bald conclusions." *Moore v. Trapp, No. 90-7077, 1991 U.S. App. LEXIS 10683, 1991 WL 65074 at *2 (10th Cir. 1991)* (affirming dismissal of *§ 1983* complaint alleging *inter alia* overcrowding, plumbing problems, no physical exercise, no lights, no personal sanitation, inadequate diet and lack of access to the courts); *Robinson v. Gibson, Nos. 98-7145, 98-7149, 98-7193, 99-7028 and 99-7030, 1999 U.S. App. LEXIS 29508, 1999 WL 1009497 at *2 (10th Cir. 1999)* (affirming dismissal of prisoner's *§ 1983* conditions of confinement claim alleging the roof leaked, portions of the ceiling were caving in, raw sewage flowed through the area, the electrical wiring was dangerous and the food was not hot and sometimes contained insects as such allegations were too conclusory).

While Plaintiff has alleged (in very general terms) that **[*21]** the conditions of his confinement at the GCLEC were unconstitutional, he has not alleged any facts to show how these conditions had adversely affected him. Because Plaintiff states "no specific facts connecting the allegedly unconstitutional conditions with his own experiences [at the Center], or indicating how the conditions caused him injury" *Swoboda v. Dubach, 992 F.2d 286, 289 (10th Cir. 1993)*, his conclusory allegations are insufficient to state a claim for relief. *Id. at 289-90*. *See also Dittmeyer v. Whetsel, 91 Fed. Appx. 111, 2004 WL 249618 at *7 (10th Cir. 2004)* (unpublished op.) (dismissing *§ 1983* claims alleging unconstitutional conditions of confinement where plaintiff failed to allege any actual injury resulted from the unsanitary conditions about which he complained).

Moreover, Plaintiff fails to allege that the deprivations he suffered were the result of Defendant Gerlach's deliberate indifference to his safety or intent to punish him. There are no facts in the complaint to support an allegation that Defendant Gerlach had acted with sufficiently culpable state of mind, and no facts indicating that Defendant Gerlach disregarded or ignored Plaintiff's safety. *See, e.g., Galloway v. Whetsel, 124 Fed. Appx. 617, 2005 WL 459598 at *2 (10th Cir. 2005)* (dismissal of *§ 1983* claims alleging unsanitary conditions of confinement was proper where plaintiff alleged no facts demonstrating evidence of defendant's **[*22]** deliberate indifference to his personal health or safety); *Aston v. Cunningham, No. 99-4156, 2000 U.S. App. LEXIS 14379, 2000 WL 796086 at *4 (10th Cir. 2000)* (pretrial detainee's *§ 1983* claim alleging, *inter alia*, "he never saw the sun for a nine-month period in 1995; he was forced to sleep on the floor without a mattress or blanket and roaches crawled over him while he slept; he was forced to wear the same clothes and underwear for three to six weeks at a time; he was not given hygiene items and was unable to shave or shower; . . . he was denied his outgoing and incoming mail, reading materials and access to a law library; . . . the jail building in which he lived was condemned, human feces leaked from the ceiling, the sewer system overflowed into the shower and he had no fresh air or 'outside relief' during his entire incarceration" was properly dismissed where prisoner "failed to allege or to present facts tending to show that any of the [named] defendants knew of and disregarded an excessive risk of harm to him."). The Court will not infer an improper motive on the part of Defendant Gerlach without some factual allegations to support such an inference. *See, e.g., Shifrin v. Fields, 39 F.3d 1112, 1114 (10th Cir. 1994)* ("Absent allegations of 'deliberate indifference' by prison officials and of a 'specific deprivation' of a 'human need,' **[*23]** an *Eighth Amendment* claim based on prison conditions must fail.") (*quoting Wilson, 501 U.S. at 303-05*). For these reasons, Plaintiff's claims regarding the conditions of his confinement should be dismissed for failure to state a claim upon which relief can be granted.

## VIII. RECOMMENDATION

Upon preliminary review of Plaintiff's claims, the Court should: (1) dismiss, as moot, the claims for

2017 U.S. Dist. LEXIS 204276, *23

injunctive relief against both Defendants; (2) dismiss, with prejudice, the claims for declaratory relief against both Defendants; (3) dismiss, without prejudice, the official capacity claims for monetary damages against both Defendants; (4) dismiss, without prejudice, the individual capacity damages claim based on a theory of "Punishment without Due Process;" (5) conclude that Plaintiff has stated a valid individual capacity *Eighth Amendment* claim against Defendant Owings for monetary damages based on the alleged sexual assault; (6) dismiss, without prejudice, the individual capacity *Eighth Amendment* claim for monetary damages against Defendant Gerlach based on the theory that he failed to protect Plaintiff from being sexually assaulted; (7) conclude that Plaintiff has stated a valid individual capacity *Eighth Amendment* claim against Defendant Gerlach for monetary damages based on a theory **[*24]** that Defendant Gerlach had failed to protect Plaintiff after gaining knowledge of the sexual assault; and (8) dismiss, without prejudice, Plaintiff's individual capacity claims for monetary damages against Defendant Gerlach alleging unconstitutional conditions of confinement for failure to state a claim.

For the claims dismissed without prejudice, Mr. Gilbert-Mitchell should be granted leave to file an amended complaint to cure the deficiencies through additional allegations consistent with the discussion above. *See Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 806 (10th Cir. 1999)*. In proposing dismissal with leave to amend, Plaintiff is hereby reminded of his obligations under *Rule 11 of the Federal Rules of Civil Procedure*.

## IX. NOTICE OF RIGHT TO OBJECT

Plaintiff is hereby advised of his right to object to this Report and Recommendation. *See 28 U.S.C. § 636*. Any objection must be filed with the Clerk of the District Court by **October 10, 2017**. *See 28 U.S.C. § 636(b)(1)*; and *Fed. R. Civ. P. 72(b)(2)*. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal questions contained herein. *Casanova v. Ulibarri, 595 F.3d 1120, 1123 (10th Cir. 2010)*.

## X. STATUS OF THE REFERRAL

This Report and Recommendation does not terminate the referral to the undersigned magistrate judge in the captioned matter.

ENTERED on September 22, 2017.

/s/ Shon T. Erwin

SHON **[*25]** T. ERWIN

UNITED STATES MAGISTRATE JUDGE

---

*End of Document*

◆ Positive
As of: August 13, 2021 5:18 PM Z

# *Hamlin v. Smith*

United States District Court for the District of Colorado

July 12, 2010, Decided; July 12, 2010, Filed

Civil Action No. 07-cv-01058-CBS-KMT

**Reporter**

2010 U.S. Dist. LEXIS 69205 *; 2010 WL 2740119

JOJO HAMLIN, Plaintiff, v. CHERYL SMITH, Assistant Warden, CURTIS ROBINETTE, Programs Manager, ALAN TRUJILLO, Security Captain, and, Defendants.

**Prior History:** *Hamlin v. Smith, 2010 U.S. Dist. LEXIS 27703 (D. Colo., Mar. 24, 2010)*

## Core Terms

alleges, religion, inmates, substantial burden, summary judgment, religious, charcoal, constitutional right, observances, wand, qualified immunity, religious practice, religious belief, tablets, indoor, rights, exercise of religion, chalk, burning, notices, weather, individual capacity, injunctive relief, regulation, nonmoving, quotation, sincerely, burdened, prison, marks

**Counsel:  [*1]** JoJo Hamlin, Plaintiff, Pro se, Las Animas, CO.

For Cheryl Smith, Assistant Warden, Curtis Robinette, Program Manager, Alan Trujillo, Security Major, Defendants: James Xavier Quinn, Colorado Attorney General's Office-Employment Law, Denver, CO.

**Judges:** Craig B. Shaffer, United States Magistrate Judge.

**Opinion by:** Craig B. Shaffer

## Opinion

MEMORANDUM OPINION AND ORDER

This civil action comes before the court on

"Defendants' Renewed Motion for Summary Judgment" (filed April 30, 2010) (doc. # 115). On October 8, 2009, the above-captioned case was referred to Magistrate Judge Craig B. Shaffer to handle all dispositive matters including trial and entry of a final judgment in accordance with *28 U.S.C. 636(c)*, *Fed. R. Civ. P. 73*, and *D.C. COLO. LCivR 72.2*. (*See* doc. # 91). The court has reviewed the Motion, the exhibits and affidavits, the entire case file, and the applicable law and is sufficiently advised in the premises.

I. Statement of the Case

The events forming the basis of this civil action occurred at the Fort Lyon Correctional Facility ("FLCF") of the Colorado Department of Corrections. Mr. Hamlin is currently incarcerated in the Bent County Correctional Facility ("BCCF"). Proceeding *pro se*, Mr. Hamlin filed his initial **[*2]** 19-page Complaint on or about May 21, 2007 pursuant to *42 U.S.C. § 1983*, alleging eight claims against Cheryl Smith, Curtis Robinette, Alan Trujillo, Rae Timmie, Daniel Barbero, Lou Archuleta, and Aristedes Zavaras. (*See* doc. # 3). At the court's direction (*see* doc. # 10), Mr. Hamlin filed his 25-page Amended Complaint on July 13, 2007, against all of the same Defendants except Defendant Barbero. (*See* doc. # 11). Mr. Hamlin alleged denial of his right to practice his religion, in violation of his rights under the Religious Freedom Restoration Act ("RFRA"), *42 U.S.C. § 2000bb et seq.,* the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), *42 U.S.C. §§ 2000cc-2000cc-5*, the Colorado Constitution, and the United States Constitution. [1] Mr. Hamlin seeks

---

[1] RFRA does not apply to state actors such as the Defendants

2010 U.S. Dist. LEXIS 69205, *2

various forms of relief, including monetary damages "for pain and suffering." (*See id.*).

On August 27, 2008, Magistrate Judge Tafoya filed a "Recommendation of United States Magistrate Judge" on Defendants' Motion to Dismiss Plaintiff's Amended Complaint. (*See* doc. # 53). After no party objected, on September 10, 2008, District Judge Nottingham granted in part and denied in part Defendants' Motion. District Judge Nottingham dismissed with prejudice Mr. Hamlin's claims against all Defendants in their official capacities as barred by the *Eleventh Amendment*, dismissed with prejudice Claims Two, Six, Seven, and Eight as barred by the *Eleventh Amendment*, dismissed Defendant Smith in her individual **[*4]** capacity from Claim Four for failure to allege personal participation, dismissed Defendants Timmie, Archuleta, and Zavaras from the Amended Complaint for failure to allege personal participation, dismissed with prejudice all Defendants in their individual capacities under RLUIPA, dismissed with prejudice Mr. Hamlin's damages claims under RLUIPA, dismissed with prejudice Mr. Hamlin's state law claims for lack of jurisdiction, and permitted this action to proceed as to Claims One, Three, Four, and Five for injunctive relief and an award of nominal damages in the sum of one dollar pursuant to *§ 1983* and RLUIPA. (*See* "Order Accepting Magistrate Judge's Recommendation" (doc. # 54).

On October 31, 2008, upon the resignation of District Judge Nottingham, this case was

here. On June 25, 1997, the Supreme Court invalidated RFRA as it applied to the states, holding that Congress had exceeded its powers under the *Fourteenth Amendment's* enforcement clause. *City of Boerne v. Flores, 521 U.S. 507, 536, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997)*. In September 2000, Congress responded **[*3]** with RLUIPA, *42 U.S.C. §§ 2000cc to cc-5*. RLUIPA does not change the holding of *City of Boerne, 521 U.S. at 507*.

To the extent Mr Hamlin alleges violation of the Colorado Constitution, "*Section 1983* does not . . . provide a basis for redressing violations of state law, but only for those violations of federal law done under color of state law." *Jones v. City & County of Denver, Colo., 854 F.2d 1206, 1209 (10th Cir.1988)*; *see also Malek v. Haun, 26 F.3d 1013, 1016 (10th Cir.1994)* (It is well established that a claim cannot be brought under *§ 1983* for an alleged violation of state law.).

reassigned to District Judge Krieger. (*See* doc. # 65). On October 8, 2009, District Judge Krieger determined that while the parties' consent to the availability of a Magistrate Judge to exercise jurisdiction was untimely, "the parties have unanimously expressed their desire to proceed before a Magistrate Judge." (*See* doc. # 91). Judge Krieger referred this case to Magistrate Judge Watanabe "for all purposes pursuant to *28 U.S.C. § 636(c)* **[*5]** and *D.C. COLO. LCivR 72.2*." (*See id.*). On October 27, 2009, Magistrate Judge Watanabe issued his "Order Directing Reassignment to Another Magistrate Judge," based on his assignment to the case between July 26, 2007 and January 9, 2008 (*See* doc. # 95). On October 28, 2009, the case was reassigned to Magistrate Judge Shaffer. This civil action is proceeding on the Amended Complaint (doc. # 11), as modified by the court's Order (doc. # 54), to the extent that Mr. Hamlin may be entitled to injunctive relief and/or an award of nominal damages pursuant to *§ 1983* based on his *First Amendment* rights against Defendants in their individual capacities and pursuant to RLUIPA against Defendants in their official capacities on: (1) Claim One against Defendants Robinette and Trujillo; (2) Claim Three against Defendants Smith, Robinette, and Trujillo; (3) Claim Four against Defendants Robinette and Trujillo; and (4) Claim Five against Defendants Smith, Robinette, and Trujillo.

Mr. Hamlin alleges he started practicing the Wiccan Faith in 2003, prior to his incarceration at FLCF. (*See* Amended Complaint ("AC") (doc. # 11) at p. 4 of 25). Mr. Hamlin's remaining claims all relate to his inability to practice **[*6]** his religion, alleging violation of his rights under the *First Amendment* and RLUIPA. (*See* doc. # 11). In Claim One, Mr. Hamlin alleges he "has been denied his constitutional right to practice his religion due to the Defendants' failure to post notice" of the Wiccan services. (*See id.* at p. 8 of 25). Mr. Hamlin alleges that Defendants Smith and Robinette were to ensure he had the opportunity to participate in the practice of his religion by publishing a schedule of the group services as required by AR 800-01. (*See id.* at PP 34-35).

In Claim Three, Mr. Hamlin alleges he "has been

placed under fear and threat that if he exercises his constitutional right to practice his religion he will suffer a penalty." (*See* doc. # 11 at p. 12 of 25). Mr. Hamlin asserts that Defendant Trujillo led him to believe he will be retaliated against for practicing his religion. (*See id.* at P 83). Mr. Hamlin alleges the Wiccan congregation was strip-searched and given drug tests at the conclusion of a service on September 16, 2006. (*See id.* at P 19). Mr. Hamlin contends the Wiccan Faith Group is being treated differently than other religious groups at FLCF that have not been strip-searched or subjected to urinalysis **[*7]** at the conclusion of their services. (*See id.* at PP 84, 86).

In Claim Four, Mr. Hamlin alleges he "has been denied his constitutional right to practice his religion by being denied ritual tools and supplies." (*See* doc. # 11 at p. 13 of 25). Mr. Hamlin states he has been denied chalk, candles, quarters, a wand, and charcoal, all used to practice his religion. (*See id.* at PP 89-99).

In Claim Five, Mr. Hamlin alleges that to attend Wiccan services, he is required "to endure the harsh, unhealthy weather conditions." (*See id.* at p. 14 of 25). Mr. Hamlin alleges that the Wiccan Faith Group was given an indoor faith group area, but after a couple of meetings Defendants Trujillo and Robinette informed the group that they could no longer burn herbs and oils indoors. (*See id.* at PP 105, 107). Mr. Hamlin states his inability to tolerate cold has forced him to miss several Wiccan services and denied him the ability to practice his religion. (*See id.* at PP 109, 110).

Defendants move for summary judgment pursuant to *Fed. R. Civ. P. 56* on all of Mr. Hamlin's remaining claims.

II. Standard of Review

> Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party **[*8]** is entitled to a judgment as a matter of law.
> To meet the burden of production required to support summary judgment, the movant need only point to those portions of the record that demonstrate an absence of a genuine issue of

material fact given the relevant substantive law. Summary judgment will then lie if the movant establishes entitlement to judgment as a matter of law given [the] uncontroverted, operative facts. . . . Factual disputes that are irrelevant or unnecessary will not be counted.

> Where a movant has met the initial burden required to support summary judgment, the non-movant then must either establish the existence of a triable issue of fact under *Fed.R.Civ.P. 56(e)* or explain why he cannot . . . under *Rule 56(f)*. Conclusory allegations made by a non-movant will not suffice. Instead, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein.

*Diaz v. Paul J. Kennedy Law Firm, 289 F.3d 671, 674-75 (10th Cir. 2002)* (citations omitted).

At a hearing on April 30, 2010, with Mr. Hamlin present via telephone, the court directed that Mr. Hamlin's response to Defendants' **[*9]** Renewed Motion for Summary Judgment be filed on or before May 24, 2010. (*See* Courtroom Minutes/Minute Order (doc. # 113)). As of this date, Mr. Hamlin has not filed any response to Defendants' Motion. *Fed. R. Civ. P. 56(e)* specifically contemplates the consequences of failing to oppose a summary judgment motion:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided by this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

*See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 160-61, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)* (the burden on the nonmovant to respond arises only if the summary judgment motion is properly "supported" as required by *Rule 56(c)*), *superseded on other grounds by Celotex Corp. v.*

2010 U.S. Dist. LEXIS 69205, *9

*Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "Accordingly, summary judgment is 'appropriate' under *Rule 56(e)* only when the moving party has met its initial burden of production under *Rule 56(c)*." *Murray v. City of Tahlequah, Oklahoma, 312 F.3d 1196, 1200 (10th Cir. 2002)*. **[*10]** "If the evidence produced in support of the summary judgment motion does not meet this burden, summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (internal quotation marks and citation omitted). "If the nonmoving party fails to respond, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Id. See also Barton v. City and County of Denver, 432 F. Supp. 2d 1178, 1188 (D. Colo. 2006)* (although plaintiff's failure to make a substantive response constituted a confession of facts asserted by defendants, it remained incumbent upon the court to make the specific determinations required under *Rule 56(c)*).

As Mr. Hamlin submitted the AC sworn under penalty of perjury (*see* doc. # 11 at p. 19 of 25), the court may treat it as an affidavit. *Green v. Branson, 108 F.3d 1296, 1301 n. 1 (10th Cir. 1997)*. *See also Conaway v. Smith, 853 F.2d 789, 792 (10th Cir. 1988)* ("Although a nonmoving party may not rely merely on the unsupported or conclusory **[*11]** allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in *Rule 56(e)*.")*. "*Rule 56(e)* requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein." *Conaway, 853 F.2d at 792*. Where the court treats a verified affidavit in opposition to summary judgment is "sufficient to create a genuine issue of material fact must be evaluated in light of the principle that 'conclusory allegations without specific supporting facts have no probative value.'" *Nichols v. Hurley, 921 F.2d 1101, 1113 (10th Cir. 1990)* (quoting *Evers v. General Motors Corp., 770 F.2d 984, 986*

*(11th Cir. 1985))*. "[T]here may be cases where the sole reliance on a verified complaint would be insufficient to meet a nonmoving party's burden . . . , especially when the allegations contained in the pleading are merely conclusory." *Conaway, 853 F.2d at 792-93*. The court must determine whether Mr. Hamlin has met his burden of presenting specific **[*12]** facts to overcome Defendants' Motion.

III. Analysis

A. Claim One

Mr. Hamlin alleges that Defendants Robinette and Trujillo denied his constitutional right to practice his religion due to their failure to post notice of Wiccan services according to Colorado Department of Corrections ("CDOC") Administrative Regulations on February 7, 2006, March 3, 2006, March 20, 2006, May 1, 2006, November 2006, January 2007, and March of 2007. (*See* AC (doc. # 11) at PP 6, 32-35). Defendants argue that Mr. Hamlin's allegations fail to state and the evidence fails to show a violation under either the *First Amendment* or RLUIPA.

"It is well-settled that '[i]nmates . . . retain protections afforded by the *First Amendment*, including its directive that no law shall prohibit the free exercise of religion.'" *Kay v. Bemis, 500 F.3d 1214, 1218 (10th Cir. 2007)* (quoting *O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987))*. "Yet such protections are not without reasonable limitations." *Kay, 500 F.3d at 1218*. "The Supreme Court has cautioned that prison inmates are also subject to the 'necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal **[*13]** system.'" *Kay, 500 F.3d at 1218* (quoting *O'Lone, 482 U.S. at 348*). *See also Overton v. Bazzetta, 539 U.S. 126, 131, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003)* ("An inmate does not retain rights inconsistent with proper incarceration."). "Accordingly, the Court has held that a prison regulation imping[ing] on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." *Kay, 500 F.3d at 1218* (internal quotation marks and citation

omitted). *See also* *Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)* ("What constitutes a reasonable opportunity is determined in reference to legitimate penological objectives.") (internal quotation marks and citation omitted); *Hammons v. Saffle, 348 F.3d 1250, 1254-55 (10th Cir. 2003)* ("Inmates' free exercise rights are . . . subject to prison restrictions rationally related to legitimate penological interests."). Prison administrators, not the courts, should "make the difficult judgments concerning institutional operations . . . ." *Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)*. *See also* *Shaw v. Murphy, 532 U.S. 223, 229-30, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001)* (in the *First Amendment* context "some rights are simply inconsistent with the status of a prisoner or 'with the **[*14]** legitimate penological objectives of the corrections system'") (quoting *Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974))*.

"Thus, in order to allege a constitutional violation based on a free exercise claim, a prisoner-plaintiff must survive a two-step inquiry." *Kay, 500 F.3d at 1218*. "First, the prisoner-plaintiff must first [sic] show that a prison regulation 'substantially burdened . . . sincerely-held religious beliefs.'" *Kay, 500 F.3d at 1218* (quoting *Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007))*. "Second, prison officials-defendants may 'identif[y] the legitimate penological interests that justif[ied] the impinging conduct.'" *Kay, 500 F.3d at 1218* (quoting *Boles, 486 F.3d at 1182*). "The burden then returns to the prisoner to 'show that these articulated concerns were irrational.'" *Kay, 500 F.3d at 1219 n. 2* (quoting *Salahuddin v. Goord, 467 F.3d 263, 275 (2d Cir. 2006))*.

"At that point, courts balance the factors set forth in *Turner v. Safley, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)*, to determine the reasonableness of the regulation: (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether **[*15]** alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the

right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Kay, 500 F.3d at 1219* (citation omitted).

To proceed with his RLUIPA claim, Mr. Hamlin "must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb, 600 F.3d at 1312* (citations omitted).

[A] religious exercise is substantially burdened under [RLUIPA] when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice-an illusory **[*16]** choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

*Abdulhaseeb, 600 F.3d at 1315* (citations omitted). If Mr. Hamlin fails to demonstrate a substantial burden, the inquiry ends. Even if Mr. Hamlin meets the substantial burden test, "it does not necessarily follow that [he] has established a RLUIPA violation." *Abdulhaseeb, 600 F.3d at 1318*. "Rather, the burden of proof shifts to the Defendants to show the substantial burden results from a compelling governmental interest and that the government has employed the least restrictive means of accomplishing its interest." *Abdulhaseeb, 600 F.3d at 1318* (internal quotation marks and citation omitted).

First, to the extent that Mr. Hamlin alleges violation of his constitutional rights based on Defendants' failure to comply with CDOC Administrative Regulations regarding posting of notices for services, violation of a prison regulation does not

state a constitutional claim under *§ 1983*. *See Hovater v. Robinson, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993)* ("failure to adhere to administrative regulations does not equate to a constitutional violation"). *See also Gaines v. Stenseng, 292 F.3d 1222, 1225 (10th Cir. 2002)* **[\*17]** ("[t]o the extent [plaintiff] seeks relief for alleged violations of state statutes and prison regulations, . . . he has stated no cognizable claim under *§ 1983*") (citations omitted).

Second, the evidence indicates that written notices specifically naming Mr. Hamlin were posted and that postings and notification were sent over the television titler device at FLCF. (*See* Affidavit of Curtis Robinette, Defendants' Exhibit A to Motion (doc. # 115-1) at p. 3 of 114, PP7-9; Exhibit A-4 (doc. # 115-1 at pp. 10-89 of 114); Exhibit A-5 (doc. # 115-1 at pp. 90-99 of 114); Exhibit A-6 (doc. # 115-1 at pp. 100-09 of 114)). Mr. Hamlin has alleged that Defendants failed to post notices for services for Imbolc Sabat and the Full Moon Rite on February 7, 2006 and for the Full Moon Rite on March 3, 2006. (*See* AC (doc. # 11) at P 6). The CDOC's calendar indicates that Imbolc Sabat was on February 2, 2006 and the Full Moon Rite was on February 13, 2006 and March 14, 2006. (*See* doc. # 115-1 at pp. 31, 56, 91 of 114). Mr. Hamlin has not presented any evidence regarding the significance of the other dates he alleges in the AC. Defendants have also presented evidence that notices were posted on March 6, **[\*18]** 2006 for Ostara Sabat on March 20, 2006, on April 27, 2006 for Beltane Sabat on May 1, 2006, on October 23, 2006 for the Full Moon Rite on November 5, 2006, on December 26, 2006 for the Full Moon Rite on January 3, 2007, and on February 27, 2007 for the Full Moon Rite on March 3, 2007. (*See* doc. # 115-1 at pp. 2-3, 33, 58, 82, 90, 92-95, 100, 102, 105-06 of 114). Mr. Hamlin has not refuted Defendants' evidence that the notices were posted. The court concludes that Mr. Hamlin does not state or establish a violation of either the *First Amendment* or RLUIPA in Claim One.

B. Claim Three

Mr. Hamlin alleges that Defendant Trujillo has led "Mr. Hamlin to firmly believe he will be retaliated against for practicing his religion with other Wicca Members" by subjecting the Wicca Faith Group to strip search and drug testing. (*See* AC (doc. # 11) at PP 81-87). Mr. Hamlin makes no allegations in Claim Three regarding any other Defendants. As noted above, in order to establish a constitutional violation of his right to free exercise of religion, the plaintiff bears the burden of demonstrating that the restriction substantially burdened his sincerely-held religious beliefs. *Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007)*.

This **[\*19]** claim lacks evidentiary support. While Defendant Trujillo had two offenders searched and drug screened because he detected an odor of marijuana immediately following a Wicca service, Mr. Hamlin was not at the service and was not searched or tested. (*See* Affidavit of Albert Trujillo, Exhibit B to Defendants' Motion (doc. # 115-2 at PP 6-7). No searches or drug tests of Wicca Faith Group members have since occurred. (*See id.*). Thus, Mr. Hamlin fails to establish a substantial burden on his religious practices.

Further, verbal harassment or threats, without some reinforcing act accompanying them, fail to state a constitutional claim. *Maclean v. Secor, 876 F. Supp. 695, 699 (E.D. Pa. 1995)* (citing *Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)* ("Verbal harassment or abuse of the sort alleged in this case [sheriff threatened to hang prisoner] is not sufficient to state a constitutional deprivation under *42 U.S.C. § 1983*.")). Finally, Mr. Hamlin's allegations are conclusory. In order to state a valid claim of retaliation, a plaintiff must "allege specific facts showing retaliation [on account] of the exercise of the prisoner's constitutional rights," *Frazier v. Dubois, 922 F.2d 560, 562 n. 1 (10th Cir. 1990)*, **[\*20]** and "prove that 'but for' the retaliatory motive, the incidents to which [the inmate] refers, . . . would not have taken place." *Smith v. Maschner, 899 F.2d 940, 949-50 (10th Cir. 1990)*. Mr. Hamlin has not alleged or produced evidence that but for retaliatory motivation the complained-of conduct would not have occurred. Nor has Mr. Hamlin alleged or demonstrated a chronology of events from which retaliation may plausibly be inferred. The court concludes that Mr. Hamlin does not state or establish a violation of either the *First*

2010 U.S. Dist. LEXIS 69205, *20

*Amendment* or RLUIPA in Claim Three.

C. Claim Four

Mr. Hamlin alleges that Defendants Trujillo and Robinette denied his constitutional right to practice his religion by denying ritual tools and supplies. (*See* AC (doc. # 11) at PP 88-102).

Mr. Hamlin alleges that he was not provided with a wand. (*See* doc. # 11 at P 93 ("Mr. Hamlin's ability to perfect his Wicca practice is obstructed by CDOC not permitting him access to obtain a wand for his use."); *see also* PP 11 ("[t]he wand Mr. Hamlin is required to purchase from CDOC . . . is not acceptable. . . CDOC does not give Mr. Hamlin the ability to purchase wands made of rowan, ash, willow, oak, maple, etc.")). Prison **[*21]** regulations permit Mr. Hamlin to possess a wand. (*See* doc. # 115-1 at pp. 30, 34, 55, 59, 81, 89 of 114). However, prisons do not have an affirmative duty to provide religious materials or other religious articles free of charge to inmates. *See Cutter v. Wilkinson, 544 U.S. 709, 720 n. 8, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)* ("RLUIPA does not require a State to pay for an inmate's devotional accessories."). RLUIPA does not require governments to affirmatively subsidize religion. *Abdulhaseeb, 600 F.3d at 1321* (citing *Mayweathers v. Newland, 314 F.3d 1062, 1068-69 (9th Cir.2002)* (holding RLUIPA constitutional under the *Establishment Clause* because "[i]t does not impose affirmative duties on states that would require them to facilitate or subsidize the exercise of religion")). While Mr. Hamlin's preference is for a different type of wand, he does not present evidence suggesting that his religious practice is substantially burdened by type of the wand that is available for purchase in the prison canteen. Mr. Hamlin has not shown that being denied the type of wand of his choosing caused him to be subjected to a deprivation that significantly hampered his religious practice. *See Smith v. Allen, 502 F.3d 1255, 1277 (11th Cir. 2007)* **[*22]** ("to constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice"). As to his allegations that he was denied a proper wand, Mr. Hamlin has failed to demonstrate a violation of the *First Amendment* or RLUIPA

because he has not shown that the practice of his religious beliefs was substantially burdened.

Mr. Hamlin also alleges that he was not permitted to chalk his circle on an indoor carpet floor, but was instead told to chalk a circle on a large piece of cardboard. (*See* doc. # 11 at PP 89-91). FLCF provides space and time for services for all religious preferences and the facility needs to keep the rooms neutral for all uses. (*See* doc. # 115-2 at P 13). Inmates who were participating in the Wicca celebration were not allowed to use chalk to mark the carpet because chalk was difficult to remove from the carpet, and other religious services were planned to be held in the same room. (*See id.* at P 10). The Wicca group was provided with a large piece of cardboard so that they could draw a chalk circle on the cardboard rather than drawing it on the carpet. (*See id.* at P 11).

Mr. Hamlin must show that Defendants' conduct imposed a **[*23]** substantial burden on his religious practice. *Abdulhaseeb, 600 F.3d at 1312-15* (applying RLUIPA); *Gallagher v. Shelton, 587 F.3d at 1069-70* (applying *Free Exercise Clause*). "[A]t a minimum the substantial burden test requires . . . more than an inconvenience to one's religious practice." *Abdulhaseeb, 600 F.3d at 1316*. *See also Smith v. Allen, 502 F.3d 1255, 1277 (11th Cir. 2007)* ("We have previously defined a substantial burden as being significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. . . [I]n order to constitute a substantial burden on religious practice, the government's action must be more than . . . incidental and must place more than an inconvenience on religious exercise.") (internal quotation marks and citation omitted).

Mr. Hamlin has not presented evidence that casting a circle with chalk is significant enough to Wiccan practitioners that any limitation necessarily imposed a substantial burden on his religious exercise. *See Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003)* (a substantial burden is one that bears a direct, primary and fundamental responsibility for rendering **[*24]** religious exercise effectively impracticable). The evidence shows no more than

Case No. 1:21-cv-01269-KAS    Document 79-1    filed 06/13/22    USDC Colorado    pg
44 of 141

Page 8 of 10
2010 U.S. Dist. LEXIS 69205, *24

an inconvenience. All that is required is a reasonable opportunity to practice one's religion and the evidence does not support a claim that Defendants denied Mr. Hamlin such an opportunity. The evidence does not establish that the limitation that the Wiccans cast their circle with chalk on a large piece of cardboard rather than the carpet substantially burdened Mr. Hamlin's exercise of his religion.

Mr. Hamlin further alleges that Wiccans were denied charcoal for two services, on "June 10" and "June 20th." (*See* doc. # 11 at P 97). In 2007, a change in policy occurred regarding inmates' possession of charcoal. The Swift-Lite Charcoal Tablets ordered from the religious catalog had been on the canteen list and inmates could take them to their cells. (*See* doc. # 115-1 at p. 4 of 114, P 12). In June 2007, Swift-Lite Charcoal Tablets ordered from the religious catalog were determined to be contraband and were not to be allowed in the possession of inmates due to the incendiary capabilities. (*See id.* at pp. 4, 109-112 of 114). The charcoal tablets were in the individual inmates' possession for use in the June 10, [*25] 2007 service. (*See id.* at p. 4 of 114, P 13). On June 11, 2007, the Warden requested that Defendant Robinette investigate which inmates had charcoal tablets in their possession. (*See id.* at p. 4 of 114, P 11). Mr. Hamlin was not one of the two inmates who had charcoal tablets. (*See id.* at p. 4 of 114, P 11). The charcoal tablets were confiscated from the two inmates on June 11, 2007. (*See id.* at p. 4 of 114, P 13). The inmates donated the tablets to the Wicca Faith Group for use at scheduled services. (*See id.* at pp. 4, 112 of 114). The charcoal tablets are an allowable faith group item and are required to be stored with other faith group property. (*See id.* at p. 4 of 114, P 12). A locked storage area was established to store Wicca Faith Group property. (*See id.* at p. 4, P 14; pp.111-12 of 114).

The evidence indicates that the charcoal tablets were in the possession of individual Wiccan Faith Group members for use in the June 10, 2007 service. (*See* doc. # 115-1 at p. 4 of 114, P 13). Mr. Hamlin's allegation that the Wiccan Faith Group was denied the charcoal for the June 20th

service fails to state a claim. This single isolated incident is not sufficient to implicate the Constitution [*26] or substantially burden Mr. Hamlin's exercise of his religion. *See White v. Glantz, 986 F.2d 1431 (10th Cir. 1993)* (finding that an isolated occurrence did not violate a Muslim inmate's *First Amendment* rights). *See also Hankins v. NYS Dept. of Correctional Services, 2008 U.S. Dist. LEXIS 68978, 2008 WL 2019655 *6 (N.D.N.Y. 2008)* ("Courts have found that causing a prisoner to miss one religious service does not constitute a violation of RLUIPA."). [2] Mr. Hamlin does not argue or demonstrate that the deprivation of charcoal on one occasion on June 20, 2007 prevented him from exercising his religious beliefs. [3]

In sum, Mr. Hamlin has not established a violation of either the *First Amendment* or RLUIPA in Claim Four.

**D. Claim Five**

Mr. Hamlin alleges that due to prohibitions on burning "herbs/oils to cleanse the service/worship area," the Wicca Faith Group did not have access to the indoor worship area during certain periods of inclement weather. (*See* [*27] AC (doc. # 11) at PP 26, 103-110). Mr. Hamlin alleges that inclement weather "coupled with Mr. Hamlin[']s inability to tolerate cold, caused Mr. Hamlin to miss the Full Moon Esbats for November 2006, December 2006, January 2006, February 2006, and March 2006, the Yule Sabat in December, the Imbolc Sabat in February, and the Wicca monthly study service from November 2006 to March 2007." (*See* AC (doc. # 11) at P 109). Mr. Hamlin alleges that "[n]ot having access to an environmentally safe indoor Wiccan Service area, has denied Mr. Hamlin the ability to practice his religion." (*See* AC (doc. # 11) at P 110).

Again, Mr. Hamlin must show that Defendants'

---

[2] Copies of unpublished decisions cited are attached to this Recommendation.

[3] Mr. Hamlin has not presented any allegations or evidence of the significance of candles and quarters, such that any limitation on those items imposed a substantial burden on his religious exercise.

2010 U.S. Dist. LEXIS 69205, *27

conduct imposed a substantial burden on his religious practice. *Abdulhaseeb, 600 F.3d at 1312-15*; *Gallagher v. Shelton, 587 F.3d at 1069-70*. FLCF provides a room designated for religious services to be used by all faith groups. (*See* doc. # 115-2 at p. 3 of 9, P 13). FLCF does not have sufficient rooms and space to have separate facilities for each religion. (*See id.*). AR 800-01 provides that the Wiccan Faith Group prefers to gather outdoors for Holy Day observances, but that indoor observances are also appropriate. (*See* doc. # 115-1 at pp. **[*28]** 3, 30, 55, 81, of 114; *see also* p. 5 of 114, P 18). When Holy Day observances take place in cold weather, the Shift Commander had the authority to move the group inside. (*See* doc. # 115-1 at p. 3 of 114, P 19). "When the group is moved inside for the Holy Day observance, there would be no burning of herbs allowed because of the prohibition on burning in state buildings." (*See* doc. # 115-1 at p. 5 of 114, P 19).

Mr. Hamlin has not refuted the evidence that Wiccan Faith Group observances were permitted to take place indoors in inclement weather, *albeit* without burning any herbs or oils. To the extent that Mr. Hamlin alleges that he missed several Wiccan observances in 2006 and 2007, he alleges nothing more than occasional and insubstantial inconveniences to his practice of his religion due to the weather, the ban on burning indoors, and his "inability to tolerate cold." There were numerous other Wiccan observances available to him in 2006 and 2007. (*See* doc. # 115-1 at pp. 31-33, 56-58, 82-87 of 114). "In addition to the services provided for in AR 800-01, FLCF also provides two hours per month for Wiccan participants to gather." (*See* doc. # 115-1 at p. 3 of 114, P 10). Mr. Hamlin's allegations **[*29]** do not support and he has not presented any evidence to establish a substantial burden on his religious practice. *See, e.g., Smith v. Graziano, 2010 U.S. Dist. LEXIS 33811, 2010 WL 1330019 at * 9 (N.D.N.Y. 2010)* ("[T]he cancellation of two religious services is a *de minimis,* or insubstantial, burden on an inmate's ability to freely exercise his religion.") (citations omitted). Mr. Hamlin has not alleged or demonstrated that the Wiccan observances did not take place, only that burning was not permitted at indoor observances

and that he did not attend some outdoor observances due to cold weather. The court concludes that Mr. Hamlin has not established a violation of either the *First Amendment* or RLUIPA in Claim Five.

E. Claim for Injunctive Relief

Defendants argue that Mr. Hamlin's claim for injunctive relief is moot because he was transferred from FLCF to BCCF and is no longer under the custody or control of any of the Defendants.

> Article III delimits the jurisdiction of federal courts, allowing us to consider only actual cases or controversies. [A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. In deciding whether a case is moot, the crucial question is **[*30]** whether granting a present determination of the issues offered will have some effect in the real world. When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot.

*Abdulhaseeb v. Calbone, 600 F.3d 1301, 1311 (10th Cir. 2010)* (internal quotation marks and citations omitted). Because Mr. Hamlin has been transferred away from FLCF, "it appears that . . . injunctive relief will not be available" against the FLCF Defendants. *Abdulhaseeb, 600 F.3d at 1311* (citations omitted). Mr. Hamlin's claim for injunctive relief is moot.

F. Qualified Immunity

Defendants assert the defense of qualified immunity. In an action brought under *§ 1983*, the doctrine of qualified immunity protects government officials who perform discretionary government functions from liability for civil damages and the obligation to defend the action. *See Johnson v. Fankell, 520 U.S. 911, 914, 117 S. Ct. 1800, 138 L. Ed. 2d 108 (1997)* ("officials performing discretionary function[s], generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known") (quoting

2010 U.S. Dist. LEXIS 69205, *30

*Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. **[\*31]** "When the defense of qualified immunity is raised in a summary judgment motion, the Plaintiff bears the burden to show both that each Defendant's action violated a constitutional right, and that that right was clearly established at the time of the conduct." *Murphy v. Gardner, 413 F. Supp. 2d 1156, 1162 (D. Colo. 2006)*. Although a plaintiff must ultimately establish both elements to avoid application of the doctrine, the court has discretion to consider the elements in any order. *See Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L. Ed. 2d 565 (2009)*; *Green v. Post, 574 F.3d 1294, 1299 (10th Cir. 2009)*.

As to Mr. Hamlin's constitutional claims, because the court has concluded in this Recommendation that the evidence, even viewed in the light most favorable to Mr. Hamlin, is insufficient to establish that Defendants violated his constitutional rights, Defendants in their individual capacities are entitled to qualified immunity from Mr. Hamlin's claims brought pursuant to *§ 1983*. *See Wilder, 490 F.3d at 815* (instructing district court on remand to enter judgment in favor of defendant on basis of qualified immunity, where plaintiff failed to carry his burden to show violation of a constitutional right).

Because **[\*32]** the court previously concluded that RLUIPA does not permit a claim against Defendants in their individual capacities (*see* doc. # 54), the court need not address the secondary question of whether they would be entitled to a defense of qualified immunity as to the RLUIPA claim. *See Sossamon, 560 F.3d at 327* ("if no private right of action exists against the defendants in their individual capacities, then a qualified immunity . . . analysis would be unnecessary."); *Smith v. Allen, 502 F.3d at 1275* (stating that the qualified immunity defense only applies when the defendant is sued individually)).

Accordingly, IT IS ORDERED that "Defendants' Renewed Motion for Summary Judgment" (filed April 30, 2010 (doc. # 115) is GRANTED. Judgment shall enter on all remaining claims in the Amended Complaint (doc. # 11) in favor of

Defendants and against Plaintiff.

DATED at Denver, Colorado, this 12th day of July, 2010.

BY THE COURT:

/s/ Craig B. Shaffer

United States Magistrate Judge

---

End of Document

⚠️ Caution
As of: August 13, 2021 5:11 PM Z

# *Jones v. Barry*

United States Court of Appeals for the Tenth Circuit

April 25, 2002, Filed

No. 01-2092

**Reporter**
33 Fed. Appx. 967 *; 2002 U.S. App. LEXIS 7620 **

MACEO JONES, Plaintiff - Appellant, v. MARION S. BARRY, Mayor; MARGARET MOORE, Director, District of Columbia Department of Corrections; DOC R. CRANT, President and Chairman, Corrections Corporation of America; WILLIS GIBSON, Warden, Corrections Corporation of America; ADRIENNE POTEAT, Assistant Director, Corrections Corporation of America; ROB ADAMS, Chief of Security; DARREN SWENSON, Chief of Security; T. ROBINSON, Captain Shift Supervisor; DENISE YOUNG, Classification Supervisor; DENISE KING, Program Classification Supervisor; JAY SMITH, Assistant Warden of Programs; JIMMY TURNER, Warden; JASON D. MEDLIN, Captain Shift Commander; JOHN/JANE DOE, also known as Officer Cunningham, also known as Sgt. Crawford, also known as Lt. Thomas; DONALD DORSEY, Warden, Torrance County Correctional Facility; J. PRESTON, Sergeant, Torrance County Correctional Facility; CLIFFORD HARRIS, Correctional Officer, Torrance County Correctional Facility; EDWARD HINES, Assistant Commanding Officer, Torrance County Correctional Facility; ARTHUR L. JOHANNES, Officer, Torrance County Correctional Facility; WAYNE A. RICE, Officer, Torrance County Correctional Facility; JOHN/JANE DOE, Commander, Torrance County Correctional Facility, also known as Oberge; FELIX GONZALES, Correctional Officer, Torrance County Correctional Facility; KIMBERLY BULLOCK, Correctional Officer, Torrance County Correctional Facility; JOHN/JANE DOE, Commander, Torrance County Correctional Facility, also known as Carpenter; JOHN PENNYCUFF, Security, Torrance County Correctional Facility; ANN GARCIA, Director of Programs, Torrance County Correctional Facility; JUAN IBARRA, Unit Manager, Torrance County Correctional Facility;

TRE O'BRIEN, Hospital Administrator, Torrance County Correctional Facility; JUDY MARROW, Nurse, Torrance County Correctional Facility; JANE DOE, Nurse, Torrance County Correctional Facility, also known as Elaine; RUSTY SMITH, Chaplain, Torrance County Correctional Facility, Defendants - Appellees.

**Notice: [**1]** RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** Dismissed by, Without prejudice, Motion denied by, As moot *Jones v. Barry, 2003 U.S. Dist. LEXIS 30543 (D.N.M., Oct. 27, 2003)*

Appeal after remand at *Jones v. Barry, 2005 U.S. App. LEXIS 2180 (10th Cir., Feb. 10, 2005)*

**Prior History:** (D. New Mexico). (D.C. No. CIV-00-1370-MV).

**Disposition:** Dismissed in part, affirmed in part, reversed in part and remanded.

## Core Terms

district court, Prison, amended complaint, official capacity, original complaint, sua sponte, medical treatment, excessive force, final judgment, proceedings, construe, amend

## Case Summary

**Procedural Posture**

33 Fed. Appx. 967, *967; 2002 U.S. App. LEXIS 7620, **1

Appellant inmate filed suit against appellees, correction officers, department of corrections, and other government officials (officials) for violations of *42 U.S.C.S. § 1983* that were related to his incarceration. The United States District Court for the District of New Mexico dismissed most of the inmate's claims on summary judgment. The court designated its order as a final judgment for appeal, pursuant to *Fed. R. Civ. P. 54(b)*.

**Overview**

The inmate alleged various civil rights claims against the officials. The appellate court affirmed the district court's dismissal of the inmate's claims for alleged violations of freedom of religion, procedural due process rights, contractual provisions, filing false reports, unreasonable search, and injunctive relief sua sponte, as it was patently obvious that the inmate would not be able to prevail on his claims, and that allowing an opportunity to amend would be futile. The district court erred in dismissing claims against the District of Columbia officials based on excessive force on the grounds that such claims violated *U.S. Const. amend. XI*. As the *Eleventh Amendment* immunity only applied to states, and the District of Columbia was not a state, the District of Columbia defendants were not entitled to *Eleventh Amendment* immunity with respect to the official capacity claims. Although the court noted that the inmate had not sufficiently pleaded either municipal or supervisory liability against the officials, the court could not definitively state that it would be futile to allow the inmate to try and amend his pleadings to state such a claim.

**Outcome**

The court affirmed the sua sponte dismissal of the claims relating to alleged violations of freedom of religion, procedural due process rights, contractual provisions, filing false reports, unreasonable search, and injunctive relief; the court reversed the district court's grant of summary judgment of official capacity and supervisory liability for the excessive force claims.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Dismissal > Involuntary Dismissals > General Overview

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

*HN1*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews a dismissal for frivolousness for an abuse of discretion.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

*HN2*[⬇] **Standards of Review, De Novo Review**

An appellate court reviews a dismissal for failure to state a claim de novo.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > Parties > Pro Se Litigants > General Overview

33 Fed. Appx. 967, *967; 2002 U.S. App. LEXIS 7620, **1

Civil Procedure > Parties > Pro Se
Litigants > Pleading Standards

Civil Procedure > Dismissal > Involuntary
Dismissals > Failure to State Claims

*HN3*[🔻]  **Motions to Dismiss, Failure to State
Claim**

Dismissal of a pro se complaint for failure to state a
claim is proper only where it is obvious that the
plaintiff cannot prevail on the facts he has alleged
and it would be futile to give him an opportunity to
amend. In applying this standard, the court accepts
the allegations of the complaint as true, and it
liberally construes the allegations of a pro se
complaint.

Civil Procedure > Dismissal > Involuntary
Dismissals > General Overview

Civil Procedure > ... > Pleadings > Amendment
of Pleadings > General Overview

*HN4*[🔻]  **Dismissal, Involuntary Dismissals**

*28 US.C.S. § 1915(e)(2)(B)* allows a district court
to dismiss a complaint "at any time," and there is
no requirement under the statute that the court
must first provide notice or an opportunity to
respond. Second, a court may sua sponte dismiss
a complaint under *Fed. R. Civ. P. 12(b)(6)* when it
is patently obvious that the plaintiff cannot prevail
on the facts alleged, and allowing an opportunity to
amend would be futile. Further, the majority view is
that sua sponte dismissal of a meritless claim that
cannot be salvaged by amendment comports with
due process and does not infringe the right of
access to the courts. Nonetheless, a district court
should allow a plaintiff an opportunity to cure
technical errors or otherwise amend the complaint
when doing so would yield a meritorious claim.

Civil Rights Law > ... > Immunity From
Liability > Local Officials > General Overview

*HN5*[🔻]  **Immunity From Liability, Local**

Officials

If a complaint does not clearly indicate that
defendants are being sued individually and/or in
their official capacities, the determination must be
made by reviewing the course of the proceedings.

Civil Procedure > ... > Federal & State
Interrelationships > State Sovereign
Immunity > State Immunity

Constitutional Law > State Sovereign
Immunity > General Overview

*HN6*[🔻]  **State Sovereign Immunity, State
Immunity**

*Eleventh Amendment* immunity only applies to
states, and the District of Columbia is not a state.

Constitutional Law > State Sovereign
Immunity > General Overview

Governments > Local Governments > Claims
By & Against

*HN7*[🔻]  **Constitutional Law, State Sovereign
Immunity**

For purposes of *42 U.S.C.S. § 1983*, the District of
Columbia is treated like a municipality, and a *§
1983* suit for damages against District of Columbia
officials in their official capacities is thus equivalent
to a suit against the District of Columbia itself. As a
result, for a plaintiff to recover on his official
capacity claims, he must establish that a policy or
custom of the District of Columbia was the moving
force behind the alleged constitutional
deprivations.

Civil Rights Law > Protection of
Rights > Section 1983 Actions > Scope

*HN8*[🔻]  **Protection of Rights, Section 1983
Actions**

33 Fed. Appx. 967, *967; 2002 U.S. App. LEXIS 7620, **1

A supervisor is liable under _42 U.S.C.S. § 1983_ if the plaintiff can establish that an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.

Civil Procedure > ... > Venue > Federal Venue Transfers > Convenience Transfers

Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

**HN9**[⬇]  **Federal Venue Transfers, Convenience Transfers**

_28 U.S.C.S. § 1404(a)_ only authorizes the transfer of an entire action, and that a district court may not transfer part of a case and maintain jurisdiction over another part unless the court severs part of the case under _Fed. R. Civ. P. 21_ or certifies part of the case as a final judgment under _Fed. R. Civ. P. 54(b)_.

**Counsel:** For MACEO JONES, Plaintiff - Appellant: Maceo Jones, Edgefield, SC.

For MARION S. BARRY, Mayor, MARGARET MOORE, DOCTOR GRANT, WILLIS GIBSON, ROB ADAM, DARREN SWENSON, T. ROBINSON, DENISE YOUNG, DENISE KING, JAY WARDEN OF PROGRAMS OF CCA, JIMMY TURNER, JASON D. MEDLIN, CORRECTIONS CORPORATION OF AMERICA, Defendants - Appellees: Mark D. Hopson, Virginia A. Seitz, Frank R. Volpe, Sidley, Austin, Brown & Wood, Washington, DC.

For JOHN/JANE DOE aka Officer Cunningham aka Sgt. Crawford aka Lt. Thomas, Defendants - Appellees: Virginia A. Seitz, Sidley, Austin, Brown & Wood, Washington, DC.

**Judges:** Before KELLY, BRISCOE, and LUCERO, Circuit Judges.

**Opinion by:** Mary Beck Briscoe

# Opinion

**[*969] ORDER AND JUDGMENT** *

**[**2]** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. _See Fed. R. App. P. 34(a)(2)_; _10th Cir. R. 34.1(G)_. The case is therefore ordered submitted without oral argument.

Plaintiff-appellant Maceo Jones, an inmate appearing pro se, appeals the district court's interlocutory order, designated as a final judgment for appeal pursuant to _Fed. R. Civ. P. 54(b)_, dismissing most of the claims asserted in his amended civil rights complaint. We exercise jurisdiction under _28 U.S.C. § 1291_ and dismiss in part, affirm in part, reverse in part and remand.

I.

In January 1999, Mr. Jones filed his original complaint under _42 U.S.C. § 1983_ in the United States District Court for the District of Columbia, asserting various constitutional claims arising from his incarceration at a private prison in Youngstown, Ohio (Youngstown Prison). Corrections Corporation of America (CCA) operated the Youngstown Prison pursuant to a contract with the District of Columbia, and Mr. Jones named as defendants three officials of the District of Columbia, **[**3]** the chairman and president of CCA, and certain employees of CCA who worked at the Youngstown Prison. Mr. Jones also alleged that he had been subsequently transferred to another private prison operated by CCA in Torrance County, New Mexico (Torrance Prison), and he claimed that the transfer violated CCA's contract with the District of Columbia and that the physical conditions under which he was

_____

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of _10th Cir. R. 36.3_.

33 Fed. Appx. 967, *969; 2002 U.S. App. LEXIS 7620, **3

transported to New Mexico violated the *Eighth Amendment*.

Defendants filed a motion to dismiss Mr. Jones' original complaint. Before the court ruled on the motion, Mr. Jones filed an amended complaint in the District of Columbia. In his amended complaint, Mr. Jones alleged various constitutional claims arising from his incarceration at the Torrance Prison, [1] and he named as defendants the same three officials of the District of Columbia (Marion Barry, Margaret Moore, and Andrienne Poteat [2]), the chairman and president of CCA (Doc R. Crant), and certain employees of CCA who worked at the Torrance Prison, including the warden (Donald Dorsey). Defendants objected to [*970] the filing of Mr. Jones' amended complaint and requested that it be dismissed without prejudice, arguing that it was not a proper [**4] supplemental complaint under *Fed. R. Civ. P. 15(d)* since it involved claims that were unrelated to the claims in the original complaint.

In August 2000, the District of Columbia district court dismissed Mr. Jones' original complaint. However, the court did not enter a final judgment, and it refused to dismiss Mr. Jones' amended complaint. Instead, after noting that the claims in the amended complaint relate to events [**5] that occurred in New Mexico, the court ordered the "case" transferred to the District of New Mexico for further proceedings. *See* D.C. R., Doc. No. 22 at 9 and Doc. No. 23. The original case file was then transmitted to the District of New Mexico, and no further proceedings have taken place in the District of Columbia.

In February 2001, the District of New Mexico district court dismissed most of the claims in Mr. Jones' amended complaint sua sponte under *28 U.S.C. § 1915(e)(2)(B)* and *Fed. R. Civ. P. 12(b)(6)*. Specifically, the court dismissed: (1) all claims asserted against defendants in their official capacities; (2) all claims related to alleged violations of freedom of religion, procedural due process rights, contractual provisions, filing false reports, unreasonable search, and injunctive relief; and (3) all claims asserted against defendants Dorsey, Oberge, Bullock, Carpenter, Pennycuff, Garcia, Ibarra, O'Brien, Marrow, Elaine ____, and Smith. *See* R., Doc. No. 5 at 5-6. The court also entered a final judgment on the dismissed claims under *Fed. R. Civ. P. 54(b)*. *See id.* at Doc. No. 6 at 1-2. However, the court did not dismiss the claims Mr. [**6] Jones asserted against defendants Preston, Harris, Gonzales, and Hines for use of excessive force and denial of medical treatment relating to an incident that occurred at the Torrance Prison on February 11, 1999.

Mr. Jones is appealing the final judgment entered by the New Mexico district court, claiming that the court erred in dismissing the above-noted claims sua sponte and in failing to construe his pro se allegations liberally. [3] Mr. Jones is also attempting to appeal the District of Columbia district court's dismissal of his *Eighth Amendment* claim relating to his transfer to the Torrance Prison.

[**7] II.

The New Mexico district court dismissed Mr. Jones official capacity claims as frivolous under *§ 1915(e)(2)(B)(i)*, finding that the claims are barred by the *Eleventh Amendment*. The court dismissed the other claims for failure to state a claim under *§*

---

[1] Mr. Jones also renewed his claim that his transfer to the Torrance Prison violated CCA's contract with the District of Columbia. Because the District of Columbia district court dismissed this claim when it dismissed Mr. Jones' original complaint, we do not need to address this aspect of Mr. Jones' amended complaint.

[2] Although Ms. Poteat is not named as a defendant in the section of Mr. Jones' amended complaint where he lists the named defendants, she is referred to as a defendant in the body of the amended complaint, and we will treat her as a named defendant for purposes of this appeal.

[3] Mr. Jones also claims that both district courts erred by failing to rule on his motion for appointment of counsel. However, the District of Columbia district court considered and denied his motion for appointment of counsel. *See* D.C. R., Doc. No. 19. "The decision whether to appoint counsel in a civil case is left to the sound discretion of the trial court," *see Blankenship v. Meachum, 840 F.2d 741, 743 (10th Cir. 1988)*, and we see no abuse of discretion here. We also note that Mr. Jones' motion was denied without prejudice, and he can therefore renew it on remand.

33 Fed. Appx. 967, *970; 2002 U.S. App. LEXIS 7620, **7

1915(e)(2)(B)(ii) and Rule 12(b)(6). HN1[↑] We review a dismissal for frivolousness for an abuse of discretion. See Schlicher v. Thomas, 111 F.3d 777, 779 (10th Cir. 1997). HN2[↑] We review a dismissal for failure to state a claim de novo. See Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 806 (10th Cir. 1999). HN3[↑] "Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." Id. In applying this standard, we [*971] accept the allegations of the complaint as true, and we liberally construe the allegations of a pro se complaint. See id.

A. Sua Sponte Dismissal

We reject Mr. Jones' claim that the district court erred by granting a dismissal sua sponte without notice or a hearing. First, HN4[↑] § 1915(e)(2)(B) allows a district court to dismiss a complaint "at any [**8] time," and there is no requirement under the statute that the court must first provide notice or an opportunity to respond. Second, a court may sua sponte dismiss a complaint under Rule 12(b)(6) when it is patently obvious that the plaintiff cannot prevail on the facts alleged, and allowing an opportunity to amend would be futile. See Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991). Further, we have expressly adopted "the majority view that sua sponte dismissal of a meritless claim that cannot be salvaged by amendment comports with due process and does not infringe the right of access to the courts." Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir.), cert. denied, 151 L. Ed. 2d 201, 122 S. Ct. 274 (2001). Nonetheless, a "district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim." Id.

B. Dismissed Claims

We affirm the New Mexico district court's entry of judgment on Mr. Jones' claims for alleged violations of freedom of religion, procedural due process rights, contractual provisions, filing false reports, unreasonable search, [**9] and injunctive relief for substantially the same reasons set forth in the memorandum opinion and order entered by the court on February 21, 2001. See R., Doc. No. 5 at

2-7. We also affirm the court's entry of judgment in favor of defendants Dorsey, Oberge, Bullock, Carpenter, Pennycuff, Garcia, Ibarra, O'Brien, Marrow, Elaine ____, and Smith for substantially the same reasons set forth in the court's memorandum opinion and order. [4] Id.

[**10]  C. Official Capacity Claims

The only named defendants that can be sued in their official capacities are the three officials of the District of Columbia. [5] Although Mr. Jones does not state in his amended complaint whether he is suing these defendants in their official capacities, we will liberally construe his amended complaint to include official capacity claims given the fact that the New Mexico district court dismissed the amended complaint before any proceedings could be conducted [*972] thereon. Cf. Houston v. Reich, 932 F.2d 883, 885 (10th Cir. 1991) (holding that HN5[↑] "if the complaint does not clearly indicate that defendants are being sued individually and/or in their official capacities, the determination must be made by reviewing the course of the proceedings") (quotation omitted).

---

[4] The New Mexico district court did not address the claims Mr. Jones asserted in his amended complaint against defendant Johannes, and the court will need to address the claims on remand. In addition, while the court indicated in its memorandum opinion and order that it was dismissing the claims against defendant Rice, see R., Doc. No. 5 at 5, defendant Rice is not listed among the dismissed defendants at the conclusion of the opinion or in the court's judgment and final order of dismissal. Thus, the court will also need to clarify its disposition of the claims against defendant Rice on remand.

[5] Defendants have informed the court, and Mr. Jones does not dispute, that the Torrance Prison is a private facility that is operated by CCA pursuant to a contract with the District of Columbia and the United States Marshals Service. See Appellees' Brief at 3 n.2. As a result, the CCA defendants are not state actors, and they do not have an "official capacity" as that term is used under the Eleventh Amendment. This is not to say, however, that the CCA defendants cannot be held personally liable under § 1983. In 1979, Congress amended § 1983 to include acts committed under color of the law of the District of Columbia, and we will assume for purposes of this appeal that the CCA defendants are District of Columbia actors for purposes of § 1983.

33 Fed. Appx. 967, *972; 2002 U.S. App. LEXIS 7620, **10

[**11] The New Mexico district court committed an error of law when it determined that the official capacity claims are barred by the *Eleventh Amendment*. HN6[↑] *Eleventh Amendment* immunity only applies to states, and the District of Columbia is not a state. *See LaShawn A. ex rel. Moore v. Barry, 330 U.S. App. D.C. 204, 144 F.3d 847, 853 n.7 (D.C. Cir. 1998)*. Thus, the District of Columbia defendants are not entitled to *Eleventh Amendment* immunity with respect to the official capacity claims.

HN7[↑] For purposes of *§ 1983*, the District of Columbia is treated like a municipality, and "[a] *section 1983* suit for damages against [District of Columbia] officials in their official capacities is thus equivalent to a suit against the [District of Columbia] itself." *Atchinson v. Dist. of Columbia, 315 U.S. App. D.C. 318, 73 F.3d 418, 424 (D.C. Cir. 1996)*. As a result, for Mr. Jones to recover on his official capacity claims, he must establish that a policy or custom of the District of Columbia was the moving force behind the alleged constitutional deprivations. *See Daskalea v. Dist. of Columbia, 343 U.S. App. D.C. 261, 227 F.3d 433, 441 (D.C. Cir. 2000)*. [**12]

As noted above, the New Mexico district court did not dismiss Mr. Jones' claims against defendants Preston, Harris, Gonzales, and Hines for use of excessive force and denial of medical treatment. Even if we liberally construe his amended complaint, Mr. Jones has not adequately alleged that the operative conduct of these defendants was the result of a policy or custom of the District of Columbia. Nonetheless, we cannot definitively say at this juncture that it would be futile to give him an opportunity to amend his pleadings to attempt to state such a claim. Accordingly, we reverse the judgment entered by the New Mexico district court on the official capacity claims. In doing so, we make no ruling regarding whether Mr. Jones can state a municipal liability claim against the District of Columbia for the excessive force and denial of medical treatment claims, an issue the New Mexico district court has not addressed.

D. Supervisory Liability

In his amended complaint, Mr. Jones named the warden of the Torrance Prison, Donald Dorsey, as a defendant. [6] However, the New Mexico district court only addressed defendant Dorsey's liability in the context of Mr. Jones' procedural due process [**13] claim.

HN8[↑] A supervisor is liable under *§ 1983* if the plaintiff can establish "that an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1187 (10th Cir. 2001)* (quotation omitted), *petition for cert. filed*, 70 U.S.L.W. 3581 (U.S. Feb. 26, 2002) (No. 01-1339). Even if we liberally construe his amended complaint, Mr. Jones has not stated a claim for supervisory liability against defendant Dorsey for the excessive force and denial of medical treatment claims. Again, however, we [*973] cannot definitively say at this juncture [**14] that it would be futile to give him an opportunity to amend his pleadings to attempt to state such a claim. Accordingly, we reverse the judgment entered by the New Mexico district court in favor of defendant Dorsey to the extent it covered supervisory liability for the excessive force and denial of medical treatment claims. In doing so, we make no ruling regarding whether Mr. Jones can state a claim for supervisory liability against defendant Dorsey, an issue the New Mexico district court has not addressed.

E. Prison Transfer

We have no jurisdiction over Mr. Jones' *Eighth Amendment* claim relating to his transfer to the Torrance Prison. The District of Columbia district court dismissed that claim as part of its order dismissing Mr. Jones' original complaint, *see* D.C. R., Doc. No. 22 at 8-9, and the court then transferred the entire "case" to the District of New Mexico without entering a final judgment on the claims in the original complaint, *see id.* at Doc. 23.

_____

[6] As noted above, Mr. Jones also asserted claims against the president and chairman of CCA, Doc R. Crant, in his amended complaint. However, the New Mexico district court did not address the claims against defendant Crant, and the court will need to address the claims on remand.

33 Fed. Appx. 967, *973; 2002 U.S. App. LEXIS 7620, **14

[7] Further, the New Mexico district court did not include the prison transfer claim in the *Rule 54(b)* certification that is presently before this court. We therefore have no jurisdiction to consider the prison transfer **[**15]** claim as part of this appeal and that claim is dismissed for lack of jurisdiction.

**[**16]** DISMISSED IN PART, AFFIRMED IN PART, REVERSED IN PART and REMANDED for further proceedings. The district court granted Mr. Jones' motion to proceed in forma pauperis on appeal, payable in partial payments. We remind Mr. Jones of his obligation to make partial payments until the entire fee is paid.

Entered for the Court

Mary Beck Briscoe

Circuit Judge

End of Document

---

[7] Because the District of Columbia district court did not sever the claims in the original complaint or enter a final judgment on the claims under *Fed. R. Civ. P. 54(b)* before transferring the case to the District of New Mexico, the prison transfer claim is presently a part of the case pending before the New Mexico district court. *See Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1518-20 (10th Cir. 1991)* (holding that *HN9*[↑] *§ 1404(a)* only authorizes the transfer of an entire action, and that a district court may not transfer part of a case and maintain jurisdiction over another part unless the court severs part of the case under *Rule 21* or certifies part of the case as a final judgment under *Rule 54(b)*). Thus, in order to appeal the dismissal of his prison transfer claim, Mr. Jones needs to either move for a *Rule 54(b)* certification of the claim in the New Mexico district court or move to have the claim severed and retransferred to the District of Columbia and then request the entry of a final judgment there. *Id. at 1521*.

✚ Positive
As of: August 13, 2021 5:21 PM Z

## *Nichols v. Fed. Bureau of Prisons*

United States District Court for the District of Colorado

August 12, 2010, Decided; August 12, 2010, Filed

Civil Action No. 09-cv-00558-CMA-CBS

**Reporter**

2010 U.S. Dist. LEXIS 83006 *

TERRY L. NICHOLS, Plaintiff, v. FEDERAL BUREAU OF PRISONS, HARLEY LAPPIN, MICHAEL NALLEY, RON WILEY, ROD BAUER, DR. STEVEN NAFZIGER, M.D., DERRICK JONES, and KEITH POWLEY, Defendants.

**Subsequent History:** Motion denied by *Nichols v. Fed. Bureau of Prisons, 2010 U.S. Dist. LEXIS 100826 (D. Colo., Sept. 8, 2010)*

**Prior History:** *Nichols v. Fed. Bureau of Prisons, 2010 U.S. Dist. LEXIS 83693 (D. Colo., June 22, 2010)*

## Core Terms

allegations, Recommendation, diet, foods, religious, personal jurisdiction, personal participation, grievances, meals, instant case, substantial burden, rights, Fare, Defendants' failure to state a claim, deliberate indifference, statute of limitations, motion to dismiss, vegetables, quotation, policies, reasons, fiber, marks, eat, exercise of religion, religious practice, medical need, asserts, kosher

## Case Summary

### Procedural Posture

Plaintiff federal prisoner filed objections to a magistrate judge's recommendation that the court dismiss *Eighth Amendment* claims against defendants, the Bureau of Prisons (BOP) and several employees. The magistrate also recommended denial of the BOP's motion to dismiss a *First Amendment* claim and denial of a motion by the BOP and two employees to dismiss claims under the Religious Freedom Restoration Act (RFRA), *42 U.S.C.S. § 2000bb et seq.*

### Overview

Plaintiff's claims centered on the purported insufficiency of whole unrefined and living foods high in insoluble fiber in his daily diet. Plaintiff claimed that such foods were necessary both for his medical needs and his religious beliefs. Plaintiff asserted that none of the current meal options in the prison were suitable for his medical and religious requirements. The magistrate properly found that plaintiff failed to state an *Eighth Amendment* cruel and unusual punishment claim. The injury alleged by plaintiff was not sufficiently serious, and defendants' failure to provide the diet that plaintiff sought based on one reference in post-surgery medical records that were more than 20 years old did not rise to the level of deliberate indifference. Because plaintiff failed to substantively allege how the BOP's food service policies substantially burdened the exercise of his religion, the court disagreed with the magistrate's recommendation regarding the *First Amendment* free exercise claim against the BOP and the RFRA claim against the BOP and two employees.

### Outcome

The court overruled the magistrate judge's recommendation insofar as he recommended denial of the BOP's motion to dismiss plaintiff's *First Amendment* claim and denial of the motion by the BOP and two employees to dismiss the RFRA claim. The court affirmed and adopted the recommendation in all other respects. The court granted defendants' motions to dismiss, and it

2010 U.S. Dist. LEXIS 83006, *83006

dismissed all of plaintiff's claims with prejudice.

## LexisNexis® Headnotes

Civil Procedure > Judicial Officers > Magistrates > Standards of Review

*HN1*[⤓] **Magistrates, Standards of Review**

The court may review portions of a magistrate judge's recommendation that were not objected to under any standard it deems appropriate.

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

*HN2*[⤓] **Pro Se Litigants, Pleading Standards**

Where the plaintiff is proceeding pro se, the court must liberally construe his pleadings. However, the court cannot act as an advocate for a pro se litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

Evidence > Burdens of Proof > Allocation

*HN3*[⤓] **In Rem & Personal Jurisdiction, In Personam Actions**

Jurisdiction to resolve cases on the merits requires authority over the parties (personal jurisdiction), so that the court's decision will bind them. In determining whether a federal court has personal jurisdiction over a defendant, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process. A plaintiff bears the burden of

establishing personal jurisdiction over defendants. Where there has been no evidentiary hearing and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists.

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > Constitutional Limits

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Substantial Contacts

*HN4*[⤓] **In Rem & Personal Jurisdiction, Constitutional Limits**

In Benton v. Cameco Corp, the Tenth Circuit has carefully and succinctly laid out the well-established constitutional analysis for personal jurisdiction: The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. Therefore, a court may exercise personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts between the defendant and the forum state. The minimum contacts standard may be met in two ways. First, a court may, consistent with due process, assert specific jurisdiction over a nonresident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to

2010 U.S. Dist. LEXIS 83006, *83006

State Claim

*HN5*[⇩] **Motions to Dismiss, Failure to State Claim**

The court may dismiss a complaint for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. Dismissal is appropriate only if the complaint, viewed in the light most favorable to the plaintiff, lacks enough facts to state a claim to relief that is plausible on its face. A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Conclusory allegations alone are not sufficient to state a valid claim.

> Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Minimum Contacts

> Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

*HN6*[⇩] **In Personam Actions, Minimum Contacts**

It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state.

> Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN7*[⇩] **Motions to Dismiss, Failure to State Claim**

According to the Tenth Circuit, the court's function on a *Fed. R. Civ. P. 12(b)(6)* motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief can be granted.

> Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

> Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN8*[⇩] **Prisoner Rights, Confinement Conditions**

The *Eighth Amendment* protects against the infliction of cruel and unusual punishments. *U.S. Const. amend. VIII*. Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care and must take reasonable measures to guarantee the safety of the inmates. Conditions of confinement that unnecessarily and wantonly inflict pain, may constitute cruel and unusual punishment under the *Eighth Amendment*.

> Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

> Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN9*[⇩] **Prisoner Rights, Confinement Conditions**

An *Eighth Amendment* claim involves a two-pronged inquiry, comprised of an objective component and a subjective component. First, under the objective component, the injury must be sufficiently serious, showing a substantial risk of serious harm. Second, under the subjective component, the defendant must have a sufficiently culpable state of mind.

> Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

> Constitutional Law > Bill of Rights > Fundamental Rights > Cruel &

2010 U.S. Dist. LEXIS 83006, *83006

Unusual Punishment

#### HN10[⬇] Prisoner Rights, Medical Treatment

A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Examples of serious medical needs include a brain tumor, delay in removing broken pins in a hip, premature return to prison after surgery, a bleeding ulcer, and loss of an ear. In Erickson, the U.S. Supreme Court deemed an allegedly life-threatening removal from a hepatitis C treatment to be sufficiently serious. A medically-required diet has been considered sufficiently serious in the context of a prisoner suffering from diabetes.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

#### HN11[⬇] Prisoner Rights, Medical Treatment

A plaintiff must establish that the defendant knew the plaintiff faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it. The official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference. A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*.

Civil Rights Law > Protection of Rights > Implied Causes of Action

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

#### HN12[⬇] Protection of Rights, Implied Causes of Action

Although the U.S. Supreme Court has not affirmatively extended Bivens liability to *First Amendment* claims, it has assumed the application of Bivens to *First Amendment* claims.

Civil Rights Law > Protection of Rights > Implied Causes of Action

#### HN13[⬇] Protection of Rights, Implied Causes of Action

Personal participation is an essential allegation in a Bivens action. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. A plaintiff suing federal officials for constitutional violations under Bivens must show an affirmative link between the defendant's conduct and the alleged constitutional deprivation.

Civil Rights Law > Protection of Rights > Prisoner Rights > Freedom of Religion

#### HN14[⬇] Prisoner Rights, Freedom of Religion

A prisoner's belief in religious dietary practices is constitutionally protected if the belief is genuine and sincere, even if such dietary practices are not doctrinally required by the prisoner's religion. Further, the inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment and, therefore, the issue of sincerity can rarely be determined on summary judgment, let alone a motion to dismiss. The determination of what is a "religious" belief or practice does not turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit *First Amendment* protection. A plaintiff need not plead facts sufficient for an objectively reasonable person to conclude that his belief his religious in nature. Religion is by its nature subjective. If a plaintiff could explain or prove

2010 U.S. Dist. LEXIS 83006, *83006

objectively why his religion commanded the belief in question, it might no longer be a religious belief, or at least not one rooted in faith.

Civil Rights Law > Protection of Rights > Prisoner Rights > Freedom of Religion

**HN15**[⬇] **Prisoner Rights, Freedom of Religion**

A substantial burden is one that (1) significantly inhibits or constrains a plaintiff's religious conduct or expression, (2) meaningfully curtails a plaintiff's ability to express adherence to his faith, or (3) denies the plaintiff reasonable opportunity to engage in fundamental religious activities.

Civil Rights Law > Protection of Rights > Implied Causes of Action

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

**HN16**[⬇] **Protection of Rights, Implied Causes of Action**

A Bivens claim is subject to the general personal injury statute in the state where the action arose. Under Colorado law, personal injury actions are subject to a two-year statute of limitations. *Colo. Rev. Stat. § 13-80-102* (1995).

Civil Rights Law > Protection of Rights > Procedural Matters > Continuing Violations

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

**HN17**[⬇] **Procedural Matters, Continuing Violations**

Courts have recognized that in some circumstances, ongoing constitutional deprivations can constitute continuing violations that toll the statute of limitations or otherwise defeat a defense of untimeliness. However, the Tenth Circuit has never endorsed such a "continuing violation" theory of ex post facto liability in this context; to the contrary, it has rejected analogous arguments in the past. Additionally, if a single, discrete act has continuing consequences, then the continuing violation doctrine does not apply.

Civil Rights Law > Protection of Rights > Prisoner Rights > Freedom of Religion

Constitutional Law > ... > Fundamental Freedoms > Freedom of Religion > Free Exercise of Religion

Evidence > Burdens of Proof > Burden Shifting

Civil Rights Law > Protection of Rights > Religious Freedom > Religious Freedom Restoration Act

**HN18**[⬇] **Prisoner Rights, Freedom of Religion**

Prisoners retain *First Amendment* rights, including the right of free exercise of religion; however, those rights may be subject to reasonable limitations. In order to allege a constitutional violation based on a free exercise claim, a prisoner-plaintiff must survive a two-step inquiry. First, the prisoner-plaintiff must show that a prison regulation substantially burdened sincerely-held religious beliefs. A "substantial burden" is one that (1) significantly inhibits or constrains a plaintiff's religious conduct or expression, (2) meaningfully curtails a plaintiff's ability to express adherence to his faith, or (3) denies a plaintiff reasonable opportunity to engage in fundamental religious activities. The Tenth Circuit uses the same substantial burden test to evaluate *First Amendment* free exercise prisoner claims and claims under the Religious Freedom Restoration Act, *42 U.S.C.S. § 2000bb et seq.* Second, prison officials-defendants may identify the legitimate penological interests that justified the impinging conduct. The burden then shifts back to the prisoner to show that the penological concern is irrational.

2010 U.S. Dist. LEXIS 83006, *83006

Civil Rights Law > Protection of
Rights > Prisoner Rights > Freedom of Religion

Evidence > Burdens of Proof > General
Overview

Civil Rights Law > Protection of
Rights > Religious Freedom > Religious
Freedom Restoration Act

*HN19*[⬇] **Prisoner Rights, Freedom of Religion**

To establish a claim under the Religious Freedom
Restoration Act (RFRA), *42 U.S.C.S. § 2000bb et
seq.*, a prisoner must show that the federal
government substantially burdened the prisoner's
sincere exercise of religion. According to the
RFRA, the government may not substantially
burden a person's practice of their religion unless
the restriction is furthering a compelling
government interest and is the least restrictive
means of doing so. *42 U.S.C.S. § 2000bb-1*.

**Counsel:** [*1] Terry L. Nichols, Plaintiff, Pro se,
FLORENCE, CO.

For Federal Bureau of Prisons, Harley Lappin,
Michael Nalley, Ron Wiley, Rod Bauer, Stephen
Nafziger, Dr., M.D., Derrick Jones, Keith Powley,
Defendants: Amy L. Padden, U.S. Attorney's
Office-Denver, Denver, CO.

**Judges:** CHRISTINE M. ARGUELLO, United
States District Judge.

**Opinion by:** CHRISTINE M. ARGUELLO

# Opinion

**ORDER ADOPTING IN PART AND
OVERRULING IN PART THE JUNE 22, 2010
RECOMMENDATION OF A UNITED STATES
MAGISTRATE JUDGE AND ORDER
DISMISSING ALL CLAIMS**

This matter is before the Court on the June 22,
2010 Recommendation of Magistrate Judge Craig

B. Shaffer. (Doc. # 107.) Plaintiff objects to the
Magistrate Judge's Recommendation regarding his
*Eighth Amendment* claims (Doc. # 108) and the
Court has conducted the requisite *de novo* review
of Plaintiff's objections. *See Summers v. State of
Utah, 927 F.2d 1165, 1167 (10th Cir. 1991)*.
Plaintiff does not object to the Magistrate Judge's
conclusions with regard to his claims under the
*First Amendment* and the Religious Freedom
Restoration Act ("RFRA"), *42 U.S.C. § 2000bb to
bb-4* and none of the Defendants filed objections to
the Recommendation. *HN1*[⬆] The Court may
review portions of the Recommendation that were
not objected to [*2] under any standard it deems
appropriate. *Id.* (citing *Thomas v. Arn, 474 U.S.
140, 150, 154, 106 S. Ct. 466, 88 L. Ed. 2d 435
(1985))*. As discussed below, the Court affirms and
adopts, in part, and overrules, in part, the
Magistrate Judge's Recommendation. Plaintiff's
claims are dismissed.

# I. BACKGROUND AND PROCEDURAL HISTORY

The Court discusses only those facts that are
necessary to address the Recommendation and
Plaintiff's Objections to the Recommendation. A
more detailed recitation of the factual and
procedural background is set out in the Magistrate
Judge's Recommendation. (Doc. # 107.)

Plaintiff, Terry Nichols, is incarcerated at the U.S.
Penitentiary Administrative Maximum ("ADX") in
Florence, Colorado, serving a life sentence. On
March 16, 2009, Plaintiff filed his initial complaint,
which he amended on two occasions. On August
27, 2009, Plaintiff filed his Second Amended
Complaint ("Complaint") alleging two claims
pursuant to *Bivens v. Six Unknown Named Agents
of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.
Ct. 1999, 29 L. Ed. 2d 619 (1971)*, and one RFRA
claim, against the Federal Bureau of Prisons
("BOP") and seven employees of the BOP. (Doc. #
67.) The seven individually named defendants
are[1]: (1) Harley Lappin, Director of the BOP; (2)
Michael [*3] Nalley, Regional Director of the BOP;

---

[1] At the time Plaintiff filed his Complaint, all Defendants were
employees of the BOP in the listed position of employment.

2010 U.S. Dist. LEXIS 83006, *3

(3) Ron Wiley, Warden of the ADX; (4) Rod Bauer, Captain and ADX Healthcare Administrator; (5) Dr. Stephen Nafziger, ADX Clinical Services Director; (6) Derrick Jones, ADX Food Services Administrator; and (7) Keith Powley, ADX Chaplain. (*Id.* at 2-3.) Plaintiff is suing the BOP employees in their individual and official capacities in Claims One and Two, and in their official capacities in Claim Three.[2] (*Id.* at 3.) With respect to his claims against the BOP, Plaintiff requests injunctive relief only. (*Id.* at 2.)

Claim One, alleging cruel and unusual punishment in violation of Plaintiff's *Eighth Amendment* rights, is brought against the BOP and Defendants Lappin, Nalley, Wiley, Bauer, Nafziger, and Jones. (Doc. # **[*4]** 67 at 9-18.) Claim Two, alleging a violation of Plaintiff's right to free exercise of religion under the *First Amendment*, is brought against the BOP and Defendants Lappin, Nalley, Wiley, and Powley. (Doc. # 67 at 19-28.) Claim Three, alleging religious discrimination in violation of RFRA, is brought against the same defendants as in Claim Two, incorporating, by reference, the factual allegations of Claim Two. (*Id.* at 29.) All of the claims center on the purported insufficiency of whole unrefined and living foods high in insoluble fiber in Plaintiff's daily diet. (Doc. # 67.) Specifically, Plaintiff is seeking a daily diet with 100% whole grain foods, bran products, unpeeled and uncooked fruits and vegetables, and legumes and nuts. (*Id.* at 5.) He claims these foods are necessary for both his medical needs and his religious beliefs. (*Id.* at 5-8.) Plaintiff asserts that none of the current meal options are suitable for his medical and religious requirements.[3] (*Id.* at 20.)

All eight Defendants moved to dismiss Plaintiff's claims against them. (*See* Doc. ## 68, 72, 73, 74, 76, & 83.) **[*5]** The Magistrate Judge

recommended dismissal of Plaintiff's *Eighth Amendment* claim ("Claim One"). (Doc. # 107 at 40-41.) He also recommended dismissal of Plaintiff's *First Amendment* claim ("Claim Two") against Defendants Lappin, Nalley, Wiley, and Powley. (*Id.*) Finally, the Magistrate Judge recommended dismissal of Plaintiff's RFRA claim ("Claim Three") against Defendants Lappin and Nalley. (*Id.*)

On July 12, 2010, Petitioner filed Objections to the Recommendation. (Doc. # 108.) Specifically, Plaintiff objected to the Magistrate Judge's findings on the *Eighth Amendment* claim. (*Id.* at 2-7.) On July 26, 2010, Defendants filed a Response to Petitioner's Objections. (Doc. # 109.) Defendants argued that Petitioner's Objections should be overruled and the Magistrate Judge's Recommendation should be adopted. (*Id.* at 1.)

## II. STANDARDS OF REVIEW

### A. *PRO SE* PLAINTIFF

**HN2**[⬆] The Plaintiff is proceeding *pro se*; thus, the Court must liberally construe his pleadings. *Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*. However, the Court cannot act as an advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*.

### B. **[*6]** LACK OF PERSONAL JURISDICTION UNDER *FED. R. CIV. P. 12(b)(2)*

**HN3**[⬆] "Jurisdiction to resolve cases on the merits requires . . . authority over the parties (personal jurisdiction), so that the court's decision will bind them." *Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir. 2000)* (quoting *Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999))*. "In determining whether a federal court has personal jurisdiction over a defendant, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the

---

[2] The Court need not address claims for damages against BOP employee defendants in their official capacities because damages are barred by sovereign immunity, as conceded by Plaintiff. (Doc. # 80 at 3; Doc. # 81 at 3; Doc. # 86 at 3; Doc. # 87 at 3; Doc. # 93 at 3.) *See Hatten v. White 275 F.3d 1208, 1210 (10th Cir. 2002)*.

[3] The five meal options are: Regular, Vegetarian, No Pork, Heart Healthy, and Common Fare. (Doc. # 67 at 20.)

2010 U.S. Dist. LEXIS 83006, *6

defendant and (2) whether the exercise of jurisdiction comports with due process." *Trujillo v. Williams, 465 F.3d 1210, 1217 (10th Cir. 2006)* (internal quotation marks and citation omitted). A plaintiff bears the burden of establishing personal jurisdiction over defendants. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1069 (10th Cir. 2008)* (citation omitted). "Where . . . there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists." *Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995)* **[\*7]** (citations omitted).

**HN4**[↑] The Tenth Circuit has "carefully and succinctly la[id] out the well-established constitutional analysis for personal jurisdiction." *Benton v. Cameco Corp., 375 F.3d 1070, 1075 (10th Cir. 2004)*.

> The *Due Process Clause* protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. Therefore, a court may exercise personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts between the defendant and the forum state . . .
>
> The minimum contacts standard may be met in two ways. First, a court may, consistent with due process, assert specific jurisdiction over a nonresident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state.

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1090-91 (10th Cir. 1998)* **[\*8]** (internal quotation marks and citations

omitted).

## C. FAILURE TO STATE A CLAIM UNDER *FED. R. CIV. P. 12(b)(6)*

**HN5**[↑] ] The Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. "Dismissal is appropriate only if the complaint, viewed in the light most favorable to the plaintiff, lacks enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Connor v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008)* (internal quotation marks and citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Conclusory allegations alone are not sufficient to state a valid claim. *Id. at 1950*; *see also Masters v. Gilmore, 663 F. Supp. 2d 1027, 1037 (D. Colo. 2009)*.

## III. ANALYSIS

## A. LACK OF PERSONAL JURISDICTION OVER DEFENDANTS LAPPIN AND NALLEY

At the outset, the Court notes that the Magistrate Judge correctly concludes that all claims against Defendants **[\*9]** Lappin and Nalley must be dismissed for lack of personal jurisdiction.[4] Plaintiff alleges that Defendants Lappin and Nalley (1) were aware of Plaintiff's medical issues; (2) as supervisors, denied Plaintiff's grievances and appeals; (3) directed, knew of, allowed, and/or encouraged Defendant Wiley to cut the ADX budget; and (4) approved Plaintiff's placement on

---

[4] Plaintiff does not object to this portion of the Magistrate Judge's Recommendation (*see* Doc. # 108), so the Court reviews for clear error. *See Summers v. State of Utah, 927 F.2d 1165, 1167 (10th Cir. 1991)* (citing *Thomas v. Arn, 474 U.S. 140, 150, 154, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985))*.

2010 U.S. Dist. LEXIS 83006, *9

the Common Fare diet after denying his request to see a non-BOP proctologist. (Doc. # 67 at 17-18, 26-28.)

*HN6*[↑] "It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state." *Hill v. Pugh, 75 F. App'x 715, 719 (10th Cir. 2003)* (unpublished). As the Magistrate Judge notes, receipt of grievances and letters is insufficient to establish personal jurisdiction over the BOP Director. *See id.; see also Georgacarakos v. Wiley, No. 07-cv-01712, 2008 U.S. Dist. LEXIS 69144, 2008 WL 4216265, at *5 (D. Colo. Sept. 12, 2008)* [*10] (unpublished) (finding that personal jurisdiction did not arise simply because Defendant Lappin received notice of unconstitutional conditions); *see also Bradshaw v. Lappin, No. 08-cv-02542, 2010 U.S. Dist. LEXIS 22455, 2010 WL 908925, at *1 (D. Colo. March 11, 2010)* (unpublished) (finding no personal jurisdiction where Defendant Lappin issued generalized orders to cut costs).

Plaintiff does not allege that Defendants Lappin or Nalley conducted any activities in Colorado or had any contact with him in Colorado. (*See* Doc. # 80 at 3 (". . . neither Defendant works nor lives nor physically entered Colorado . . .")). To the extent that Plaintiff alleges that Defendants Lappin or Nalley gave direction to other Defendants, such allegations are speculative. (*See* Doc. # 67 at 17-18, 26-28.) Therefore, allegations against Defendants Lappin and Nalley for actions taken in their supervisory roles, and their awareness and denial of Plaintiff's grievances are not sufficient to establish personal jurisdiction. Accordingly, the Magistrate Judge properly recommended dismissal of all claims against Defendants Lappin and Nalley pursuant to *Fed. R. Civ. P. 12(b)(2)*.

## B. CLAIM ONE: *EIGHTH AMENDMENT* CLAIM

In Claim One, Plaintiff alleges [*11] that the BOP and Defendants Lappin, Nalley, Wiley, Bauer, Nafziger, and Jones violated Plaintiff's *Eighth Amendment* rights. The Magistrate Judge's

Recommendation provides a detailed breakdown of Plaintiff's allegations against each Defendant. (Doc. # 107 at 11-12, 16, 19-20, 23-24, 26-27, 28, 32-33.) In sum, Plaintiff alleges that certain Defendants (1) were aware of his grievances (*id.* at 11, 12); (2) received and denied his cop-outs (*id.* at 11, 16, 19); (3) cut the ADX budget and/or encouraged the budget to be cut (*id.* at 11, 16); (4) as supervisors, failed to ensure medical care and approved policies which allow "illegal acts to exist" (*id.* at 11, 16); (5) were deliberately indifferent in depriving Plaintiff of a high fiber diet (*id.* at 16, 19, 23); (6) denied his requests to see a physician and, instead, placed him on a diet inconsistent with his needs (*id.* at 12, 23); and (7) created and/or allowed policies to exist which deprived Plaintiff of medical care and the daily diet he requests. (*Id.* at 16, 28, 32-33).

The Magistrate Judge recommended dismissal of Plaintiff's *Eighth Amendment* claim in its entirety for failure to state a claim, pursuant to *Fed. R. Civ. P. 12(b)(6)*. (*Id.* at 19, 23, 26, 32). [*12] He recommended that Claim One be dismissed against the BOP and Defendant Nafziger for failure to state an *Eighth Amendment* Claim, and that it be dismissed as against Defendants Wiley, Jones, and Bauer for failure to state a claim due to lack of personal participation.[5] (*Id.*)

In his objection, Plaintiff asserts that his allegations sufficiently state an *Eighth Amendment* claim. (Doc. # 108 at 2-3, 6-7.) Specifically, Plaintiff contends that he may "bolster his claim" in responses and replies (*id.* at 4); that he was on a physician-prescribed diet and conditions of confinement prohibit further documentation of his medical condition (*id.* at 3-6); and that Defendant Nafziger acted with deliberate indifference when he referred Plaintiff to the Chaplain regarding a medical condition (*id.* at 4-5). For the following reasons the Court adopts the Magistrate Judge's recommendation to dismiss Plaintiff's *Eighth Amendment* claim.

_____

[5] Because all claims against Defendants Lappin and Nalley are dismissed for lack of personal jurisdiction, the Court will not address Plaintiff's *Eighth Amendment* claim against them.

2010 U.S. Dist. LEXIS 83006, *12

1. Plaintiff's Contention That He May Clarify His Allegations In Later Filings

In support of his **[*13]** contention that he may clarify his allegations in later filings, Plaintiff relies on *Erickson v. Pardus*,[6] and asserts that the Magistrate Judge's reliance on *Shanahan v. City of Chicago*,[7] for the opposite conclusion, is misplaced. (Doc. # 107 at 20.) The Court, however, disagrees with Plaintiff's interpretation of *Erickson*.

The Plaintiff in *Erickson* brought an action under *42 U.S.C. § 1983* because he was removed from a hepatitis C treatment. *Erickson, 551 U.S. at 89-90*. The district and appellate courts dismissed Erickson's claims because they found his allegations to be conclusory. The Supreme Court disagreed and vacated the judgment, holding that the allegations in the complaint were sufficient to state a claim and satisfy *Fed. R. Civ. P. 8(a)(2)*. *See id. at 94*. As an aside, the Supreme Court recognized that the Petitioner "bolstered his claim by making more specific allegations in documents **attached to the complaint** and in later filings." *Id.* (emphasis added).

In the instant case, Plaintiff did not bolster his claims with attachments to his complaint, but incorrectly argues he may do so in later filings. **HN7**[↑] According to the Tenth Circuit, **[*14]** "[t]he court's function on a 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief can be granted." *Peterson v. Grisham, 594 F.3d 723, 727 (10th Cir. 2010)* (quoting *Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991))*. For the reasons discussed below, Plaintiff's *Eighth Amendment* claim should be dismissed under *Fed. R. Civ. P. 12(b)(6)*, for failure to state a claim.[8]

_____

[6] *551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*.

[7] *82 F.3d 776 (7th Cir. 1996)*.

[8] Even if the Court considers additional information from Plaintiff's responses and replies, Plaintiff still has not sufficiently stated an *Eighth Amendment* claim, thus, Claim One would still fail.

2. Failure To State An *Eighth Amendment* Claim

**HN8**[↑] The *Eighth Amendment* protects against the infliction of "cruel and unusual punishments." U.S. CONST. *Amend. VIII*. "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)* (internal quotation marks and citation omitted). Conditions of confinement that unnecessarily and **[*15]** wantonly inflict pain, may constitute cruel and unusual punishment under the *Eighth Amendment*. *Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)*; *see Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*; *see also Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)* ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed in the *Eighth Amendment*.") (internal quotation marks and citation omitted).

As the Magistrate Judge duly noted, **HN9**[↑] an *Eighth Amendment* claim involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006)*. First, under the objective component, the injury must be sufficiently serious, showing a substantial risk of serious harm. *Farmer, 511 U.S. at 834*; *see also Self, 439 F.3d at 1230*. Second, under the subjective component, the defendant must have a "sufficiently culpable state of mind." *Farmer, 511 U.S. at 834* (citation omitted); *see also Self, 439 F.3d at 1230-31*.

a) Sufficiently Serious

Plaintiff's complaint does not satisfy the *Eighth Amendment* inquiry. First, the injury alleged by Plaintiff is not sufficiently serious to warrant a **[*16]** claim under the *Eighth Amendment*. Plaintiff alleges "serious chronic medical issues" that require a high fiber diet.[9] **HN10**[↑] "A medical

_____

[9] A description **[*17]** of Plaintiff's symptoms related to his

2010 U.S. Dist. LEXIS 83006, *17

need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)* (quoting *Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)*). "[E]xamples of serious medical needs include a brain tumor, delay in removing broken pins in a hip, premature return to prison after surgery, a bleeding ulcer, and loss of an ear." *Mandala v. Coughlin, 920 F. Supp. 342, 353 (E.D.N.Y. 1996)* (internal citations omitted). In *Erickson*, the Supreme Court deemed an allegedly life-threatening removal from a hepatitis C treatment to be sufficiently serious. *Erickson v. Pardus, 551 U.S. 89, 91, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*. A medically-required diet has been considered sufficiently serious in the context of a prisoner suffering from diabetes. *Johnson v. Harris, 479 F. Supp. 333, 334 (S.D.N.Y. 1979)* (where the prisoner suffered from diabetic gangrene requiring amputation of a portion of his leg).

In the instant case, Plaintiff points to medical records from a surgery that he underwent in 1984, which instructed him to stay on a high fiber diet. (*See* Doc. # 108 at 5.) Post-surgery recommendations from 1984 do not sufficiently represent a diagnosis "mandating treatment" that would rise to the necessary level for Plaintiff to satisfy the objective prong of an *Eighth Amendment* inquiry. Thus, Plaintiff does not demonstrate a denial of treatment that is sufficiently serious to maintain an *Eighth Amendment* claim.

*b) Deliberate Indifference*

Plaintiff's allegations also fail because they do not demonstrate deliberate indifference by Defendants, which is necessary to meet the subjective prong of an *Eighth Amendment* inquiry. *HN11*[⬆] A plaintiff must establish the defendant "knew [plaintiff] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."

*Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)* (internal quotation marks and citation omitted). "[T]he official must both be aware of facts from which the inference could **[*18]** be drawn that a substantial risk of harm exists, and he must draw the inference." *Farmer, 511 U.S. at 837*. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*." *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*.

In the instant case, Defendants' failure to provide the treatment that Plaintiff seeks based on one reference in post-surgery medical records that are more than 20 years old does not rise to the level of deliberate indifference required under an *Eighth Amendment* claim. *See Perkins v. Kansas Dept. of Corrs., 165 F.3d 803, 811 (10th Cir. 1999)* (disagreement with medical personnel "does not rise to a claim for deliberate indifference to serious medical needs"); *see also Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993)* ("[a] difference of opinion does not support a claim of cruel and unusual punishment"). Plaintiff asserts that Defendant Nafziger's "passing the buck" to the Chaplain after being asked by Plaintiff to be examined by a non-BOP proctologist rises to the level of deliberate indifference. (Doc. # 108 at 2, 4.) However, Plaintiff's allegations do not **[*19]** demonstrate that Defendants knew Plaintiff faced a substantial risk of harm and failed to take reasonable measures to avoid that harm. Plaintiff's allegations simply do not show that Defendants were deliberately indifferent to a substantial risk of harm. Thus, Plaintiff does not satisfy the subjective prong of an *Eighth Amendment* inquiry and his *Eighth Amendment* claim[10] against the BOP and the individual Defendants is dismissed in its entirety.

---

"serious chronic medical issues" is detailed in the Complaint. (Doc. # 67 at 5 n.1.)

[10] Because the Court finds that Plaintiff does not state an *Eighth Amendment* claim, it is unnecessary to go through a personal participation analysis for Defendants Wiley, Jones, and Bauer. However, the Court agrees with the Magistrate Judge that this claim against those Defendants would also be dismissed under *12(b)(6)* for lack of personal participation. (*See* Doc. # 107 at 18-19, 23.)

## B. CLAIM TWO: *FIRST AMENDMENT* CLAIM

Plaintiff next alleges that he was, and continues to be, subjected to religious discrimination in violation of the *First Amendment*. (Doc. # 67 at 19.) This claim is brought against the BOP and Defendants Wiley, Lappin, Nalley, and Powley.[11] Plaintiff does not object to the Magistrate Judge's Recommendation regarding Claim Two, so **[*20]** the Court reviews for clear error. *See Summers v. State of Utah, 927 F.2d 1165, 1167* (citing *Thomas v. Arn, 474 U.S. 140, 150, 154, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985))*.

In sum, Plaintiff alleges that (1) he was arbitrarily removed from the Common Fare diet and was not offered a comparable alternative to meet his religious needs; (2) Defendants created policies condoning illegal acts; and (3) Defendants ignored Plaintiff's grievances and failed to properly supervise subordinates. (Doc. # 67 at 19-28.) The Magistrate Judge recommended dismissal of the claims against Defendants Wiley and Powley for lack of personal participation; however, he recommended denial of the BOP's motion to dismiss Claim Two. Finding no clear error regarding the recommended dismissal of Defendant Wiley, the Court affirms that recommendation. However, the Court finds that Defendant Powley's and BOP's Motions to Dismiss Claim Two should be granted for failure to state a claim.

At the outset, the Court notes that **HN12**[⬆] although the Supreme Court has not affirmatively extended **[*21]** *Bivens* liability to *First Amendment* claims, it has assumed the application of *Bivens* to *First Amendment* claims. *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009)*. Accordingly, the Court will address Plaintiff's *First Amendment* claim assuming, without deciding, that it is actionable under *Bivens*.

### 1. Defendant Wiley

The Magistrate Judge correctly recommended the dismissal of Defendant Wiley from Claim Two for lack of personal participation. (Doc. # 107.) Plaintiff's *First Amendment* claim against Defendant Wiley focused on denial of grievances, budget cuts, and failure to supervise subordinates, which are insufficient to establish personal participation. (Doc. # 107 at 16.) *See Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)* ("Supervisory status alone does not create [ ] liability.") (citing *Duffield v. Jackson, 545 F.3d 1234, 1239 (10th Cir. 2008)); see also Whitington v. Ortiz, 307 F. App'x 179, 193 (10th Cir. 2009)* **[*22]** (unpublished) (holding that denial of grievances is insufficient to establish personal participation). Thus, finding no clear error, the Court adopts the Magistrate Judge's recommendation to dismiss Defendant Wiley from Claim Two for lack of personal participation.

### 2. Defendant Powley

The Court disagrees with the recommended dismissal of Defendant Powley for lack of personal participation,[12] but finds Defendant Powley should be dismissed from Claim Two on other grounds. (*See* Doc. # 107 at 26-28.) As previously noted, **HN13**[⬆] personal participation is an essential allegation in a *Bivens* action. *See Iqbal, 129 S. Ct. at 1949* ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *see also Kite v. Kelley, 546 F.2d 334, 337-38 (10th Cir. 1976)* (a plaintiff suing federal officials for constitutional violations under *Bivens* must show an affirmative link between the defendant's conduct and the alleged constitutional deprivation).

Defendants argue that Plaintiff's claims against Defendant Powley are conclusory and do not show personal participation. (Doc. # 109 at 17-18.) The Court is not persuaded with respect to Defendant Powley's alleged participation. Plaintiff asserts

---

[11] Because all claims against Defendants Lappin and Nalley are dismissed for lack of personal jurisdiction, the Court will not address Plaintiff's *First Amendment* claims against them.

---

[12] In his recommended dismissal of Claim Two against Defendant Powley, the Magistrate Judge appears to have premised his recommendation on a conflation of the tests for *First* and *Eighth Amendment* **[*23]** claims. (Doc. # 107 at 27.) Plaintiff did not allege an *Eighth Amendment* claim against Defendant Powley.

2010 U.S. Dist. LEXIS 83006, *23

specific allegations regarding actions by Defendant Powley which allegedly violate his *First Amendment* rights. Plaintiff alleges that Defendant Powley, in his role as Chaplain, discriminated against him and arbitrarily removed him from the Common Fare diet without providing an alternative, thereby placing a substantial burden on his religious beliefs. (Doc. # 67 at 23-25.) Specifically, Plaintiff alleges that Defendant Powley removed him from the Common Fare diet following Plaintiff's refusal "to deny his Christian faith and claim a Jewish or Muslim faith." (Doc. # 67 at 23.) Therefore, Plaintiff sufficiently alleges personal participation by Defendant Powley in Claim Two.

However, upon a closer review, while Plaintiff appears to plead generally the elements in support of a *First Amendment* claim, Plaintiff's allegations are largely unsubstantiated. **[*24]** Moreover, certain allegations belie his contention that his need to maintain a diet comprised of "unrefined whole-grains and living foods with its natural insoluble fiber intact" is religious-based and/or that meals Defendants provide impose a "substantial burden" on his ability to practice his Christianity. For example, Plaintiff's allegations clearly state that he "adhered to a daily diet high in insoluble fiber of whole foods" prior to his arrest in April 1995, dating back as early as 1984, upon the recommendation of a surgeon. (Doc. #67, ¶¶ 11, 12, n.3). However, Plaintiff did not become a Christian until June 1996, twelve years later. (*Id.*, ¶ 15). Therefore, in drawing all reasonable inferences from this *pro se* plaintiff's Complaint, as the Court must, the Court infers that Plaintiff's adoption of a whole foods diet was for health reasons, rather than for religious reasons, as Plaintiff now contends.[13] This is

underscored by Plaintiff's conflation of his purported religious rights with his medical/health needs by alleging that "Chaplin Powley's acts and omissions [in arbitrarily removing Plaintiff from the common fare diet] directly contribute to exacerbating Plaintiff's medical **[*25]** issues [*e.g.*, symptoms of constipation, hemorrhoids, bleeding, cramps, *etc.*, which Plaintiff experienced prior to his surgery in 1984] whereby needlessly causing ongoing physical and spiritual pain and suffering to this day." (*Id.*, ¶ 119). Upon the Court's review, the reference to consequent "spiritual pain" is vague and a mere afterthought.

Even if Plaintiff later embraced religious reasons for adopting a whole foods diet, Plaintiff has failed to allege sufficiently that the BOP's meal service imposes a "substantial burden" on his ability to practice Christianity. Further, the instant facts are distinguishable from other decisions in which courts found that prison officials' failure to comply

---

into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment, . **[*26]** . . and therefore the issue of sincerity can rarely be determined on summary judgment,' let alone a motion to dismiss." *Id. at 1219* (quoting *Snyder v. Murray City Corp., 124 F.3d 1349, 1352-53 (10th Cir. 1997)).* The determination of what is a "religious" belief or practice does not "turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit *First Amendment* protection." *Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 714, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981).* A plaintiff need not "plead facts sufficient for an objectively reasonable person to conclude that his belief his religious in nature . . . . Religion is by its nature subjective . . . . If [a plaintiff] could explain or prove objectively why his religion commanded the belief in question, it might no longer be a religious belief, or at least not one rooted in faith." *Watts v. Florida Int'l Univ., 495 F.3d 1289, 1296 (11th Cir. 2007).*

In the instant case, the Court is not questioning the truth of God's purported dietary requirements for Christians. However, though mindful of the fact that "sincerity and genuineness" **[*27]** of one's religious beliefs is a credibility determination for the trier of fact, the Court finds that Plaintiff's own allegations render his religious belief-based claims suspect. In viewing the Complaint as a whole, the health-based motivation for his adoption of the at-issue diet is readily apparent. The religious/spiritual motivation for this diet is far less apparent; the *First Amendment* argument appears to be an attempt to obtain special treatment for which Plaintiff has not alleged sufficiently a medical necessity.

---

[13] The Court is well aware of this Circuit's standard for affording religious dietary practices constitutional protection. The Tenth Circuit has held that *HN14* "a prisoner's belief in religious dietary practices is constitutionally protected if the belief is 'genuine and sincere,' even if such dietary practices are not doctrinally 'required' by the prisoner's religion." *Kay v. Bemis, 500 F.3d 1214, 1220 (10th Cir. 2007)* (discussing *LaFevers v. Saffle, 936 F.2d 1117, 1119 (10th Cir. 1991)* (concluding that the "district court abused its discretion in dismissing [the] plaintiff's complaint to the extent it based its decision on the fact that a vegetarian diet is not required by the Seventh Day Adventist Church."). Further, "'[t]he inquiry

2010 U.S. Dist. LEXIS 83006, *27

with the plaintiffs' dietary requests imposed a substantial burden on their religious practices.

HN15[↑] A "substantial burden" is one that (1) significantly inhibits or constrains a plaintiff's religious conduct or expression, (2) meaningfully curtails a plaintiff's ability to express adherence to his faith, or (3) denies [*28] the plaintiff reasonable opportunity to engage in fundamental religious activities. *Wares v. Simmons, 524 F. Supp. 2d 1313, 1320, n.9 (D. Kan. 2007)*.[14] In sum, Plaintiff has failed to allege sufficient facts to show that the diet he currently eats lacks sufficient food items that he may consume without violating his religion.

The facts alleged render the instant case analogous to *Barner v. Marberry, No. 07-98, 2008 U.S. Dist. LEXIS 63345, 2008 WL 3891264 (W.D. Pa. Aug. 18, 2008)* (unpublished) (finding that the prisoner plaintiff, who kept kosher and received pre-packaged kosher meals that included prepared kosher vegetables, failed to state a *First Amendment* claim in connection with the prison's failure to provide him with fresh kosher vegetables). In pertinent part, the district court concluded, "Plaintiff's allegations are reduced to no more than an expression of his preference for fresh vegetables" because "Plaintiff does not complain that the religious certified meals [ ] failed to comply with his religious standards . . . [A]bsent from Plaintiff's allegations is any claim that [*29] his religion requires him to eat fresh vegetables, and that the omission of fresh vegetables from his kosher diet was, thus, a substantial burden on his religious practice." *Barner, 2008 U.S. Dist. LEXIS 63345, 2008 WL 3891264, at *7*.

Similarly, in the instant case, Plaintiff appears to state a preference for eating meals comprised entirely, or almost entirely, of "unrefined whole-grains and living foods". (Doc. #67, ¶ 17). However, Plaintiff does not state that Christianity requires him to consume only un-refined whole grains and living foods, and he does not contend that his meals are bereft of any such foods. Rather,

Plaintiff contends that his meals do not contain enough of them and that the meals are small and lack variety. (*Id.*, ¶ 21; n.21). Plaintiff does not contend that the meals leave him without anything to eat. Rather, Plaintiff portends ominous consequences without any substantiation. (*See* Doc. # 93, Plaintiff's Response to Defendant Powley's Motion to Dismiss, at 5) ("For if [Plaintiff] stops consuming those refined and dead foods that defile his body he will lose weight, then BOP staff will force feed him to prevent death by malnutrition.")

The instant case is clearly distinguishable from the situation [*30] presented in *Abdulhaseeb v. Calbone, 600 F.3d 1301 (10th Cir. 2008)*, in which the prisoner plaintiff, who was Muslim, was denied halal food and provided vegetarian or non-pork common fare food instead. The Tenth Circuit reversed the district court's grant of summary judgment in connection with the plaintiff's religion-based claim. The court drew a reasonable inference that the defendants' "failure to provide a halal diet either prevents [Plaintiff's] religious exercise, or, at the least, places substantial pressure on [Plaintiff] not to engage in his religious exercise by presenting him with a Hobson's choice — either he eats a non-halal diet in violation of his held beliefs, or he does not eat." *600 F.3d at 1317*.

The instant dispute is also distinguishable from *Vashone-Caruso v. Zenon, No. 95-1578, 2005 U.S. Dist. LEXIS 45904, 2005 WL 5957978 (D. Colo. July 25, 2005)* (granting judgment in favor of prisoner plaintiff on religion-based claim). The prisoner plaintiff, a practitioner of the Hanafi school of Sunni Islam, complained that the defendants' failure to provide him with halal red meat imposed a substantial burden on his religious practices. In the plaintiff's view, consuming halal red meat was a sign [*31] of gratitude towards God's provision of such food. Upon consideration of evidence that Muslim inmates were only provided halal red meat twice a year, the court determined that the defendants' food service policies imposed a substantial burden on the plaintiff's religious practices. *2005 U.S. Dist. LEXIS 45904, WL] at *12*.

---

[14] The Tenth Circuit uses the same "substantial burden" test to evaluate RFRA and *First Amendment* free exercise prisoner claims. *Id.*

2010 U.S. Dist. LEXIS 83006, *31

In the instant case, Plaintiff has not alleged that he faces the Hobson choice present in *Abdulhaseeb v. Calbone* or that Defendants have infrequently provided him with the foods that are purportedly integral to Plaintiff's religious practice, as was the case in *Vashone-Caruso v. Zenon.*

In any event, even if Plaintiff has stated a valid *First Amendment* claim, the Court finds that this claim is barred by the statute of limitations.[15] *HN16*[↑] "A *Bivens* claim is subject to the general personal injury statute in the state where the action arose." *Trujillo v. Simer, 934 F. Supp. 1217, 1226 (D. Colo. 1996)* (citing *Wilson v. Garcia, 471 U.S. 261, 276, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985);* *Indus. Constructors v. United States Bureau of Reclamation, 15 F.3d 963, 968 (10th Cir. 1994)).* Under Colorado law, personal injury actions are subject to a two-year statute of limitations. *See COLO. REV. STAT. § 13-80-102 (1995).*

In the instant case, Defendant Powley removed Plaintiff from the Common Fare diet on March 3, 2006. (Doc. # 67 at 23.) Plaintiff did not file his complaint in the instant case until March 16, 2009. (Doc. # 2.) The action is thus barred by the two-year statute of limitations. Even if the statute of limitations was tolled while Plaintiff was filing required administrative grievances with the BOP, the action is still barred by the statute of limitations. According to Plaintiff's Second Amended Complaint, his administrative grievance, with respect to his religious needs, was denied on June 6, 2006 (Doc. # 67 at 25), and his administrative appeals were denied on August 31, 2006 and November 27, 2006 (*id.* at 26-27). After the denial of his grievance and subsequent appeals, Plaintiff waited more than two years before filing his complaint in this Court.

Plaintiff argues that his claim against Defendant Powley is not time-barred because Plaintiff is suffering a continuing violation **[*33]** of his *First Amendment* rights. (Doc. # 93 at 29.) The Court is not persuaded. *HN17*[↑] "Courts have recognized that in some circumstances, ongoing constitutional deprivations can constitute continuing violations that toll the statute of limitations or otherwise defeat a defense of untimeliness." *Georgacarakos v. Wiley, No. 17-cv-01712, 2008 U.S. Dist. LEXIS 69144, 2008 WL 4216265, at *12 (D. Colo. Sept. 12, 2008)* (unpublished) (citing *Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2002)).* However, the Tenth Circuit has "never endorsed such a 'continuing violation' theory of ex post facto liability in this context; to the contrary, [it has] rejected analogous arguments in the past." *Wood v. Utah Bd. of Pardons & Parole, No. 09-4225, 375 Fed. Appx. 871, 2010 U.S. App. LEXIS 7483, 2010 WL 1434400, at *3 n.2 (10th Cir. April 12, 2010)* (unpublished). Additionally, if a single, discrete act has continuing consequences, then the 'continuing violation' doctrine does not apply. *Georgacarakos, 2010 U.S. App. LEXIS 7483, 2008 WL 4216265, at *12* (citing *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)).* Plaintiff's allegations against Defendant Powley focus on Plaintiff's removal from the Common Fare diet, *i.e.,* a discrete event. (Doc. # 67 at 23-25.) The Court finds no continuing violation **[*34]** of Plaintiff's rights with respect to Defendant Powley. Thus, Claim Two against Defendant Powley is barred by the statute of limitations.

3. Defendant BOP

Finally, the Court disagrees with the Magistrate Judge that Plaintiff sufficiently stated a *First Amendment* claim with respect to the BOP. *HN18*[↑] Prisoners retain *First Amendment* rights, including the right of free exercise of religion, however, those rights may be subject to reasonable limitations. *Kay v. Bemis, 500 F.3d 1214, 1218 (10th Cir. 2007)* (citing *O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987)).* "[I]n order to allege a constitutional violation based on a free exercise claim, a prisoner-plaintiff must survive a two-step inquiry." *Id.* "First, the prisoner-plaintiff must [ ] show that a prison regulation 'substantially

---

[15] Defendant Powley asserts **[*32]** this affirmative defense in his motion to dismiss. (Doc. # 83 at 17-18.) Defendant Powley also asserts a qualified immunity defense (id. at 13-16), but the Court need not address this because the claim is time-barred.

2010 U.S. Dist. LEXIS 83006, *34

burdened . . . sincerely-held religious beliefs.'"[16] *Id.* (quoting *Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007))*. "Second, prison officials-defendants may 'identif[y] the legitimate penological interests that justif[ied] the impinging conduct.'"[17] *Id.* (quoting *Boles, 486 F.3d at 1182*).

As already discussed, the Court finds that Plaintiff's allegations undermine his purported religious motivation to adopt a whole foods diet. Further, Plaintiff fails to substantively allege how Defendants' food service policies substantially burdened the exercise of his religion. Because Plaintiff has failed to satisfy the first part of the inquiry, the Court need not consider whether legitimate penological interests exist.

Therefore, the Court finds that Plaintiff has not stated a plausible claim against the BOP under the *First Amendment*.

## C. CLAIM THREE: RELIGIOUS FREEDOM RESTORATION ACT CLAIM

In Claim Three, Plaintiff alleges that the **[*36]** BOP and Defendants Wiley, Lappin, Nalley, and Powley violated the RFRA, *42 U.S.C. § 2000bb to bb-4*.[18] (Doc. # 67 at 29.) In this claim, Plaintiff alleges the same conduct as alleged in support of his *First Amendment* claim (Claim Two). (*Id.*) The Magistrate Judge recommended that the Court deny motions to dismiss by Defendants Wiley,

Powley, and the BOP. (Doc. # 107 at 41.) No objections were made to this portion of the Recommendation, therefore, the Court reviews for clear error. *See Summers v. State of Utah, 927 F.2d 1165, 1167* (citing *Thomas v. Arn, 474 U.S. 140, 150, 154, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985))*.

As the Magistrate Judge duly noted, **HN19**[⬆] to establish an RFRA claim, a prisoner must show that the federal government substantially burdened the prisoner's sincere exercise of religion. *Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir. 2001)*. According to the RFRA, the government may not substantially burden a person's practice of their religion unless the restriction is furthering a compelling government interest and is the least restrictive means **[*37]** of doing so. *42 U.S.C. § 2000bb-1 (1993)*.

Because Plaintiff fails to substantively allege how Defendants' food service policies substantially burdened his practice of Christianity, the Court finds that Plaintiff's RFRA claim also fails.

## IV. CONCLUSION

For the reasons discussed above, the Court AFFIRMS AND ADOPTS, IN PART, AND OVERRULES, IN PART, the June 22, 2010 Recommendation of Magistrate Judge Craig B. Shaffer. (Doc. # 107.) Accordingly, IT IS ORDERED THAT:

> 1. Defendants' various Motions to Dismiss are GRANTED (Doc. ## 68, 72, 73, 74, 76, and 83); and

> 2. Plaintiffs claims are DISMISSED WITH PREJUDICE.

DATED: August 12, 2010

BY THE COURT:

/s/ Christine M. Arguello

CHRISTINE M. ARGUELLO

United States District Judge

---

[16] A "substantial burden" is one that (1) significantly inhibits or constrains a plaintiff's religious conduct or expression, **[*35]** (2) meaningfully curtails a plaintiff's ability to express adherence to his faith, or (3) denies a plaintiff reasonable opportunity to engage in fundamental religious activities. *Wares v. Simmons, 524 F. Supp. 2d 1313, 1320 n.9 (D. Kan. 2007)*. The Tenth Circuit uses the same "substantial burden" test to evaluate RFRA and *First Amendment* free exercise prisoner claims. *Id.*

[17] The burden then shifts back to the prisoner to show that the penological concern is irrational. *Kay, 500 F.3d at 1219 n.2* (quoting *Salahuddin v. Goord, 467 F.3d 263, 275 (2d Cir. 2006))*.

[18] Again, the Court notes that Defendants Lappin and Nalley are dismissed for lack of personal jurisdiction, therefore, RFRA claims against them will not be addressed.

2010 U.S. Dist. LEXIS 83006, *37

**End of Document**

Positive
As of: August 13, 2021 5:10 PM Z

# *Phillips v. Tiona*

United States Court of Appeals for the Tenth Circuit

January 23, 2013, Filed

No. 12-1055

## Reporter

508 Fed. Appx. 737 *; 2013 U.S. App. LEXIS 1505 **; 2013 WL 239891

JEFFREY ALLEN PHILLIPS, Plaintiff - Appellant, v. SUSAN TIONA, Doctor, Kit Carson Correctional Center; HOYT BRILL, Warden, Kit Carson Correctional Center; JODI GRAY, Health Administrator, Kit Carson Correctional Center; CORRECTIONS CORPORATION OF AMERICA, owner of private KCCC; Defendants - Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** (D. Colorado). (D.C. No. 1:10-CV-00334-PAB-KMT).

*Phillips v. Tiona, 2012 U.S. Dist. LEXIS 17236 (D. Colo., Feb. 13, 2012)*

## Core Terms

screw, prison, ankle, public entity, syndesmotic, surgery, summary judgment, instrumentality, contracting, inmates, pain, district court, removal, x-ray, limp, employees, shower, recommendation, correctional facility, Corrections, prescribed, plate, county jail, regulations, deliberate, disability, orthopedic, fracture, offender, fibula

## Case Summary

### Procedural Posture

Appellant prisoner appealed the judgment of the United States District Court for the District of Colorado that dismissed *42 U.S.C.S. § 1983* claims against appellee warden under *Fed. R. Civ. P. 12(b)(6)*, granted summary judgment to appellee employees as to Eight Amendment claims, and granted summary judgment to appellee corrections corporation as to claims under Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131 et seq.*

### Overview

The court held that the prisoner's allegations did not state a constitutional violation on the part of the warden. The court ruled that the employees were not deliberately indifferent to the prisoner's condition and that any disagreement between them and the prisoner was attributable only to a difference of medical opinion. As to Title II, the court stated that the word "instrumentality" in the definition of public entity under *§ 12131(1)* referred to a traditional government unit or one created by a government unit. Accordingly, the court joined the Eleventh Circuit and the overwhelming majority of other courts that had spoken directly on the issue and held that Title II did not generally apply to private corporations that operated prisons. Therefore, Title II did not apply to the corporation with respect to the management of the correctional center at issue, and the complaint failed to state a claim against the corporation upon which relief could be granted for an alleged violation of the ADA.

### Outcome

The judgment was affirmed.

## LexisNexis® Headnotes

508 Fed. Appx. 737, *737; 2013 U.S. App. LEXIS 1505, **1

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

**HN1**[⬇] **Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's dismissal of a complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, for failure to state a claim, accepting all well-pleaded factual allegations in the complaint as true and drawing all inferences in favor of the plaintiff. To survive a *Rule 12(b)(6)* motion, the pleadings must contain enough facts to state a claim to relief that is plausible on its face. A party's pro se status entitles him to a liberal reading of his pleadings; a court will not, however, serve as his advocate.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

**HN2**[⬇] **Appeals, Appellate Briefs**

Arguments inadequately briefed in the opening brief are waived.

Civil Rights Law > Protection of Rights > Immunity From Liability > Respondeat Superior Distinguished

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

**HN3**[⬇] **Immunity From Liability, Respondeat Superior Distinguished**

A plaintiff cannot establish liability under *42*

*U.S.C.S. § 1983* merely by showing that the defendant was in charge of others who may have committed a constitutional violation. Instead, the plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights. It is uncertain, however, whether or in what form supervisory liability survives the United States Supreme Court's decision in Ashcroft v. Iqbal. At least, under Iqbal, a supervisor's mere knowledge of his subordinate's discriminatory purpose and acquiescence are insufficient to establish a constitutional violation.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

**HN4**[⬇] **Prisoner Rights, Medical Treatment**

A prison official may reasonably rely on the judgment of medical professionals.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Rights Law > ... > Immunity From Liability > Local Officials > Deliberate Indifference

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

**HN5**[⬇] **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate in cases where the record discloses no genuine issue as to any

508 Fed. Appx. 737, *737; 2013 U.S. App. LEXIS 1505, **1

material fact. *Fed. R. Civ. P. 56(c)*. In a deliberate indifference case under the *Eighth Amendment*, courts look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party. The plaintiff must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment. To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

*HN6*[ ] **Prisoner Rights, Confinement Conditions**

Prison officials violate the *Eighth Amendment* when they are deliberately indifferent to a prisoner's serious medical needs. To establish an *Eighth Amendment* claim under that standard, a prisoner must satisfy two requirements, consisting of an objective and a subjective component. To satisfy the objective component the prisoner must establish that the deprivation alleged was sufficiently serious. The subjective component requires the prison official to have a sufficiently culpable state of mind. In the context of prison conditions cases, that state of mind is one of deliberate indifference to inmate health or safety. A prison official cannot be found liable under the *Eighth Amendment* for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health. A mere difference of opinion between a

prisoner and the prison's medical staff with respect to a diagnosis or a plan of treatment, or a mere medical difference of opinion, is not actionable under the *Eighth Amendment*.

Business & Corporate Compliance > ... > Disability Discrimination > Scope & Definitions > Covered Entities

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Legislative Intent

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > General Overview

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN7*[ ] **Scope & Definitions, Covered Entities**

Title II of the Americans with Disabilities Act, *42 U.S.C.S. § 12131 et seq.*, provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. *42 U.S.C.S. § 12132*. The Act defines a "public entity" as any state or local government, department, agency, special purpose district, or other instrumentality of a state or states or local government; and the National Railroad Passenger Corporation, and any commuter authority. *§ 12131(1)*. An individual is disabled if he has a physical or mental impairment that substantially limits one or more major life activities. *42 U.S.C.S. § 12102(1)(A)*.

508 Fed. Appx. 737, *737; 2013 U.S. App. LEXIS 1505, **1

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > State Sovereign Immunity > General Overview

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

## HN8[↓] Affirmative Defenses, Immunity

The line separating a state-operated prison from one operated by a private corporation is not just cosmetic. There are important differences, creating a material and significant asymmetry. Thus, for instance, whereas a state and its department of corrections employees enjoy *Eleventh Amendment* immunity from damages suits under *42 U.S.C.S. § 1983* for their official actions, and department of corrections employees in their individual capacities enjoy qualified immunity in *§ 1983* damages actions, a private corporation and its private prison employees enjoy neither. They are fully exposed to the numerous civil rights suits brought by inmates.

Civil Rights Law > Protection of Rights > Implied Causes of Action

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Torts > Negligence > General Overview

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

## HN9[↓] Protection of Rights, Implied Causes of Action

Unlike federal prisoner suits against government employees, federal prisoners at a privately run federal prison cannot bring a Bivens action against the private corporation that manages the prison, or its privately employed personnel working there, when there is a remedy under state tort law. But

that prohibition is more than offset by the ability to bring actions for simple negligence—a ground not available, for instance, in an *Eighth Amendment* claim under *42 U.S.C.S. § 1983*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Defenses

Constitutional Law > State Sovereign Immunity > General Overview

Labor & Employment Law > ... > Disability Discrimination > Defenses > Sovereign Immunity

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

## HN10[↓] Affirmative Defenses, Immunity

With respect to the application of Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131 et seq.*, states may, for certain conduct, enjoy sovereign immunity from ADA suits for money damages where that conduct does not actually violate the *Fourteenth Amendment*.

Business & Corporate Compliance > ... > Disability Discrimination > Scope & Definitions > Covered Entities

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

## HN11[↓] Scope & Definitions, Covered Entities

Title II of the Americans with Disabilities Act, *42 U.S.C.S. § 12131 et seq.*, does not apply to federal prisoners in federal prisons, including those privately managed by corporations. That is so because Title II covers only states and defined

508 Fed. Appx. 737, *737; 2013 U.S. App. LEXIS 1505, **1

appendages thereof.

Business & Corporate
Compliance > ... > Disability
Discrimination > Scope & Definitions > Covered
Entities

Civil Rights Law > ... > Protection of Disabled
Persons > Americans With Disabilities
Act > Scope

*HN12*[⬇] **Scope & Definitions, Covered Entities**

Regulations issued by the Attorney General
implementing Title II of the Americans with
Disabilities Act, *42 U.S.C.S. § 12131 et seq.*,
suggest that states may not avoid the responsibility
to provide services to disabled prisoners by
contracting away those obligations. Thus, prison
assignments should not make a material
difference. The regulations require that a public
entity in providing any aid, benefit, or service, may
not, directly or through contractual, licensing, or
other arrangements, discriminate against
individuals with disabilities. *28 C.F.R. §
35.130(b)(1)*.

Business & Corporate
Compliance > ... > Disability
Discrimination > Scope & Definitions > Covered
Entities

Civil Rights Law > ... > Protection of Disabled
Persons > Americans With Disabilities
Act > Scope

Governments > Legislation > Interpretation

*HN13*[⬇] **Scope & Definitions, Covered Entities**

As to Title II of the Americans with Disabilities Act,
*42 U.S.C.S. § 12131 et seq.*, the proper canon of
construction to apply is noscitur a sociis (a word is
known by the company it keeps), and that
"instrumentality" refers to a traditional government
unit or one created by a government unit.

Business & Corporate
Compliance > ... > Disability
Discrimination > Scope & Definitions > Covered
Entities

Civil Rights Law > ... > Protection of Disabled
Persons > Americans With Disabilities
Act > Scope

*HN14*[⬇] **Scope & Definitions, Covered Entities**

Title II of the Americans with Disabilities Act, *42
U.S.C.S. § 12131 et seq.*, does not generally apply
to private corporations that operate prisons.

Civil Rights Law > ... > Protection of Disabled
Persons > Americans With Disabilities
Act > Remedies

Labor & Employment Law > ... > Disability
Discrimination > Remedies > Injunctions

*HN15*[⬇] **Americans With Disabilities Act,
Remedies**

A private individual may only obtain injunctive relief
for violations of a right granted under Title III of the
Americans with Disabilities Act, *42 U.S.C.S. §
12181 et seq.*; he cannot recover damages.

**Counsel:** JEFFREY ALLEN PHILLIPS, Plaintiff -
Appellant, Pro se, Colorado Springs, CO.

For SUSAN TIONA, Doctor, Kit Carson
Correctional Center, JODI GRAY, Health
Administrator, Kit Carson Correctional Center,
CORRECTIONS CORPORATION OF AMERICA,
owner of private prison KCCC, Defendants -
Appellees: Edmund Martin Kennedy, Hall & Evans,
Denver, CO.

**Judges:** Before HARTZ, ANDERSON, and EBEL,
Circuit Judges.

**Opinion by:** Stephen H. Anderson

# Opinion

508 Fed. Appx. 737, *737; 2013 U.S. App. LEXIS 1505, **1

**[*739] ORDER AND JUDGMENT**[*]

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Jeffrey Allen Phillips, a state prisoner proceeding pro se, brought this 42 U.S.C. § 1983 and Americans with Disabilities Act ("ADA") action [**2] claiming that the Corrections Corporation of America ("CCA") and three of its employees at the Kit Carson Correctional Center ("KCCC") were deliberately indifferent to his medical needs in violation of the Eighth Amendment, and failed to accommodate those needs in violation of Titles II and III of the ADA and § 504 of the Rehabilitation Act.[1] Pursuant to Fed. R. Civ. P. 12(b)(6), the district court dismissed the Eighth Amendment claim against the defendants Warden Hoyt Brill and CCA, and dismissed Mr. Phillips' § 504 claim against all defendants. Subsequently the court granted the defendants' motion for summary judgment on all remaining claims. For the reasons stated below, we affirm.

**BACKGROUND**

On August 25, 2009, while he was assigned to a halfway house, Mr. Phillips fractured the fibula in his right leg. On August 26, 2009, Dr. David Matthews, an orthopedic surgeon, repaired the fracture using two metal plates and seven screws. One of those screws was a 4.5 mm cortical screw (the syndesmotic screw) inserted across the syndesmosis (a wide sheet of ligament connecting the fibula to the tibia at the ankle) [**3] tying the

fibula and tibia together. R. Vol. 4 at 222-23. After the operation, Mr. Phillips was taken to the El Paso County Jail.

Dr. Matthews next saw Mr. Phillips for a follow-up visit on September 11, 2009, noting the fixation to be in proper position and that the "ankle wound [was] healing well." Id. at 228-29. He prescribed Tylenol or Tylenol 3 for pain and directed corrections personnel at the El Paso County Jail to bring Mr. Phillips back "in about a month for an X-ray of his right ankle out of the cast. At that point we will make plans to remove the syndesmotic screw." Id. at 228. Phillips was to "remain [non-weight-bearing] on crutches." Id. at 229. The record suggests that the next appointment was scheduled for October 13, 2009. However, on October 8, 2009, Mr. Phillips was regressed to KCCC to continue serving his sentence. While Mr. Phillips was at the El Paso County Jail, doctors there additionally prescribed Neurontin for a thirty-day period.

Mr. Phillips remained at KCCC for about two months, until his transfer to the state-operated Sterling Correctional Facility ("SCF") on December 11, 2009. While at KCCC, he was under the medical supervision of defendants Dr. Susan M. [**4] Tiona, a physician employed by CCA to provide medical services to inmates housed in KCCC, and Jodi Gray, a Health Services Administrator at KCCC, as well as others.

During his two months at KCCC, Mr. Phillips mounted a vociferous, sometimes strident, and ongoing campaign to have the **[*740]** syndesmotic screw removed from his ankle. He submitted dozens of requests/demands by way of grievances, "kites" and other means to Dr. Tiona, Administrator Gray, Warden Brill and others (including the Governor, the Department of Corrections, and Doug Roberts, a Medical Monitor for the private Prisons Monitoring Unit of the Colorado Department of Corrections ("CDOC")) contending that Dr. Matthews had directed that the screw be removed on October 8, the date of his arrival at KCCC. Failure to do so, Mr. Phillips asserted, would result in him walking with a limp. He also contended that Dr. Matthews wanted him to remain non-weight-bearing until the screw was

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of **10th Cir. R. 32.1.**

[1] 42 U.S.C. §§ 12132, 12182, and Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794.

508 Fed. Appx. 737, *740; 2013 U.S. App. LEXIS 1505, **4

removed, so he apparently continued on crutches, or at least not using his right leg, although he was issued a walker on November 5. On November 10 he was told to start placing some weight on his right leg since the fracture had healed.

On or about October **[**5] 13, Dr. Tiona ordered an x-ray of Mr. Phillips' ankle, to be taken at the next scheduled arrival of CCA's portable x-ray equipment at KCCC. The x-ray was performed on October 28, 2009, and a diagnostic report was issued on October 29, 2009, by Dr. Benjamin Huang. Dr. Huang stated that the x-ray showed a "well fixated fracture of right distal fibula and without displacement." Id. at 273. The doctor also noted that there was no dislocation and that the ankle mortise was intact. Id.

On October 28 and again on October 30, 2009, Administrator Gray responded to complaints by Mr. Phillips by advising him that the x-rays just taken were being evaluated by Dr. Tiona. Id. at 346, 366. Then, on November 5, 2009, Dr. Tiona removed Mr. Phillips' cast and entered the following note in Mr. Phillips' Ambulatory Health Record: "X-ray taken on 10/29/09 shows well healed fracture with hardware in place, including syndesmotic screw through fibula and tibia. Cast removed without difficulty. His surgical incision is nicely healed. Leg is thoroughly cleaned up. He received a walker to use in his cell until I hear back [exhibit indecipherable] . . . about ambulation." Id. at 279.

In her affidavit in support **[**6] of her Motion for Summary Judgment, Dr. Tiona relates her actions and conclusions from that point, as follows:

6. Denver Health Medical Center is the referring facility used by Kit Carson Correctional Facility.

7. After identifying Plaintiff's postsurgical status, I consulted with an Orthopedic PA at Denver Health Medical Center. The Orthopedic PA conveyed to me that the removal of the syndesmotic screw is elective and that his department does not routinely remove the screw. Further, it is expected that the screw will break after the patient starts weight-bearing. If persistent pain exists 3 to 6 months after the screw breaks, the screw can then be removed.

8. In addition to the consultation with Denver Medical Health Centers, I reviewed orthopedic literature about weight-bearing and screw removal.

9. From the recommendation of my consulting specialist, as well as the support from the current orthopedic literature, there was no medical necessity to remove the syndesmotic screw during the time that Plaintiff was under my care at Kit Carson Correctional Center.

Id. at 82. Based on information she had received and researched, as well as her experience,[2] and her conclusions, Dr. Tiona **[*741]** then **[**7] reported to the Medical Monitor, Doug Roberts, by e-mail on November 6, 2009:

Briefly .... removed his cast on Thursday. Surgical site looks good. X-ray showed well-healed distal fib fracture with stable hardware. I e-mailed DHMC Ortho about the necessity for screw removal – as I suspected, there is no need to have the syndesmotic screw removed. It will naturally break (the screw, that is) when the patient starts to bear weight. The fact is that he is being treated quite appropriately. I will follow-up with a phone call to you next week, though, in case you have any other questions.

Id. at 91. Dr. Tiona conveyed this information to Mr. Phillips on November 10, noting the following information in his Ambulatory Health Record:

Visited Mr. Phillips in segregation. Discussed with him that I had communicated with orthopedics at DHMC and that the syndesmotic screw does not need to be removed. He can start his ROM [range of motion] exercises (I reviewed these with him verbally), and can bear weight as tolerated, using the walker for support as needed for the next couple of weeks until his ankle gets stronger.

Id. at 280.

_____

[2] In her answers to interrogatories, Dr. Tiona stated that she had "managed **[**8] the post-surgical care of several other inmates over the past 6 years with the same ORIF procedure." Id. at 473.

508 Fed. Appx. 737, *741; 2013 U.S. App. LEXIS 1505, **8

Subsequently Dr. Tiona examined Mr. Phillips on December 1, 2009, and made the following notation in the Ambulatory Health Record:

I took his right ankle in my hands and started working with it. Initially, there was basically zero ROM–both voluntary and involuntary stiffness of the ankle. After working with it for a few minutes, and talking with Mr. Phillips to distract him, I was able to get several millimeters of motion in all planes. When I pointed out to him how much better his foot and ankle looked with just this limited amount of therapy, he said "but I can't do that in my cell." I showed him that he can, indeed, put his right leg across his left leg, grab his ankle with his hands, and work it just like I was doing. He says that he will try, and I told him that my nurses were going to be bugging him about doing his therapy regularly. I also demonstrated how to use his walker to better support his ankle while still encouraging weight bearing and ROM.

Id. at 306. In a letter dated December 3, 2009, Dr. Matthews responded to inquiries from Mr. Phillips as follows:

Dear Mr. **[**9]** Phillips:

I received your letter. As we discussed when you were in my office, we typically remove the syndesmotic screw six weeks after the surgery. I can't comment on the symptoms you are having now, as I have not seen you or gotten any other X-rays. If you have been walking on the ankle a fair amount then the screw may already be broken. That is not the end of the world but it is difficult to remove and may give you symptoms if it is broken.

Id. at 319 (emphasis added). On December 11, 2009, Mr. Roberts, the Medical Monitor, entered the following note in his Contact Management folder:

12/11/2009 I have communicated with the mother several times, both by phone and email. The offender has received appropriate care. It is not essential that the screws be removed. The offender has not been following the recommendations of the MD at KCCC to start weight bearing and PT. However, the offender has been in Seg, and his opportunities to exercise and use his ankle are limited. **[*742]** I spoke w/him 12/09, and told him I think that the best thing would be to get him moved ASAP, so that he will be allowed greater movement. The offender has been wait-listed to be transferred out of KCCC. I spoke to Offender **[**10]** Services and this move will be done immediately. I told Offender Services that SCF would be a good choice b/c of their new PA. The mother has been informed. (note: the offender was moved today, 12/11/09) /dcr

Id. at 287 (emphasis added). As indicated by Mr. Roberts' memo for the file, Mr. Phillips was moved that same day, December 11, to SCF, a state-operated prison, and thereafter was in the care of health care providers other than Dr. Tiona.

X-rays taken at SCF on December 17, 2009, showed "good healing and no loosening of hardware." Id. at 309. The physician's assistant, Kathleen Melloh, noted: "He has not been putting wt on the R foot since that time [August 25] using crutches. Only exercise he has done is drawing the alphabet so consequently he cannot dorsiflex foot past neutral. Plantar flexion is only approx 15 degrees. I did see him in office yesterday and started on ROM exercises, but cannot start any weight-bearing exercises until syndesmotic screw is removed." Id. (emphasis added).

Subsequently, on January 13, 2010, the syndesmotic screw was removed from Mr. Phillips' ankle, intact. The surgeon's notes state that "[s]crew head was cleared and backed out. Wound was closed with **[**11]** Steri-Strips. . . . He can weight bear as tolerated. Ankle was stressed and stable." Id. at 435.

On April 22, 2010, following Mr. Phillips' continuing complaints of pain, he underwent further surgery. After inspection of the prior surgery site, a surgeon removed the right fibular plate (one of the two plates inserted on August 26, 2009), noting:

The area of swelling that bothered the patient was secondary to muscle impingement over

508 Fed. Appx. 737, *742; 2013 U.S. App. LEXIS 1505, **11

the proximal end of the plate. There was no sign of infection. No sign of necrotic tissue. No tissues, fluid plains or anything noted to suggest infection. All tissue looked healthy. Screws were removed. Plate removed. Where the syndesmotic screw had been we did take a tissue block from that. However, this showed just normal characteristics and no obvious concern of infection. It was felt that the proximal muscle plate interface was what had been irritated.

Id. at 321.

Mr. Phillips constantly complained of pain. At KCCC he demanded the Neurontin that had been prescribed at the El Paso County Jail, but that was denied by Dr. Tiona because it was considered a restricted drug for which Mr. Phillips did not qualify. Dr. Tiona at first prescribed Ibuprofen (to which **[**12]** Mr. Phillips objected because Dr. Matthews initially did not want him to take NSAIDs), then several days later, on October 13, she prescribed large doses of Tylenol and, later, combined doses of Tylenol and Ibuprofen. On October 18, 2009, Mr. Phillips wrote to Dr. Tiona thanking her for the 1000-mg Tylenol prescription. Id. at 463.

With the possible exception of a few days at the El Paso County Jail in September 2009, the record does not show Mr. Phillips receiving anything but Tylenol and Ibuprofen for pain[3] from the date of his surgery on August 26, 2009, through at least 2010. That period includes his incarceration **[*743]** at SCF after December 11, 2009, and two surgical procedures in 2010.

During his two months at KCCC, Mr. Phillips refused to put any weight on his right foot, despite advice to the contrary from Dr. Tiona beginning on November 5. As a result, he maintained that the only way he could balance himself on one leg and still access food delivered through the slot in his cell door was to place the food tray on the floor and **[**13]** slide it to the table or bed where he could lift the tray to an eating position. He particularly

objected to the tray-sliding technique due to the alleged presence of old dried urine stains on the floor from past occupants. Accordingly, he demanded a wheelchair, to use in his cell, so he could put food trays on his lap.

Likewise, Mr. Phillips demanded a handicap shower facility having grab bars and a fold-down bench. But the one available handicap shower was not working, so he was directed to the regular shower. From October 8 through November 2, 2009, the prison gave Mr. Phillips a plastic chair to assist him in showering. The chair was discontinued on November 2 after Mr. Phillips fell off it. For the next month or so, Mr. Phillips alleges that to undress and dress for his shower, he was forced to sit on the shower floor which he described in lurid detail, not repeated here, as being covered with human wastes of all kinds. He did not complain at the prison and does not assert anywhere in his pleadings that he was unable to shower as such. His complaints are confined to having to dress sitting on a contaminated floor.

Mr. Phillips brought this action alleging that the defendants (1) **[**14]** violated his *Eighth Amendment* rights by not removing or delaying removal of the syndesmotic screw contrary to Dr. Matthews' treatment plan, resulting in pain and a permanent limp; and (2) violated Titles II and III of the ADA and *§ 504* by not furnishing a handicap shower or a wheelchair, thus forcing him to sit on a dirty shower floor to dress and to slide his food tray over the dirty cell floor from the door to his bed or table.

The district court, adopting the recommendation of the magistrate judge, dismissed the *Eighth Amendment* claim against CCA and Warden Brill pursuant to *Fed. R. Civ. P. 12(b)(6)* and, likewise, the § 504 claim as to all defendants. Subsequently, the court granted summary judgment in favor of the defendants on all remaining claims.

## DISCUSSION

## I. Dismissal of *Eighth Amendment* Claims Against CCA and Warden Brill and § 504

---

[3] The record does disclose the administration of medications related to other conditions; but those prescriptions were not linked to complaints of ankle pain.

508 Fed. Appx. 737, *743; 2013 U.S. App. LEXIS 1505, **14

## Claims Against All Defendants for Failure to State a Claim Upon Which Relief can be Granted

*HN1*[↑] We review de novo a district court's dismissal of a complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, for failure to state a claim, accepting all well-pleaded factual allegations in the complaint as true and drawing all inferences in favor of the plaintiff. *Casanova v. Ulibarri, 595 F.3d 1120, 1124-25 (10th Cir. 2010)*; [**15] *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. To survive a *Rule 12(b)(6)* motion, the pleadings must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 570*. We are mindful that Mr. Phillips' pro se status entitles him to a liberal reading of his pleadings; we will not, however, serve as his advocate. See *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*.

As a preliminary matter, we note that Mr. Phillips states that he appeals the district court's order that dismissed his [*744] *§ 1983* claim as against CCA and Warden Brill and that dismissed his *§ 504* claim as against all defendants. As best we can understand his opening brief, however, Mr. Phillips does not assert any claim of error other than the dismissal of his *§ 1983* claim against Warden Brill. Accordingly, to the extent he appeals the dismissal of his *§ 1983* claim against CCA or the dismissal of his *§ 504* claim against all defendants, Mr. Phillips has waived appellate review. See *United States v. Cooper, 654 F.3d 1104, 1128 (10th Cir. 2011)* (*HN2*[↑] "[A]rguments inadequately briefed in the opening brief are waived.") (internal quotation marks omitted).

We have said that *HN3*[↑] a plaintiff [**16] cannot establish liability under *§ 1983* merely by showing that the defendant was in charge of others who may have committed a constitutional violation. Instead, the plaintiff must establish a "deliberate, intentional act by the supervisor to violate constitutional rights." *Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010)*. It is uncertain, however, whether or in what form supervisory liability survives the Supreme Court's decision in *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. See *Dodds, 614 F.3d at 1200* ("*Iqbal* may very well have abrogated *§ 1983* supervisory liability as we previously understood it . . . in ways we do not need to address to resolve this case."); *Lewis v. Tripp, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010)* (*Iqbal* "has generated significant debate about the continued vitality and scope of supervisory liability."). At least, under *Iqbal*, a supervisor's mere knowledge of his subordinate's discriminatory purpose and acquiescence are insufficient to establish a constitutional violation. See *Iqbal, 556 U.S. at 677*.

In any event, Mr. Phillips cannot meet even our pre-*Iqbal* standard. He argues that Warden Brill was "dismissed for failure to personally participate, which is [**17] not [t]rue." Aplt. Br. at 29. He further claims that Brill denied him the use of a wheelchair and "was personally involved in the medical treatment [Mr. Phillips] was complaining of [and] had the power, as is his duty[,] to abate the pain and suffering." Id.

Mr. Phillips states that he sent "kites" to the warden on October 27, 28 and 29 regarding removal of the syndesmotic screw and requesting transfer to a medical yard. Id. at 9-10. And, he noted that Warden Brill responded on October 30, 2009, by stating that "Dr. Tiona is evaluating your case. You will hear soon." Id. at 10. Such allegations do not state a constitutional violation on the part of the warden. Merely sending grievances to a warden is not enough to attach liability, and the warden's response signified nothing more than a reasonable reliance on the judgment of prison medical staff. We agree with another panel of this court which stated that such reliance "negates rather than supports liability." *Arocho v. Nafziger, 367 Fed. Appx. 942, 956 (10th Cir. 2010)* (unpublished). See also *Johnson v. Doughty, 433 F.3d 1001, 1010-11 (7th Cir. 2006)* (finding [**18] that *HN4*[↑] prison official may reasonably rely on the judgment of medical professionals).

We have reviewed the parties' briefs, the record on appeal, and the relevant legal authority, and we agree with the magistrate judge's detailed report and recommendation on this issue. Therefore, with respect to Mr. Phillips' challenges to the dismissal

508 Fed. Appx. 737, *744; 2013 U.S. App. LEXIS 1505, **18

of his § 1983 claim against Warden Brill, we affirm the district court for the reasons stated above and for substantially the same reasons as those set forth by the magistrate judge in her report and recommendation dated March 11, 2011, which the district court adopted in its amended order dated June 9, 2011.

**[*745] II. Summary Judgment Dismissing § 1983 Eighth Amendment Medical Treatment Claims Against Dr. Tiona and Ms. Gray**

The district court granted summary judgment to Dr. Tiona and Ms. Gray on Mr. Phillips' Eighth Amendment claims, concluding that those defendants were not deliberately indifferent to Mr. Phillips' condition, and that any disagreement between them and Mr. Phillips were attributable only to a difference of medical opinion, or, at most, to mere negligence.[4]

**A. Standard of Review**

HN5[⬆] Summary judgment is appropriate in cases where the record discloses "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In a deliberate indifference case under the Eighth Amendment, we look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party. Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). The plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." Id. (further quotation omitted). "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004).

"Unsubstantiated allegations carry no probative weight in summary judgment proceedings." Phillips v. Calhoun, 956 F.2d 949, 951 n.3 (10th Cir. 1992); **[**20]** accord Annett v. Univ. of Kan., 371 F.3d 1233, 1237 (10th Cir. 2004) (noting that "unsupported conclusory allegations . . . do not create a genuine issue of fact") (further quotation omitted).

**B. Medical Care Claim**

Mr. Phillips contends that Dr. Tiona and Ms. Gray violated the Cruel and Unusual Punishments Clause of the Eighth Amendment when they failed to have the syndesmotic screw in his ankle removed during the two months he was at KCCC, i.e. within 3-1/2 months of his surgery. He claims that this failure, and their insistence that he could bear some weight on his right leg after November 5, resulted in his having a permanent limp, and continual pain. As pled, his claims of omission, delay and resulting limp do not cover the additional month between December 11, 2009, when he was transferred to SCF, and January 13, 2010, when the screw was removed, because he firmly asserted in grievances at KCCC that he was going to have a permanent limp if the screw was not removed while he was there. And, according to his allegations, the screw removal in January did not cure his limp.

HN6[⬆] Prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical **[**21]** needs. Estelle v. Gamble, 429 U.S. 97, 104-106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). To establish an Eighth Amendment claim under that standard, a prisoner must satisfy two requirements, consisting of an objective and a subjective component. To satisfy the objective component the prisoner must establish that the deprivation alleged was sufficiently serious. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The subjective component requires the **[*746]** prison official to have a "sufficiently culpable state of mind." Id. In the context of prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety."

---

[4] While there is some confusion in the record, it is clear that in his brief on appeal, **[**19]** Mr. Phillips does not include the question of a wheelchair or a handicap-accessible shower in the Eighth Amendment claims. Rather, his claims are confined to claims under the ADA, and we treat them as such.

508 Fed. Appx. 737, *746; 2013 U.S. App. LEXIS 1505, **21

Id. (quoting *Wilson v. Seiter, 501 U.S. 294, 302-303, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991))*. "[A] prison official cannot be found liable under the *Eighth Amendment* for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health. . . ." *Id. at 837*.

A mere difference of opinion between a prisoner and the prison's medical staff with respect to a diagnosis or a plan of treatment, or a mere medical difference of opinion, is not actionable under the *Eighth Amendment*. See *Estelle, 429 U.S. at 107*; *Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006)*; *Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002)*; **[**22]** *Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999)*; *Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)*. Applying that rule, the district court concluded that Mr. Phillips failed to satisfy the subjective prong of the deliberate indifference test, that is that Dr. Tiona and Ms. Gray acted with a culpable state of mind. It reasoned that Mr. Phillips' arguments reflected only a disagreement with his post-operative medical care. We agree.

In her affidavit in support of the motion for summary judgment, Dr. Tiona stated that she considered Mr. Phillips' request to have the screw surgically removed, but after consulting with the orthopedics department at Denver Health Medical Center (the referring facility used by KCCC), and researching the question, she determined that the screw did not need to be removed during his time at KCCC, i.e., within 3-1/2 months of surgery.

That Dr. Matthews planned to remove the screw around six weeks after surgery, which is his typical practice, does not mean that either removal or removal within six weeks are medical absolutes for all doctors for syndesmotic screws, as Dr. Tiona's affidavit and course of action make clear. Certainly there is no **[**23]** evidence that Dr. Matthews thought that failure to remove the screw within six weeks, or 3-1/2 months, or more, presented an "excessive risk" of harm. In his December 3, 2009, letter to Mr. Phillips (more than three months after surgery), Dr. Matthews stated that "If you have been walking on the ankle a fair amount then the

screw may already be broken. That is not the end of the world but it is difficult to remove and may give you symptoms if it is broken." R. Vol. 4 at 319 (emphasis added). Notably, the screw in Mr. Phillips' ankle was intact when removed on January 11; and even if it had not been (as Dr. Tiona envisioned would eventually happen), it would not present a major problem ("That is not the end of the world").

But, Mr. Phillips argues, he limps. At KCCC he insisted he would limp if the screw was not removed at that time. However, there is not one iota of medical evidence linking non-removal of syndesmotic screws within 3-1/2 months of surgery to a limp. Not from Dr. Matthews or anyone else. What the record does disclose is that multiple x-rays, and visual examinations during surgery on January 13 and April 22, 2010, showed that the fractured fibula was well healed, that **[**24]** all ankle structures were intact and in place, that there was no problem at the site of the screw, and no necrotic tissue or infection. There was some unrelated irritation discovered in April 2010 around one of the plates.

Absent any medical evidence linking screw removal to a limp, there is no fact [*747] question on this subject which could properly be submitted to a jury. More to the point, there is no evidence pointing to a culpable state of mind on this subject where Dr. Tiona is concerned. And, the fact that Mr. Phillips avoided doing prescribed range of motion exercises, including non-weight-bearing ones, until January 2010, or at least December 17, 2009, is significant.

Likewise, there is no medical evidence linking a limp to the fact that Dr. Tiona wanted Mr. Phillips to bear some weight on his right foot after November 5, 2009. Dr. Matthews, who, as one would expect, told Mr. Phillips not to put weight on his foot for the first six weeks after setting and fixing in place a broken fibula, expected that Mr. Phillips would have been "walking a fair amount" by three months after surgery.

The same rationale applies to Mr. Phillips' subjective complaints of pain. He complained continuously **[**25]** of pain: after his surgery, at

508 Fed. Appx. 737, *747; 2013 U.S. App. LEXIS 1505, **25

the El Paso County Jail, at KCCC, and at SCF, and both before and after the removal of the syndesmotic screw. But there is nothing in the medical evidence with respect to pain that isolates his two months at KCCC from the standpoint of an excessive risk of serious harm, or knowledge by Dr. Tiona of a substantial risk of harm. As indicated above, what the record does show is a normally healing ankle, with no necrosis or infection, and with no identifiable abnormality in structure, throughout the entire period, excepting only the unrelated tissue irritation around one plate observed in the April 2010 surgery. And, medical professionals at SCF apparently prescribed nothing more for pain than Dr. Tiona prescribed— Tylenol and Ibuprofen—based upon their objective evaluation of Mr. Phillips' ankle and leg.

We have reviewed the parties' briefs, the record on appeal, and the relevant legal authority, and we agree with the magistrate judge's detailed report and recommendation on this issue. Therefore, with respect to Mr. Phillips' challenges to the dismissal of his _§ 1983_ claim against Dr. Tiona and Ms. Gray, we affirm the district court for the reasons stated above **[**26]** and for substantially the same reasons as those set forth by the magistrate judge in her report and recommendation dated November 10, 2012, which the district court adopted in its order dated February 13, 2012.

**III. Summary Judgment Dismissing Phillips' ADA Claims**

Mr. Phillips claims that the defendants violated Titles II and III of the ADA by failing to provide him with a wheelchair, primarily to assist him with meals in his cell, and a handicap shower with a bench to aid him in getting dressed. He appeals the district court's dismissal of this claim on summary judgment.

_HN7_[↑] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." _42_

_U.S.C. § 12132_ (emphasis added).[5] The Act defines a "public entity" as any State or local government, department, agency, special purpose district, or other instrumentality **[*748]** of a State or States or local government; and the National Railroad Passenger Corporation, and any commuter authority. See _42 U.S.C. § 12131(1)_ (emphasis added). See **[**27]** _Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir. 2007)_. An individual is disabled if he has a "physical or mental impairment that substantially limits one or more major life activities." _42 U.S.C. § 12102(1)(A)_.

The question is whether CCA, a private, for-profit corporation, is an instrumentality of the State of Colorado with respect to KCCC, hence subject to Title II of the ADA as a "public entity." The district court held CCA did not so qualify and granted summary judgment in favor of CCA on the issue.[6]

**A.**

Relevant decisions by the overwhelming majority of courts support the conclusion that the ADA does not apply to private prisons. At least two circuit courts have held, as did the district court, that a private prison is not a public entity under the ADA. See _Edison v. Douberly, 604 F.3d 1307 (11th Cir. 2010)_; _Maringo v. Warden, 283 Fed. Appx. 205 (5th Cir. 2008)_ (unpublished).

The Eleventh Circuit in _Edison_ held that a private prison management corporation, which operated a

_____

5 The ADA was amended, effective January 1, 2009, by the ADA Amendments Act of 2008 (ADAA), **Pub. L. No. 110-325, 122 Stat. 3553**, to expand the definition and construction of what constitutes a disability. See _42 U.S.C. § 12102(4)(A)_. The term "substantially limits" was also broadened, particularly as set forth in EEOC Regulations issued in 2011. See _29 C.F.R. § 1630.2(j)(4) (2012)_.

6 The district court granted summary judgment to defendants Brill, Tiona, and Gray on Mr. Phillips' Title II claim, reasoning that the ADA does not contemplate liability against individuals in their personal capacity, since it is limited to "public entities." Mr. Phillips does not **[**28]** specifically challenge that determination. Accordingly, our analysis is confined to the question of liability against CCA, a corporation.

508 Fed. Appx. 737, *748; 2013 U.S. App. LEXIS 1505, **28

Florida state prison, was not a public entity subject to Title II of the ADA: "a private corporation is not a public entity merely because it contracts with a public entity to provide some service." *Edison, 604 F.3d at 1310*. In so concluding, the Eleventh Circuit relied upon the analysis of the Second Circuit in *Green v. New York, 465 F.3d 65 (2d Cir. 2006)*, which, largely in reliance upon the actual language of the ADA, concluded that a private hospital performing services pursuant to a contract with a municipality was not an instrumentality of the government, and thus not a **[**29]** public entity under the ADA.

The analysis of the *Green* court is instructive. The court observed that "public entity" under Title II of the ADA is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *42 U.S.C. § 12131(1)(B)*. Thus, the question became what the statute meant by the term "instrumentality of a State." *Green, 465 F. 3d at 78-79*. Applying the canon of statutory construction known as *noscitur a sociis* ("a word is known by the company it keeps"), *id. at 79* (citing *Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S. Ct. 1579, 6 L. Ed. 2d 859, 1961-2 C.B. 254 (1961))*, the *Green* court noted that the defining characteristics of the "company" kept by "instrumentality" ("department, agency [and] special purpose district . . . of a State . . . or local government") are that they are traditional government units or are created by a government unit. The Second Circuit concluded that the private hospital in *Green* was not a governmental unit but, rather, was a "parallel private entity." Id. Accordingly, as the *Edison* court, agreeing with *Green*, concluded: "A private contractor does not . . . become liable under Title II merely by contracting with the State **[**30]** to provide governmental service, essential or otherwise." *Edison, 604 F.3d at 1310*.

Numerous courts have agreed with this analysis. See *Wilkins-Jones v. County of Alameda, 859 F. Supp. 2d 1039, 1048 [*749] (N.D. Calif. 2012)* (Title II does not apply to government contractors); *Rodrigues v. Arizona Dep't of Corr., 2012 U.S. Dist. LEXIS 176125, 2012 WL 6200624, at **9-10 (D. Ariz. Dec. 12, 2012)* (unpublished) (a private

prison does not qualify as an instrumentality of a state and therefore Title II of the ADA does not apply); *Rickerson v. Gills, 2012 U.S. Dist. LEXIS 40524, 2012 WL 1004733, at *2 (N.D. Fla. Feb. 8, 2012)* (unpublished) (holding that CCA was not liable under Title II of the ADA); *Collazo v. CCA, 2011 U.S. Dist. LEXIS 137666, 2011 WL 6012425, at *3 (N.D. Ohio Nov. 30, 2011)* (unpublished) ("A private prison does not qualify as a department or agency of a state or local government and therefore is not a 'public entity' under the [ADA]."); (unpublished) (analyzing *Green* and *Edison* and concluding that "the [ADA] was intended to include only state entities and instrumentalities created by the state. Private contractors do not fit within the strict definition"); *Gonzalez-Jarquin v. CCA, 2008 U.S. Dist. LEXIS 60532, 2008 WL 3285764, at *3 (S.D. Ga. Aug. 8, 2008)* **[**31]** (unpublished) ("Although the CCA is contracted with the BOP to operate [the state prison], it does not constitute a 'public entity' within the meaning of Title II."); cf. *Maxwell v. South Bend Work Release Ctr., 787 F. Supp. 2d 819, 822 (N.D. Ind. 2011)* (following *Edison* and *Green* to hold that a private corporation that employs prisoners is not a public entity); *Castle v. Eurofresh, Inc., 734 F. Supp. 2d 938, 943 (D. Ariz. 2010)* (following *Green* and *Edison* to hold that a private corporation to whom prison contracts prison labor is not a public entity); *Cox v. Jackson, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008)* (holding that a private company providing medical services to a prison is not a public entity, stating, "[a] private contractor does not become a 'public entity' under Title II merely by contracting with a governmental entity to provide governmental services").

## B.

The opposing view is captured in Judge Barkett's dissent in *Edison*. She argued that the *Edison* majority "conflate[d] government *contracting* with government *function*." *Edison, 604 F.3d at 1311* (Barkett, J., dissenting). While the dissent agreed with the majority that simply contracting with the government does not render **[**32]** a private company subject to Title II of the ADA, it distinguished the facts of *Edison*, in which a private

508 Fed. Appx. 737, *749; 2013 U.S. App. LEXIS 1505, **32

company "*takes the place of the state* in performing a function within the exclusive province of the state." *Id. at 1311-12*. In such a situation, the dissent concluded that the "company cannot be permitted to avoid the requirements of the law governing that state function." *Id. at 1312*. The dissent therefore distinguished <u>Green</u> and other factually similar cases from the situation presented in <u>Edison</u> and in this case: in those cases a private entity only contracted to provide services it was otherwise lawfully able to provide; in <u>Edison</u> and in the case before us, state involvement was essential to perform the function at issue—i.e., operating a prison. *Id. at 1311*. Nonetheless, that dissent has not found traction in the caselaw on the topic thus far.

The rationale underpinning the <u>Edison</u> dissent finds support in other contexts. In *Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 209, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998)*, the Supreme Court held that Title II of the ADA applies to state prisons, reasoning that a state prison is unquestionably a public entity and that management of a state prison is one **[**33]** of the primary functions of government. In *Smith v. Cochran, 339 F.3d 1205, 1215-16 (10th Cir. 2003)*, a case involving the rape of a prisoner by a state driver's license examiner, we upheld an *Eighth Amendment* **[*750]** claim brought under *42 U.S.C. § 1983* reasoning that "persons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable for violations of the *Eighth Amendment*." In reaching that conclusion, we relied on two Supreme Court cases: *Evans v. Newton, 382 U.S. 296, 299, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966)* ("[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State. . . ."); and *West v. Atkins, 487 U.S. 42, 57, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)* (holding that a private doctor treating prisoners under a contract with state prison authorities acted under color of state law for purposes of a *§ 1983* suit).

We have long assumed that employees of a private prison act under color of state law for

purposes of *§ 1983* suits by inmates, a question left open by the Supreme Court in *Richardson v. McKnight, 521 U.S. 399, 413, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997)*. See *Peoples v. CCA Det. Ctrs., 422 F.3d 1090, 1111, nn. 8, 11 (10th Cir. 2005)* **[**34]** (Ebel, J., dissenting) (citing *Lugar v. Edmondson Oil Co., 457 U.S. 922, 941-42, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)*; *Street v. CCA, 102 F.3d 810, 814 (6th Cir. 1996)* (holding that employers of a private prison management company were acting under color of state law for *§ 1983* purposes in that they were performing a "traditional state function."). See also *Marsh v. Newton*, 134 F.3d 383, 1998 WL 39235, at *4 (10th Cir. Jan. 30, 1998)* (unpublished) ("We assume, for purposes of this analysis, that Corrections Corporation of America, the private company operating the women's prison, and its employees, are state actors.").

Perhaps more to the point, several courts have held that under the Religious Land Use and Institutionalized Persons Act of 2000, *42 U.S.C. § 2000cc-1(a)*, private prisons qualify as "instrumentalities" of state government. See *John Knows His Gun v. Montana, 866 F. Supp. 2d 1235, 2012 WL 2087226 (D. Mont. 2012)* (unpublished) (citing *West v. Atkins, 487 U.S. at 49-51*)); *Dean v. Corr. Corp. of Am., 540 F. Supp. 2d 691 (N.D. Miss. 2008)*; but see *Aladimi v. Alvis House/Cope Ctr., 2012 U.S. Dist. LEXIS 29694, 2012 WL 726852 (S.D. Ohio Mar. 6, 2012)* (unpublished) (holding to the contrary).

But these lines of reasoning are not without exceptions. **[**35]** Thus, for purposes of the Federal Tort Claims Act (FTCA), a panel of this court has held that the independent contractor exception applies to private prisons, i.e., they are not federal agencies. See, e.g., *Menteer v. Applebee, 196 Fed. Appx. 624, 2006 WL 2294845 (10th Cir. 2006)* (unpublished) (citing *Logue v. United States, 412 U.S. 521, 93 S. Ct. 2215, 37 L. Ed. 2d 121 (1973))*. And the Supreme Court has rejected the proposition that a private prison management firm is a federal agent for purposes of a prisoner's suit. *Minneci v. Pollard, 132 S. Ct. 617, 623, 181 L. Ed. 2d 606 (2012)* (characterizing the rejection of a suggestion by the dissent in *Corr.*

508 Fed. Appx. 737, *750; 2013 U.S. App. LEXIS 1505, **35

*Servs. Corp. v. Malesko, 534 U.S. 61, 122 S. Ct. 515, 151 L. Ed. 2d 456 (2001)).*

## C.

The question, however, as recognized in the majority of authorities to address Title II and private prisons is not so simple as merely looking generally at function.

### 1. Structure/Function

Structurally, CCA is in no way a public entity. It is a private, for-profit, business corporation, listed on the New York Stock Exchange, in the business of, among other things, the private management of prisons and other correctional facilities under contract **[*751]** with all three federal corrections agencies, sixteen states, and local municipalities. It is the fifth-largest **[**36]** corrections system in the nation behind only the federal government and three states. It houses more than 80,000 inmates in more than 60 facilities, 44 of which are company-owned, and it employs nearly 17,000 people.

CCA operates three correctional facilities in the State of Colorado, under contract with the State: Bent County Correctional Facility, Crowley County Correctional Facility, and, as relevant here, Kit Carson Correctional Center. The State of Colorado contracts with CCA pursuant to state statute authorizing the CDOC "to permanently place state inmates classified as medium custody and below in private prisons," *Colo. Rev. Stat. § 17-1-104.9*, subject to legislation comprehensively regulating such prisons.[7]

---

[7] See, e.g., §§ *17-1-102(7.3)*, *17-1-103(1)(a)*, *17-1-103.8(4)*, *17-1-104.5*, *17-1-104.9*, *17-1-105*, *17-1-105.1* (Accreditation of private contract prisons), 17-1-113.7, *17-1-115.5*, and Part 2 of Article I (Department of Corrections): "Corrections Privatization - Requests For Proposals Process." Statutory provisions under Part 2 include *17-1-202* ("Requests for competitive proposals and contract requirements"), *17-1-202.5* ("Private prison planning process"), *17-1-203* ("Powers and **[**37]** duties not delegable to contractor"), *17-1-205* (Contract termination), and *17-1-206* (incorporating the provisions of *16-11-308* regarding inmates in the custody of the CDOC).

Functionally, private prisons like KCCC only partly mirror prisons operated by the state.[8] As indicated above, the State of Colorado remains intimately involved. Private prisons in Colorado must, among other things, "abide by operations standards for correctional facilities adopted by the executive director of the department of corrections." Id. at § 17-1-202(1)(e). Notably, inmates assigned to private prisons remain officially in the custody of the CDOC, and the CDOC retains sole authority to assign and transfer inmates, make final determinations on disciplinary matters affecting liberty interests, make decisions that affect sentences or time served, including earned time credits, make recommendations to the state board of parole, develop work requirements, and determine eligibility for any form of release from a correctional facility. *§ 17-1-203*.

By outsourcing the incarceration of its prisoners, the State relieves **[**38]** itself of significant expenses, from those related to housing prisoners and providing food, medical, dental and other care, plus a full range of programs, to security, and the burden of payroll and state benefits to staff and administrators. In addition the State avoids exposure to the risks and expense of litigation and judgments. CCA personnel have no claim on benefits from the State, and CCA, by statute, indemnifies the State and its employees from all liabilities, including those stemming from civil rights claims; and it must carry insurance to back up that indemnification. *Colo. Rev. Stat. § 17-1-202(1)(b).*

### 2. Asymmetry

**HN8**[⬆] The line separating a State-operated prison from one operated by a private corporation is not just cosmetic. There are important differences, creating a material and significant asymmetry. Thus, for instance, whereas the State and its CDOC employees enjoy *Eleventh Amendment* immunity from damages suits under *§ 1983* for their official actions,[9] and CDOC

---

[8] The CDOC operates twenty-two state correctional facilities. See **Colo. Rev. Stat. §17-1-104.3(1)(b)**.

[9] See *Quern v. Jordan, 440 U.S. 332, 338-40, 99 S. Ct. 1139,*

508 Fed. Appx. 737, *751; 2013 U.S. App. LEXIS 1505, **38

employees **[*752]** in their individual capacities enjoy qualified immunity in *§ 1983* damages actions, CCA and its private prison employees enjoy neither. They are fully exposed to the numerous civil rights suits brought by **[**39]** inmates. See, *Richardson, 521 U.S. at 412* ("[P]rivate prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a *§ 1983* case."). In arriving at that conclusion, the Court in Richardson expressly rejected a functional test, stating: "Indeed a purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery." *Id. at 409*. Of course, the reasoning in Richardson relates to the justification for an immunity, but it is still instructive. The Court concluded by stating:

> Our examination of history and purpose thus reveals nothing special enough about the job or about its organizational structure that would warrant providing these private prison guards with a governmental immunity. The job is one that private industry might, or might not, perform; and which history shows private firms did sometimes perform without relevant immunities. The organizational structure is one subject to the ordinary competitive pressures that normally help private firms adjust their behavior in **[**40]** response to the incentives that tort suits provide–pressures not necessarily present in government departments.

*Id. at 412*.

On the other hand, *HN9*[⬆] unlike federal prisoner suits against government employees, federal prisoners at a privately run federal prison cannot bring a Bivens[10] action against the private

---

*59 L. Ed. 2d 358 (1979)*; *Procunier v. Navarette, 434 U.S. 555, 561-62, 98 S. Ct. 855, 55 L. Ed. 2d 24 (1978)*; *Griess v. Colo., 841 F.2d 1042, 1044 (10th Cir. 1988)*.

[10] *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*.

corporation that manages the prison, or its privately employed personnel working there, when there is a remedy under state tort law. See *Malesko, 534 U.S. at 72-73*; *Minneci, 132 S. Ct. at 620*. But that prohibition is more than offset by the ability to bring actions for simple negligence—a ground not available, for instance, in an *Eighth Amendment* claim under *§ 1983*. See *Minneci, 132 S. Ct. at 626*. (The "potential existence of an adequate 'alternative, existing process [a tort remedy under state law]' differs dramatically in the two sets of cases. Prisoners ordinarily cannot bring state-law tort actions against employees of the Federal Government . . . . But prisoners ordinarily can bring state-law tort actions against employees **[**41]** of a private firm.").

And, *HN10*[⬆] with respect to the application of Title II of the ADA, states may, for certain conduct, enjoy sovereign immunity from ADA suits for money damages where that conduct does not actually violate the *Fourteenth Amendment*. See *United States v. Georgia, 546 U.S. 151, 159, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006)*; cf., *Guttman v. Khalsa, 669 F.3d 1101, 1118-19 (10th Cir. 2012)*. If it is determined that Title II of the ADA applies to them, private prison management corporations will have no such opportunity for protection.

Finally, *HN11*[⬆] Title II of the ADA does not apply to federal prisoners in federal prisons, including those privately managed by corporations such as CCA. That is so because Title II covers only states and defined appendages thereof.

**[*753]** D.

Importantly, *HN12*[⬆] regulations issued by the Attorney General implementing Title II suggest that states may not avoid the responsibility to provide services to disabled prisoners by contracting away those obligations. Thus, prison assignments should not make a material difference. The regulations require that:

> A public entity in providing any aid, benefit, or service, may not, **[**42]** directly or through contractual, licensing, or other arrangements,

508 Fed. Appx. 737, *753; 2013 U.S. App. LEXIS 1505, **42

[discriminate against individuals with disabilities].

*28 C.F.R. § 35.130(b)(1).*

Pursuant to that regulation, the State of California, for example, has been required by the courts to ensure that county jails housing state prisoners pursuant to contract do so under ADA-compliant conditions. *Armstrong v. Schwarzenegger, 622 F.3d 1058, 1069 (9th Cir. 2010).* The court described the contract obligations as follows:

> The State's contracts and arrangements with the counties are not simply to incarcerate parolees and prisoners, but to provide such individuals with various positive opportunities, from educational and treatment programs, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication. The restrictions imposed by incarceration mean that all of these positive opportunities must be provided or allowed to individuals incarcerated pursuant to state contracts and arrangements to the same extent that they are provided to all other detainees and prisoners.

*Id. at 1068* (emphasis added).

The remedy for violations **[**43]** of the regulation, and such conditions, is not to sue the jails for breach of contract under a third-party beneficiary theory, or for violations of the ADA, but to sue the state for failing to meet its own obligations under the ADA. *Id. at 1069.*

The Armstrong case involves a seventeen-year-old ADA class action suit by California prisoners. Colorado has had a similar ADA class action suit, Montez v. Hickenlooper, No. 92-CV-870-JLK,[11] which resulted in an ADA Remedial Plan for class members, dated August 27, 2003; Administrative Regulation 750-04 governing prisoner requests for accommodation, and the establishment of an ADA

Inmate Coordinator and Facility ADA Coordinators.[12]

The record does not disclose what, if any, contract arrangements are in place between CDOC and CCA with respect to the Kit Carson Correctional **[**44]** Center. But there are strong evidences of ADA policies and practices in place.[13]

**[*754]** Mr. Phillips has not joined the State as a party, so we do not pursue the matter here. The point is, however, that it would be a mistake to assume some stark difference in disability

_____

[11] The Montez case commenced in 1992 as a pro se civil rights action. It was subsequently certified as a class action under the ADA. It ultimately generated the Remedial Plan.

_____

[12] To the extent it may be applicable, certain contracts entered into by the CDOC do not accord third-party beneficiary status to any inmate or to any member of the general public. **Colo. Rev. Stat. 17-1-202(2).**

[13] Whether by contract, other operational arrangement with CDOC, or otherwise, it is evident from the record that CCA implements ADA accommodations to some degree. As Mr. Phillips asserts, the prison had both a handicap shower (not functional) and a cell. Apparently inmates also had access to a state ADA coordinator and use of state forms and procedures for ADA alerts and requests for accommodation. See, e.g., R. Vol. 5 at 233 (in responding to an interrogatory, CCA stated it was "unaware of Plaintiff filing the proper paperwork or going through the required process to be considered for ADA accommodation"); id. at 91, 234 (references to "ADA Inmate Coordinator"; R. Vol. 4 at 427-28 (Request for Accommodation: memo from ADA inmate coordinator). There is no indication whether or to what extent CCA complies with CDOC A.R. 750-04.

Furthermore, we note that CCA has been inconsistent in its assertion that the ADA does not apply to it, at least by contract. For example, in CCA's Reply in Support of its Motion to Dismiss, CCA avers that "[T]he ADA is not an official custom or policy of CCA. Rather, the ADA is a **[**45]** legislative act that places certain requirements on CCA." Reply at 4, R. Vol. 1 at 324 (emphasis added); R. Vol. 5 at 248 (CCA responded to an interrogatory asking about "A.D.A. . . . showers" without disputing applicability of the ADA). Mr. Phillips also referred, without apparent objection, to the occurrence of "ADA alerts" at the prison. Id. at 91. Also it is a matter of interest that in the district court CCA did not assert the non-applicability of the ADA in its motion to dismiss but addressed the claim on other grounds. Defendant CCA's Motion to Dismiss, R. Vol. 1 at 204. It waited for the motion for summary judgment to assert that the ADA claim must be dismissed for failing to state a claim upon which relief may be granted. Defendants' Mot. for Summ. J., R. Vol. 4 at 21.

CCA has been unhelpful in explaining its operational practices with respect to ADA accommodations.

accommodations between Colorado inmates in State-run prisons and those in private facilities operated under contract.

**E.**

In any event, **[\*\*46]** while all these considerations bear somewhat on the problem, in the end we are still faced directly with a question of statutory interpretation: Is CCA a public entity? Is it an instrumentality of government in the same sense as a "department, agency, or special purpose district"? We think not. In the absence of clarification on the point in the 2008 Amendments to the ADA or any of the regulations issued before or since, we agree with the reasoning of the Second Circuit in *Green* that **_HN13_**[⬆️] the proper canon of construction to apply is *noscitur a sociis* (a word is known by the company it keeps), and that "instrumentality" refers to a traditional government unit or one created by a government unit.

Accordingly, we join the Eleventh Circuit and the overwhelming majority of other courts that have spoken directly on the issue, and hold that **_HN14_**[⬆️] Title II of the ADA does not generally apply to private corporations that operate prisons. In particular, it does not apply to CCA with respect to the management of KCCC. And the complaint fails to state a claim against CCA upon which relief could be granted for an alleged violation of the ADA.

**F.**

Mr. Phillips also challenges the district court's summary dismissal **[\*\*47]** of his Title III claim, upon recommendation of the magistrate judge, on the basis that the court lacked jurisdiction over the claim. Because Mr. Phillips' sole remedy for a Title III claim is injunctive relief, and he alleged only past exposure to ADA violations, we perceive no error. See *42 U.S.C. § 12188(a)(2)*; *Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 86 (2d Cir. 2004)* (**_HN15_**[⬆️]) "A private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover

damages.").

**CONCLUSION**

For the reasons stated above, the judgment of the district court dismissing Mr. Phillips' claims is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson

Circuit Judge

---

Ⓐ Neutral
As of: August 13, 2021 5:14 PM Z

## *Quality Jeep Chrysler, Inc. v. Chrysler Group, LLC*

United States District Court for the District of New Mexico

March 22, 2010, Decided; March 22, 2011, Filed

No. 1:10-cv-00900-PJK-RHS

**Reporter**
2010 U.S. Dist. LEXIS 145005 *

QUALITY JEEP CHRYSLER, INC., n/k/a QUALITY AUTOMOTIVE SALES AND SERVICE, INC., Plaintiff, vs. CHRYSLER GROUP, LLC, Defendant, and LARRY H. MILLER CORPORATION - ALBUQUERQUE, d/b/a LARRY H. MILLER CHRYSLER JEEP DODGE ALBUQUERQUE, Necessary Party Defendant.

**Subsequent History:** Transfer denied by, Stay denied by, As moot *Quality Jeep Chrysler, Inc. v. Chrysler Group, LLC, 2010 U.S. Dist. LEXIS 144833 (D.N.M., Nov. 16, 2010)*

## Core Terms

franchise, dealer, termination, arbitration, necessary party, dealership, franchise agreement, state law, reinstatement, manufacturer, argues, declaratory judgment, complete relief, obligations, customary, line-make, asserts, network, renewal, rights

## Case Summary

### Overview

An automobile dealer's motion to dismiss a terminated dealer's claims arising from the bankruptcy of the automobile manufacturer was granted pursuant to *Fed. R. Civ. P. 19* where complete relief could be afforded the terminated dealer under Pub. L. No. 111-117, § 747(b), 123 Stat. 3034, 3220 (2010), without the presence of the dealer.

### Outcome
Motion to dismiss granted.

## LexisNexis® Headnotes

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > General Overview

*HN1*[⤓] **Distributorships & Franchises, Franchise Relationships**

See Pub. L. No. 111-117, § 747(b), 123 Stat. 3034, 3220 (2010).

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > General Overview

*HN2*[⤓] **Distributorships & Franchises, Franchise Relationships**

See Pub. L. No. 111-117, § 747(e), 123 Stat. 3034, 3221 (2010).

Civil Procedure > ... > Joinder of Parties > Compulsory Joinder > Necessary Parties

*HN3*[⤓] **Compulsory Joinder, Necessary Parties**

The first issue under *Fed. R. Civ. P. 19* is whether in a party's absence the court cannot accord complete relief among existing parties. *Fed. R. Civ.*

Case No. 1:21-cv-01269-KAS    Document 79-1    filed 06/13/22    USDC Colorado    pg
92 of 141

Page 2 of 8
2010 U.S. Dist. LEXIS 145005, *145005

*P. 19(a)(1)(A)*. The second issue is whether the party claims an interest relating to the subject of the action and whether the party is so situated that disposing of the action in the party's absence may: (1) as a practical matter impair or impede the party's ability to protect the interest; or (2i) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. *Fed. R. Civ. P. 19(a)*.

Civil Procedure > ... > Joinder of
Parties > Compulsory Joinder > Necessary
Parties

*HN4*[⬇]    **Compulsory Joinder, Necessary Parties**

Although in a diversity action the interest of an outside party may involve state law, the rule relating to joinder of persons needed for just adjudication is a rule of procedure and, therefore, federal law is applicable in determining which parties are, in fact, indispensable.

Civil Procedure > ... > Joinder of
Parties > Compulsory Joinder > Necessary
Parties

*HN5*[⬇]    **Compulsory Joinder, Necessary Parties**

The United States Court of Appeals for the Tenth Circuit has interpreted *Fed. R. Civ. P. 19* to exclude only claimed interests that are patently frivolous. Thus, the underlying merits of the litigation are irrelevant to a *Rule 19* inquiry, except to the extent that the claims are frivolous. This is because *Rule 19* does not require the absent party to actually possess an interest; it only requires the movant to show that the absent party claims an interest relating to the subject of the action.

Civil Procedure > ... > Joinder of
Parties > Compulsory Joinder > Necessary
Parties

*HN6*[⬇]    **Compulsory Joinder, Necessary Parties**

That a plaintiff has asserted no claims against a party is not determinative of the *Fed. R. Civ. P. 19* inquiry.

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > General Overview

*HN7*[⬇]    **Distributorships & Franchises, Franchise Relationships**

Nothing in the plain language of Pub. L. No. 111-117, § 747, 123 Stat. 3034, 3220 (2010), or its legislative history implicates the interests of third-party dealers who entered into franchise agreements following the old car manufacturer's bankruptcy and prior to the operation of § 747 and its arbitration provisions. The statute merely provides for continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Pub. L. No. 111-117, § 747(b), 123 Stat. 3034, 3220 (2010). An arbitrator is to consider whether the covered dealership should be added to the dealer network of the covered manufacturer. Pub. L. No. 111-117, § 747(d), 123 Stat. 3034, 3220 (2010). The remedy provision provides that, given a dealer's successful invocation of the procedure, the covered manufacturer must provide the dealer a customary and usual letter of intent to enter into a sales and service agreement. Pub. L. No. 111-117, § 747(e), 123 Stat. 3034, 3221 (2010).

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > General Overview

*HN8*[⬇]    **Distributorships & Franchises, Franchise Relationships**

Pub. L. No. 111-117, § 747, 123 Stat. 3034, 3220 (2010), does not address the rights of third party dealers who acquired their franchises prior to its passage. Nothing in § 747 suggests that Congress diluted the rights of the new automobile manufacturers vis-a-vis the existing franchisees.

Business & Corporate Law > Distributorships & Franchises > Causes of Action > General Overview

*HN9*[↓] **Distributorships & Franchises, Causes of Action**

New Mexico Motor Vehicle Dealer Franchise Act, *N.M. Stat. Ann. § 57-16-1 et seq.*, prohibits establishment of an additional franchise but excluding the relocation of existing franchises, for the same line-make in a relevant market area where the same line-make is presently being served by an existing motor vehicle dealer if such addition would be inequitable to the existing dealer; provided, however, that the sales and service needs of the public shall be given due consideration in determining the equities of the existing dealer. provided, further, that the manufacturer, distributor, or representative shall give a ninety-day written notice by registered mail to all same line-make dealers in a relevant market area of its intention to establish an additional franchise. *N.M. Stat. Ann. § 57-16-5(P)*.

**Counsel:** [*1] Stanley N. Hatch and Jesse C. Hatch, Hatch Law Firm, LLC, Albuquerque, New Mexico, and Michael J. Dommermuth and Karl D. Kaesemeyer, McGloin, Davenport, Severson and Snow Professional Corporation, Denver, Colorado, for Defendant, Larry H. Miller Corporation - Albuquerque.

Henry M. Bohnhoff, Leslie McCarthy Apodaca, and Nicholas M. Sydow, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, for Plaintiff, Quality Jeep Chrysler, Inc.

**Judges:** Paul Kelly, Jr., United States Circuit Judge, Sitting by Designation.

**Opinion by:** Paul Kelly, Jr.

# Opinion

MEMORANDUM OPINION AND ORDER

THIS MATTER comes on for consideration of Defendant Larry H. Miller Corporation's ("Miller") Motion to Dismiss filed November 18, 2010 (Doc. 31). Upon consideration thereof, the motion is well taken and should be granted.

The dispute arises out of the bankruptcy proceedings of the predecessor to Chrysler Group, LLC ("New Chrysler") and subsequent federal legislation. See *In re Chrysler LLC (Chrysler I), 405 B.R. 84, 108 (Bankr. S.D.N.Y. 2009)*, aff'd, *576 F.3d 108 (2d Cir. 2009)*, vacated, *558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009)*, dismissed as moot, *592 F.3d 370 (2d Cir. 2010)* (per curiam). Quality Jeep Chrysler, Inc. ("Quality") commenced this action [*2] on September 25, 2010, against New Chrysler as defendant and Larry H. Miller Corporation ("Miller") as a necessary party defendant. Doc. 1 (Complaint).

Quality seeks the confirmation and enforcement of an award issued in an arbitration conducted pursuant to *Section 747 of the Consolidated Appropriations Act of 2010 ("Section 747"), Pub. L. No. 111-117, 123 Stat. 3034*, contending that a letter of intent sent to Quality by New Chrysler following this arbitration was not "customary and usual" within the meaning of Section 747(e) and also was unconscionable, onerous, illusory, and/or commercially unreasonable and therefore outside the meaning of Section 747(e). Quality further alleges that New Chrysler has breached a duty of good faith and fair dealing in carrying out this award.

Briefly, on April 30, 2009, New Chrysler's predecessor ("Old Chrysler") filed for Chapter 11 bankruptcy protection in the Southern District of New York. Rather than liquidating, Old Chrysler sold substantially all of its assets to a buyer group (Fiat) that ultimately became New Chrysler. As part of the Purchase Agreement, New Chrysler agreed to accept approximately 2,400 of Old Chrysler's dealer agreements. The [*3] remaining 789 agreements were excluded from the purchased

2010 U.S. Dist. LEXIS 145005, *3

assets. The sale closed on June 10, 2009. On May 14, 2009, Old Chrysler filed a motion with the Bankruptcy Court seeking authorization to reject the 789 dealer agreements that New Chrysler did not agree to purchase. The Bankruptcy Court approved the rejections on June 9, 2009. See In re Old Carco LLC, 406 B.R. 180, 186-87, 212-13 (Bankr. S.D.N.Y. 2009); 11 U.S.C. §§ 105, 365; Bankr. R. 6006. The Bankruptcy Court also determined that New Chrysler would assume the assets of Old Chrysler free and clear of liens and encumbrances. See 11 U.S.C. §§ 105, 363; Bankr. R. 6004.

Quality was one of these rejected dealers. Quality was located down the street from Zangara Dodge, an insolvent Dodge dealer whose franchise was not rejected as part of the bankruptcy. Doc. 1 at 3-4. After closing, Zangara sold its Dodge franchise to Miller, and, on August 26, 2009, New Chrysler entered into a one-year sales and service agreement granting Miller the rights to Chrysler and Jeep lines. Id.

In December 2009, Congress enacted Section 747, which provides,

> HN1[↑] A covered dealership that was not lawfully terminated under applicable State law on or before April [*4] 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued.

§ 747(b). It further provides, HN2[↑] "If the arbitrator finds in favor of a covered dealership, the covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement." § 747(e). The remedy is limited and expressly precludes "compensatory, punitive, or exemplary damages to any party." Id.

About 400 dealers, including Quality, elected to arbitrate. Doc. 10 at 5. Thirty-two dealers ultimately prevailed. Doc. 15 at 9. Quality prevailed in arbitration, and it was ordered that Quality "be reinstated to the Covered Manufacturer's dealer network." Doc. 1 exhibit C at 2. Quality was subsequently issued what New Chrysler asserts is a Section 747-compliant Letter of Intent ("LOI"). [*5] This was Quality's first dealing with New Chrysler, having had to this point only a contractual relationship with Old Chrysler, which was terminated in the bankruptcy proceeding. Quality disputes the letter's compliance with Section 747, arguing that the letter issued imposed new and burdensome requirements and, thus, was not "usual and customary." Quality now seeks, among other things, enforcement of the arbitration award, namely, the issuance of what it deems a customary and usual LOI; declaratory judgment that Section 747 preempts the New Mexico Motor Vehicle Dealer Franchise Act ("State Franchise Act"), N.M. Stat. Ann. §§ 57-16-1 to 16, which in many cases prohibits establishment of an additional franchise for the same line-make in a market area served by an existing dealer, such that Quality legally may be installed at its prior location notwithstanding state law; and an order enjoining New Chrysler from continuing alleged violations of the State Franchise Act, namely, the sale of Jeep and Chrysler line-make cars to Miller. Doc. 1 at 13-14, 17-22; Doc. 61 at 13-14, 17-24. The complaint also contains claims for compensatory and punitive damages against New Chrysler. Doc. 1 at 14-15, [*6] 17, 23; Doc. 61 at 14-15, 17, 24-25. In sum, Quality insists that it is entitled to be put back in the status quo ante, as if it were an existing dealership at the time of its termination and that it, not Miller, is entitled to enforce state law, which, Quality argues, requires New Chrysler to terminate Miller's dealership. Doc. 1 at 9, 22-23; Doc. 61 at 9, 23-24; Doc. 44 at 10-11.

Often, a motion to join a necessary party is made by defendants; here, Plaintiff brought Miller in as a necessary party but without asserting independent claims against Miller. Miller seeks dismissal from the suit on the grounds that (1) Quality's franchise was lawfully terminated in the Chrysler bankruptcy, which termination cannot be collaterally attacked in

Page 5 of 8

2010 U.S. Dist. LEXIS 145005, *6

this proceeding; (2) Quality had no franchise when Miller was appointed as a Jeep-Chrysler dealer and therefore was not an existing dealer under the State Franchise Act; (3) Section 747 does not provide Quality with any relief against Miller; (4) Miller was a protected, existing dealership pursuant to the State Franchise Act and was entitled to renewal of its franchise; (5) Quality's proposed injunction violates New Mexico law; and (6) Miller is not **[*7]** a necessary party under *Fed. R. Civ. P. 19*. Quality responds that the court should only consider whether Miller is a necessary party under *Fed. R. Civ. P. 19(a)*, and contends that the other grounds in the motion are essentially *Fed. R. Civ. P. 12(b)(6)* arguments better left to Chrysler. The court concludes that Miller is not a necessary party to this action and that, because Quality otherwise asserts no claims against Miller, Miller should be dismissed as a party-defendant.

<u>Discussion</u>

*HN3*[↑] The first issue under *Rule 19* is whether in a party's absence the "court cannot accord complete relief among existing parties." *Fed. R. Civ. P. 19(a)(1)(A)*; *Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250, 1258 (10th Cir. 2001)*. The second issue is whether Miller claims an interest relating to the subject of the action and whether Miller "is so situated that disposing of the action in [Miller's] absence may: (i) as a practical matter impair or impede [Miller's] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." *Fed. R. Civ. P. 19(a)*.

Miller's alleged legal interests **[*8]** in this case inhere in both federal and New Mexico state law. *HN4*[↑] "Although in a diversity action the 'interest' of an 'outside party' may involve state law, the rule relating to joinder of persons needed for just adjudication is a rule of procedure and, therefore, federal law is applicable in determining which parties are, in fact, indispensable." *Wright v. Albuquerque Auto-Truck Stop Plaza, Inc., 591 F.2d 585, 587 (10th Cir. 1979)* (citations omitted).

*HN5*[↑] The Tenth Circuit has interpreted *Rule 19* to exclude only claimed interests that are "patently frivolous." *Davis v. United States (Davis II), 343 F.3d 1282, 1291 (10th Cir. 2003)* (quoting *Davis v. United States (Davis I), 192 F.3d 951, 959 (10th Cir. 1999))*; see, e.g., *Radian Asset Assur., Inc. v. College of the Christian Brothers of N.M., No. 09-0885, 2010 U.S. Dist. LEXIS 21582, 2010 WL 965515, at *5, 8 (D.N.M. Feb. 11, 2010)*. Thus, "the underlying merits of the litigation are irrelevant" to a Rule 19 inquiry, *Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 998 (10th Cir. 2001)*, except to the extent that the claims are frivolous, *Davis II, 343 F.3d at 1291* (quoting *Davis I, 192 F.3d at 959*). This is because *Rule 19* "does not require the absent party to actually **[*9]** possess an interest; it only requires the movant to show that the absent party <u>claims an interest</u> relating to the subject of the action." *Citizen Potawatomi Nation, 248 F.3d at 998* (quoting *Davis I, 192 F.3d at 958*).

*HN6*[↑] That Quality has asserted no claims against Miller is not determinative of the Rule 19 inquiry. <u>See *Sierra Club v. Hodel*, 848 F.2d 1068, 1077 (10th Cir. 1988)</u>, overruled on other grounds by *Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992)*. But neither does the lack of claims against Miller preclude Miller from arguing that it is not a necessary party because Quality has made no nonfrivolous claims for relief flowing through Chrysler implicating Miller's interests. The predicate of Quality's claims as they pertain to Miller is that New Chrysler's franchise agreements with Miller and Quality are mutually exclusive. The focus of our Rule 19 inquiry in this case is thus whether complete relief may be accorded between New Chrysler and Quality in the absence of Miller and whether any remedies available to Quality are mutually exclusive of other obligations of New Chrysler in which Miller has an interest.

A. Miller is not a necessary party to Quality's
 **[*10]** Section 747 claims.

Miller's presence in this action is clearly premature, dependent upon a finding that New Chrysler did not comply with its Section 747 obligations or the

2010 U.S. Dist. LEXIS 145005, *10

arbitrator's award, and the court ordering the broad relief suggested by Quality. But more problematic and determinative of our Rule 19 inquiry is Quality's position under Section 747. **HN7[↑]** Nothing in the plain language of the statute or its legislative history implicates the interests of third-party dealers who entered into franchise agreements following the Old Chrysler bankruptcy and prior to the operation of Section 747 and its arbitration provisions. As noted, the statute merely provides for "continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued." § 747(b). An arbitrator is to consider whether "the covered dealership should be added to the dealer network of the covered manufacturer." § 747(d). The remedy provision provides that, given a dealer's successful invocation of the procedure, **[*11]** the covered manufacturer must "provide the dealer a customary and usual letter of intent to enter into a sales and service agreement." § 747(e). The arbitrator could not and did not require more. Doc. 1 app. 4 at 2-3.

Quality argues that Section 747 requires this court "to place [Quality] again in a former state or position; to restore," which requires injunctive relief placing Quality in its status quo ante position prior to the termination of its dealership as the <u>only</u> local Chrysler dealership in the area. Doc. 44 at 4. However, while Quality argues that this relief requires this court to terminate the Miller franchise, the statute simply does not state or imply such a requirement. Cf. *In re Motors Liquidation Co., 2010 U.S. Dist. LEXIS 118166, 2010 WL 4449425, at *5 (S.D.N.Y. 2010)* (rejecting argument that statute contained any right to appeal arbitrator's decision). Neither is Quality's reliance on the legislative history to Section 747 persuasive. Moreover, given the lapse of time between the bankruptcy court's rejection of many dealerships and the enactment of Section 747, it seems passing strange that the extreme remedy of terminating interim franchises would be required—and certainly not on this language. **[*12]** Therefore, the court concludes that complete relief in this action may be accorded

in the absence of Miller. See 4 *Moore's Federal Practice § 19.03[2][b]*, at 19-39 to 19-41 ("Properly interpreted, the Rule is not invoked simply because some absentee may cause future litigation . . . . The fact that the absentee might later frustrate the outcome of the litigation does not by itself make the absentee necessary for complete relief." (footnotes omitted)).

Next, Quality's assertion that Miller claims an interest relating to the subject of the action is purely speculative. While in form the franchise to which Quality asserts it is entitled might not be the same franchise in which Miller has an interest, see *Radian Asset Assur., Inc., 2010 U.S. Dist. LEXIS 21582, 2010 WL 965515, at *8*, Quality appears to assert that in substance this is precisely the case. However, **HN8[↑]** Section 747 does not address the rights of third party dealers who acquired their franchises prior to its passage. Nothing in Section 747 suggests that Congress diluted the rights of New Chrysler vis-a-vis these existing franchisees. See, e.g., *LaBelle Chevrolet, LLC v. General Motors, LLC, 705 F. Supp. 2d 97, 100 (D. Mass. 2010)* ("Section 747 merely provides **[*13]** that dealers may seek, through binding arbitration, reinstatement of their franchise agreements. It does not, however, amend the terms of those agreements, nor does it provide LaBelle with a right to be free from near-by competition."). And, regardless, Quality cannot escape the bankruptcy court's orders, which rejected the Quality franchise and approved the sale of Old Chrysler's assets without such encumbrances prior to enactment of Section 747.

**B. Miller is not a necessary party to Quality's claim for declaratory relief.**

Quality's claim for declaratory judgment likewise does not implicate Miller as a necessary party. In addition to its arguments, addressed above, urging termination of Miller's franchise based on Section 747, Quality essentially argues that Miller may potentially claim that the federal statute's remedy is a violation of state law and, therefore, Miller is a necessary party. However, the fact that Miller might potentially choose to challenge the legal

basis of an order here is too tenuous and contingent to render Miller a necessary party under *Rule 19*. Here, Quality seeks declaratory judgment relief on a purely legal question. There is no reason why the court cannot **[\*14]** accord complete relief in Miller's absence. Moreover, the fact that a decision in this case could be adverse to Miller's general interests—and therefore inspire Miller to take some action against New Chrysler at some point in the future—is distinct from a claim related to the subject matter of this action, namely Quality's franchise rights; and this action for declaratory judgment does not as a practical matter impair Miller's ability to protect its more general interests or leave New Chrysler subject to the risk of incurring inconsistent obligations with respect to Quality's due franchise rights for the purposes of *Rule 19*. See *Begay v. Public Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1182-84 (D.N.M. 2010)* (discussing distinction between inconsistent obligations and inconsistent adjudications).

C. Miller is not a necessary party to Quality's state law claims.

Outside of Section 747, Quality's claims are limited to those asserted under the State Franchise Act. **HN9**[⬆] New Mexico's Act prohibits

establish[ment] [of] an additional franchise . . . but excluding the relocation of existing franchises, for the same line-make in a relevant market area where the same line-make is presently being served **[\*15]** by an existing motor vehicle dealer if such addition would be inequitable to the existing dealer; provided, however, that the sales and service needs of the public shall be given due consideration in determining the equities of the existing dealer. . . . provided, further, that the manufacturer, distributor, or representative shall give a ninety-day written notice by registered mail to all same line-make dealers in a relevant market area of its intention to establish an additional franchise.

*N.M. Stat. Ann. § 57-16-5(P)*.

Quality's claims concerning the State Franchise Act are twofold. Quality seeks a declaratory judgment that Section 747 preempts state dealer laws to the extent that third-party dealers awarded franchises during the period of time after the Old Chrysler bankruptcy and prior to continuation, reinstatement, or addition of dealers under Section 747 would have viable state-law claims to challenge the remedies. But Quality also seeks to enforce the Act, arguing that Quality qualified as an "existing dealer" under New Mexico law and, thus, New Chrysler's renewal of Miller's franchise violated the State Franchise Act.

In response, Miller asserts that the relief under the Act **[\*16]** sought by Quality would amount to an unlawful retroactive application of the state statute. Doc. 31 at 6-7. See generally Ronald T. Coleman, Jr. & David B. Darden, The Constitutionality of Retroactive Franchise Laws, *21 Franchise L.J. 13 (2001)*. Quality argues that awarding an injunction to prevent the renewal of Miller's franchise on equitable grounds would not amount to a retroactive application of the state statute, to the extent that the inequitable conduct occurred well after the passage and most recent amendment of the state law. Doc. 44 at 10-11. But the question presented by Quality's claims is really distinct from whether federal legislation may attach new legal consequences to actions completed prior to enactment. See *Landgraf v. USI Film Prods., 511 U.S. 244, 265, 269-70, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1993)*. Rather, Quality argues that the term "reinstate" requires its existing dealer status to relate back to the termination of its franchise agreement, rendering it an "existing dealer" for application of the State Franchise Act to New Chrysler's dealings with Miller.

The issue raised by Quality's claim is the meaning of "existing dealer" under New Mexico law—specifically, whether the state law rights **[\*17]** of a dealer that is reinstated or added to the dealer network pursuant to Section 747 relate back to the termination of its franchise pursuant to bankruptcy order. As stated, Quality would characterize the series of transactions performed by Old and New Chrysler as an unlawful transfer of its franchise. But the indisputable effect of the Old Chrysler

2010 U.S. Dist. LEXIS 145005, *17

bankruptcy was to terminate Quality's franchise and allow Old Chrysler's assets to be sold. New Chrysler was then free to establish franchises within the territories covered by Old Chrysler's previous agreements. *In re Old Carco LLC, 442 B.R. 196, 209-13 (S.D.N.Y. 2010)*. Thus, by the decree of the bankruptcy court, Quality simply was not an "existing dealer" under the Act at the time Miller entered into its franchise agreement.

Finally, given the court's construction of Section 747, it is not necessary to reach the contention that the statutory protections of *N.M. Stat. Ann. §§ 57-16-5(F)*, *57-16-9*, prohibiting termination, cancellation or non-renewal of a dealer franchise without cause, and *§ 57-16-5(D)*, prohibiting refusal to deliver vehicles without cause, somehow necessitate the presence of Miller in this lawsuit.

NOW, THEREFORE, IT IS **[*18]** ORDERED, ADJUDGED, and DECREED that Defendant Larry H. Miller Corporation's ("Miller") Motion to Dismiss filed November 18, 2010 (Doc. 31) is granted, and Miller is dismissed as a party-defendant.

DATED this 22nd day of March 2010, at Santa Fe, New Mexico.

/s/ Paul Kelly, Jr.

United States Circuit Judge

Sitting by Designation

End of Document

✚ Positive
As of: August 13, 2021 5:19 PM Z

# *Slater v. Teague*

United States District Court for the District of Colorado

March 21, 2018, Decided; March 21, 2018, Filed

Civil Action No. 17-cv-02084-PAB-STV

**Reporter**

2018 U.S. Dist. LEXIS 63605 *

COREY SLATER, Plaintiff, v. KENNETH TEAGUE and DOUGLAS COUNTY JAIL, Defendants.

**Subsequent History:** Adopted by, Dismissed by *Slater v. Teague, 2018 U.S. Dist. LEXIS 63263 (D. Colo., Apr. 12, 2018)*

**Prior History:** *Slater v. Teague, 2017 U.S. Dist. LEXIS 153002 (D. Colo., Sept. 20, 2017)*

## Core Terms

kosher, food, meals, allegations, religious, county jail, commissary, inmates, kitchen, texts, staff, non-kosher, rights, kite, violations, official capacity, preparation, municipal, diabetic, utensils, RECOMMENDS, responded, snack, diet, free exercise, custom, eat, constitutional violation, motion to dismiss, give rise

**Counsel:** **[*1]** Corey A Slater, Plaintiff, Pro se, Denver, CO.

For Kenneth Teague, Douglas County Jail, Defendants: Dawn Lynnette Johnson, Douglas County Attorney's Office, Castle Rock, CO.

**Judges:** Scott T. Varholak, United States Magistrate Judge.

**Opinion by:** Scott T. Varholak

## Opinion

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Magistrate Judge Scott T. Varholak

This matter comes before the Court on Defendants Douglas County Jail and Kenneth Teague's Motion to Dismiss (the "Motion"), filed September 14, 2017 [#13], which has been referred to this Court [#14]. This Court has carefully considered the Motion and related briefing, the entire case file and the applicable case law, and has determined that oral argument would not materially assist in the Motion's disposition. For the following reasons, I respectfully **RECOMMEND** that the Motion be **GRANTED**.

## I. PROCEDURAL BACKGROUND

Plaintiff Corey Slater, proceeding pro se, originally filed the instant lawsuit in the District Court for Douglas County, Colorado on August 11, 2017. [##1, 4] Plaintiff alleges that Defendants violated his *First Amendment* rights during his incarceration at the Douglas County Jail. [#4] While the Complaint does not specify, Plaintiff's claims appear to arise under *42 U.S.C. § 1983*. *See, e.g.,* **[*2]** *Gray v. Kufahl, No. 15-9203-CM, 2016 U.S. Dist. LEXIS 120726, 2016 WL 4613394, at *2 (D. Kan. Sept. 6, 2016)* (assuming that pro se plaintiff was asserting his constitutional claims under *§ 1983*, though plaintiff had not specified whether he intended to do so); [*see also* #1 at 2, 2 n.2]. Defendants filed a Notice of Removal pursuant to *28 U.S.C. §§ 1331*, *1441*, and *1446* on August 30, 2017. [#1 at 1-2] Defendants then filed the instant Motion on September 14, 2017. [#13] Plaintiff opposes the Motion [#20], and Defendants have filed a reply [#22].

2018 U.S. Dist. LEXIS 63605, *2

## II. FACTUAL ALLEGATIONS[1]

Plaintiff was incarcerated at the Douglas County Jail "for approximately a month between January and February" of 2017.[2] [#4 at 2] Shortly after his arrival, Plaintiff submitted a request for kosher meals, with references to his synagogue and rabbi. [*Id.*] Plaintiff used the inmate correspondence system to submit multiple kites directed to Defendant "Chaplain Kenneth Teague," in which Plaintiff inquired about the status of his kosher meals and noted that he was diabetic. [*Id.*] The request was ultimately approved and Plaintiff began receiving kosher meals, but there was a three-day delay in processing the request. [*Id.*]

Although Plaintiff was provided with kosher meals, he "did not receive a kosher diabetic snack." [*Id.*] Plaintiff submitted a kite about [*3] this to Teague who "clouded the two issues." [*Id.*] Without access to a kosher diabetic snack, Plaintiff had multiple diabetic insulin reactions [*id.*], including in April, when Plaintiff fell out of the top bunk of his cell after an insulin reaction [*id.* at 3].

Plaintiff notified the kitchen staff and Teague that Jewish law prohibited him from eating hot meals on the Sabbath. [*Id.* at 2] Nevertheless, "they refused to abide," and during the Sabbath Plaintiff "had to put [his] TV dinners in [his] cell and wait for the sun to go down," which he states is a facility violation. [*Id.*] Plaintiff further alleges that kosher utensils used in food preparation "were mixed with non-

---

[1] The facts are drawn from the allegations in Plaintiff's Complaint, which must be taken as true when considering a motion to dismiss. *Wilson v. Montano, 715 F.3d 847, 850 n.1 (10th Cir. 2013)* (citing *Brown v. Montoya, 662 F.3d 1152, 1162 (10th Cir. 2011))*.

[2] Plaintiff does not indicate the year in which the purported events took place, but copies of communications with Douglas County Jail officials, referenced numerous times throughout the Complaint, and attached to Plaintiff's response to Defendants' Motion to Dismiss, indicate that Plaintiff is describing events in 2017. [*See* #20 at 11-24]; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)* (holding a court "must consider the complaint in its entirety . . . [and] documents incorporated into the complaint by reference").

kosher foods, including meat and dairy products." [*Id.*] Plaintiff's request for separate utensils was denied and kosher meals were not served with disposable cutlery. [*Id.*] Plaintiff asked Teague for information about the process that Trinity Food Services, presumably the facility's food provider, used for complying with kashrut—Jewish food law—but never received a response. [*Id.*] Plaintiff "was forced to eat improperly prepared or contaminated food" because of both his diabetes and the facility's "refusal to adjust its incorrect kashrut." [*4] [*Id.* at 3] Plaintiff also notes that there are only seven different kosher meals available to him, and that the lack of variety is "boring" and "terribly unhealthy." [*Id.*]

Additionally, Plaintiff alleges that there were various issues with the facility's commissary system. Plaintiff asserts that food for order through the commissary included items that were actually kosher, but mislabeled as non-kosher, and therefore were not available to inmates on a kosher diet. [*Id.* at 4] Plaintiff submitted multiple kites pointing out this issue, but was told that this was just how the commissary works. [*Id.*] Plaintiff recognizes that the Douglas County Jail "may use a commissary system that is not a part of the jail," but argues that someone from the facility could have changed the kosher or non-kosher coding on the computer, or notified the commissary company. [*Id.*] Now a new commissary system is in place that allows an individual to order non-kosher items, even if he is on the kosher diet. [*Id.*] Plaintiff was able to take advantage of this system. [*Id.*]

Plaintiff also describes the lack of preparation for religious holidays by Douglas County Jail staff. In February 2017, Plaintiff submitted a kite to Teague, [*5] notifying him that Plaintiff might be housed in the Douglas County Jail during Passover. [*Id.* at 5] Teague responded that he would check the status of kosher food for Passover, but Plaintiff did not receive any additional information. [*Id.*] Teague did not respond to multiple phone calls and voicemails, or an email by Plaintiff and his rabbi. [*Id.*] On April 3, Plaintiff asked Teague in person about kosher food for Passover. [*Id.*] Teague responded, "No leaven. That's the last I want to hear about it." [*Id.*] Plaintiff

2018 U.S. Dist. LEXIS 63605, *5

received matzah beginning a couple days before Passover, but also received cereal, ravioli, and other non-kosher Passover foods throughout that period. [*Id.*] Because Plaintiff anticipated these problems, he had ordered food from the commissary that was the closest substitute to kosher food he could find. [*Id.*] When Plaintiff ran out of that food, he was "forced to trade" the non-kosher food he was receiving from the facility with other inmates to get more food resembling kosher food, in violation of facility rules. [*Id.*] Plaintiff eventually ran out of all of his kosher food, could no longer trade, and was forced to eat non-kosher over Passover. [*Id.*]

Finally, Plaintiff complains **[*6]** about his lack of access to religious texts during his incarceration. Plaintiff notes that according to the inmate handbook, "Hebrew religious texts are either available upon request and/or if available." [*Id.* at 3] Plaintiff requested a Torah and a siddur, a Jewish prayer book, but was informed that the facility did not have them. [*Id.*] Teague told Plaintiff to get a Bible instead since "it's got the same stuff," and Plaintiff suggests that Teague has attempted to push a Christian agenda on other inmates. [*Id.* at 3-4] Plaintiff ultimately had to order the religious texts himself. [*Id.* at 3]

## III. STANDARD OF REVIEW

Under *Federal Rule of Civil Procedure 12(b)(6)*, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. In deciding a motion under *Rule 12(b)(6)*, a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri, 595 F.3d 1120, 1124 (10th Cir. 2010)* (alteration in original) (quoting *Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009))*. Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **[*7]** plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)* (quoting *Twombly, 550 U.S. at 570*). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly, 550 U.S. at 556*). The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren, 478 F.3d 1149, 1160 (10th Cir. 2007)*.

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)* (citing *Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972))*. "The *Haines* rule applies to all proceedings involving a pro se litigant." *Id. at 1110 n.3*. The court, however, cannot be a pro se litigant's advocate. *See Yang v. Archuleta, 525 F.3d 925, 927 n.1 (10th Cir. 2008)*.

## IV. ANALYSIS

Plaintiff alleges *First Amendment* violations as a result of improperly prepared kosher meals and the limited availability of religious texts at the Douglas County Jail. [#4] Plaintiff does not state what type of relief he seeks. But because **[*8]** Plaintiff is no longer incarcerated [*see, e.g.*, ## 33, 34], any request for injunctive relief would be moot. *See, e.g., Wirsching v. Colorado, 360 F.3d 1191, 1196 (10th Cir. 2004)*. Accordingly, liberally construing Plaintiff's Complaint, the Court presumes that Plaintiff is seeking monetary damages. *See Hall, 935 F.2d at 1110*.

2018 U.S. Dist. LEXIS 63605, *8

Incarcerated individuals "retain fundamental constitutional rights," including "the reasonable opportunity to pursue one's religion as guaranteed by the *free exercise clause of the First Amendment*." *Williams v. Wilkinson, 645 F. App'x 692, 703-04 (10th Cir. 2016)* (quoting *Makin v. Colo. Dep't of Corr., 183 F.3d 1205, 1209 (10th Cir. 1999))*. The right to free exercise of religion includes inmates' "constitutional right to a diet conforming to their religious beliefs." *Beerheide v. Suthers, 286 F.3d 1179, 1185 (10th Cir. 2002)*. To prevail on a free exercise claim, the plaintiff must demonstrate that the defendants "substantially burdened [his] sincerely-held[3] religious beliefs." *Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)* (quoting *Kay v. Bemis, 500 F.3d 1214, 1218 (10th Cir. 2007))*. "[I]solated acts of negligence" are insufficient to establish a substantial burden, *id. at 1070*, and the plaintiff must allege more than a mere inconvenience on his free exercise, *Strope v. Cummings, 381 F. App'x 878, 882 (10th Cir. 2010)*. When an alleged deprivation is "the result of a sporadic or isolated incident," it merely constitutes an "inconvenience." *Ind v. Colo. Dep't of Corr., No. 09-CV-0537-WJM-KLM, 2014 U.S. Dist. LEXIS 43461, 2014 WL 1312457, at *12 (D. Colo. Mar. 31, 2014)* (second quoting *Gallagher, 587 F.3d at 1070*), *rev'd and remanded on other grounds*, *801 F.3d 1209 (10th Cir. 2015)*. By contrast, "a consistent restriction or flat denial of access to something" gives [*9] rise to a free exercise violation. *Id.* (citing *Strope, 381 F. App'x at 882*). Finally, the substantial burden must be a result of a defendant's "intentional interference" with the plaintiff's free exercise rights "to state a valid claim under *§ 1983*"—negligence is not sufficient.[4]

_____

[3] The parties do not appear to dispute that Plaintiff's Jewish beliefs are sincerely-held. Accordingly, the Court does not address this step of the analysis.

[4] The Tenth Circuit recently explained that it has not decided whether *conscious* interference, as opposed to intentional interference with the right to free exercise, may also support a *First Amendment* claim. *Ralston v. Cannon, 884 F.3d 1060, 2018 WL 1279738, at *2 n.3 (10th Cir. 2018)*. The Court need not resolve that issue here because Plaintiff's allegations do not give rise to either conscious or intentional interference with his free exercise rights.

*Gallagher, 587 F.3d at 1070*; *see also Moore v. Jay, No. CIV-16-940-R, 2018 U.S. Dist. LEXIS 34078, 2018 WL 1145945, at *3 (W.D. Okla. Mar. 2, 2018)* (collecting cases).

In their Motion to Dismiss, Defendants argue that: (1) the Douglas County Jail is not a proper party to this suit [#13 at 5-6] and, relatedly, that any official capacity claims against Teague fail [*id.* at 10-11]; (2) Plaintiff has not alleged that Teague was personally involved in any of the purported constitutional violations, and thus Plaintiff also fails to state a claim against Teague in his individual capacity [*id.* at 7-10]; and (3) Teague is entitled to qualified immunity [*id.* at 12-15].

## A. Douglas County Jail and Official Capacity Claims Against Teague

Defendants argue that the Douglas County Jail is not a proper defendant in this suit because Colorado law does not authorize county jails to sue and be sued. [#13 at 5-6] Relatedly, Defendants contend that Plaintiff has failed to state a claim against Mr. Teague in his official capacity. [*Id.* at 10-11] Plaintiff responds that "[i]f the jail is in fact a non su[ab]le [*10] party," the Court should substitute the Douglas County Sheriff's Office as the proper defendant. [#20 at 3]

"Title *42 U.S.C. § 1983* provides a cause of action against '[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .'" *Wyatt v. Cole, 504 U.S. 158, 161, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992)* (alterations in original) (quoting *42 U.S.C. § 1983*). Accordingly, a plaintiff may only bring suit against a "person" within the meaning of *§ 1983*. *See, e.g., Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)*.

Neither the Douglas County Jail, nor the Douglas County Sheriff's Office, as Plaintiff suggests as an alternative defendant, are suable persons under *§ 1983* because they "do[] not exist as [] separate legal entit[ies]," independent of Douglas County

2018 U.S. Dist. LEXIS 63605, *10

itself. *Stump v. Gates, 777 F. Supp. 808, 815 (D. Colo. 1991)*, *aff'd*, 986 F.2d 1429 (10th Cir. 1993); *Farrand v. Douglas Cty. Sheriff Dep't, No. 09-CV-01266-BNB, 2009 U.S. Dist. LEXIS 105775, 2009 WL 3698412, at *1 (D. Colo. Nov. 4, 2009)* (finding plaintiff could "not sue Defendant Douglas County Sheriff's Department because the sheriff's department is not a separate entity from Douglas County and, therefore, is not a person under *42 U.S.C. § 1983*"); *see also Lancaster v. Straightline, No. 15-cv-02852-GPG, 2016 U.S. Dist. LEXIS 27980, 2016 WL 852863, at *3 (D. Colo. Mar. 4, 2016)* ("Plaintiff may not sue the Weld County Sheriff and Weld County Jail because these entities are not 'persons' subject to suit under *42 U.S.C. § 1983*.").

**[*11]** This conclusion is consistent with Colorado state law. "The law of the state in which the district court sits governs the capacity of a governmental entity to sue or to be sued." *White v. Utah, 5 F. App'x 852, 853 (10th Cir. 2001)* (citing *Fed. R. Civ. P. 17(b)*). "Under Colorado law[,] municipalities and counties, not their various subsidiary departments'—such as Colorado county jails— "exist as 'bodies corporate and politic' empowered to 'sue and be sued.'" *Stump, 777 F. Supp. at 816* (citing *Colo. Rev. Stat. §§ 30-11-101(1)(a), 31-15-101(1)(a)-(b)*); *see also Lewis v. Denver Fire Dep't, No. 09-cv-0004-RBJ-MJW, 2013 U.S. Dist. LEXIS 447, 2013 WL 24279, at *5 (D. Colo. Jan. 2, 2013)* (same). The Douglas County Jail and the Douglas County Sheriff's Department therefore are also not proper defendants under Colorado law.

Even construing the Complaint liberally as asserting a claim against Douglas County itself, Plaintiff's claims nevertheless fail. "[M]unicipalities and municipal entities . . . are not liable under *42 U.S.C. § 1983* solely because their employees inflict injury on a plaintiff." *Fofana v. Jefferson Cty. Sheriff's, No. 11-cv-00132-BNB, 2011 U.S. Dist. LEXIS 25574, 2011 WL 780965, at *2 (D. Colo. Feb. 28, 2011)* (citing *Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*; *Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993))*. Instead, to establish a county's liability, the plaintiff must demonstrate that a municipal policy or

custom directly caused his injury. *Id.*

"A challenged practice may be deemed an official policy or custom for *§ 1983* municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 770 (10th Cir. 2013)*. After identifying an official policy or custom, the plaintiff must demonstrate causation by showing that the **[*12]** policy or custom "is the moving force behind the injury alleged." *Cacioppo v. Town of Vail, 528 F. App'x 929, 931 (10th Cir. 2013)* (quoting *Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998))*; *see also Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)* (same). Finally, the plaintiff must demonstrate "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Cacioppo, 528 F. App'x at 931* (quoting *Schneider, 717 F.3d at 769*).

Plaintiff has not made any allegations that the insufficient kosher meals, or his limited access to Jewish religious texts, were the direct result of a Douglas County policy or custom, enacted with deliberate indifference to foreseeable constitutional injury. In fact, many of Plaintiff's allegations suggest that it was Douglas County's practice to provide inmates with kosher food, and also to provide access to religious texts when available. [*See* #4 at 2 (alleging that Plaintiff submitted a request for kosher meals that was ultimately approved); *id.* at 4 (noting that the commissary included kosher food available for sale, and that a new commissary has since been put in place that enables an individual to order items labeled as non-kosher in his discretion, even if he is on a kosher diet); *id.* at 5 (Plaintiff noting that he began receiving matzah a couple of days before Passover); *id.* at 3 (Plaintiff stating that he requested religious texts, and when he was informed that the facility did not have them, he was able to order them himself)] Insofar as Plaintiff alleges that his kosher meals were **[*13]** not always prepared properly [*see, e.g., id.* at 2], Plaintiff does not suggest that a Douglas County

2018 U.S. Dist. LEXIS 63605, *13

policy is the "moving force" behind any such alleged violation.

The municipal liability analysis applies with equal force to any official capacity claims against Teague. "Suing individual defendants in their official capacities under §1983 . . . is essentially another way of pleading an action against the county or municipality they represent," and thus courts apply the same standards of liability to municipalities as to official capacity claims against municipal officials. Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010) (citing Monell, 436 U.S. at 690 n.55). To the extent Plaintiff has named Teague in his official capacity, those claims thus fail for the same reasons Plaintiff has failed to state a claim against Douglas County.

Accordingly, the Court **RECOMMENDS** that all claims asserted against the Douglas County Jail, even construed liberally as claims against the Douglas County Sheriff's Office or Douglas County itself, be **DISMISSED**. The Court further **RECOMMENDS** that any official capacity claims against Teague be **DISMISSED**.

## B. Individual Claims Against Teague

Defendants next argue that Plaintiff has failed to state a claim against Defendant Teague in his individual capacity [*14] because Plaintiff has not alleged that Teague was personally involved in any purported First Amendment violations. [#13 at 7-10]

"Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Williams, 645 F. App'x at 705 (quoting Brown v. Montoya, 662 F.3d 1152, 1163 (10th Cir. 2011)). In other words, "[t]here must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise." Aguilar v. Colorado Dep't of Corr., Civil Action No. 16-00509-GPG, 2016 U.S. Dist. LEXIS 54843, 2016 WL 1626024, at *1 (D. Colo. Apr. 25, 2016) (citing Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993)). To the extent the plaintiff is relying upon a theory of supervisory liability, the

plaintiff "must plead: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." Williams, 645 F. App'x at 705 (quoting Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)). Accordingly, under a supervisory liability theory here, Plaintiff must first "identify the specific policies over which" Teague was responsible "that led to the alleged" First Amendment violation, and then he "must establish a deliberate, intentional act" by Teague to violate Plaintiff's First Amendment rights. Id. at 706 (first quoting Pahls v. Thomas, 718 F.3d 1210, 1226 (10th Cir. 2013), then quoting Porro, 624 F.3d at 1327-28).

Plaintiff's [*15] allegations against Defendant Teague consist of complaints relating to kosher meals and snacks, the improper use of kosher utensils, the unavailability of religious texts, and the failure to make religious holiday accommodations. Considering each of these claims in turn, the Court finds that Plaintiff has failed to allege Teague's personal involvement in any of the alleged First Amendment violations.

## 1. Kosher Meals and Snacks

First, Plaintiff argues that he "kept kiting . . . [Teague] as to why [he] was not receiving kosher meals." [#4 at 2] When Plaintiff spoke with Teague in person, Teague explained that he had not received that paperwork. [Id.] Ultimately the correspondence took three days to process and Plaintiff then began receiving kosher meals. [Id.] The Tenth Circuit has held that multiple instances of alleged delays in approval for religious holiday meal accommodations, resulting in approval after the holiday had passed, "were, at most, isolated acts of negligence, not pervasive violations of [the plaintiff's] right to free exercise of religion." Gallagher, 587 F.3d at 1070; see also Kanatzar v. Cole, No. 17-3115-SAC, 2017 U.S. Dist. LEXIS 198067, 2017 WL 5970836, at *3 (D. Kan. Dec. 1, 2017) (finding, in the Fourteenth Amendment

2018 U.S. Dist. LEXIS 63605, *15

context, that the failure to respond to plaintiff's grievances did not by itself give rise to a § 1983 claim). Thus, as [*16] an initial matter, Plaintiff's allegations about the paperwork do not give rise to a First Amendment violation. But regardless, Plaintiff does not suggest that Teague was in any way responsible for the delay in the paperwork processing.

Second, Plaintiff alleges that he submitted a kite about not receiving a kosher diabetic snack and that "Chaplain Teague clouded the two issues" in his response. [#4 at 2] Plaintiff's conclusory statement that Teague "clouded the two issues," is insufficient to give rise to personal involvement and Plaintiff's correspondence with Teague[5] underscores that Teague did not have the authority to manage diabetic meal plans. See Aguilar, 2016 U.S. Dist. LEXIS 54843, 2016 WL 1626024, at *1 ("There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction . . . ."). Teague informed Plaintiff that he would "not get a nighttime snack," because, as Teague had previously explained, if Plaintiff was claiming that he had diabetes, the request would be referred to the medical department, which would coordinate "a medical diet." [#20 at 21] Teague's response also demonstrates that the decision of whether Plaintiff would receive a nighttime snack had nothing to do with Plaintiff's [*17] religion, but rather depended on medical policies. See Gallagher, 587 F.3d at 1070 (the substantial burden on plaintiff's free exercise rights must be a result of a defendant's "intentional interference" with those rights "to state a valid claim under § 1983").

Third, Plaintiff complains about the lack of variety of kosher meals. That allegation does not support a free exercise claim. See Strope, 381 F. App'x at 880, 882 (finding that plaintiff's allegations, including that kosher meals had less variety than regular meals, lacked seasonal fruits and vegetables, and occasionally included "wilted or even rotten items," "reflect[ed] the inconvenience of non-preferred or occasionally unsatisfactory

items in a meal," but did not "constitute[] a substantial burden on [plaintiff's] practice of maintaining a kosher diet"). Moreover, Plaintiff makes no mention of Defendant Teague's involvement in the planning of the kosher meal menus.

## 2. Kosher Utensils

Plaintiff observed that kosher utensils were mixed with non-kosher foods and that he did not receive proper disposable kosher utensils. [#4 at 2] Plaintiff submitted a kite asking Teague to determine "who Trinity Food Services utilizes for Kashrut (Jewish food law observation)." [Id.] Teague replied that [*18] he would look into that issue, but never responded to Plaintiff. [Id.] Plaintiff's allegations themselves demonstrate that Trinity Food Services, not Defendant Teague, was responsible for preparing food in accordance with Jewish food laws. Plaintiff does not allege that Teague himself intentionally refused to prepare food with separate kosher utensils, see Gallagher, 587 F.3d at 1070, or that Teague was responsible for a policy leading to the alleged free exercise violation, see Williams, 645 F. App'x at 705. See also Williams v. Valazair, No. CIV-14-456-M, 2015 U.S. Dist. LEXIS 171325, 2015 WL 9315537, at *5 (W.D. Okla. Nov. 9, 2015) (finding plaintiff had failed to allege that the defendant "was the officer having the requisite authority to approve a religious diet," where plaintiff complained that defendant had refused to provide plaintiff with a vegetarian meal tray, or to find another alternative consistent with plaintiff's religion), report and recommendation adopted, 2015 U.S. Dist. LEXIS 171559, 2015 WL 9413888 (W.D. Okla. Dec. 22, 2015). Furthermore, failure to respond to a grievance does not give rise to a § 1983 claim. See Kanatzar, 2017 U.S. Dist. LEXIS 198067, 2017 WL 5970836, at *3; Martin v. Birch, No. 09-CV-758-GKF-TLW, 2010 U.S. Dist. LEXIS 954, 2010 WL 125007, at *2 (N.D. Okla. Jan. 7, 2010) ("A prison official's failure, if any, to adequately respond to a prisoner's grievance does not implicate a constitutional right.")

## 3. Religious Texts

---

[5] See Tellabs, Inc., 551 U.S. at 322.

2018 U.S. Dist. LEXIS 63605, *18

Plaintiff next argues that he requested a Torah or Tanach, and siddur but was told [*19] that the facility did not have them. [#4 at 3] Plaintiff alleges that Teague told him to "Get a bible, it's got the same stuff."[6] [*Id.*] Plaintiff then attempted to order a Tanach from commissary, but states that it was removed before he could order it. [*Id.*] However, Plaintiff apparently was able to obtain a Torah and siddur, which he states that he donated to the Douglas County Jail after "order[ing] at great cost for expedited shipping to receive before Passover." [*Id.*]

Correctional facilities are not required to subsidize inmates' access to religious materials. *Pfeil v. Lampert, 603 F. App'x 665, 670 (10th Cir. 2015)*. In *Pfeil*, the inmate claimed that a Department of Corrections policy prohibiting hardbound books in inmates' living quarters violated his free exercise rights. *Id. at 669*. As a result of the policy, the inmate was forced to give up two bibles and a biblical reference work, which the facility refused to replace. *Id.* The plaintiff argued that he could not afford to purchase replacements for the confiscated texts. *Id. at 670*. The Tenth Circuit found no constitutional violation, holding that even under the *Religious Land Use and Institutionalized Persons Act of 2000* ("RLUIPA"), which has stricter requirements than the *Free Exercise Clause*, "the State [*20] is 'not require[d] . . . to pay for an inmate's devotional accessories.'" *Id. at 670* (alterations in original) (quoting *Cutter v. Wilkinson, 544 U.S. 709, 720 n.8, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005))*. In fact, the court explained, correctional facilities do not have to "provide replacements for confiscated" religious texts "at all." *Id.* (citing *Abdulhaseeb v. Calbone, 600 F.3d 1301, 1320-21 (10th Cir. 2010))*. Accordingly, Plaintiff has failed to state a free exercise claim with respect to his allegations of the limited availability of religious texts. Moreover, even if Plaintiff had properly invoked a *First Amendment* violation, there is no indication that Teague was personally responsible for the lack of religious texts at the facility.

## 4. Sabbath and Passover

Finally, Plaintiff contends that he notified kitchen staff and Teague that he could not eat hot meals on the Sabbath, but that they "refused to abide," and that Teague responded, "I've been to Israel, and you can get hot food on the Sabbath."[7] [#4 at 2] Plaintiff also argues that he had communicated with Teague to ensure the availability of appropriate kosher food during Passover. [*Id.* at 5] Teague responded that he would look into it, but did not follow up with Plaintiff. [*Id.*] When Plaintiff asked Teague again about the status of Passover kosher food, Teague communicated his understanding that Plaintiff [*21] could not have leaven, and said, "That's the last I want to hear about it." [*Id.*] Although Plaintiff received matzah for

---

[6] Insofar as Plaintiff includes allegations that Teague "pushed Christian literature" on other inmates [*see* #4 at 3-4], Plaintiff does not have standing to assert those claims. *See, e.g., Savage v. Fallin, 663 F. App'x 588, 592 (10th Cir. 2016)* ("To the extent [plaintiff] attempts to rely on indignities suffered by other inmates, he lacks standing to seek redress for injuries committed against others." (citing *Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993))*.

[7] Plaintiff also alleges that Teague displayed his lack of understanding about Plaintiff not being able to work on the Sabbath. [#4 at 4] However, Plaintiff notes that "[t]his point is made simply to show Chaplain Teague's lack of knowledge about Judaism," and thus the Court does not construe this claim as an alleged free exercise violation. Plaintiff additionally asserts that food for order through the commissary included items that were actually kosher, but mislabeled as non-kosher, and that when he attempted to have this rectified, he was told that this was simply how commissary worked. [*Id.*] There is no indication from the face of the Complaint that Teague was involved in that interaction and Plaintiff admits that the Douglas County Jail "may use a commissary system that is not a part of the jail, like Keefe." [*Id.*] Furthermore, labeling food as non-kosher, far from constituting a constitutional violation, appears to be a measure taken out of an abundance of caution. It does not present a scenario where Plaintiff is "force[d] to make the Hobson's choice of eating a diet contrary to his beliefs or not eating at all." *Williams, 645 F. App'x at 702*; *see also Abdulhaseeb, 600 F.3d at 1316-17* (same). Instead, as Plaintiff alleges, he could purchase other kosher food that was properly labeled. [#4 at 4] Plaintiff ultimately seems to take issue with the fact that he could not order a wider variety of items from the commissary that he believed were kosher—a matter of inconvenience that does not give rise to a free exercise violation. *See Strope, 381 F. App'x at 882*.

2018 U.S. Dist. LEXIS 63605, *21

Passover, he did not receive any other kosher for Passover food, the matzah was served with food that Plaintiff could not eat during Passover, thereby contaminating it, and Plaintiff had to buy substitute foods from commissary and trade food with other inmates. [*Id.*] Plaintiff ultimately was forced to eat non-kosher food during Passover. [*Id.*]

Defendants argue that the Complaint does not allege that Plaintiff told Teague or any other county employee that he was not receiving kosher meals during Passover. [#13 at 3] But Plaintiff attaches correspondence with Teague to his opposition to the Motion to Dismiss, dated April 12, 2017, which appears to be written during Passover. [#20 at 16] Although Plaintiff does not explicitly reference his Passover communications with Teague in the Complaint, he repeatedly references ongoing communications with Teague and submission of kites, and thus, construing the Complaint liberally, the Court considers the April 12 letter. *See Tellabs, Inc., 551 U.S. at 322*. In that correspondence, Plaintiff notes that he appreciated the matzah, but could [*22] not "have the cereal or cookies during Passover," and that having these items included "in the box makes the whole meal inedible." [#20 at 16] Teague simply responded "kite received." [*Id.*]

The Court finds *Aragon v. Erlanger, No. 13-cv-01726-RBJ-BNB, 2014 U.S. Dist. LEXIS 74671, 2014 WL 2462553 (D. Colo. June 2, 2014)* instructive. There, the plaintiff alleged that defendant Captain Edmonds was the supervisor over all staff in the facility kitchen. *2014 U.S. Dist. LEXIS 74671, [WL] at *8*. Plaintiff filed complaints about the improper preparation of Passover meals to Edmonds, and met with Edmonds personally, who promised that the violations would be corrected. *2014 U.S. Dist. LEXIS 74671, [WL] at *4, *8*. Plaintiff claimed that Edmonds had "authorized kitchen staff to prepare Passover meals in the kosher kitchen where there was no special preparation, cleaning of the area, and/or cleaning of the equipment to meet kosher requirements." *2014 U.S. Dist. LEXIS 74671, [WL] at *8*. Finally, plaintiff alleged that Edmonds "authorized the use of a janitorial sink for the cleaning of kosher foods, utensils, and equipment and that he failed to supervise and train his staff

how to clean a kosher kitchen and prepare kosher meals to meet kosher Passover and dietary requirements." *Id.* Despite these allegations, this Court held that plaintiff had failed to "allege any specific facts to show that [*23] Edmonds was personally involved in the kitchen violations or the tampering, or that he possessed any responsibility for the continued operation of a policy that caused violations of the plaintiff's *First Amendment* rights." *Id.* By contrast, this Court found that plaintiff plausibly alleged that another defendant, Sergeant Butterfield, was personally involved in the violations because, in addition to repeating the same claims plaintiff had asserted against Edmonds, plaintiff also alleged that Butterfield was "in charge of everything kosher and food related," and that kitchen staff stated they were following Butterfield's orders. *Id.*

Here, Plaintiff's allegations with respect to Teague's personal involvement include even less detail than the plaintiff's insufficient allegations against Captain Edmonds in *Aragon*. Plaintiff merely alleges that he notified kitchen staff and Teague about dietary restrictions in accordance with Passover and the Sabbath, but that they "refused to abide," and that Teague was dismissive in conversations about Plaintiff's religious practices. [#4 at 2, 5] Plaintiff offers no insight as to what, if any, level of control or personal participation Teague had in the facility kitchen, [*24] kosher meal preparation, or Plaintiff's meals in particular. In fact, except for Plaintiff referring to Teague intermittently as "Chaplain Teague," the Court has no means by which to decipher Teague's role at the facility, and how that role impacted Plaintiff's kosher meal observance, if at all. Plaintiff does not allege that Teague had a supervisory position, that he failed to oversee or train kitchen staff, or that he authorized kitchen staff to prepare kosher meals in ways that did not comply with Plaintiff's religious practices. By the same token, Plaintiff does not suggest that kitchen staff refused to provide properly prepared meals pursuant to orders by Teague. Furthermore, and as noted above, other allegations in the Complaint suggest that outside actors controlled the kosher menu and kosher items available through commissary. [*See, e.g.*, #4 at 2 ("After

2018 U.S. Dist. LEXIS 63605, *24

kiting Teague to ask who Trinity Food Services utilizes for Kashrut (Jewish food law observation), I was told he would look into it, but never received a response."); *id.* at 4 ("I understand you may use a commissary system that is not a part of the jail, like Keefe.")]

Accordingly, Plaintiff has failed to allege that Defendant Teague **[*25]** was personally involved in any of the claimed free exercise violations and the Court **RECOMMENDS** that all claims asserted against Defendant Teague in his personal capacity be **DISMISSED**.[8]

## V. CONCLUSION

For the foregoing reasons, this Court respectfully **RECOMMENDS** that the Motion to Dismiss [#13] be **GRANTED**.[9]

---

[8] Defendant Teague also raises a qualified immunity defense. [#13 at 12-15] As discussed above, at least with respect to Plaintiff's claims about the delay in receiving kosher meals, the lack of diabetic kosher snacks, the limited variety of kosher meals, and the facility's refusal to provide Plaintiff with religious texts, Plaintiff has failed to plead a free exercise violation. Accordingly, with respect to these claims, Plaintiff has failed to satisfy a necessary prerequisite to overcome Teague's qualified immunity defense. *See Quinn v. Young, 780 F.3d 998, 1004 (10th Cir. 2015)* (holding that once the defense of qualified immunity has been raised, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was "clearly established" at the time of the challenged conduct'" (quoting *Ashcroft v. al-Kidd, 563 U.S. 731, 735, 31 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*)).

[9] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the Magistrate Judge's **[*26]** proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)*; *Griego v. Padilla (In re Griego), 64 F.3d 580, 583 (10th Cir. 1995)*. A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review." *United States v. One Parcel of Real Prop., 73 F.3d 1057, 1060 (10th Cir. 1996)*. Failure to make timely objections may bar *de novo* review by the District Judge

DATED: March 21, 2018

BY THE COURT:

/s/ Scott T. Varholak

United States Magistrate Judge

---

End of Document

---

of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the Magistrate Judge. *See Vega v. Suthers, 195 F.3d 573, 579-80 (10th Cir. 1999)* (holding that the district court's decision to review Magistrate Judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc., 52 F.3d 901, 904 (10th Cir. 1995)* (finding that cross-claimant waived right to appeal certain portions of Magistrate Judge's order by failing to object to those portions); *Ayala v. United States, 980 F.2d 1342, 1352 (10th Cir. 1992)* (finding that plaintiffs waived their right to appeal the Magistrate Judge's ruling by failing **[*27]** to file objections). *But see, Morales-Fernandez v. INS, 418 F.3d 1116, 1122 (10th Cir. 2005)* (holding that firm waiver rule does not apply when the interests of justice require review).

✚ Positive
As of: August 13, 2021 5:19 PM Z

## *Strope v. Cummings*

United States Court of Appeals for the Tenth Circuit

June 9, 2010, Filed

No. 09-3306

**Reporter**

381 Fed. Appx. 878 *; 2010 U.S. App. LEXIS 11806 **

MICHAEL LEE STROPE, a/k/a Gordon Strope, Plaintiff-Appellant, v. WILLIAM CUMMINGS, Kansas Department of Corrections, in his individual capacity; DAVID R. MCKUNE, Warden, Lansing Correctional Facility, in his individual capacity; COLLETTE WINKLEBAUER, Lansing Correctional Facility, in her individual capacity; DANIELLE WAGNER, Lansing Correctional Facility, in her individual capacity; (FNU) THEISEN, Correctional Officer I, Lansing Correctional Facility, in his individual capacity; (FNU) JACKSON, Kitchen Supervisor, Lansing Correctional Facility, in her individual capacity, Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** (D.C. No. 5:05-CV-03385-SAC). (D. Kan.).

*Strope v. Cummings, 2009 U.S. Dist. LEXIS 86885 (D. Kan., Sept. 22, 2009)*

## Core Terms

kosher, grievances, religious, retaliation, diet, meal, substantial burden, summary judgment, prison, religious belief, district court, quotation, free exercise, sincerely, call-out, inmates

## Case Summary

**Procedural Posture**

Plaintiff prisoner appealed a grant of summary judgment by the United States District Court for the District of Kansas in favor of defendant prison officials in prison civil rights action brought under *42 U.S.C.S. § 1983* and the Religious Land Use and Institutionalized Persons Act of 2000, *42 U.S.C.S. §§ 2000cc to 2000cc-5*, regarding conditions at the facility.

**Overview**

The prisoner claimed deficiencies in the kosher diet, interference with access to religious services, and a retaliatory transfer between cell units. The prisoner contended that deficiencies in kosher meals violated his right to the free exercise of religion under the *First Amendment* and his *Eighth Amendment* right to an adequate diet. On review, the court affirmed. The court agreed with the district court that the prisoner's scattered and minor complaints about kosher meals were insufficient as a matter of law to show that the officials had imposed a substantial burden on his religious exercise. Also, whatever complaints the prisoner might have voiced regarding the content, variety, and preparation of the kosher menu, he did not show that the menu failed to provide a nutritionally adequate diet under the *Eighth Amendment*. Isolated mistakes regarding call-outs for religious services were not actionable bases for a Free Exercise claim or a retaliation claim. Finally, the prisoner failed to show that a retaliatory motive might have played some role in his transfer and that such a motive was the strict but-for cause of his transfer.

**Outcome**

The court affirmed the grant of summary judgment

381 Fed. Appx. 878, *878; 2010 U.S. App. LEXIS 11806, **1

in favor of the officials.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary
Judgment > Evidentiary Considerations

Civil Procedure > Appeals > Summary
Judgment Review > Standards of Review

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General
Overview

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of
Law > General Overview

### HN1[⤓]  Summary Judgment, Evidentiary Considerations

An appellate court reviews the grant of summary judgment de novo, applying the same standard the district court should apply under *Fed. R. Civ. P. 56(c)*. For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment. Evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings.

Civil Procedure > Parties > Pro Se
Litigants > Pleading Standards

### HN2[⤓]  Pro Se Litigants, Pleading Standards

While courts liberally construe the pleadings of the pro se plaintiff, the courts do not act as his advocate. Thus, although the court makes some allowances for his failure to cite proper legal authority, his confusion of various legal theories,

his poor syntax and sentence construction, or his unfamiliarity with pleading requirements, the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record.

Constitutional Law > ... > Fundamental
Freedoms > Freedom of Religion > Free
Exercise of Religion

### HN3[⤓]  Freedom of Religion, Free Exercise of Religion

The United States Court of Appeals for the Tenth Circuit has identified three broad ways government action may impose a substantial burden on religious exercise: (1) requiring participation in an activity prohibited by a sincerely held religious belief; or (2) preventing participation in conduct motivated by a sincerely held religious belief; or (3) placing substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice-an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

Constitutional Law > ... > Fundamental
Freedoms > Freedom of Religion > Free
Exercise of Religion

### HN4[⤓]  Freedom of Religion, Free Exercise of Religion

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

381 Fed. Appx. 878, *878; 2010 U.S. App. LEXIS 11806, **1

Civil Rights Law > Protection of Rights > Prisoner Rights > Freedom of Religion

Constitutional Law > ... > Fundamental Freedoms > Freedom of Religion > Free Exercise of Religion

**HN5[**⬇**] Prisoner Rights, Freedom of Religion**

Every infringement on a religious exercise will constitute a substantial burden. At a minimum the substantial burden test requires more than an inconvenience to one's religious practice. Illustrating the distinction between substantial burden and inconvenience, the United States Court of Appeals for the Tenth Circuit has held (1) the flat denial of a halal diet with approved meats was actionable, but (2) an incident in which a prisoner's meal was rendered inedible by service of prohibited items contaminating his tray was not actionable.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

**HN6[**⬇**] Summary Judgment, Evidentiary Considerations**

At the summary judgment stage, where the purpose is to determine whether there is evidence to support a party's factual claims and unsupported conclusory allegations do not create a genuine issue of fact.

Civil Rights Law > Protection of Rights > Prisoner Rights > Welfare

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

**HN7[**⬇**] Prisoner Rights, Welfare**

A main aspect of the *Eighth Amendment* standard

related to prison food guarantees inmates merely the basic necessities of nutritionally adequate food.

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Scope

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

**HN8[**⬇**] Protection of Rights, Prisoner Rights**

An inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of his constitutional rights.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Scope

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

**HN9[**⬇**] Prisoner Rights, Confinement Conditions**

Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity. Moreover, the United States Court of Appeals for the Tenth Circuit has consistently held that temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the causal nexus for a retaliation claim. Indeed, even outside the prison context, temporal proximity per se is insufficient to show that the stated explanation for a challenged action is pretextual.

Constitutional Law > ... > Fundamental

381 Fed. Appx. 878, *878; 2010 U.S. App. LEXIS 11806, **1

Freedoms > Freedom of Religion > Free Exercise of Religion

**HN10**[⬇] **Freedom of Religion, Free Exercise of Religion**

An isolated mistake is also not an actionable basis for a Free Exercise claim.

**Counsel:** MICHAEL LEE STROPE, AKA Gordon Strope, Plaintiff - Appellant, Pro se, El Dorado, KS.

For WILLIAM CUMMINGS, Kansas Department of Corrections, in his individual capacity, DAVID R. MCKUNE, Warden, Lansing Correctional Facility, in his individual capacity, COLLETTE WINKLEBAUER, Lansing Correctional Facility, in her individual capacity, DANIELLE WAGNER, Lansing Correctional Facility, in her individual capacity, (FNU) THEISEN, Correctional Officer I, Lansing Correctional Facility, in his individual capacity, Defendants - Appellees: Eric J. Aufdengarten, Kimberly M.J. Lynch, Attorney General for the State of Kansas, Topeka, KS.

For (FNU) JACKSON, Kitchen Supervisor, Lansing Correctional Facility, in her individual capacity, Defendant - Appellee: Marcos A. Barbosa, Esq., James S. Kreamer, Baker Sterchi Cowden & Rice, LLC, Kansas City, MO.

**Judges:** Before McKAY, Circuit Judge, BRORBY, Senior Circuit Judge, and EBEL, Circuit Judge.

**Opinion by:** Wade Brorby

# Opinion

**[\*879] ORDER AND JUDGMENT** *

---

* After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* **Fed. R. App. P. 34(f)**; *10th Cir. R. 34.1(G)*. **[\*\*2]** The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with **Fed. R. App. P. 32.1** and **10th Cir. R. 32.1**.

Plaintiff Michael Lee Strope appeals from the grant of summary judgment to defendants in this prison civil rights action involving conditions at the Lansing Correctional Facility (LCF) in Kansas, **[\*880]** brought under *42 U.S.C. § 1983* and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), *42 U.S.C. §§ 2000cc to 2000cc-5*. His amended complaint set out twenty counts, but, as the district court noted, these clustered into six basic claims involving events at LCF in the summer of 2005. Of these, only three are specifically argued on appeal: (1) deficiencies in the kosher diet at LCF; (2) interference with access to scheduled religious services; and (3) retaliatory transfer between cell units. [1] Aplt. Br. at 2, supp. to page 3. Focusing on the disposition of these three claims, we affirm for substantially the reasons stated by the district court.

Our standard of review is well-settled:

**HN1**[⬆] We review the grant of summary judgment de novo, applying the same standard the district court should apply under *Fed.R.Civ.P. 56(c)*. For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment. Evidence, including testimony, must be based on more than mere **[\*\*4]** speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings.

*Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th*

---

[1] Mr. Strope also contends **[\*\*3]** more generally that the district court improperly "tr[ied] the case on prison official's grievance responses." Aplt. Br. at 2. This broad-brush objection is both inaccurate and analytically superfluous. Although he initially cites in perfunctory fashion to counts "1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 16, 17, 18, 19, and 20" in his "argument and authorities" for this issue, he limits his discussion of specifics to the same three claims listed above. *Id.,* supp. to page 3. Our review of the district court's disposition of these claims on the merits necessarily includes consideration of its treatment of evidentiary materials, which we conclude was proper in all material respects.

381 Fed. Appx. 878, *880; 2010 U.S. App. LEXIS 11806, **3

Cir. 2007) (quotations, citations, and alterations omitted). HN2[↑] While we liberally construe the pleadings of the pro se plaintiff, "we do not act as his advocate." Id. "Thus, although we make some allowances for [his] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements, the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005) (quotation, citation, and alterations omitted). With these standards in mind, we address the claims presented for our review.

**Deficiencies in the Kosher Diet at LCF**

Mr. Strope claims that deficiencies in LCF kosher meals served during the summer of 2005 violated both his right to the free exercise of his religion and his *Eighth Amendment* right to an adequate diet. Much of his objection to the diet has been advanced in general terms: [**5] kosher meals were less varied than the regular meals, had a paucity of seasonal fruits and vegetables, included wilted or even rotten items on occasion, and entirely lacked certain items found on the regular menu. [2] [*881] The specific instances gleaned from his pleadings and grievances cited therein are: (1) on June 27, Strope received a warm sandwich (that should have been "cool/crisp"), along with a "green orange" and a "nasty" carrot/cabbage salad, R. vol. 1 at 67; (2) on June 30, he was served salad dressing that was not kosher, *id.* at 90; and (3) lunch on July 16 included a salad that was "rotted and clearly smelled spoiled," *id.* at 80. Grievances attached to but not cited in the complaint add: (4) on July 4, the

regular line had a holiday meal with ice cream but the kosher line did not, even though the ice cream was kosher (the prison explained that the ice cream could not be given to the kosher line, which already was being served meat and therefore could not be served a dairy product), *id.* at 70-72; (5) a July 10 grievance over the lack of meal rotation complained of two consecutive chicken suppers and three rice/soy bean meals in the last several days (the prison noted that the [**6] former were different chicken dishes and the latter included soy chili and red beans and rice dishes), *id.* at 78; (6) on July 11, he was served a "cold tray" that was warm with wilted carrot sticks, *id.* at 81; and (7) on July 14, he received a turkey sandwich and rotted orange, while the regular line had a full balanced tray with macaroni salad, *id.* at 79.

Mr. Strope's primary claim here is that the inadequacies in the kosher diet burdened his religious observance, violating the *Free Exercise Clause* and the RLUIPA. While the analysis under these authorities differs in some respects, the principle dispositive here is the same: Strope must show that defendants' conduct imposed a [**7] *substantial burden* on his religious practice. *Abdulhaseeb v. Calbone, 600 F.3d 1301, 1312-15 (10th Cir. 2010)* (applying RLUIPA); *Gallagher v. Shelton, 587 F.3d 1063, 1069-70 (10th Cir. 2009)* (applying *Free Exercise Clause*). The district court held that Strope's scattered and minor complaints about kosher meals were insufficient as a matter of law to show that defendants had imposed a substantial burden on his religious exercise. We agree.

HN3[↑] In *Abdulhaseeb* we identified three broad ways government action may impose a substantial burden on religious exercise:

> (1) requir[ing] participation in an activity prohibited by a sincerely held religious belief, or (2) prevent[ing] participation in conduct motivated by a sincerely held religious belief, or (3) plac[ing] substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely

---

[2] One grievance complained that "we [on the kosher diet] never receive macaroni salad or potato salad, cucumbers, peppers, or tomatoes, watermelon, cantaloupe or baked potatoes." R. vol. 1 at 66. Macaroni salad seems to be of particular significance to Mr. Strope. An early response to one of his grievances noted that he had been "advised to submit a request to Aramark [LCF's vendor for food service] to see if macaroni salad could be added to the [kosher] menu [for] . . . the next seasonal menu." R. vol. 1 at 61.

381 Fed. Appx. 878, *881; 2010 U.S. App. LEXIS 11806, **7

held religious belief, such as where the government presents the plaintiff with a Hobson's choice-an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

*600 F.3d at 1315*. The first two are clearly **[**8]** not applicable here.

As for the third, we explained the concept of "substantial pressure" in terms of coercion created by the conditional receipt or denial of an *important benefit:*

> **HN4[↑]** "[W]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."

*Id.* (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 717-18, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981)).* We cautioned that not **HN5[↑]** "every infringement on a religious exercise will constitute a substantial burden," reinforcing the point **[*882]** with a quote from *Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007)*: "[A]t a minimum the substantial burden test requires . . . more than an inconvenience to one's religious practice." *Abdulhaseeb, 600 F.3d at 1316.* Illustrating the distinction between substantial burden and inconvenience, we held (1) the flat denial of a halal diet with approved meats was actionable, **[**9]** *id. at 1316-20*, but (2) an incident (the panel concurrence notes "sporadic incidents") in which a prisoner's meal was rendered inedible by service of prohibited items contaminating his tray was not actionable, *id. at 1320-21*; *id. at 1325*; *see also* *Gallagher, 587 F.3d at 1070* (holding isolated violation of kosher restrictions did not support Free Exercise claim). We "assume[d] that as the frequency of presenting unacceptable foods increases, at some point the situation would rise to the level of a substantial burden," but that level had

clearly not been reached. *Abdulhaseeb, 600 F.3d at 1321*.

Neither has that level been reached here. The complaints summarized above reflect the inconvenience of non-preferred or occasionally unsatisfactory items in a meal. We cannot say that they constituted a substantial burden on Mr. Strope's practice of maintaining a kosher diet. While there were perhaps more instances involved here than in *Abdulhaseeb,* none were shown to have completely denied an edible meal to the prisoner, so in that respect the burden was lighter here than the burden deemed insubstantial in *Abdulhaseeb.* As for his broader complaints about the variety, quality, and rotation of the **[**10]** menu, such general allegations are insufficient **HN6[↑]** at the summary judgment stage, where "[t]he purpose . . . is to determine whether there is evidence to support a party's factual claims" and "[u]nsupported conclusory allegations . . . do not create a genuine issue of fact." *Abdulhaseeb, 600 F.3d at 1321* (quotation omitted).

Mr. Strope's alternative reliance on the *Eighth Amendment* does not obviate the deficiency in his case regarding the diet at LCF. Indeed, *HN7[↑]* the relevant aspect of the *Eighth Amendment* standard is, if anything, considerably lower, guaranteeing inmates merely "the basic necessities of [nutritionally] adequate food." *Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006)* (quotation omitted). Whatever complaints Strope may have voiced regarding the content, variety, and preparation of the kosher menu, he has not shown that it failed to provide a nutritionally adequate diet.

## Interference with Access to Religious Services

LCF accommodates the religious needs of inmates through the use of a "call out" system. Religious groups schedule services and maintain lists of the inmates authorized to attend. The services for Mr. Strope's group were scheduled for 8:30 to 9:30 a.m. on **[**11]** Saturdays and 6:15 to 8:15 p.m. on Tuesdays, and he was on the call-out list for these

381 Fed. Appx. 878, *882; 2010 U.S. App. LEXIS 11806, **11

times. However, following his transfer from the D-Cell House to the IMU (segregation) unit in A-Cell House in July, Mr. Strope was denied a call-out on three consecutive Tuesday nights, being told that he was not on the applicable list. R. vol. 1 at 94-96. He also missed much of one Saturday morning service, because the call-out was posted late. *Id.* In response to his grievance over these matters, prison officials verified that he was on the call-out list for A-Cell House, told him measures had been taken to ensure that the list would be posted and followed, and apologized for the misunderstanding. *Id.* at 94-95, 97.

On appeal, Strope refers to this episode as an example of retaliation for filing grievances, though in his pleadings he also complained of the burden it placed on his **[\*883]** Free Exercise rights, which is how the district court analyzed the claim. As it happens, not only is the claim deficient from a retaliation standpoint, but that deficiency also bolsters the district court's rationale for rejecting it under Free Exercise principles.

Strope's attribution of retaliatory motive is conjectural **[\*\*12]** and conclusory. "*HN8*[⬆]] An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of [his] constitutional rights." *Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998)* (quotation omitted) (also noting that retaliation claim is governed by strict "but for" standard for causation). Strope does not cite any evidence supporting his speculative accusation of retaliation. While he undeniably engaged in protected activity--he has pursued a plethora of prison grievances and lawsuits over the years--that alone does not establish the requisite causal connection for his retaliation claim. If it did, litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness. *HN9*[⬆]] "Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity." *Id.* Moreover, we have consistently held that temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the causal

nexus for a retaliation claim. *See, e.g., Friedman v. Kennard, 248 F. App'x 918, 922 (10th Cir. 2007)* **[\*\*13]** (citing cases). Indeed, even outside the prison context, temporal proximity per se is insufficient to show that the stated explanation for a challenged action is pretextual. *See, e.g., Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1066 (10th Cir. 2009)*.

We are thus left with defendants' explanation indicating that the problems with Strope's call-outs reflected nothing more than isolated mistakes, which clearly warrants the entry of summary judgment for defendants on Strope's retaliation claim. And, as we have already noted, *HN10*[⬆]] an isolated mistake is also not an actionable basis for a Free Exercise claim. *See Abdulhaseeb, 600 F.3d at 1320-21, 1325; Gallagher, 587 F.3d at 1070*.

### Retaliatory Inter-Unit Transfer

Strope's retaliatory-transfer claim suffers from the same basic evidentiary deficiency. Once again based primarily on his own litigiousness, he conjectures that his transfer from D-Cell House to A-Cell House in early July was done in retaliation for the exercise of constitutional rights. Defendants, on the other hand, offered a legitimate and facially plausible explanation for the transfer: to reunite the discontented Strope with a particular counselor with whom he had a good relationship **[\*\*14]** before the counselor was transferred from D-Cell House to A-Cell House earlier in 2005. *See* R. vol. 1 at 46-49; R. vol. 2 at 152-53.

In this instance, however, Strope seeks to bolster his case by referring to an affidavit submitted in response to defendants' motion for summary judgment, in which he stated that two of the defendants met with him on June 15, 2005 "to instruct/reprimand [him] for the filing of numerous grievances, and did in fact tell [him] to quit filing said grievances on Aramark or he would be transferred." R. vol. 2 at 167. The following circumstances make this self-serving statement unusually dubious: (1) Strope said nothing about this threat in his grievances over the transfer; (2) he specifically recounted the June 15 meeting in

381 Fed. Appx. 878, *883; 2010 U.S. App. LEXIS 11806, **14

another grievance, where he noted the parties discussed kosher diet issues, but did not mention anything about a threat; (3) the threat is not mentioned in his complaint or amended complaint; (4) in his **[*884]** answer to interrogatories asking for the facts underlying his retaliatory-transfer claim, he just referred defendants to his complaint and grievances and said nothing about a threat; (5) only after defendants moved for summary judgment did **[**15]** he prepare the affidavit-- nearly four years after the fact--and introduce for the first time this alleged threat that one would expect to see foregrounded from the outset. In contrast, from their first response to Strope's grievances, defendants have consistently and plausibly maintained that Strope was transferred to facilitate his counseling. Keeping in mind the rigorous burden placed on Strope to show not only that a retaliatory motive may have played some role in his transfer but that such a motive was the strict but-for cause of his transfer, *Peterson, 149 F.3d at 1144*, we conclude that he has failed to make the necessary showing on this element to defeat summary judgment, i.e., his evidence was "merely colorable" at best and not "significantly probative," *Revell v. Hoffman, 309 F.3d 1228, 1232 (10th Cir. 2002)* (quotation omitted) (applying summary judgment standard from *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*.

The judgment of the district court is AFFIRMED.

Entered for the Court

Wade Brorby

Senior Circuit Judge

✚ Positive
As of: August 13, 2021 5:13 PM Z

## *Van Deelen v. Fairchild*

United States District Court for the District of Kansas

December 1, 2005, Decided ; December 1, 2005, Filed

CIVIL ACTION Case No. 05-2017

**Reporter**
2005 U.S. Dist. LEXIS 30503 *; 2005 WL 3263885

MICHAEL D. VAN DEELEN, Plaintiff, v. ROBERT FAIRCHILD, et al., Defendants.

**Subsequent History:** Affirmed by *Van Deelen v. Fairchild, 2006 U.S. App. LEXIS 22537 (10th Cir., Aug. 31, 2006)*

**Prior History:** *Van Deelen v. Fairchild, 2005 U.S. Dist. LEXIS 20459 (D. Kan., Sept. 19, 2005)*

## Core Terms

declaratory relief, absolute immunity, motion to dismiss, immunity, plaintiff's claim, declaration, employees, declaratory judgment, state official, judicial immunity, court personnel, district court, damages, parties, recusal, subject matter jurisdiction, supplemental jurisdiction, administrative assistant, individual capacity, Defendants', allegations, reassigned, rights, constitutional right, amended complaint, official capacity, state law claim, state court, relations, chambers

## Case Summary

### Procedural Posture

Defendants, three judges of the Douglas County Court and a judge's administrative assistant, filed a motion to dismiss plaintiff's action, which alleged under *42 U.S.C.S. § 1983* that each defendant deprived him of, and retaliated against him for exercising, numerous constitutional rights, and also alleged state law claims for defamation and negligence.

### Overview

Plaintiff, a frequent litigant in state court, alleged that by case reassignments, hearing cancellations, recusal, non-disclosure of a judge's availability, limitations on access to court personnel, and refusal to allow service of summons, defendants violated his constitutional rights and retaliated against him for exercising those rights. The court held that, to the extent that plaintiff proceeded against defendants in their official capacities, the *Eleventh Amendment* barred all claims against defendants in their official capacities because the judges were clearly state officials and not mere county employees, and the assistant was a state employee. The court held that the doctrine of absolute immunity warranted dismissal of the claims against defendants in their individual capacities because judges were absolutely immune in the assignment of cases and their control of the court docket, and the assistant was absolutely immune in acting under a judge's direction. The court also held that it lacked jurisdiction over plaintiff's individual capacity claims for declaratory relief because plaintiff only sought a declaration that he was wronged in the past.

### Outcome

The court sustained defendants' motion, dismissing plaintiff's federal claims. The court declined to exercise supplemental jurisdiction over plaintiff's state law claims, dismissing them without prejudice.

## LexisNexis® Headnotes

2005 U.S. Dist. LEXIS 30503, *30503

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

**HN1[🔻] Defenses, Demurrers & Objections, Motions to Dismiss**

The trial court may only exercise jurisdiction when specifically authorized to do so, and must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking. *Fed. R. Civ. P. 12(h)(3)*. The plaintiff sustains the burden of showing that jurisdiction is proper, and he must demonstrate that the case should not be dismissed. *Fed. R. Civ. P. 12(b)(1)* motions to dismiss for lack of subject matter jurisdiction generally take two forms: facial attacks on the complaint or factual attacks on the accuracy of the allegations in the complaint.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

**HN2[🔻] Motions to Dismiss, Failure to State Claim**

A *Fed. R. Civ. P. 12(b)(6)* motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The trial court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences from those facts in favor of the plaintiff. In reviewing the sufficiency of the plaintiff's complaint, the issue is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims. Although the plaintiff need not precisely state each element of his claims, he must plead minimal factual allegations on those material elements that must be proved.

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

**HN3[🔻] Pro Se Litigants, Pleading Standards**

The trial court affords a pro se plaintiff some leniency and must liberally construe the complaint. While pro se complaints are held to less stringent standards than pleadings drafted by lawyers, pro se litigants must follow the same procedural rules as other litigants. The trial court may not assume the role of advocate for a pro se litigant.

Civil Rights Law > ... > Immunity From Liability > Local Officials > General Overview

Constitutional Law > State Sovereign Immunity > General Overview

**HN4[🔻] Immunity From Liability, Local Officials**

The *Eleventh Amendment* applies to shield the state and "arms of the state" from suit in federal court. Official capacity suits against state officials or employees under *42 U.S.C.S. § 1983* are treated as if against the state itself. Thus, for the *Eleventh Amendment* to apply, the defendants must be state officials or employees.

Governments > Courts > Creation & Organization

**HN5[🔻] Courts, Creation & Organization**

*Kan. Const. art. 3, § 6*, establishes the district courts of Kansas and their jurisdiction and sets the method by which judges are selected. Kansas state law clearly characterizes the district courts as arms of state government, part of a unified judicial branch along with the Kansas Supreme Court and Kansas Court of Appeals. District court judges are state officials.

Governments > Courts > Creation & Organization

**HN6[🔻] Courts, Creation & Organization**

2005 U.S. Dist. LEXIS 30503, *30503

Under Kansas law, the chief judge of each judicial district has authority to appoint secretaries and clerical personnel as necessary to perform judicial and administrative functions of the court. *Kan. Stat. Ann. §§ 20-345*. Such court employees, appointed by a state official to serve in the district court, are undoubtedly state employees. Indeed, the only court personnel who are not considered "state employees" because they are paid by their respective counties, are county auditors, coroners, court trustees and personnel in each trustee's office, and personnel performing services in adult or juvenile detention or correctional facilities. *Kan. Stat. Ann. § 20-162(a)*, *(b)*.

harassment or intimidation. It is well-established that judges are absolutely immune from civil damages liability for acts performed in their judicial capacities. An act is judicial, whether in a formal court setting or not, if (1) it is a function normally performed by a judge and (2) the parties dealt with the judge in his judicial capacity. Immunity does not extend to acts which are nonjudicial in nature, but administrative or ministerial acts may also be "judicial." The broadly drawn immunity applies even to judicial acts done in error, maliciously, or in excess of authority. Indeed, a judge is only liable for those acts taken in the clear absence of all jurisdiction.

Civil Rights Law > Protection of Rights > Immunity From Liability > State Consent & Waiver of Immunity

**HN7[↓]  Immunity From Liability, State Consent & Waiver of Immunity**

The *Eleventh Amendment* confirms the sovereignty of the states by providing a shield from suits by individuals absent state consent. To ensure the enforcement of federal law, however, the *Eleventh Amendment* permits suits against state officials and employees in their official capacities when plaintiff seeks prospective injunctive relief for a federal violation. Thus, for official capacity claims, federal courts may grant prospective equitable relief, including appropriate ancillary measures, but cannot award retrospective relief such as damages and declaratory relief. On the other hand, the *Eleventh Amendment* does not bar actions for damages or declaratory relief against state officials or employees in their individual capacities.

Civil Rights Law > Protection of Rights > Immunity From Liability > Judicial & Quasi-Judicial Functions

**HN8[↓]  Immunity From Liability, Judicial & Quasi-Judicial Functions**

Absolute judicial immunity is necessary to ensure that judges can perform their functions without

Civil Procedure > Judgments > Declaratory Judgments

Civil Rights Law > Protection of Rights > Immunity From Liability > Judicial & Quasi-Judicial Functions

**HN9[↓]  Judgments, Declaratory Judgments**

Absolute judicial immunity does not shield a judge from claims for declaratory relief.

Civil Rights Law > Protection of Rights > Immunity From Liability > Judicial & Quasi-Judicial Functions

**HN10[↓]  Immunity From Liability, Judicial & Quasi-Judicial Functions**

Although administrative in nature, the assignment of cases is a judicial function. Even if a particular case assignment is improper, the assigning judge is nevertheless entitled to judicial immunity. Judges are also absolutely immune in their control of the court docket. Furthermore, absolute immunity has been attached to the imposition of restrictions on a party. Absolute immunity similarly applies to a judge's discretionary power to recuse himself from a case. Absolute judicial immunity extends beyond a judge's actions in a particular case. The courtroom and courthouse premises are subject to the control of the court, and a judge is entitled to

C  Case No. 1:21-cv-01269-KAS    Document 79-1    filed 06/13/22    USDC Colorado    pg 1
120 of 141

Page 4 of 12
2005 U.S. Dist. LEXIS 30503, *30503

absolute immunity for actions taken to restrict an individual's access to the courthouse in order to maintain the sanctity and decorum of the court.

Civil Rights Law > Protection of Rights > Immunity From Liability > Judicial & Quasi-Judicial Functions

**HN11**[⤓]  **Immunity From Liability, Judicial & Quasi-Judicial Functions**

Absolute immunity applies to persons who perform judicial functions in aide of a judge and whose duties are integral to the judicial process. Absolute immunity generally extends to non-judicial officers who perform discretionary judicial acts, and those performing ministerial acts at the direction of a judge are also entitled to absolute immunity. The policy justifying an extension of absolute immunity in these circumstances is to prevent court personnel and other officials from becoming a lightning rod for harassing litigation aimed at the court.

Civil Procedure > Judgments > Declaratory Judgments > Federal Declaratory Judgments

**HN12**[⤓]  **Declaratory Judgments, Federal Declaratory Judgments**

The Declaratory Judgment Act, *28 U.S.C.S. § 2201*, validly confers jurisdiction on federal courts to issue declaratory judgments in appropriate cases.

Civil Procedure > Judgments > Declaratory Judgments > Federal Declaratory Judgments

**HN13**[⤓]  **Declaratory Judgments, Federal Declaratory Judgments**

See *28 U.S.C.S. § 2201(a)*.

Civil Procedure > Judgments > Declaratory Judgments > Federal Declaratory Judgments

**HN14**[⤓]  **Declaratory Judgments, Federal Declaratory Judgments**

*28 U.S.C.S. 2201* provides federal courts discretion to grant declaratory relief. The Declaratory Judgment Act does not, however, set out an independent basis for federal jurisdiction; it simply incorporates the case or controversy requirement of the U.S. Constitution. Because *§ 2201* is procedural and does not create a substantive cause of action, the trial court may consider the jurisdictional question under Fed. R. Civ. P 12(b)(1).

Civil Procedure > Judgments > Declaratory Judgments > Federal Declaratory Judgments

**HN15**[⤓]  **Declaratory Judgments, Federal Declaratory Judgments**

In conformity with the case or controversy limitation, to warrant declaratory judgment under the Declaratory Judgment Act, *28 U.S.C.S. § 2201*, the plaintiff must establish that the controversy is: (1) definite and concrete, touching on the legal relations of the parties; and (2) of sufficient immediacy and reality. Whether a case or controversy exists is a matter of degree. The ultimate question is whether declaratory relief will have some effect in the real world. That the relief sought would give the plaintiff the satisfaction of a declaration that he was wronged in the past is insufficient to create an actual, live controversy.

Civil Procedure > Judgments > Declaratory Judgments > Federal Declaratory Judgments

**HN16**[⤓]  **Declaratory Judgments, Federal Declaratory Judgments**

Even if subject matter jurisdiction exists, the trial court has unique and substantial discretion to determine the propriety of a declaratory judgment. The Declaratory Judgment Act, *28 U.S.C.S. § 2201*, is an enabling act and does not confer an absolute right to relief. The trial court must consider several factors, including whether: (1) a

2005 U.S. Dist. LEXIS 30503, *30503

declaration would settle the controversy; (2) it would serve a useful purpose in clarifying the legal relations at issue; (3) the declaration is merely being used for "procedural fencing" or to provide an arena for a race to res judicata; (4) use of declaratory relief would increase friction between federal and state courts and encroach upon state jurisdiction; and (5) a better and more effective remedy is available. The trial court must remain mindful, however, that it cannot decline to entertain such an action as a matter of whim or personal disinclination.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

*HN17*[↓]  **Supplemental Jurisdiction, Pendent Claims**

In its discretion, the trial court may exercise supplemental jurisdiction over a state law claim if it sufficiently relates to a pending claim over which the trial court has original jurisdiction. *28 U.S.C.S. § 1367(a)*. The trial court need not exercise supplemental jurisdiction, however, and it may decline to do so if it has dismissed all claims over which it has original jurisdiction. *28 U.S.C.S. § 1367(c)*.

**Counsel:** **[*1]** For Michael D Van Deelen, Plaintiff: Pro se, Eudora, KS.

For Robert Fairchild, Sherry Bernhardt, Adrian Allen, Steven Six, Defendants: Stephen O. Phillips, Kansas Attorney General-10th Ave, Topeka, KS.

**Judges:** Kathryn H. Vratil, United States District Judge.

**Opinion by:** Kathryn H. Vratil

# Opinion

## MEMORANDUM AND ORDER

Michael D. Van Deelen brings suit against Robert Fairchild, Adrian Allen and Steven Six, District Judges of Douglas County, Kansas and Sherry Bernhardt, Judge Fairchild's administrative assistant, under *42 U.S.C. § 1983* and Kansas law. Plaintiff claims that each defendant deprived him of, and retaliated against him for exercising, numerous constitutional rights. Plaintiff also brings state law claims for defamation against Bernhardt and negligence against Judge Fairchild. This matter comes before the Court on Defendants' Motion To Dismiss (Doc. # 26) filed August 11, 2005. For reasons stated below, defendants' motion is sustained.

## Factual and Procedural Background

Plaintiff's second amended complaint may be summarized as follows:

Plaintiff is a Kansas resident and a frequent litigant in state court. Prior to 1997, plaintiff filed **[*2]** numerous suits in the District Court of Douglas County, Kansas ("Douglas County Court"). In each instance, the Douglas County Court randomly assigned a judge to preside over the matter. In 1997, plaintiff sued Judge Paula Martin, who had presided over one of plaintiff's cases, for violating his civil rights. Plaintiff and Judge Martin settled the matter out of court and plaintiff voluntarily dismissed the action. After that, plaintiff filed additional actions in Douglas County Court.

In May of 2004, plaintiff scheduled a case management conference with Judge Robert Fairchild, Chief Judge of the Douglas County Court, regarding case 02C680. [1] Plaintiff gave notice of the conference to opposing counsel. On August 10, 2004 plaintiff and defendants appeared for the conference but, without explanation, Judge Fairchild chose not to hold it.

On September 30, 2004, plaintiff filed case 04C566 in Douglas County Court, which was assigned to Judge **[*3]** Jack Murphy. [2] The court scheduled a hearing for January 10, 2005 regarding a motion

---

[1] Plaintiff does not explain the nature of case 02C680 in his complaint.

[2] Plaintiff does not explain the nature of case 04C566.

2005 U.S. Dist. LEXIS 30503, *3

for default judgment. On approximately January 3, 2005, Judge Murphy's assistant informed plaintiff that Judge Murphy had recused himself and cancelled the default judgment hearing. Plaintiff asked for an explanation, but Judge Murphy's assistant did not offer one. Chief Judge Fairchild reassigned the case to Judge Steven Six, who had not yet taken office. On January 10, 2005, plaintiff spoke to Sherry Bernhardt, Judge Fairchild's administrative assistant, to get information on when Judge Six would be available. Bernhardt did not give plaintiff any information and refused to let him contact Linda Vogelsang, the Douglas County Court administrator, on the matter. During plaintiff's encounter with Bernhardt, Judge Six arrived for a meeting in Judge Fairchild's chambers. Plaintiff told Bernhardt that he planned to wait in Judge Fairchild's chambers to personally ask Judge Six. Bernhardt would not let plaintiff remain in chambers or approach Judge Six on court property. Bernhardt refused to take a message and told plaintiff that court security would remove him if he did not leave.

 [*4] The next day, January 11, 2005, plaintiff called Judge Fairchild's chambers to again request information on Judge Six's availability. Bernhardt told plaintiff that after he left the previous day, she and Judge Fairchild decided that they would not address plaintiff's inquiry. Plaintiff told Bernhardt that she and Judge Fairchild had violated his constitutional rights and that he could file a federal lawsuit. Plaintiff told Bernhardt to relay that message to Judge Fairchild. Bernhardt replied that she would tell Judge Fairchild that plaintiff had threatened them with a lawsuit. Plaintiff received a letter from Judge Fairchild dated January 11, 2005 which stated that because of his conversation with Bernhardt, plaintiff's future communication with court personnel should be in writing.

On February 4, 2005, Judge Six assumed his duties with the Douglas County Court. Judge Six recused himself from case 04C566, and it was reassigned (along with 02C680) to Judge Adrian Allen, a retired judge who previously served in the District Court of Shawnee County, Kansas. Bernhardt serves as administrative assistant to Judge Allen.

On February 23, 2005, a party not identified in the complaint sued **[*5]** plaintiff in Douglas County Court case 05LM475, which was assigned to Judge Six. On March 7, 2005, plaintiff filed his answer and counterclaim, which added two additional parties. Plaintiff delivered copies of the counterclaim to the Douglas County Court Clerk for service on the additional parties. The clerk told plaintiff that he had complied with court procedure and that the parties would be served. Without explanation, however, Judges Fairchild and Six directed the clerk to withhold service. On April 14, 2005, the clerk notified plaintiff that the parties had not been served. On April 11, 2005, Judge Six recused himself from case 05LM475 and the court reassigned it to Judge Allen. Without explanation, Judge Allen issued an order on April 15, 2005 which prohibited the clerk from serving any summons requested by plaintiff.

On January 13, 2005, plaintiff filed his original complaint (Doc. # 1) in this case. Under *Section 1983*, plaintiff claims numerous constitutional violations. On March 7, 2005, defendants filed a motion to dismiss (Doc. # 5). On March 30, 2005, plaintiff filed an amended complaint (Doc. # 10). Judge Fairchild and Bernhardt responded with another motion to dismiss **[*6]** (Doc. # 12), filed April 4, 2005. On July 8, 2005, because the court had granted plaintiff leave to submit *Section 1983* claims against Judges Six and Allen, the Court overruled both motions to dismiss (Doc. # 5 & 12) as moot. Plaintiff's second amended complaint alleges that by case reassignments, hearing cancellations, recusal, non-disclosure of a judge's availability, limitations on access to court personnel and refusal to allow service of summons, defendants have violated his constitutional rights and retaliated against him for exercising those rights. On August 11, 2005, defendants filed their current motion to dismiss the second amended complaint. Defendants seek to dismiss all counts on the grounds that (1) the Court lacks subject matter jurisdiction; and (2) the complaint fails to state claims upon which relief can be granted. See Defendants' Motion To Dismiss (Doc. # 26). [3]

---

[3] Plaintiff sought permission to file a supplement to his second amended complaint pursuant to *Rule 15(d), Fed. R. Civ. P.*

2005 U.S. Dist. LEXIS 30503, *6

## [*7] *Rule 12(b)(1)* **Motion to Dismiss**

*HN1* The Court may only exercise jurisdiction when specifically authorized to do so, see *Castaneda v. INS, 23 F.3d 1576, 1580(10th Cir. 1994)*, and must "dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Scheideman v. Shawnee County Bd. of County Comm'rs, 895 F. Supp. 279, 280 (D. Kan. 1995)* (citing *Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)*); *Fed. R. Civ. P. 12(h)(3)*. Plaintiff sustains the burden of showing that juridiction is proper, see id., and he must demonstrate that the case should not be dismissed. See *Jensen v. Johnson County Youth Baseball League, 838 F. Supp. 1437, 1439-40 (D. Kan. 1993)*.

*Rule 12(b)(1)* motions to dismiss for lack of subject matter jurisdiction generally take two forms: facial attacks on the complaint or factual attacks on the accuracy of the allegations in the complaint. See *Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995)*. Defendants' motion to dismiss falls within the former category because [*8] the Court need not consider evidence outside the complaint.

## *Rule 12(b)(6)* **Motion to Dismiss**

*HN2* A *Rule 12(b)(6), Fed. R. Civ. P.*, motion should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). The Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences from those facts in favor of plaintiff. See *Shaw v. Valdez, 819 F.2d 965, 968 (10th Cir.*

---

See Exhibit A, Plaintiff's Motion For Leave To File Supplemental Pleading And Memorandum Brief In Support Thereof (Doc. # 37). By text entry, U.S. Magistrate Judge David J. Waxse overruled the motion because the Court entered an order (Doc. # 35) on September 29, 2005 which stayed all pretrial proceedings until the Court has ruled on the current motion to dismiss. Even if the Court were to consider plaintiff's new allegation, it would not alter the result of this motion to dismiss. See id. at P 19a.

*1987)*. In reviewing the sufficiency of plaintiffs complaint, the issue is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support his claims. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*. Although plaintiff need not precisely state each element of his claims, he must plead minimal factual allegations on those material elements that must be proved. See *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*. [*9]

*HN3* The Court affords a pro se plaintiff some leniency and must liberally construe the complaint. *Oltremari by McDaniel v. Kansas Social & Rehabilitative Serv., 871 F. Supp. 1331, 1333 (D. Kan. 1994)*. While pro se complaints are held to less stringent standards than pleadings drafted by lawyers, pro se litigants must follow the same procedural rules as other litigants. *Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)*; *Green v. Dorrell, 969 F.2d 915, 917 (10th Cir. 1992)*. The Court may not assume the role of advocate for a pro se litigant. *Hall, 935 F.2d at 1110*.

## Discussion

## I. Subject Matter Jurisdiction

Defendants seek to dismiss plaintiff's claims for lack of subject matter jurisdiction pursuant to *Rule 12(b)(1), Fed. R. Civ. P.* Specifically, defendants argue that this Court lacks jurisdiction because of (1) *Eleventh Amendment* immunity and (2) absolute judicial immunity. Defendants also request that the Court decline to exercise its discretion to hear plaintiff's claims for declaratory relief.

### A. *Eleventh Amendment* Immunity

Defendants argue that *Eleventh Amendment* immunity [*10] bars plaintiff's official capacity damages claims and his claims for declaratory judgment. Plaintiff argues that defendants -- who are three state court judges and an administrative assistant to a state court judge -- are not state

2005 U.S. Dist. LEXIS 30503, *10

officials. Plaintiff urges that defendants are county employees, to whom *Eleventh Amendment* immunity does not apply. [4] Plaintiff also asserts that immunity only applies to claims for monetary damages.

**HN4**[⬆] The *Eleventh Amendment* applies to shield the state and "arms of the state" from suit in federal court. *Duke v. Grady Mun. Sch., 127 F.3d 972, 974 (10th Cir. 1997)* **[*11]** (citations omitted). Official capacity suits against state officials or employees under *Section 1983* are treated as if against the state itself. *Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)* (citing *Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*. Thus, for the *Eleventh Amendment* to apply in this action, defendants must be state officials or employees.

**HN5**[⬆] *Article 3, Section 6 of the Kansas Constitution* establishes the district courts of Kansas and their jurisdiction and sets the method by which judges are selected. See also *K.S.A. § 20-301a* (jurisdiction and authority of district judges in Kansas). Kansas state law clearly characterizes the district courts as arms of state government -- part of a unified judicial branch along with the Kansas Supreme Court and Kansas Court of Appeals. *Wilkins v. Skiles, 2005 U.S. Dist. LEXIS 4172, No. 02-3190, 2005 WL 627962, at *4 (D. Kan. March 4, 2005)*. District court judges are state officials. *Schroeder v. Kochanowski, 311 F. Supp. 2d 1241, 1256 (D. Kan. 2004)*. **HN6**[⬆] Under Kansas law, the chief judge of each judicial district has authority to appoint secretaries and clerical personnel as necessary **[*12]** to perform judicial and administrative functions of the court. *K.S.A. §§ 20-345*. Such court employees, appointed by a state official to serve in the district court, are undoubtedly state employees. See *Wilkins, 2005 U.S. Dist. LEXIS 4172, 2005 WL 627962, at *4*

---

[4] Plaintiff bases his argument that defendants are county employees on his assertion that "Douglas County, Kansas, [sic] provides compensation and support to District Court judges in the form of health insurance, building infrastructure, supplies and possibly even salary." Plaintiff's Response To Defendants' Motion To Dismiss And Memorandum Brief In Support Thereof (Doc. # 28) at 8, filed August 15, 2005.

(clerk of district court is state employee because appointed by chief judge to serve in state court). Indeed, the only court personnel who are not considered "state employees" because they are paid by their respective counties, are "county auditors, coroners, court trustees and personnel in each trustee's office, and personnel performing services in adult or juvenile detention or correctional facilities." Id. (citing *K.S.A. § 20-162(a), (b)*). Judges Fairchild, Allen and Six are clearly state officials and not mere employees of Douglas County as plaintiff contends. Bernhardt, like the court clerk in *Wilkins*, is also a state employee. Thus, the *Eleventh Amendment* is applicable in this case.

**HN7**[⬆] The *Eleventh Amendment* confirms the sovereignty of the states by providing a shield from suits by individuals absent state consent. *Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996)*. **[*13]** To ensure the enforcement of federal law, however, the *Eleventh Amendment* permits suits against state officials and employees in their official capacities when plaintiff seeks prospective injunctive relief for a federal violation. *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*; see also *Barger v. State of Kan., 620 F. Supp. 1432, 1436 (D. Kan. 1985)*. Thus, for official capacity claims, federal courts may grant prospective equitable relief, including appropriate ancillary measures, but cannot award retrospective relief such as damages and declaratory relief. *Meiners v. Univ. of Kan., 359 F.3d 1222, 1232-33 (10th Cir. 2004)*; *Medcalf v. State of Kan., 626 F. Supp. 1179, 1183-84 (D. Kan. 1986)* (citing *Pennhurst State Sch. & Hosp., 465 U.S. 89, 118-20, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)*). On the other hand, the *Eleventh Amendment* does not bar actions for damages or declaratory relief against state officials or employees in their individual capacities. *Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1571 n.9 (10th Cir. 1995)* (citing *Ex Parte Young, 209 U.S. at 159-60* & *167)*. Plaintiff does not seek prospective injunctive **[*14]** relief against defendants. Plaintiff seeks compensatory, punitive and nominal damages, and retrospective declaratory relief. Therefore, to the extent plaintiff proceeds against defendants in their official

2005 U.S. Dist. LEXIS 30503, *14

capacities, the *Eleventh Amendment* bars all claims against defendants. The *Eleventh Amendment* does not bar plaintiff's individual capacity claims for damages and declaratory relief.

## B. Absolute Judicial Immunity

Defendants assert that the doctrine of absolute judicial immunity warrants dismissal of plaintiff's individual capacity claims. Defendants urge that they are immune from suit because they acted toward plaintiff in their judicial roles. Plaintiff responds that because he acted in an administrative role when he restricted plaintiff's access to the courthouse and court personnel, Judge Fairchild is not entitled to immunity. Plaintiff also argues that each judge acted in the absence of all jurisdiction. As for Bernhardt, plaintiff asserts that she is not entitled to absolute immunity because she is not a judicial officer and does not perform judicial functions.

*HN8*[ ] Absolute judicial immunity is necessary to ensure that judges can perform their functions without harassment **[*15]** or intimidation. *Butz v. Economou, 438 U.S. 478, 512, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978)*. It is well-established that judges are absolutely immune from civil damages liability for acts performed in their judicial capacities. [5] *De Young v. State of Kansas, 890 F. Supp. 949, 953 (D. Kan. 1995)* (citing *Stump v. Sparkman, 435 U.S. 349, 356-57, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978)*). An act is judicial, whether in a formal court setting or not, if (1) it is a function normally performed by a judge and (2) the parties dealt with the judge in his judicial capacity. *Stump, 435 U.S. at 362*. Immunity does not extend to acts which are nonjudicial in nature, but administrative or ministerial acts may also be "judicial." See *Martinez v. Winner, 771 F.2d 424, 434 (10th Cir. 1985)*, judgment vacated as moot, *800 F.2d 230 (1986)*. This broadly drawn immunity applies even

---

[5] *HN9*[ ] Absolute judicial immunity does not shield a judge from claims for declaratory relief. *Schepp v. Fremont County, Wyo., 900 F.2d 1448, 1452 (10th Cir. 1990)* (citing *Pulliam v. Allen, 466 U.S. 522, 541-42, 104 S. Ct. 1970, 80 L. Ed. 2d 565 (1984)*).

to judicial acts "done in error, maliciously, or in excess of authority." *Id. at 356*. Indeed, a judge is only liable for those acts taken in the clear absence of all jurisdiction. Id. (citing *Bradley v. Fisher, 80 U.S. 335, 351, 20 L. Ed. 646 (1872)*).

**[*16]** Plaintiff alleges that Judges Fairchild, Six and Allen violated several of his constitutional rights. Specifically, plaintiff points to constitutional deprivations and retaliation which arise from case reassignments and management, recusal, and limitations on access to the courthouse and court personnel. *HN10*[ ] Although administrative in nature, the assignment of cases is a judicial function. *Martinez, 771 F.2d at 434*. judgment vacated as moot. *800 F.2d 230 (1986)*. Even if a particular case assignment is improper, the assigning judge is nevertheless entitled to judicial immunity. Id. Judges are also absolutely immune in their control of the court docket. *Rodriguez v. Weprin, 116 F.3d 62, 66 (2d Cir. 1997)*. Furthermore, absolute immunity has been attached to the imposition of restrictions on a party. See *Whaley v. Kennedy, 1998 U.S. App. LEXIS 8326, No. 97-7077, 1998 WL 208881, *2 (10th Cir. Apr. 29, 1998)* (absolute immunity for acts done pursuant to filing restriction placed on party). Absolute immunity similarly applies to a judge's discretionary power to recuse himself from a case. *U.S. ex. rel. Price v. McFarland, 2004 U.S. Dist. LEXIS 26971, No. 04-4058, 2004 WL 3171649, [*17] *9 (D. Kan. Sept. 22, 2004)*. Absolute judicial immunity extends beyond a judge's actions in a particular case. The courtroom and courthouse premises are "subject to the control of the court," *Sheppard v. Maxwell, 384 U.S. 333, 358, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966)*, and a judge is entitled to absolute immunity for actions taken to restrict an individual's access to the courthouse in order to maintain the sanctity and decorum of the court. *Mullins v. Oakley, 437 F.2d 1217, 1218 (4th Cir. 1971)*. A judge's action to limit an individual's contact with court personnel would clearly fall along the same line -- particularly when, as here, the judge provides that written correspondence may continue. Plaintiff's complaint does not allege conduct by Judges Fairchild, Six and Allen in the clear absence of jurisdiction. Thus, they are entitled to absolute immunity.

2005 U.S. Dist. LEXIS 30503, *17

HN11[↑] Absolute immunity also applies to persons who perform judicial functions in aide of a judge and whose duties are integral to the judicial process. _Schroeder v. Kochanowski, 311 F. Supp. 2d 1241, 1257 (D. Kan. 2004)_; _Dickerson v. Bates, 287 F. Supp. 2d 1251, 1253 (D. Kan. 2003)_ (citing _Whitesel v. Sengenberger, 222 F.3d 861, 867 (10th Cir. 2000)_) **[*18]** (court clerk entitled to immunity for, _inter alia_, mailing copies of orders to plaintiff). Absolute immunity generally extends to non-judicial officers who perform discretionary judicial acts, and several circuits (including the Tenth Circuit) have held that "those performing ministerial acts at the direction of a judge are also entitled to absolute immunity." _Whitesel, 222 F.3d at 869_. The Seventh Circuit has recognized that "the policy justifying an extension of absolute immunity in these circumstances is to prevent court personnel and other officials from becoming a lightning rod for harassing litigation aimed at the court." _Snyder v. Nolen, 380 F.3d 279, 287 (7th Cir. 2004)_ (quoting _Richman v. Sheahan, 270 F.3d 430, 435 (7th Cir. 2001)_).

Plaintiff alleges that Bernhardt violated several of his constitutional rights. Specifically, plaintiff claims that Bernhardt violated his rights when she (1) refused to disclose information about Judge Six's availability after being sworn in, (2) would not allow him to remain in Judge Fairchild's chambers or speak with Judge Six on the premises, (3) informed him that Judge Fairchild would **[*19]** not give information on Judge Six's availability, and (4) told Judge Fairchild that plaintiff threatened to file a civil rights suit. Plaintiff's claims arise from his contact with Bernhardt while she acted under Judge Fairchild's direction as his administrative assistant. Without a doubt, the duties of a district judge's administrative assistant are integral to the judicial process. Bernhardt is therefore entitled to absolute judicial immunity.

Defendants acted toward plaintiff in their judicial roles. The Court therefore dismisses plaintiff's damages claims against defendants in their individual capacities.

## C. Individual Capacity Claims for Declaratory

### Relief

Defendants argue that plaintiff's individual capacity claims for declaratory relief should be dismissed. They urge the Court to exercise its discretion and decline to entertain the claims. Plaintiff responds that _Section 1983_ serves as the basis for his claims, over which the Court has jurisdiction pursuant to _28 U.S.C. §§ 1331_ and _1343_. Plaintiff claims that because jurisdiction is clearly proper, a trial should determine whether he is entitled to declaratory relief.

In conjunction with _Section **[*20]** 1983_ claims for damages or injunctive relief, civil rights plaintiffs frequently seek declaratory relief pursuant to the federal Declaratory Judgment Act ("DJA"), _28 U.S.C. § 2201_. See e.g., _Hagans v. Lavine, 415 U.S. 528, 94 S. Ct. 1372, 39 L. Ed. 2d 577 (1974)_; _Ward v. Utah, 398 F.3d 1239 (10th Cir. 2005)_; _Moongate Water Co., Inc. v. Butterfield Park Mut. Domestic Water Ass'n, 291 F.3d 1262 (10th Cir. 2002)_; _Cannon v. City and County of Denver, 998 F.2d 867 (10th Cir. 1993)_; _Kerr v. Kimmell, 740 F.Supp. 1525 (D. Kan. 1990)_. The Supreme Court has held that HN12[↑] the DJA "validly confers jurisdiction on federal courts to issue declaratory judgments in appropriate cases." _Calderon v. Ashmus, 523 U.S. 740, 745, 118 S. Ct. 1694, 140 L. Ed. 2d 970 (1998)_. _Section 2201(a)_ provides, as follows:

HN13[↑] In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, _may_ declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect **[*21]** of a final judgment or decree and shall be reviewable as such.

_28 U.S.C. § 2201(a)_ (emphasis added). HN14[↑] _Section 2201_ thus provides federal courts discretion to grant declaratory relief. _Kunkel v. Continental Cas. Co., 866 F.2d 1269, 1273 (10th Cir. 1989)_. The DJA does not, however, set out an independent basis for federal jurisdiction; it simply incorporates the case or controversy requirement

2005 U.S. Dist. LEXIS 30503, *21

of the Constitution. *Executive Risk Indem. Inc. v. Sprint Corp., 282 F. Supp. 2d 1196, 1202 (D. Kan. 2003)*. Because *Section 2201* is procedural and does not create a substantive cause of action, the Court may consider the jurisdictional question under *Rule 12(b)(1), Fed. R. Civ. P.*, alone. Id.

*HN15*[↑] In conformity with the case or controversy limitation, to warrant declaratory judgment under the DJA, plaintiff must establish that the controversy is (1) definite and concrete, touching on the legal relations of the parties; and (2) of sufficient immediacy and reality. Id. (citations omitted). Whether a case or controversy exists is a matter of degree. Id. The ultimate question is whether [*22] declaratory relief will have some effect in the real world. *Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000)* (citing *Kennecott Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir. 1999))*. That the relief sought would give plaintiff the satisfaction of a declaration that he was wronged in the past is insufficient to create an actual, live controversy. *Bauchman for Bauchman v. West High Sch., 132 F.3d 542, 548-49 (10th Cir. 1997)* (case or controversy requirement not met because declaratory relief claim found moot).

*HN16*[↑] Even if subject matter jurisdiction exists, the Court has unique and substantial discretion to determine the propriety of declaratory judgment -- the DJA is an enabling act and does not confer an absolute right to relief. *Executive Risk, 282 F. Supp. 2d at 1202*. The Court must consider several factors, including whether (1) a declaration would settle the controversy; (2) it would serve a useful purpose in clarifying the legal relations at issue; (3) the declaration is merely being used for "procedural fencing" or "to provide an arena for [*23] a race to res judicata;" (4) use of declaratory relief would increase friction between federal and state courts and encroach upon state jurisdiction; and (5) a better and more effective remedy is available. *State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994)* (citing *Allstate Ins. Co. v. Green, 825 F.2d 1061, 1063 (6th Cir. 1987))*. The Court must remain mindful, however, that it "cannot decline to entertain such

an action as a matter of whim or personal disinclination." *Pub. Affairs Assocs. v. Rickover, 369 U.S. 111, 112, 82 S. Ct. 580, 7 L. Ed. 2d 604 (1962)*.

Plaintiff's second amended complaint seeks declarations as follows:

> 3. A declaratory judgment that the defendants unlawfully violated plaintiff's constitutional rights of freedom of assembly, freedom of association, freedom of speech, due process, equal protection of the laws and equal access to the courts.

> 4. A declaratory judgment that the defendants unlawfully retaliated against the plaintiff for plaintiff's exercising or attempted exercising of his constitutional rights of freedom of assembly, freedom of association, freedom of speech, due process, equal protection of the [*24] laws and equal access to the courts.

Plaintiff's Amended And Supplemental Petition (Doc. # 19) at 10-11. Plaintiff seeks declarations framed in the past tense. Even if plaintiff demonstrated past constitutional violations, the relief would do nothing more than give plaintiff the satisfaction of a declaration that in the past, defendants wronged him. Retrospective declaratory relief would not impact the present or future legal relations of the parties. In this instance, declaratory relief would be hollow and fruitless. Furthermore, even if subject matter jurisdiction existed, the Court would be reluctant to intrude into the basic operations of the Douglas County Court. If the Court entertained plaintiff's claims for declaratory judgment, it would undoubtedly risk creating friction between itself and state district courts by scrutinizing basal day-to-day court operations such as case reassignments and management, recusal, security and administration. The Court therefore dismisses plaintiff's claims for declaratory relief.

## II. Supplemental Jurisdiction

*HN17*[↑] In its discretion, the Court may exercise supplemental jurisdiction over a state law claim if it sufficiently [*25] relates to a pending claim over

2005 U.S. Dist. LEXIS 30503, *25

which the Court has original jurisdiction. See *28 U.S.C. § 1367(a)*. The Court need not exercise supplemental jurisdiction, however, and it may decline to do so if it has dismissed all claims over which it has original jurisdiction. *28 U.S.C. § 1367(c)*. Here, the Court has dismissed all of plaintiff's federal claims. It declines to exercise supplemental jurisdiction over plaintiff's state law claims. The Court therefore dismisses without prejudice plaintiff's defamation and negligence claims.

**IT IS THEREFORE ORDERED** that defendants' Motion To Dismiss (Doc. # 26) filed August 11, 2005, be and hereby is **SUSTAINED.** The Court dismisses all of plaintiff's federal claims pursuant to *Rule 12(b)(1)*, Fed. R. Civ. P, and does not address whether defendants are entitled to dismissal under *Rule 12(b)(6), Fed. R. Civ. P.* The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims and they are hereby dismissed without prejudice.

Dated this 1st day of December, 2005 at Kansas City, Kansas.

 **[*26]** Kathryn H. Vratil

United States District Judge

JUDGMENT IN A CIVIL CASE

[X] Decision by Court. This action came before the Court. The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that defendants' Motion to Dismiss (Doc. 26) filed August 11, 2005, is hereby SUSTAINED. The Court dismisses all of plaintiff's federal claims pursuant to *Rule 12(b)(1)*, Fed. R. Civ. P, and does not address whether defendants are entitled to dismissal under *Rule 12(b)(6), Fed. R. Civ. P.* The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims and they are hereby dismissed without prejudice.

Date: December 1, 2005

**End of Document**

⚠ Caution
As of: August 13, 2021 5:17 PM Z

# *Vasquez v. Ley*

United States Court of Appeals for the Tenth Circuit

November 24, 1995, Filed

No. 95-1134

**Reporter**

1995 U.S. App. LEXIS 32707 *

PAUL LUNA VASQUEZ, Plaintiff-Appellant, v. GENE LEY, Captain, Housing Supervisor and Disciplinary Officer of the Arkansas Valley Correctional Facility, Crowley CO; RUSSELL E. ELLIS, Hearing Officer of the Arkansas Valley Correctional Facility, Crowley, CO; SHERRY HALL, Sergeant, of the Arkansas Valley Correctional Facility, Crowley, CO; OFFICER BRAUN, of the Arkansas Valley Correctional Facility, Crowley, CO; TOM GARCIA, Sergeant, of the Arkansas Valley Correctional Facility, Crowley, CO; SUSAN DEVRIES, Sergeant, of the Arkansas Valley Correctional Facility, Crowley, CO, Defendants-Appellees.

**Notice: [*1]** RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** As Corrected December 12, 1995. Reported in Table Case Format at: *70 F.3d 1282, 1995 U.S. App. LEXIS 39257*.

**Prior History:** (D. Colo.). (D.C. No. 94-M-1570).

## Core Terms

magistrate judge, district court, unauthorized, religious, rosary, allegations, recommended, regulation, prison, due process claim, summary judgment, call witnesses, opening brief, oral argument, authorization, disciplinary, analytical, cumulative, requisite, seizure, inmate, prayer, amend, beads, blame

## Case Summary

**Procedural Posture**

Plaintiff prisoner brought a *42 U.S.C.S. § 1983* action against defendant prison officials, challenging the confiscation of unauthorized property and the resulting punishment imposed on the prisoner. The United States District Court for the District of Colorado adopted the magistrate judge's recommendation and granted defendants' motion for summary judgment. The prisoner's motion to amend his complaint was denied. The prisoner appealed.

**Overview**

The prisoner contended that the hearing officer's finding of guilt on the charge of unauthorized possession was substantively erroneous. The appellate court found that there was evidence to support the hearing officer's decision and that the prisoner did not offer any excuse for his failure to secure the requisite authorization for his unauthorized property. The appellate court found that the prisoner's procedural objections to his disciplinary hearing were meritless. The allegations and averments that the prisoner proffered in support of his motion to amend were vague and conclusory and the district court correctly ruled that the requested amendment could not save the prisoner's due process claim from summary judgment. The appellate court agreed with the magistrate judge that the seizure of two of three unauthorized rosaries in the prisoner's possession did not constitute the "substantial burden" on religion necessary to require defendants to justify their conduct with a compelling countervailing interest.

1995 U.S. App. LEXIS 32707, *1

## Outcome

The court affirmed the district court's judgment dismissing the prisoner's § 1983 complaint and denying him leave to amend.

# LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

**HN1[ ]  Procedural Due Process, Scope of Protection**

Judicial review of a hearing officer's finding of guilt on a charge of unauthorized possession by a prisoner is quite limited: the relevant question is whether there is any evidence in the record that could support the conclusion reached. The Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.

**Judges:** Before TACHA and BARRETT, Circuit Judges, and BROWN, ** Senior District Judge.

**Opinion by:** WESLEY E. BROWN

# Opinion

ORDER AND JUDGMENT *

After examining the briefs and appellate record, this panel has determined unanimously that oral

---

** Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. **151 F.R.D. 470**.

argument would not materially assist the determination of this appeal. *See Fed.* **[*2]** *R. App. P. 34(a)*; 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.
[1]

This pro se civil rights action arises out of a prison disciplinary proceeding in which plaintiff was found to be in possession of unauthorized property. The property was confiscated and plaintiff was punished by the loss of ten days' good time credit. In accordance with administrative guidelines governing inmate cell placement, the violation also resulted in his loss of single-cell privileges. Plaintiff brought suit under *42 U.S.C. 1983*, challenging these actions on numerous **[*3]** substantive and procedural grounds. Defendants moved for summary judgment. The magistrate judge thoroughly and thoughtfully addressed plaintiff's claims and recommended granting defendants' motion. Plaintiff then filed objections and also moved to amend his complaint. The district court considered these materials, adopted the magistrate judge's recommendation, and did not allow amendment. Plaintiff now appeals, urging several points of analytical and procedural error. We reject these and affirm.

Plaintiff maintains that the hearing officer's finding of guilt on the charge of unauthorized possession was substantively erroneous. **HN1[ ]** Judicial review in this regard is quite limited: "the relevant question is whether there is any evidence in the record that could support the conclusion reached . . . . The Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Superintendent v. Hill, 472 U.S. 445, 455-56, 86 L. Ed. 2d 356, 105 S. Ct. 2768 (1985)*. The evidence referenced in the hearing officer's decision easily satisfies this deferential standard. Moreover, plaintiff's attempt to shift blame from himself by

---

[1] Plaintiff filed his brief with a cover letter requesting the return of his original exhibits following disposition of this appeal. That unopposed request has been construed as a formal motion and referred to this panel. We grant the motion insofar as we direct the clerk to return the exhibits (contained in plaintiff's "Addendum" filed June 12, 1995) to the proper prison authority for release, if otherwise appropriate, to plaintiff.

1995 U.S. App. LEXIS 32707, *3

asserting the contributory nonfeasance of prison **[\*4]** receiving officers--who allegedly neglected their duty to screen the unauthorized items when he brought them into the facility on his return from a court leave--is undercut by the very regulation he cites for the officers' duty. On plaintiff's own account, the regulation admonishes that "inmates are responsible for ensuring their personal property is in compliance with the administrative regulation [governing authorized possessions]." Plaintiff-appellant's Opening Brief at 5. Plaintiff has offered no excuse for failing to secure the requisite authorization during the nine months between his reentry into the facility and the seizure of his property.

We likewise reject plaintiff's procedural objections to his disciplinary hearing. In light of the evidence supporting the charge against him, plaintiff's arguments regarding lack of probable cause, inadequate investigation, and misallocation of the burden of proof are clearly meritless. Plaintiff also contends he was denied an opportunity to call witnesses and present evidence on his behalf, [2] contrary to the constitutional strictures recognized in *Wolff v. McDonnell, 418 U.S. 539, 564-66, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). See also Smith v. Maschner, 899 **[\*5]** F.2d 940, 946 (10th Cir. 1990)*. Plaintiff did not include any allegations to this effect in his original complaint. Indeed, in addressing plaintiff's due process claim, the magistrate judge held that plaintiff had received the requisite notice of charges and written statement of decision, and then observed that he "does not allege that he was not allowed to call witnesses at the hearing." R. I doc. 46, at 4-5. Thereafter, plaintiff attempted to add just such allegations by amendment.

**[\*6]** The allegations and averments plaintiff proffered in support of his motion to amend were vague and conclusory. As best we can tell, plaintiff maintained that two family members and a friend would have confirmed that he had brought some of the offending property into the prison following his court leave, thereby bolstering his defense that the officers who failed to detect and address the authorization problem upon entry were really to blame. Such testimony would have been both unnecessarily cumulative and, in light of our previous discussion of this defense, essentially immaterial to the disposition of the charge plaintiff faced. Consequently, the district court correctly ruled that the requested amendment and associated materials could not save plaintiff's due process claim from the summary judgment recommended by the magistrate judge. [3] *See Ramer, 936 F.2d 1102 at 1104* (denial of witnesses whose testimony would be "irrelevant, cumulative, or otherwise unnecessary for . . . a fair resolution of the matter" does not give rise to due process violation under *Wolff*).

**[\*7]** With respect to plaintiff's *First Amendment* religious freedom claim, the magistrate judge concluded that the seizure of two of three unauthorized rosaries in plaintiff's possession did not constitute the "substantial burden" on religion necessary to require defendants to justify their conduct with a compelling countervailing interest. *See Werner v. McCotter, 49 F.3d 1476, 1480* & n.2 (10th Cir.), *cert. denied, 115 S. Ct. 2625 (1995)*. We agree. Limiting plaintiff to one rosary did not (1)

---

[2] Specifically, he argues that the hearing officer improperly denied his request for "a short continuance . . . so that he [could] obtain critical information and documentation in support of a meritorious defense of the allegation(s) in addition to securing witness testimony." Plaintiff-appellant's Opening Brief at 13. We note, however, that the notice of charges warned plaintiff a week in advance of the hearing that "it is the inmate's responsibility to contact his representative of choice and any witnesses he wants at his hearing." R. I doc. 3, app. A.

[3] Plaintiff also protested, though only sporadically, that he was not allowed to call one of the two prison officers who jointly searched his cell and seized the offending property. Plaintiff did not allege that he had requested this witness in order to contradict the testifying officer's (unremarkable) factual account of the search. Rather, he simply insisted on his entitlement to examine all participants. This unqualified demand reflects an unduly broad and simplistic understanding of the applicable law, which recognizes the need for this type of redundant testimony only where required to corroborate the inmate's position on a disputed, material matter. *See Ramer v. Kerby, 936 F.2d 1102, 1104 (10th Cir. 1991)*; *see, e.g., Smith, 899 F.2d at 946-47*. Plaintiff failed to present any such particularized justification to the district court in connection with his motion to amend.

1995 U.S. App. LEXIS 32707, *7

"significantly inhibit or constrain [plaintiff's religious] conduct or expression," (2) "meaningfully curtail [plaintiff's] ability to express adherence to his . . . faith," or (3) "deny [plaintiff] reasonable opportunity to engage in [fundamental religious] activities." *Id. at 1480*. Plaintiff's argument on appeal, that he was not allowed to keep the particular rosary he preferred, likewise overlooks the fundamental analytical point identified by the magistrate judge. *Cf. Alameen v. Coughlin, 892 F. Supp. 440, 449 & n.9 (E.D.N.Y. 1995)*(while blanket prohibition on possession of prayer beads constitutes substantial religious burden, restriction on color of beads does not). Finally, **[*8]** plaintiff's representation that he was left with an incomplete rosary is belied by the very prayer guide he relies on, which does not specify any "Hail Mary" marker for the one location where he indicates one is missing. *See* Addendum ex. F.

At the outset of his brief, plaintiff lists several "options denied by the U.S. District Court," including such matters as appointment of counsel and production of documents. Plaintiff-appellant's opening brief at 3. As many of these passing, perfunctory objections are not taken up and developed in the argument section of the brief, we need not address them. *See Phillips v. Calhoun, 956 F.2d 949, 953 (10th Cir. 1992)*(citing *Pelfresne v. Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir. 1990))*; *see also Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990)*(issue listed but not argued in brief is waived). In any event, nothing raised in this regard persuades us to disturb the district court's judgment.

We have reviewed all of the arguments asserted by plaintiff and, whether explicitly discussed or tacitly considered, each has been found to lack merit. The judgment of the United States District Court for the District **[*9]** of Colorado is AFFIRMED.

Entered for the Court

Wesley E. Brown

Senior District Judge

**End of Document**

Positive
As of: August 13, 2021 5:12 PM Z

## *Williams v. Hininger*

United States District Court for the Western District of Oklahoma

May 14, 2019, Decided; May 14, 2019, Filed

Case No. CIV-19-231-C

**Reporter**

2019 U.S. Dist. LEXIS 98681 *; 2019 WL 2440808

KENTRELL WILLIAMS, Plaintiff, v. DAMON HININGER, et al., Defendants.

**Subsequent History:** Adopted by, Dismissed by, in part, Dismissed without prejudice by, in part *Williams v. Hininger, 2019 U.S. Dist. LEXIS 97693 (W.D. Okla., June 11, 2019)*

## Core Terms

allegations, deprivation, inmate, official capacity, indigent, deliberate indifference, individual capacity, food, plaintiff's claim, cold water, conditions, clothing, hygiene, sink, soap, bag, substantial risk, prison official, state of mind, nurses, conditions of confinement, report and recommendation, medical need, employees, drink, lunch, tray

**Counsel:** [*1] Kentrell Williams, Plaintiff, Pro se, Cushing, OK.

**Judges:** SHON T. ERWIN, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** SHON T. ERWIN

## Opinion

### REPORT AND RECOMMENDATION

Plaintiff Kentrell Williams, a state prisoner appearing *pro se* and *in forma pauperis*, brings this action under *42 U.S.C. § 1983*, alleging various violations of his constitutional rights. (ECF No. 1). United States District Judge Robin J. Cauthron has referred this matter to the undersigned magistrate

judge for initial proceedings consistent with *28 U.S.C. § 636(b)(1)(B)-(C)*. A review of the complaint has been conducted pursuant to *28 U.S.C. § 1915A(a)* and *28 U.S.C. § 1915(e)(2)(B)*. Based on that review, the Court should: (1) dismiss, with prejudice, the official capacity claims against Defendants Hininger, Hall, Plural, Battles, and Rashti; (2) dismiss, without prejudice, the individual capacity claims against Defendants Hall, Miller, Lite, Beaming, Thompson, Hininger, and Plural; and (3) dismiss, without prejudice, the claims against Defendant Core Civic.

### I. SCREENING REQUIREMENT

The Court must review each complaint in which a prisoner seeks redress against a governmental entity, officer, or employee. *28 U.S.C. § 1915A(a)*. The Court likewise must review each case brought by a prisoner with respect to prison conditions and each case in which a plaintiff proceeds [*2] *in forma pauperis*. *42 U.S.C. § 1997e(c)(1)*; *28 U.S.C. § 1915(e)(2)*. The Court is required to dismiss the complaint or any portion of the complaint that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See 28 U.S.C. §§ 1915A(b)*, *1915(e)(2)(B)*; *42 U.S.C. § 1997e(c)(1)*.

### II. STANDARD OF REVIEW

The Court must accept Plaintiff's allegations as true and construe them, and any reasonable inferences to be drawn from them, in the light most favorable to Plaintiff. *See Kay v. Bemis, 500 F.3d 1214, 1217 (10th Cir. 2007)*. Since Plaintiff is

2019 U.S. Dist. LEXIS 98681, *2

proceeding *pro se*, his complaint must be construed liberally. *See id. at 1218*. The Court "review[s] the complaint for plausibility; that is, to determine whether the complaint includes enough facts to state a claim to relief that is plausible on its face." *Young v. Davis, 554 F.3d 1254, 1256 (10th Cir. 2009)* (quotations and citation omitted).

A complaint fails to state such a claim when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (footnote and citation omitted). Bare legal conclusions in a complaint, however, are not assumed to be true; legal conclusions "must be supported by factual allegations" to state a claim upon **[*3]** which relief may be granted. *Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

"[A] pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*; *see also Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997)* (noting that although courts construe *pro se* pleadings liberally, courts "will not supply additional factual allegations to round out a plaintiff's complaint"). Whether a complaint contains sufficient facts to avoid dismissal is context-specific and is determined through a court's application of "judicial experience and common sense." *Iqbal, 556 U.S. at 679*; *see also Gee v. Pacheco, 627 F.3d 1178, 1184-85 (10th Cir. 2010)* (discussing *Iqbal*).

## III. NAMED DEFENDANTS AND PLAINTIFF'S CLAIMS

Mr. Williams is incarcerated at Cimarron Correctional Facility (CCF) and has alleged various constitutional violations in connection with his incarceration. (ECF No. 1). As Defendants, Plaintiff names: (1) Damon Hininger, CEO of Core Civic,

the company which operates CCF;[1] (2) Core Civic; (3) Lieutenant Hall, employee of CCF; (4) Sergeant Plural, employee of CCF; (5) Mrs. Miller, Case Manager at CCF; (6) Mr. Battles, Unit Manager at CCF; (7) CC Lite, Case Counselor at CCF; (8) Ms. Beaming, mental health physician **[*4]** at CCF; (9) Ms. Rashti, Health Services Administrator at CCF; and (10) Victoria Thompson, Case Manager at CCF. (ECF No. 1:2-4). Mr. Williams seeks damages: (1) against Defendants Hininger, Hall, and Plural in both their official and individual capacities; (2) against Defendants Core Civic, Battles, and Rashti, in their official capacities only; and (3) against Defendants Miller, Lite, Beaming, and Thompson in their individual capacities only. (ECF No. 1:2-4).

In the Complaint, Mr. Williams alleges that Defendants violated his *Eighth Amendment* rights by denying him:

- mental health treatment and medications;
- hygiene supplies;
- indigent postage;
- a single lunch tray; and
- cold water from his sink.

(ECF Nos. 1:5-9; 1-1; 1-3; 1-4; 1-5; 1-6).[2]

## IV. DISMISSAL OF OFFICIAL CAPACITY CLAIMS

As stated, Plaintiff raises official capacity claims against Defendants Hininger, Hall, Plural, Battles, and Rashti. (ECF No. 1:2-4). But as employees of a private prison, these Defendants are not state officials, and official capacity claims cannot be asserted against them. *See Jones v. Barry, 33 F. App'x 967, 971, n.5 (10th Cir. 2002)* ("the CCA

---

[1] See www.corecivic.com/facilities.

[2] In the Complaint, Mr. Williams also invokes violations of the *First* and *Fifth Amendments*. *See* ECF No. 1:3. But Mr. Williams does not thereafter explain how he believes these amendments had been violated, obviating the need for any further discussion. *See* ECF No. 1. *See Twombly, 550 U.S. at 555* (noting that claims require more than "labels and conclusions"); *Wise v. Bravo, 666 F.2d 1328, 1333 (10th Cir. 1981)* ("Constitutional rights allegedly invaded. . . must be specifically identified. Conclusory allegations will not suffice.").

2019 U.S. Dist. LEXIS 98681, *4

defendants are not state actors, and they do not have an "official capacity."); *Alamiin v. Patton, No. CIV-13-1001-F, 2016 U.S. Dist. LEXIS 172044, 2016 WL 7217857, at *6 (W.D. Okla. Dec. 13, 2016)* ("As employees **[*5]** of a private prison, they are not state officials, and official capacity claims cannot be asserted against them."). Thus, the Court should dismiss the official capacity claims against Defendants Hininger, Hall, Plural, Battles, and Rashti with prejudice. *See Miskam v. Sherrod, No. CIV-14-0646-HE, 2015 U.S. Dist. LEXIS 103565, 2015 WL 4717105, at *3 (W.D. Okla. Aug. 7, 2015)* (dismissing official capacity claims against private prison employees with prejudice).[3]

## V. DISMISSAL OF INDIVIDUAL CAPACITY CLAIMS AGAINST DEFENDANTS HALL, BEAMING, LITE, MILLER, AND THOMPSON

Mr. Williams has alleged individual capacity claims against Defendants Hall, Miller, Lite, Beaming, and Thompson. (ECF No. 1:3-4) Specifically, Plaintiff has alleged that these Defendants have violated the *Eighth Amendment* by: (1) exhibiting deliberate indifference to his medical needs and (2) subjecting him to unconstitutional conditions of confinement. The Court should dismiss these claims without prejudice.

### A. General Requisites to State a Claim under *42 U.S.C. § 1983*

To state a claim under *42 U.S.C. § 1983*, a plaintiff must sufficiently plead personal involvement, causation, and state of mind. *Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013)*. Also, liability in a supervisory capacity may be found if a plaintiff demonstrates that any defendant: (1) promulgated, created, implemented, or possessed **[*6]** responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm and (3)

acted with the state of mind required to establish the alleged constitutional deprivation. *Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)*. To prove liability in a supervisory capacity, the plaintiff must also identify the specific policies over which the defendants possessed responsibility that led to the alleged constitutional deprivation. *Pahls v. Thomas, 718 F.3d 1210, 1226 (10th Cir. 2013)*.

### B. Specific Requisites to State an *Eighth Amendment* Claim—Denial of Medical Care and Conditions of Confinement

The Constitution, through the *Eighth Amendment*, imposes on state governments an "obligation to provide medical care for those whom [they are] punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if they fail to do so, those needs will not be met." *Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*. However, "[b]ecause society does not expect that prisoners will have unqualified access to health care," *Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)*, an inmate cannot hold a prison official liable unless the inmate shows that he or she suffered "acts or omissions sufficiently harmful to evidence deliberate indifference to [the inmate's] serious medical needs," *Gamble, 429 U.S. at 106*. "It is only such indifference that can offend 'evolving standards of decency' in violation **[*7]** of the *Eighth Amendment*." *Gamble, 429 U.S. at 106*. Additionally, the *Eighth Amendment* "does not mandate comfortable prisons," and conditions imposed may be "restrictive and even harsh." *Rhodes v. Chapman, 452 U.S. 337, 347, 349, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*. "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)*.

To prove an *Eighth Amendment* claim based on the denial of medical care, the plaintiff must demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Gamble, 429 U.S. at 106*. The test for liability "involves both an objective and a

---

[3] Plaintiff also alleges liability against Defendant Core Civic in its "official capacity." (ECF No. 1:2). But because Core Civic is an entity, rather than an individual Defendant, the undersigned has addressed this claim separately. *See infra*.

2019 U.S. Dist. LEXIS 98681, *7

subjective component." *Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005)* (internal quotation marks omitted). To prevail, Plaintiff must demonstrate: (1) objectively, the harm he complains of is "sufficiently serious" to merit constitutional protection and (2) Defendants were subjectively aware of a substantial risk to Plaintiff's health or safety and acted in purposeful disregard of that risk. *See Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)*.

With regard to the objective component, "[a] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)* (quoting *Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999))*. To establish the subjective component—i.e., deliberate indifference to a substantial risk of harm—Plaintiff **[*8]** must show that the prison official in question acted with a "culpable state of mind." *Mata v. Saiz, 427 F.3d at 751*. This element is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837 (1994)*.

Likewise, an inmate making an *Eighth Amendment* claim for constitutionally inadequate conditions of confinement must allege an objective and subjective component associated with the deficiency claimed. *Shannon v. Graves, 257 F.3d 1164, 1168 (10th Cir. 2001)*. "The objective component requires conditions sufficiently serious so as to 'deprive inmates of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (2001))*. "Alternatively, a condition must be sufficiently serious so as [to] constitute a substantial risk of serious harm." *Id.* (citing *Helling v. McKinney, 509 U.S. 25, 33-35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993))*. In turn, "[t]he subjective component requires that a ... prison official have a culpable state of mind, that he or she acts or fails to act with deliberate indifference to inmate health

and safety." *Id.* (citing *Wilson v. Seiter, 501 U.S. 294, 297, 111 S. Ct. 2321, 115 L. Ed. 2d 271, (1991))*. At the pleading stage, the subjective component is satisfied if the prisoner alleges the defendant(s) "knew [the inmate] faced a substantial **[*9]** risk of harm and disregarded that risk 'by failing to take reasonable measures to abate it.'" *Hunt, 199 F.3d at 1224* (quoting *Farmer, 511 U.S. at 847*). On the other hand, if an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability. *See DeSpain v. Uphoff, 264 F.3d 965, 975 (10th Cir. 2001)*.

## C. Dismissal of Plaintiff's Claims Involving Denial of Proper Medical Care

Plaintiff alleges that since his incarceration at CCF: (1) nurses have been intermittently discontinuing his medication and (2) he has been denied mental health treatment. (ECF No. 1:7). Neither allegation states a claim under the *Eighth Amendment*.

First, Mr. Williams states that nurses have stopped his medications a "number of times" "for no reason" and they would "lie and say [his] meds were expired, then bring it the next day and the next week after, my meds would be expired for about 2 weeks without Dr. Hennegan's notice and decision." *Id.* Plaintiff contends that the nurses "are doing this out of spite." *Id.* In connection with this claim, Plaintiff submitted a Request to Staff, stating: "Ms. Rashti and the nurses have been playing with my mental health. They're telling me my meds are canceled every week & nurse Gregory said they're lying & Dr. Hennigan said **[*10]** that there is no reason my meds should be canceled or expired[.]" (ECF No. 1-1:9).

Although Mr. Williams specifically names Defendant Rashti in connection with this claim, Plaintiff only sought liability against Defendant Rashti in her official capacity—a claim which the undersigned has previously recommended be dismissed with prejudice. *See supra*. Other than Ms. Rashti, Plaintiff has only alleged liability for this claim against unnamed "nurses." But Plaintiff must

2019 U.S. Dist. LEXIS 98681, *10

identify the individual(s) responsible for the alleged violation, and naming a generic group of "nurses" is insufficient. *See Anderson v. Bruning, No. CIV-06-358-F, 2006 U.S. Dist. LEXIS 103327, 2006 WL 2233467, at *4 (W.D. Okla. Aug. 3, 2006)* (dismissing claims against unidentified employees). As a result, dismissal of this claim is appropriate.

Second, Mr. Williams states that Defendant Beaming "has been denying [him] mental treatment." (ECF No. 1:7). These are the only allegations against Defendant Beaming. But without more, the Court should conclude that the allegations are too conclusory to state a claim under the *Eighth Amendment* and dismissal is warranted. *See Anderson 2006 U.S. Dist. LEXIS 103327, [WL] at *4* (dismissing *§ 1983* claim as conclusory which alleged only that a county employee "refused [the plaintiff] medical treatment and attention[.]").

## D. Dismissal of [*11] Plaintiff's Claims Involving Conditions of Confinement

Plaintiff alleges that several conditions of his confinement amounted to violations under the *Eighth Amendment*. According to Mr. Williams, he was wrongly denied:
   • hygiene supplies;
   • indigent postage;
   • a single lunch tray; and
   • cold water from his sink.

(ECF Nos. 1:5-14; 1-1; 1-3; 1-4; 1-5; 1-6). These allegations do not state a claim under the *Eighth Amendment*.

### 1. Denial of Hygiene Supplies

Plaintiff's allegations regarding a lack of hygiene supplies are two-fold. First, Mr. Williams alleges that from December 7th until December 24th of 2018, he was not given a change of clothing, a washcloth, or a laundry bag to wash his clothes. (ECF No. 1:6). According to Plaintiff, these deprivations caused him to be cold and his skin to itch and "bump[ ] up." (ECF Nos. 1:6, 12; 1-1:5; 1-

6:4). Second, Plaintiff alleges that he was "running out of soap" and was denied an "indigent bag" which would include things he needed for "personal grooming." (ECF Nos. 1:8; 1-1:18).

Regarding the lack of clothing, washcloth, and laundry bag, Plaintiff states that he "notified every Sgt. and Lt. and Case Counselor on every shift" about the problem and was told by "every c/o and Warden Enlesy" **[*12]** that he would be provided extra clothing," but that promise was not fulfilled until December 24, 2018. (ECF Nos. 1:6; 1-6:4). Plaintiff states that "Sgt. Sneed" and Defendant Lite were supposed to bring the items, but they never did. (ECF No. 1-6:4). Of the parties Mr. Williams names in connection with his deprivation of clothing, only Mr. Lite is a named Defendant. And with respect to him, Plaintiff alleges only that he was told by a third party that Defendant Lite was going to bring Plaintiff an extra set of clothing, but Mr. Lite failed to do so. *See* ECF No. 1-6:4. Such allegations fall short of Mr. Lite acting with the requisite "culpable state of mind" required by the *Eighth Amendment*. *See supra.* As a result, the Court should dismiss Plaintiff's claim against Defendant Lite regarding an improper denial of extra clothing, a washcloth, and a laundry bag.

Regarding the lack of soap, Plaintiff alleges he was "running out of soap" and was denied an "indigent bag" which would contain needed items for personal grooming. (ECF Nos. 1:8; 1-1:18). Mr. Williams attributes the deprivation to Defendant Thompson, whom he states failed to log him into the system as "indigent" and failed to bring Plaintiff an **[*13]** indigent bag. (ECF No. 1:8-9). The Court should conclude that these allegations do not sufficiently allege a claim under the *Eighth Amendment*.

In *Gross v. Koury, 78 F. App'x 690, 691-95 (10th Cir. 2003)*, the plaintiff-inmate alleged a violation of the *Eighth Amendment* because he had been rendered indigent and was unable to purchase hygiene items such as soap. *Gross, 78 F. App'x at 692*. The district court *sua sponte* dismissed the plaintiff's complaint, stating only that "the court is unable to find any factual allegations that would support a claim for a violation of the plaintiff's rights

2019 U.S. Dist. LEXIS 98681, *13

protected by the United States Constitution. Nothing that the plaintiff alleges constitutes a violation of the *Eighth* or *Fourteenth Amendments*." *Id.*

On appeal, the Tenth Circuit affirmed, and began by recognizing that it "is well established the *Eighth Amendment* requires prisoners to be provided humane conditions of confinement, guided by contemporary standards of decency." *Id. at 693* (citing *Penrod v. Zavaras, 94 F.3d 1399, 1405 (10th Cir. 1996)*; quoting *Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*). However, for a plaintiff to succeed on a claim that the conditions of his confinement violated the *Eighth Amendment*, he must allege: (1) the deprivation is "sufficiently serious," and (2) the prison official(s) acted with "deliberate indifference" to the inmate's health and safety. *Id. at 693-694* (quoting *Penrod, 94 F.3d at 1405-06*). The Court recognized that the deprivation of hygiene items for an extended period of [*14] time could implicate the *Eighth Amendment*. *Id. at 694* (citing *Penrod, 94 F.3d at 1405-06*). However, in *Gross*, the Court concluded that the plaintiff had not claimed any actual injury resulting from the lack of hygiene products. *Id.* In doing so, the Court rejected the plaintiff's claim regarding a lack of soap and affirmed the dismissal of the *Eighth Amendment* claim. *Id. at 694-695*.

*Gross v. Koury* is instructive in the instant case for two reasons. First, Mr. Williams alleges only that he was "running out of soap," not that he lacked soap altogether. (ECF No. 1:8). Second, Mr. Williams does not allege any injury tied to this claim. Accordingly, the Court should dismiss this *Eighth Amendment* claim against Defendant Thompson.

## 2. Denial of Indigent Postage

Plaintiff also alleges that the denial of an "indigent bag," rendered him without stamps so that he could write letters to his family. (ECF No. 1:8). These allegations do not state a constitutional claim.

"It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them." *Bounds v. Smith, 430 U.S. 817, 824-25, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)*. This benefit is grounded in the constitutional right of access to the courts. *Bounds, 430 U.S. at 817, 828*. But Mr. Williams has not alleged that he needed the stamps [*15] to mail legal documents, only letters to his family. *See* ECF No. 1:8. Thus, the Court should dismiss this claim against Defendant Thompson. *See Lemmons v. Waters, No. 11-CV-500-JED-PJC, 2013 U.S. Dist. LEXIS 146417, 2013 WL 5592977, at *16 (N.D. Okla. Oct. 10, 2013)* (stating that the constitution had not been implicated based on a defendant's refusal "to send a package to [an inmate's] parents, not to a court.").

## 3. Denial of A Lunch Tray

On December 19, 2018, Plaintiff states that he was denied his lunch tray because he had been falsely accused of "being on Food Port/Beanhole restriction." (ECF Nos. 1:6; 1-1:3, 14; 1-5:2; 1-6:2, 6). According to Plaintiff, Defendants Hall and Lite were responsible for the "false accusation," and Defendants Miller, Hall, Lite, were "all involved" in the food deprivation, which left Plaintiff "starving for over 12 hours." (ECF Nos. 1:14; 1-5:2; 1-6:5). The Court should conclude that these allegations are insufficient to state an *Eighth Amendment* claim.

A State must provide inmates with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir. 1980)*. "A substantial deprivation of food may be sufficiently serious to state a conditions of confinement [*16] claim under the *Eighth Amendment*." *Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002)*. To state a claim for food deprivation, a prisoner must allege both: (1) a "sufficiently serious" deprivation of "the minimal civilized measure of life's necessities" and (2) "deliberate indifference" by prison officials to a "substantial risk of serious harm to an inmate."

*Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998)* (quotations omitted). "Deliberate indifference" requires that the official must have acted with a "sufficiently culpable state of mind" to a substantial risk of serious harm to an inmate. *Farmer v. Brennan, 511 U.S. at 834*. This standard is subjective and a prison official is liable only if the "official knows of and disregards an excessive risk to inmate health and safety." *Id. at 837*. It is not enough to establish that the official should have known of the risk of harm. *Id.*

Plaintiff has invoked the *Eighth Amendment* based on food deprivation resulting from the denial of a single lunch tray. While the Court recognizes that being served substantially inadequate amounts of food may, in some circumstances, be sufficient to state an *Eighth Amendment* claim, Mr. Williams' allegation of being denied a single meal falls short of alleging that the deprivation was "sufficiently serious." On this basis, the Court should dismiss, without prejudice, the *Eighth Amendment* food deprivation claims **[*17]** against Defendants Miller, Hall, and Lite.[4] *See, e.g., Rainey v. Bruce, 74 F. App'x 8, 10 (10th Cir. 2003)* (affirming the district court's dismissal of an inmate's claim for denial of a religious diet for one meal on grounds that the intrusion on the plaintiff's *First Amendment* rights had been "de minimis").

## 4. Denial of Cold Water

Mr. Williams alleges that from January 1-10, 2019, his sink would only run "boiling hot water and not cold," which forced him into drinking water from his toilet, in violation of the *Eighth Amendment*. (ECF

---

[4] Mr. Williams repeatedly states that the denial of the single meal violated prison policy which guarantees him three meals per day. (ECF Nos. 1-5:2; 1-6:6). But a violation of a prison regulation does not state a constitutional claim unless the prison official's conduct "failed to conform to the constitutional standard." *Porro v. Barnes, 624 F.3d 1322, 1329 (10th Cir. 2010)* (internal quotation marks omitted) (holding prisoner must establish that violation of a prison policy necessarily stated a constitutional violation). Because the deprivation of a single meal did not implicate the *Eighth Amendment*, the related violation of DOC policy fails to state a *§ 1983* claim as well.

Nos. 1:7; 1-1:11; 1-3:1; 1-4:2-4). For two reasons, the Court should dismiss this claim.

First, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an *Eighth Amendment* violation." *Hudson v. McMillian, 503 U.S. at 9* (internal quotation marks and citations omitted). Thus, to meet the objective component of an *Eighth Amendment* conditions-of-confinement claim, "extreme deprivations are required." *Hudson, 503 U.S. at 8-9*.

Here, Mr. Williams complains that for ten days, he was denied cold water from his sink, suitable for drinking. As a result, Plaintiff suggests that the only source of cold water to drink was from his toilet, which he was "forced" **[*18]** to drink. Although the Tenth Circuit Court of Appeals has held that the State must provide both "hot and cold water,"[5] to prove an unconstitutional deprivation, "a prisoner must show that conditions were more than uncomfortable[.]" *DeSpain, 264 F.3d at 973*; *see Kanatzar v. Cole, No. 17-3115-SAC, 2018 U.S. Dist. LEXIS 38864, 2018 WL 1242071, at *3 (D. Kan. 2018)* (noting that the *Eighth Amendment* "does not entitle inmates to the amenities, conveniences and services of a good hotel."). During the ten days that Mr. Williams' sink was malfunctioning, he could have easily run water from his tap, allowed the water to cool, and then consumed it. A deprivation of water meeting a certain temperature is not the type of "extreme deprivation" contemplated by the Constitution. As a result, the Court should conclude that these allegations do not state an *Eighth Amendment* claim.

Second, Mr. Williams does not allege that he was "forced" to drink toilet water by any named Defendant, nor does he allege that any specific Defendant was deliberately indifferent in failing to fix the problem, once notified. In a written request to resolve the issue, Plaintiff states that he notified Defendant Miller regarding the broken sink. (ECF

---

[5] *Ramos v. Lamm, 639 F.2d at 568*.

No. 1-4:2).[6] But nowhere does Plaintiff state that Defendant Miller had caused the sink malfunction or acted with deliberate indifference **[\*19]** in failing to resolve the matter. *See* ECF No. 1-4:2 (noting only that Mr. Williams wrote to Defendant Miller "about the situation."). Accordingly, the Court should dismiss Plaintiff's claim alleging a violation of the *Eighth Amendment* due to a lack of cold water as asserted against Defendant Miller.

## VI. DISMISSAL OF INDIVIDUAL CAPACITY CLAIMS AGAINST DEFENDANTS PLURAL AND HININGER

Plaintiff has alleged claims against Defendants Plural and Hininger, in their individual capacities. (ECF No. 1:2-3). The Court should dismiss these claims, without prejudice. A. **Defendant Plural** Mr. Williams asserts liability against Defendant Plural because during an interview with Plaintiff, Defendant Plural asked Plaintiff about his gang affiliation. (ECF No. 1:5). When Plaintiff told Defendant Plural that certain questions "didn't pertain to the interview," Defendant Plural allegedly threatened Plaintiff and cursed at him. (ECF No. 1:5). These are the extent of the allegations against Defendant Plural. *See* ECF No. 1. But they are insufficient to state a constitutional claim. *See McBride v. Deer, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001)* (stating that taunts and threats do not constitute an *Eighth Amendment* violation); *Moore v. Morris, 116 F. App'x 203, 205 (10th Cir. 2004)* (holding that verbal abuse of inmate by correctional **[\*20]** officer does not amount to constitutional violation). Accordingly, the Court should dismiss this claim against Defendant Plural.

### B. Defendant Hininger

Mr. Williams seeks liability against Defendant Hininger because he is "the owner of CoreCivic

(CEO)." (ECF No. 1:10). Other than that single statement, Mr. Williams does not contend any particular wrongdoing by Mr. Hininger. Clearly, Plaintiff is attempting to invoke a theory of supervisory liability against Defendant Hininger based on the actions of various CCF employees.

But because the undersigned has previously concluded that Mr. Williams has failed to state a claim for relief against any individual Defendant, *see supra*, liability against Defendant Hininger cannot stand. As a result, the Court should dismiss this claim against Defendant Hininger.

## VII. DISMISSAL OF CLAIMS AGAINST DEFENDANT CORE CIVIC

As a Defendant, Plaintiff names Core Civic, the entity which operates CCF. (ECF No. 1:1). But as a private entity, Core Civic lacks a traditional official capacity. *See Smith v. Lawton Corr. Facility, No. CIV-18-110-C, 2018 U.S. Dist. LEXIS 45488, 2018 WL 1406592, at \*3 (W.D. Okla. Mar. 7, 2018),* report and recommendation adopted, *No. CIV-18-110-C, 2018 U.S. Dist. LEXIS 45020, 2018 WL 1403911 (W.D. Okla. Mar. 20, 2018)*. Even so, Core Civic may be sued under a theory of municipal liability. **[\*21]** *See Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* (establishing that municipalities are "included among those persons to whom *§ 1983* applies"); *Smedley v. Corrections Corp. of America, 175 F. App'x 943, 946 (10th Cir. 2005)* ("it is now well settled that *Monell* also extends to private defendants sued under *§ 1983*").

To establish liability under *§ 1983*, Plaintiff must allege, in part, that a policy of Core Civic caused a violation of Plaintiff's federal rights. *See supra*. But without an underlying constitutional violation, *see supra*, liability against Core Civic cannot exist. Thus, the Court should dismiss any claims against Defendant Core Civic.

## VIII. RECOMMENDATION

Upon preliminary review of Plaintiff's claims, the

---

[6] Plaintiff also states that he notified "every Sgt. LT. and Case Counselor and Correctional officer," "the Sergents & c/os," and "every officer" on his unit regarding the broken sink. (ECF Nos. 1:7; 1-1:1; 1-4:2). But as stated, these generic "group" allegations are insufficient to establish personal participation by any specific Defendant. *See supra, Anderson*.

2019 U.S. Dist. LEXIS 98681, *21

Court should: (1) dismiss, with prejudice, the official capacity claims against Defendants Hininger, Hall, Battles, and Rashti; (2) dismiss, without prejudice, the individual capacity claims against Defendants Hall, Miller, Lite, Beaming, Thompson, Plural and Hininger; and (3) dismiss, without prejudice, the claims against Defendant Core Civic.

## IX. NOTICE OF RIGHT TO OBJECT

Plaintiff is hereby advised of his right to object to this Report and Recommendation. *See* *28 U.S.C. § 636*. Any objection must be filed with the Clerk of the District Court by **May 31, 2019**. *See* *28 U.S.C. § 636(b)(1)*; and *Fed. R. Civ. P. 72(b)(2)*. Failure to make timely objection to this Report and **[*22]** Recommendation waives the right to appellate review of both factual and legal questions contained herein. *Casanova v. Ulibarri, 595 F.3d 1120, 1123 (10th Cir. 2010)*.

## X. STATUS OF THE REFERRAL

This Report and Recommendation terminates the referral.

ENTERED on May 14, 2019.

/s/ Shon T. Erwin

SHON T. ERWIN

UNITED STATES MAGISTRATE JUDGE

**End of Document**